**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 24-697

**Motion for:** Expedited briefing and oral argument schedule

Caption [use short title]

**Consumer Financial Protection Bureau**

**v.**

**StratFS, LLC**

Set forth below precise, complete statement of relief sought:

Appellants request an expedited briefing and oral argument schedule, with the requested dates in the motion

**MOVING PARTY:** Appellant-Defendant Ryan Sasson     **OPPOSING PARTY:** Plaintiffs-Appellees

☐ Plaintiff     ☑ Defendant

☐ Appellant/Petitioner     ☐ Appellee/Respondent

**MOVING ATTORNEY:** Ronald S. Safer     **OPPOSING ATTORNEY:** Vanessa Buchko

[name of attorney, with firm, address, phone number and e-mail]

Riley Safer Holmes & Cancila LLP     Consumer Financial Protection Bureau

70 W. Madison Street, Suite 2900, Chicago IL 60602     1700 G Street, NW, Washington D.C., 20552

(312)471-8700; rsafer@rshc-law.com     (202)435-9593; vanessa.buchko@cfpb.gov

Court- Judge/ Agency appealed from: U.S. District Court for the Western District of New York; Magistrate Judge Roemer

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☑ Yes   ☐ No   ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below? ☐ Yes ☑ No
Has this relief been previously sought in this court? ☐ Yes ☑ No

Requested return date and explanation of emergency:

Is the oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?   ☐ Yes ☑ No  If yes, enter date:

**Signature of Moving Attorney:**

/s/ Ronald S. Safer     **Date:** March 14, 2024     Service : ☑ Electronic   ☐ Other [Attach proof of service]

**Form T-1080 (**rev. 10-23)

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al.,<br><br>          Plaintiffs - Appellees,<br><br>    v.<br><br>STRATFS, LLC (f/k/a STRATEGIC FINANCIAL SOLUTIONS, LLC), et al.<br><br>          Defendants - Appellants, and<br><br>DANIEL BLUMKIN, et al.<br><br>          Relief Defendants. | CASE NO. 24-697 |

## APPELLANT'S MOTION TO EXPEDITE

Defendant-Appellant, Ryan Sasson ("Sasson"), files this Motion to Expedite (the "Motion") the briefing and oral argument schedules in this appeal involving the entry of a preliminary injunction by the district court against Sasson and other Defendants-Appellants. In support of the Motion, Sasson states as follows:

### I. Preliminary Statement

1. This case involves 28 different law firms (the "Law Firm Defendants")[1] that collectively represent over 65,000 consumer clients across the country. The Law Firm Defendants employ lawyers and negotiators who negotiate with their clients'

---

[1] The Law Firm Defendants intervened in the case pursuant to an order dated January 18, 2024. (*See* ECF No. 50.). While the Law Firm Defendants are not named Defendants in this litigation, Sasson uses that term for ease of reference to the Court.

1

unsecured creditors to try to settle the clients' debts for less than what is owed and defend the clients in litigation if creditors sue to recover the debts. In exchange for the agreement to negotiate down unsecured debts and defend against lawsuits brought by creditors, the Law Firms Defendants collect fees and costs from their clients enrolled in their debt-settlement program. Each client pays a retainer fee, a legal administration fee, and service costs.

2.      On January 10, 2024, the Consumer Financial Protection Bureau ("CFPB") and several state Attorneys General filed a lawsuit in which they assert that the Law Firm Defendants were using an advance fee structure that violates the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFPA") and the Telemarketing Sales Rule ("TSR") (16 C.F.R. § 310.4). Notably, the government did not name the 28 law firms as Defendants. Instead, it took the indirect route. It brought claims against StratFS, LLC and its affiliates (collectively "StratFS"), which provide administrative support to the law firms.[2] The government's strategy is simple: without access to StratFS's personnel and data, the law firms will be unable to represent their clients and will "die on the vine."

3.      The trial court entered an unfavored *ex parte* TRO and then, on March 4, 2024, a preliminary injunction barring StratFS (and, by extension, the Law Firm

---

[2] When this case was filed, the StratFS companies employed 1000 people in New York and had assets valued at over $1 billion. Ryan Sasson, an individual Defendant, is the CEO of StratFS.

Defendants) from continuing to collect advance fees. *See* Dkt. 12, 183-84.[3] But the trial court took the additional and extraordinary step of appointing a receiver (selected by the government) to operate StratFS and imposed an overarching asset freeze on Defendants, non-party Relief Defendants, non-party businesses, family members, and more. In short, the trial court effectively permitted the government to engage in a hostile takeover of StratFS during the pendency of this lawsuit while simultaneously foreclosing a multitude of entities and individuals from accessing essential assets to operate unrelated businesses in the ordinary course or otherwise pay for ordinary and necessary living expenses.

4. But there is no evidence to justify a receiver or an asset freeze in this case. The government has not presented any evidence of malfeasance, waste, fraud, breach of duty or any of the other types of conduct that may justify these extraordinary steps. Indeed, the government's *ex parte* TRO submission (which has been shown to be incomplete and misleading, at best) did not set forth any such evidence. And the government did not present any such evidence at the preliminary injunction hearing. Tellingly, the trial court's discussion of this issue takes up only 1-2 pages in a 56-page opinion and is cursory, at best. That brief discussion does not in any way justify or

---

[3] Pursuant to 28 U.S.C. § 636(c), the Parties consented to the Magistrate Judge's authority to conduct all proceedings and enter a final order in connection with Plaintiffs' Motion for Preliminary Injunction. *See* ECF No. 159.

explain the extraordinary steps of appointing a receiver or imposing a sweeping asset freeze.

5.      There is great urgency to obtain appellate review on these issues. The Receiver's actions are destroying StratFS (and, by extension, the law firms). The Receiver has effectively shut down StratFS and left the law firms without critical resources to represent their clients. He has laid off nearly all of StratFS's 1000 employees. He has refused to perform even simple tasks such as processing mail and facilitating client communications. He has refused to give the law firms access to client data needed to defend their clients in court proceedings. The damage done by the Receiver to date is incalculable. Even if Defendants prevail on the merits of the government's claims, there is a significant risk that their businesses will be shuttered and their finances in ruins.

6.      This Court should permit expedited briefing and consideration of the appointment of the receiver, the asset freeze, and the related issue of Ryan Sasson's individual liability. Defendants are prepared to defend against the government's claims on their merits. But they cannot do so if they cease to exist before this Court is able to review the trial court's rulings. Thus, Ryan Sasson respectfully asks the Court to enter an order requiring the submission of all briefs within a 25-day period.

7.      Specifically, Sasson requests the below expedited schedule:

- Appellants' opening briefs due March 25, 2024;

4

- Appellees' briefs due April 4, 2024;

- Appellants' reply briefs due April 9, 2024; and

- Oral argument scheduled for April Term Sitting.

Sasson understands this is an aggressive schedule, but with each day that passes, the chances of salvaging the businesses and helping the consumers decreases substantially.

8. Counsel for Sasson notified Plaintiffs' counsel of the requested relief in this Motion, but Plaintiffs' counsel opposes the Motion. Counsel for the other Defendants-Appellants do not oppose this Motion to Expedite.

## II.   **Relevant Background**

9. The TSR prohibits any "seller or telemarketer" from "requesting or receiving payment of any fee or consideration for any debt relief service" until and unless (1) the seller renegotiates, settles, reduces, or alters the terms of at least one debt; and (2) the customer made at least one payment to the creditor pursuant settlement. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B). But the TSR explicitly exempts telephone calls from the advance-fee ban where the sale of services "is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller[.]" 16 C.F.R. § 310.6(b)(3). The TSR provides no guidance regarding the nature of the presentation.

**The Debt-Settlement Program**

5

10. The Law Firm Defendants and their compliance counsel constructed a program that they believe is compliant with the TSR's "face-to-face presentation" exemption that allows debt-ridden consumers to receive the assistance of lawyers in reducing debt. StratFS provided all administrative services for the lawyers who help these consumers, thus making the lawyers' assistance for the consumers possible.

11. The program, referred to as the face-to-face presentation model, involved a substantive, in-person sales presentation to potential clients interested in the law firms' debt-settlement services. Independent contractors (notaries) conducted the in-person sales presentations as representatives of the law firms, which included a 25-page printed presentation that was discussed with the client and initialed by the client on each page. The notaries underwent a training program before conducting the meetings, and the Law Firm Defendants installed various quality control measures to ensure that the presentation had taken place as intended.

12. A telephonic description of the program preceded the face-to-face meeting, and if the consumer wished to hear more about the program, StratFS on behalf of the law firms would arrange with an agent of the law firms – the notary – who was trained about the program and armed with, *inter alia*, a 25-page PowerPoint presentation, script, an engagement agreement, a notice of right to cancel, a sheet with frequently asked questions, and an affidavit of compliance. Only after that meeting, and if the consumer wanted to proceed with enrolling in the debt-settlement program,

would payment information be given by the client and the engagement agreement signed. But even then, the consumer was not enrolled until a phone consultation by an in-state lawyer from the law firm occurred to confirm that the face-to-face meeting took place and the consumer had an additional opportunity to ask any questions they had about the program, the engagement agreement, and the litigation process.

13. This program was designed, in part, by Mike Thurman, a consumer-advocate lawyer and consultant who was instructed to develop a program that was not only compliant with the TSR but was created to protect consumers. He was retained to improve the system, which he did over 20 times over the last 10 years up to the time when the *ex parte* TRO was issued.

14. The fees paid by the consumers were clearly and explicitly outlined in the presentation materials and the accompanying documents reviewed during the face-to-face meeting, and those fees as well as the monthly payments to build up a settlement fund are less than the consumers' monthly minimum payments to their creditors. All fees are fully disclosed to the consumer, and Plaintiffs have not argued otherwise.

15. Once consumers accumulate sufficient funds in an account to pay toward their debt, the Law Firm Defendants negotiate settlements with the creditors and significantly reduce the consumers' debt. Consumers were told on multiple occasions before entering the program that a first settlement would usually occur after 7-9 months of being in the program. Consumers who stay with the program receive thousands of

dollars of benefits, net of fees paid. The Law Firm Defendants have settled over two billion dollars of debt for their clients.

## The *Ex Parte* TRO

16. On January 11, 2024, the district court entered a sweeping *ex parte* TRO that, among other things, enjoined Sasson and the other Defendants from operating the underlying debt-settlement and support businesses; froze the assets of Defendants and Relief Defendants; and appointed a receiver to take over the business activities of the corporate Defendants, their subsidiaries, affiliates, divisions, successors, and assigns, certain Relief Defendants, and any other business related to Defendants' debt-settlement services that the receiver concludes is owned or controlled in whole or in part by any Defendant or Relief Defendant. (*See* ECF No. 12.)

17. The court issued the TRO even though there was no emergency at hand and the CFPB has been aware since 2014 of the Law Firm Defendants' face-to-face process. For a decade, the CFPB knew about the use of notaries to conduct the face-to-face presentations to qualify for the exemption to the TSR's advance-fee ban.

18. Indeed, in *Consumer Financial Protection Bureau v. Global Client Solutions, LLC*, Case No. 14-cv-06643-DDP-JPR (C.D. Cal. Aug. 27, 2014), the CFPB initiated an action for injunctive relief against Global Client Solutions ("Global"), a payment processing company, alleging that "Global processed payments for tens of thousands of consumers who were charged tens of millions of dollars in unlawful

advanced fees for debt-relief services" because the debt settlement companies for which Global processed payments, such as the Law Firm Defendants, "improperly claimed to be exempt from the TSR based on unsubstantiated exemptions" such as the face-to-face presentation exemption. (*See id.*, Dkt. No. 10, ¶¶ 15-17.)

19. The parties entered into a Stipulated Final Judgment and Consent Order ("Consent Order"), which required Global to perform a "reasonable screening" of materials and information used by debt settlement providers claiming to be exempt from the TSR. The Consent Order required Global to obtain from them, *inter alia*, the following:

- "A detailed description of how the [debt settlement provider conducts meetings with consumers which includes information as to whether the [debt service provider] uses employees or independent contractors to conduct face-to-face sales presentations;"
- "For [debt service providers] which use *independent contractors*, a list of all independent contractors and current contract templates with the *independent contractors hired to conduct face-to-face meetings with consumers*;" and
- "Representative examples of the materials relating to the training of [debt service providers], *whether employees or independent contractors, meeting face-to-face with consumers* to provide the sales presentations, including training materials, scripts, guidance documents, or other similar materials[.]"

9

(*Id.* ¶ 29(c) (emphasis added.)[4] The Consent Order also required Global to hire outside auditors to audit the debt-settlement programs and to submit those audits to the CFPB. *Id.*

### The Preliminary Injunction

20.    This appeal arises from the district court's order granting Plaintiffs' preliminary injunction after an evidentiary hearing on February 1 and 2, 2024. Plaintiffs presented evidence on a single legal issue concerning the interpretation and application of the TSR prohibition on advance fees. (*See* ECF No. 183 and 184).

21.    The district court granted the preliminary injunction on March 4, 2024 (ECF No. 183 and 184), finding that the Defendants' face-to-face presentation business model likely violates the TCFPA and the corresponding advance-fee ban of the TSR. (*See id.*)

22.    The sole issue raised by Plaintiffs at the preliminary injunction hearing was whether the notary meetings satisfied the in-person presentation requirement of the TSR. No court previously had analyzed what that rule requires.

---

[4] In addition, ***in 2020***, four of the Law Firm Defendants responded to Civil Investigative Demands ("CIDs") issued by the CFPB related to the law firms' debt-settlement program. The law firms explained that the face-to-face presentations were typically done by a "state-licensed notary" and provided full details concerning the face-to-face process involving the notaries, including, but not limited to, details concerning (i) the training materials provided to the notary; (ii) the retention agreement, script, and PowerPoint sales presentation provided to the notary; (iii) the instruction to the notary that if the consumer had a question that "went well beyond the notary's training or scripted materials," or "if the question involved a legal question" the notary must contact the law firm; (iv) the affidavit of compliance to be completed by both the notary and the consumer; and (v) the follow up by an attorney after the notary's face-to-face presentation.

23. Plaintiffs' evidence during the preliminary injunction hearing did not match the representations made to the district court when Plaintiffs obtained the *ex parte* TRO, many of their key contentions turned out to be factually incorrect, contextually misleading, and/or belied by the documentary evidence or Plaintiffs' own witnesses.[5] The evidence Plaintiffs presented during the hearing simply did not support entry of any preliminary injunction let alone the sweeping one issued.

24. In fact, Defendants demonstrated that much of the evidence Plaintiffs presented during the preliminary injunction hearing was outdated and contrary to how Defendants' face-to-face presentation model is currently conducted. For example, Plaintiffs submitted declarations from several consumers in which the consumers purported to describe their face-to-face sales presentations. The most recent sales presentation in those declarations was in 2021, *nearly three years ago*. Defendants, on the other hand, submitted evidence that their process has materially evolved and improved since that time. Therefore, Plaintiffs' consumer declarations had little relevance and certainly did not justify a prospective injunction.

25. Plaintiffs also played tape recordings of the initial sales calls with several potential clients that indicated their notary meetings were brief, but those conversations took place in 2018, *almost six years ago*. Only a handful of Plaintiffs' declarations reflected face-to-face meetings in the 2020's.

---

[5] Specific instances are far too many to individually detail in this Motion, and therefore Sasson will only address illustrative examples.

26.     Even the witnesses that Plaintiffs presented during the evidentiary hearing recounted stale information. One of Plaintiffs' consumer witnesses who enrolled in the debt-settlement program, Mr. Elkins, had his person-to-person meeting in October 2019. Another, Ms. Barsch, had her in-person meeting in September 2020. Mr. Accardo, a notary who Plaintiffs called as a witness, testified that he conducted only a "handful of [face-to-face presentations]" six or seven years ago. In fact, on redirect, he admitted that he only did four presentations for the Law Firm Defendants.

27.     Other assertions made by Plaintiff in their pleadings were disproved. For example, Plaintiffs contended that the "notary meetings were formulaic, brief and non-substantive." The evidence established, however, that the notaries read from a script that was prepared by the law firms and was constantly reviewed and revised by Mr. Thurman, the consumer-advocate lawyer and consultant who is an expert in this area of the law and helped design the program. As the Magistrate Judge acknowledged in his Decision and Order, the PowerPoint sales presentation was detailed and described every aspect of the program. (*See* ECF No. 183, p. 30) Ms. Brooks-Ward, the only other notary whom Plaintiffs called to testify, swore that she read through every page of the sales presentation and that her presentations lasted an average of an hour to an hour-and-a-half. Defendants presented evidence that the average person-to-person presentation was 45 minutes.

28. Plaintiffs also placed great emphasis on the claim that the notaries could not answer substantive questions about the presentations. That claim was disproved by the documentary evidence and testimony, including from Plaintiffs' own witnesses. Defendants demonstrated that what Plaintiffs mischaracterized as the notaries' supposed inability to answer questions during the face-to-face presentations was in fact part of a carefully designed system to ensure that all the program's important disclosures (including the disclosures required by the TSR) were uniformly delivered to prospective clients. Indeed, Mr. Thurman explained that the goal was to "make sure that every consumer was seeing the same presentation, every notary was presenting the same presentation, and for similar reasons, that's why we had the script. *Because the goal was to make sure that you didn't have someone [i.e., notaries] doing a sloppy job.*"

29. Moreover, the notary training expressly instructs the notaries to answer basic questions, such as pointing out answers that are on the appropriate slide, offering answers from the enrollment documents, offering clarifications, and repeating information in the materials. The notaries were even given a "Top Questions Asked By Clients" cheat sheet, which recited common questions asked by clients and, importantly, how to answer them. The notaries were not, however, permitted to freelance and go beyond the comprehensive presentation materials in answering questions.

30. The notaries were therefore not only empowered and instructed to answer basic questions, but the deposition testimony from several notaries that Plaintiffs and Defendants submitted to the court during the evidentiary hearing proved that most of the notaries actually did so.

31. Notwithstanding the foregoing, in an issue of first impression, the Magistrate Judge found that the Defendants' program did not satisfy the "face-to-face" sales-presentation exemption to the advance-fee ban set forth in section 310.6(b)(3) of the TSR (16 C.F.R. § 310.6(b)(3)) because the notaries were not adequately associated with the "seller" and thus were not making a sales presentation. The court made this ruling despite finding that the notaries were trained and armed with a robust PowerPoint that described the downsides of the program and fully disclosed the fees to be paid. Ironically, in the context of a statute designed to prevent high-pressure sales tactics, the court found that the notaries were not "selling" in the traditional sense and therefore, the presentation was not a "sales presentation." (*See* ECF No. 183, pp. 13-22).

32. Accordingly, the district court entered a preliminary injunction that, among other things (i) prevents Defendants from operating their businesses; (ii) freezes the assets of Defendants (both individuals and corporate entities) and Relief Defendants; (iii) appoints a receiver with full control over the business entities with the unilateral ability to operate the business entities or cause a cessation of business;

14

and (iv) bars the individual Defendants (like Sasson) from having any involvement in the businesses whatsoever. (*See generally* ECF No. 184).

### III.    Argument

33.    Under Federal Rule of Appellate Procedure 2 this Court may on its own or on a party's motion "expedite its decision" or suspend any provision of the rules and "order proceedings as it directs[.]" Fed. R. App. P. 2(a); *see also* Fed. R. App. P. 27(a)(1) ("An application for an order or other relief is made by motion unless these rules prescribe another form.").

34.    Courts in the Second Circuit are "generous in granting motions to expedite." *In re Iceland Inc.*, 112 F.3d 504, *1 (2d Cir. 1997) (unpublished table decision). Along those lines, the Second Circuit routinely expedites appeals from orders granting or denying preliminary injunctions. *See*, *e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (granting expedited review for appeal from order granting preliminary injunction); *Pope v. County of Albany*, 687 F.3d 565, 568-69 (2d Cir. 2012) (granting expedited briefing and oral argument schedule for appeal from order denying preliminary injunction).

35.    Furthermore, Section 1657 of the Judicial Code expressly provides that "the court shall expedite the consideration of any action … for temporary or preliminary injunctive relief[.]" 28 U.S.C. § 1657(a). Hence, the "granting or denying

15

of a preliminary injunction is the basis for an expedited appeal[.]" *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 n.8 (D.C. Cir. 2001).

36.     Here, Sasson requests an expedited briefing and oral argument schedule for the present appeal from the district court's orders granting preliminary injunction. Without the expedited briefing and oral argument schedule, Sasson and the other Defendants will be forced to wait months for a decision on the appeal. *See* Local Rule 31.2(a) (explaining regular briefing schedule).

37.     Expedited briefing and oral argument schedules are particularly appropriate here because this appeal involves an issue of first impression and aims to address the propriety of the district court's orders granting a broad preliminary injunction that, in effect, shuts down the underlying business entities and deprives Defendants of their livelihood.

38.     Specifically, the appeal concerns whether the district court properly interpreted the "face-to-face" exemption under the TSR when it found that Defendants did not qualify for that exemption because (1) the independent contractors (notaries) who conducted the face-to-face presentations were not "agents" of Defendants or "sellers" for purposes of the TSR; and (2) the presentation itself was somehow insufficient, despite including all the statutorily required information, disclosures within the presentation that exceeded statutory requirements, and accompanying

documents that were reviewed with the potential clients before they could agree to enroll in the debt-settlement program.

39. More importantly, however, expedited briefing and oral argument schedules are necessary because Sasson and the other Defendants will suffer irreparable harm without an expedited schedule. Indeed, the preliminary injunction became effective as of the date of the district court's March 4, 2024, order (which extended a substantively identical *ex parte* TRO) and will remain intact during the pendency of this appeal.

40. Sasson and the other Defendants will suffer irreparable harm without expedited schedules because the injunction effectively prevents the operations of the underlying business entities and prevents Sasson's (and other individuals') participation in the underlying business entities, which business entities are his livelihood and source of income. Along those lines, Sasson and the other Defendants will suffer irreparable harm without expedited schedules because there is a strong likelihood that the receiver, who has already ground the business to a halt (*e.g.*, consumers face up to seven hour wait times on calls) will completely shut down or terminate the underlying business entities during the time that it would otherwise take for this Court to issue a ruling resolving the appeal under regular briefing and oral argument schedules.

41. Good cause for expedited briefing also exists because the consumers who utilize Defendants' services will be harmed. Specifically, the preliminary injunction authorized the government takeover of businesses that serviced 65,000 consumers who the Law Firm Defendants were helping resolve debt. The receiver essentially stopped all operations, throwing the consumers into chaos.

42. Furthermore, Sasson will suffer irreparable harm without expedited schedules because his assets are frozen, as are the assets of the underlying business entities and the other individual Defendants and Relief Defendants. Hence, Sasson and the other Defendants will continue to be foreclosed from accessing assets until such time that this Court resolves the underlying legal issues.

43. Finally, expedited briefing and oral argument schedules are appropriate under these circumstances because Defendants have agreed – and continue to agree – to ensure that during the pendency of this litigation the underlying business entities do not accept any advance fees from consumer clients of the Law Firm Defendants, which advance fees were the basis for Plaintiffs filing their Complaint and motion for injunctive relief, or take on any new debt relief law firm clients.

44. Accordingly, Sasson has good cause to request expedited briefing and oral argument schedules, and proposes the following schedule:

- Appellants' opening briefs due March 25, 2024;
- Appellees' briefs due April 4, 2024;

18

- Appellants' reply briefs due April 9, 2024; and

- Oral argument scheduled for April Term Sitting.

45.     The proposed expedited briefing and oral argument schedule provides both sides sufficient time to brief the factual and legal issues to be presented.

## IV.    <u>Alternative Request</u>

46.     Alternatively, and if this Court does not believe that expedited briefing and oral argument schedules are warranted for all issues, Sasson requests expedited briefing on the issues of the propriety of the district court's preliminary injunction order appointing a receiver to control the underlying business entities and prohibiting the individual Defendants (like Sasson) from participating in the businesses.

## V.     <u>Conclusion</u>

**Wherefore**, Sasson respectfully requests that this Court grants his Motion to Expedite and enter an order with the following deadlines:

- Appellants' opening briefs due March 25, 2024;

- Appellees' briefs due April 4, 2024;

- Appellants' reply briefs due April 9, 2024; and

- Oral argument scheduled for April Term Sitting.

**Respectfully submitted,**

Dated: March 14, 2024

/s/ *Ronald S. Safer*
Ronald S. Safer (*pro hac vice*)
Rodney Perry (*pro hac vice*)
Matthew Kennison (*pro hac vice*)

19

Maegan McAdam
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
Tel: (312) 471-8700
rsafer@rshc-law.com
rperry@rshc-law.com
mkennisioin@rshc-law.com
mmcadam@rshc-law.com

*Attorneys for Individual Defendant-Appellant Ryan Sasson and Relief Defendants Duke Enterprises LLC, Twist Financial, LLC, Blaise Investments, LLC, Daniel Blumkin, and Ian Behar*

20

**CERTIFICATE OF COMPLIANCE**

I.      This document complies with the type-volume limits of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,214 words.

II.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.