# 24-0697-cv(L),
## 24-0554, 24-0583, 24-0719, 24-0727

# United States Court of Appeals
*for the*
# Second Circuit

CONSUMER FINANCIAL PROTECTION BUREAU, THE PEOPLE OF THE STATE OF NEW YORK, by Letitia James, Attorney General of the State of New York, STATE OF COLORADO, ex rel. Philip J. Weiser, Attorney General, STATE OF DELAWARE, ex rel. Kathleen Jennings, Attorney General, State of Delaware, THE PEOPLE OF THE STATE OF ILLINOIS, through Attorney General Kwame Raoul, THE STATE OF MINNESOTA, by its Attorney General Keith Ellison, THE STATE OF NORTH CAROLINA, ex rel. Joshua H. Stein, Attorney General, THE STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## DEFERRED JOINT APPENDIX
### Volume 9 of 34 (Pages A-2401 to A-2700)

TIMOTHY D. ELLIOTT
EMILY A. SHUPE
RATHJE WOODWARD LLC
300 East Roosevelt Road, Suite 220
Wheaton, Illinois 60137
(630) 668-8500

TERRENCE M. CONNORS
ANDREW M. DEBBINS
CONNORS LLP
1000 Liberty Building
Buffalo, New York 14202
(716) 852-5533

*Attorneys for Law Firm*
  *Defendants-Appellants*

RONALD S. SAFER
RILEY SAFER HOLMES
  & CANCILA LLP
1 S. Dearborn Street, Suite 2200
Chicago, Illinois 60603
(312) 471-8700

*Attorneys for Defendant-Appellant*
  *Ryan Sasson*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS  (800) 4-APPEAL • (329408)

– v. –

RYAN SASSON, CLEAR CREEK LEGAL, LLC, CREDIT ADVOCATES
LAW FIRM, LLC, GREENSTONE LEGAL GROUP, BRADON ELLIS LAW
FIRM LLC, HAILSTONE LEGAL GROUP, HALLOCK AND ASSOCIATES,
HARBOR LEGAL GROUP, ANCHOR LAW FIRM, PLLC, BEDROCK
LEGAL GROUP, BOULDER LEGAL GROUP, CANYON LEGAL GROUP,
LLC, GREAT LAKES LAW FIRM, HEARTLAND LEGAL GROUP, LEVEL
ONE LAW, MEADOWBROOK LEGAL GROUP, MONARCH LEGAL
GROUP, NEWPORT LEGAL GROUP, LLC, NORTHSTAR LEGAL GROUP,
OPTION 1 LEGAL, PIONEER LAW FIRM P.C., ROCKWELL LEGAL
GROUP, SPRING LEGAL GROUP, ROYAL LEGAL GROUP, SLATE LEGAL
GROUP, STONEPOINT LEGAL GROUP, THE LAW FIRM OF DEREK
WILLIAMS, LLC, WHITSTONE LEGAL GROUP, WYOLAW, LLC, CHINN
LEGAL GROUP, LLC, LEIGH LEGAL GROUP, PLLC, HALLOCK &
ASSOCIATES LLC, GUSTAFSON CONSUMER LAW GROUP, LLC,
MICHEL LAW, LLC, THE LAW OFFICE OF MELISSA MICHEL LLC,
MOORE LEGAL GROUP, LLC, JASON BLUST, THE BLUST FAMILY
IRREVOCABLE TRUST through Donald J. Holmgren, Trustee, STRATFS,
LLC, formerly known as Strategic Financial Solutions, LLC, STRATEGIC
CLIENT SUPPORT, LLC, formerly known as Pioneer Client Services, LLC,
STRATEGIC CS, LLC, STRATEGIC FS BUFFALO, LLC, STRATEGIC NYC,
LLC, BCF CAPITAL, LLC, T FIN, LLC, STRATEGIC CONSULTING, LLC,
VERSARA LENDING, LLC, STRATEGIC FAMILY, INC., ANCHOR CLIENT
SERVICES, LLC., now known as CS 1 PAAS Services, LLC, BEDROCK
CLIENT SERVICES, LLC, BOULDER CLIENT SERVICES, LLC, CANYON
CLIENT SERVICES, LLC, CAROLINA CLIENT SERVICES, LLC, GREAT
LAKES CLIENT SERVICES, LLC, GUIDESTONE CLIENT SERVICES, LLC,
HARBOR CLIENT SERVICES, LLC, HEARTLAND CLIENT SERVICES,
LLC, MONARCH CLIENT SERVICES, LLC, now known as CS 2 PAAS
Services, LLC, NEWPORT CLIENT SERVICES, LLC, NORTHSTAR CLIENT
SERVICES, LLC, OPTION 1 CLIENT SERVICES, LLC, PIONEER CLIENT
SERVICING, LLC, ROCKWELL CLIENT SERVICES, LLC, ROYAL CLIENT
SERVICES, LLC, STONEPOINT CLIENT SERVICES, LLC, SUMMIT
CLIENT SERVICES, LLC, now known as CS 3 PAAS Services, LLC,
WHITESTONE CLIENT SERVICES, LLC,

*Defendants-Appellants,*

JOHN DOES 1–50, DANIEL BLUMKIN, ALBERT IAN BEHAR, STRATEGIC
ESOP, STRATEGIC ESOT, TWIST FINANCIAL, LLC, DUKE ENTERPRISES,
LLC, BLAISE INVESTMENTS, LLC, JACLYN BLUST, LIT DEF
STRATEGIES, LLC, RELIALIT, LLC,

*Defendants.*

SVETLANA K. IVY
DENNIS C. VACCO
SCOTT S. ALLEN
LIPPES MATHIAS LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
(716) 853-5100

*Attorneys for Defendants-Appellants*
*Anchor Client Services, LLC, BCF*
*Capital, LLC, Bedrock Client*
*Services, LLC, Boulder Client*
*Services, LLC, Canyon Client*
*Services, LLC, Carolina Client*
*Services, LLC, Great Lakes Client*
*Services, LLC, Guidestone Client*
*Services, LLC, Harbor Client*
*Services, LLC, Heartland Client*
*Services, LLC, Monarch Client*
*Services, LLC, Newport Client*
*Services, LLC, Northstar Client*
*Services, LLC, Option 1 Client*
*Services, LLC, Pioneer Client*
*Servicing, LLC, Rockwell Client*
*Services, LLC, Royal Client*
*Services, LLC, Stonepoint Client*
*Services, LLC, Strategic CS, LLC,*
*Strategic Client Support, LLC,*
*Strategic Consulting, LLC,*
*Strategic FS Buffalo, LLC, Strategic*
*Family, Inc., Strategic NYC, LLC,*
*StratFS, LLC, Summit Client*
*Services, LLC, T Fin, LLC, Versara*
*Lending, LLC and Whitestone*
*Client Services, LLC*


RODNEY O. PERSONIUS
PERSONIUS MELBER LLP
2100 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 855-1050

*Attorneys for Defendant-Appellant*
*Jason Blust*

EVAN K. FARBER
NOAH WEINGARTEN
LOEB & LOEB LLP
*Attorneys for Defendant-Appellant*
*The Blust Family Irrevocable Trust*
345 Park Avenue
New York, New York 10154
(212) 407-4000


SETH FROTMAN
*General Counsel*
STEVEN Y. BRESSLER
*Deputy General Counsel*
KRISTIN BATEMAN
*Assistant General Counsel*
JOSEPH M. SANDERS
*Senior Counsel*
RYAN COOPER
*Senior Counsel*
CONSUMER FINANCIAL
PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
(202) 702-7541

*Attorneys for Plaintiff-Appellee*
*Consumer Financial Protection*
*Bureau*


LETITIA JAMES
*Attorney General*
BARBARA D. UNDERWOOD
*Solicitor General*
JEFFREY W. LANG
*Deputy Solicitor General*
SARAH L. ROSENBLUTH
*Assistant Solicitor General*
350 Main Street, Suite 300A
Buffalo, New York 14202
(716) 853-8407

*Attorneys for Plaintiff-Appellee*
*The People of the State of New*
*York, by Letitia James, Attorney*
*General of the State of New York*

PHILLIP J. WEISER
    *Attorney General*
KEVIN J. BURNS
    *Senior Assistant Attorney General*
COLORADO DEPARTMENT OF LAW
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 6th Floor
Denver, Colorado 80203
(720) 508-6110
*Attorneys for Plaintiff-Appellee*
    *State of Colorado, ex rel. Philip J.*
    *Weiser, Attorney General*


KATHLEEN JENNINGS
    *Attorney General*
MARION M. QUIRK
    *Director of Consumer Protection*
DELAWARE DEPARTMENT OF JUSTICE
820 N. French Street, 5th Floor
Wilmington, Delaware 19801
(302) 683-8810

*Attorneys for Plaintiff-Appellee*
    *State of Delaware, ex rel. Kathleen*
    *Jennings, Attorney General, State of*
    *Delaware*


JOSHUA H. STEIN
    *Attorney General*
M. LYNNE WEAVER
    *Special Deputy Attorney General*
114 W. Edenton Street
Raleigh, North Carolina 27602
(919) 716-6039

*Attorneys for Plaintiff-Appellee*
    *State of North Carolina, ex rel.*
    *Joshua H. Stein, Attorney General*

JOSHUA L. KAUL
    *Attorney General*
LEWIS W. BEILIN
    *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
P.O. Box 7857
Madison, Wisconsin 53707
(608) 266-3076
*Attorneys for Plaintiff-Appellee*
    *State of Wisconsin*


KWAME RAOUL
    *Attorney General*
ANNA GOTTLIEB
    *Assistant Attorney General*
OFFICE OF THE ILLINOIS ATTORNEY
    GENERAL
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2234

*Attorneys for Plaintiff-Appellee*
    *The People of the State of Illinois,*
    *through Attorney General Kwame*
    *Raoul*


KEITH ELLISON
    *Attorney General*
EVAN ROMANOFF
    *Assistant Attorney General*
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101
(651) 728-4126

*Attorneys for Plaintiff-Appellee*
    *State of Minnesota, by its Attorney*
    *General Keith Ellison*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, dated January 10, 2024
    [ECF Dkt. No. 1] ................................................. A-108

Plaintiffs' Recommendation for a Temporary
    Receiver, dated January 10, 2024
    [ECF Dkt. No. 4] ................................................. A-172

    Attachment A to Recommendation -
    List of Proposed Attorneys and Other Personnel
    Recommended to Assist with Receivership
    [ECF Dkt. No. 4-1] ............................................. A-178

Notice of Plaintiffs' *Ex Parte* Motion for a
    Temporary Restraining Order with an Asset
    Freeze, Appointment of a Receiver, and Other
    Equitable Relief, and an Order to Show Cause
    Why a Preliminary Injunction Should Not Issue,
    dated January 10, 2024 [ECF Dkt. No. 5] ............. A-186

    Annexed to *Ex Parte* Motion -
    (i) Memorandum of Law, in Support of Plaintiffs'
    *Ex Parte* Motion for a Temporary Restraining
    Order with an Asset Freeze, Appointment of a
    Receiver, and Other Equitable Relief and an
    Order to Show Cause Why a Preliminary
    Injunction Should Not Issue, dated
    January 9, 2024 [ECF Dkt. No. 5-1]...................... A-194

    (ii) Proposed *Ex Parte* Temporary Restraining
    Order, with an Asset Freeze, Appointment of a
    Receiver, and Other Equitable Relief
    [ECF Dkt. No. 5-2] ............................................. A-247

ii

**Page**

(iii) Declaration of Vanessa Buchko in Support of
Plaintiffs' *Ex Parte* Motion for a Temporary
Restraining Order with an Asset Freeze,
Appointment of a Receiver, and Other Equitable
Relief and an Order to Show Cause Why a
Preliminary Injunction Should Not Issue, dated
January 9, 2024 [ECF Dkt. No. 5-3]...................... A-338

Declaration of B.B., dated June 9, 2023
[ECF Dkt. No. 7] .................................................. A-350

Declaration of C.E., dated December 4, 2023, with
Exhibits [ECF Dkt. No. 7-1].................................. A-352

Declaration of C.B., dated May 10, 2023
[ECF Dkt. No. 7-2] ............................................... A-484

Declaration of D.K., dated May 7, 2023
[ECF Dkt. No. 7-3] ............................................... A-487

Declaration of D.S., dated May 16, 2023, with
Exhibits [ECF Dkt. No. 7-4].................................. A-491

Affidavit of I.E., sworn to June 16, 2023, with
Exhibits [ECF Dkt. No. 7-5].................................. A-534

Declaration of E.N., dated May 8, 2023
[ECF Dkt. No. 7-6] ............................................... A-591

Declaration of E.S., dated April 27, 2023, with
Exhibits [ECF Dkt. No. 7-7].................................. A-596

Declaration of K.L., dated July 13, 2023, with
Exhibits [ECF Dkt. No. 7-8].................................. A-666

Declaration of M.B., dated July 28, 2023
[ECF Dkt. No. 7-9] ............................................... A-678

Declaration of M.B., dated June 9, 2023
[ECF Dkt. No. 7-10] ............................................. A-682

iii

Page

Declaration of P.G., dated May 12, 2023, with
Exhibits [ECF Dkt. No. 7-11] ................................. A-684

Declaration of P.K., dated July 1, 2023, with
Exhibits [ECF Dkt. No. 7-12] ................................. A-738

Declaration of R.D., dated May 11, 2023, with
Exhibits [ECF Dkt. No. 7-13] ................................. A-809

Declaration of S.E., dated April 19, 2023, with
Exhibits [ECF Dkt. Nos. 7-14 and 7-15] ............... A-820

Declaration of S.K., dated May 5, 2023
[ECF Dkt. No. 7-16] ............................................. A-876

Declaration of S.M., dated August 3, 2023
[ECF Dkt. No. 7-17] ............................................. A-882

Declaration of S.M, dated April 21, 2023, with
Exhibits [ECF Dkt. No. 7-18] ................................. A-884

Declaration of E.K., dated May 10, 2023
[ECF Dkt. No. 7-19] ............................................. A-976

Declaration of J.K., dated May 8, 2023
[ECF Dkt. No. 7-20] ............................................. A-982

Declaration of M.S., dated August 2023
[ECF Dkt. No. 7-21] ............................................. A-986

Declaration of S.R., dated May 8, 2023
[ECF Dkt. No. 7-22] ............................................. A-991

Declaration of Joanna Cohen, dated January 3, 2024
[ECF Dkt. No. 8-1] ............................................. A-996

Declaration of Patrick Callahan, dated
December 29, 2023, with Exhibit
[ECF Dkt. No. 8-4] ............................................. A-1004

iv

**Page**

Declaration of Theresa Ridder, dated
January 9, 2024, with Exhibit [ECF Dkt. No. 8-6]... A-1039

Declaration of Timothy Hanson, dated
January 9, 2024 [ECF Dkt. No. 8-7]..................... A-1114

23      Credit Documents [ECF Dkt. No. 9-25]........ A-1132

24      Parties' Stipulation with Respect to
Attorneys' Licensure Status, in *Consumer
Financial Protection Bureau v. The
Mortgage Law Group, LLP* ((U.S. District
Court for the Western District of Wisconsin,
Case No. 14-cv-513), dated April 26, 2017
[ECF Dkt. No. 9-26] .................................... A-1142

31      Press Release from the Illinois Attorney
General's Office, dated July 9, 2012
[ECF Dkt. No. 9-34] .................................... A-1151

So-ordered *Ex Parte* Temporary Restraining Order
with an Asset Freeze, Appointment of a Receiver,
and Other Equitable Relief, dated
January 11, 2024 [ECF Dkt. No. 12] .................... A-1152

Text Order to Unseal Case, dated January 16, 2024
[ECF Dkt. No. 30] ......................................... A-1200

Third-Party Law Firms' Motion to Intervene, dated
January 16, 2024 [ECF Dkt. No. 34] .................... A-1201

Minute Entry of Proceedings, dated
January 18, 2024 [ECF Dkt. No. 50] .................... A-1217

Text Order to Unseal Additional Documents, dated
January 18, 2024 [ECF Dkt. No. 51] .................... A-1219

Consent Order Regarding Asset Freeze, dated
January 22, 2024 [ECF Dkt. No. 64] .................... A-1220

v

**Page**

Exhibits Annexed to Preliminary Report of
Temporary Receiver, dated January 31, 2024
(Preliminary Report Omitted Herein):

Exhibit 18 to Preliminary Report -
E-mail from Kathrine Muse to M.L. Clark and
Others, dated January 27, 2023, with Attachment
[ECF Dkt. No. 115-20] ......................................... A-1222

Exhibit 22 to Preliminary Report -
E-mail from Salvatore Tirabassi to Ryan Sasson,
dated November 10, 2022, with Preceding E-mail
Chain and Attachment [ECF Dkt. No. 116-3]........ A-1229

Transcript of Scheduling Conference, dated
January 18, 2024 .................................................... A-1236

Transcript of Evidentiary Hearing, dated
February 1, 2024 .................................................... A-1270

Defendants' Witnesses:

Lisa Munyon                    Direct......................... A-1280
                               Cross........................... A-1309
                               Redirect ...................... A-1316

Michael Thurman               Direct......................... A-1318
                               Cross........................... A-1353
                               Redirect ...................... A-1362

Heather Lyon                  Direct......................... A-1366
                               Cross........................... A-1382
                               Redirect ...................... A-1402
                               Recross ....................... A-1404

Richard Gustafson, II         Direct......................... A-1407
                               Cross........................... A-1454
                               Redirect ...................... A-1473

vi

|  |  | Page |
|---|---|---|
| Joanna Hughes | Direct | A-1482 |
|  | Cross | A-1500 |
| Mary Lynn Clark | Direct | A-1501 |
|  | Cross | A-1513 |
|  | Redirect | A-1523 |
|  | Recross | A-1525 |
| Greg Regan | Direct | A-1527 |
|  | Cross | A-1558 |
|  | Redirect | A-1569 |

Transcript of Evidentiary Hearing, dated
   February 2, 2024 .................................................. A-1579

Plaintiffs' Witnesses:

| Ruth Brooks-Ward | Direct | A-1585 |
|---|---|---|
|  | Cross | A-1591 |
| John Accardo | Direct | A-1621 |
|  | Cross | A-1632 |
| Christopher Elkins | Direct | A-1655 |
|  | Cross | A-1696 |
|  | Redirect | A-1758 |
|  | Recross | A-1769 |
| Anne Barsch | Direct | A-1771 |
|  | Cross | A-1796 |
| Carly Richardson | Direct | A-1815 |
|  | Cross | A-1817 |
| Stephen Loft | Direct | A-1820 |
|  | Cross | A-1825 |
| Patrick Callahan | Direct | A-1836 |
|  | Cross | A-1850 |
|  | Redirect | A-1882 |

vii

**Page**

Annexed to Notice -
(i) Supplement to Preliminary Report of
Temporary Receiver and Emergency Motion to
Pay February Employee Benefit Insurance
Premiums for All Employees of the Corporate
Defendants, dated February 5, 2024
[ECF Dkt. No. 131-1] ............................................ A-1889

Exhibit A to Receiver's Reply -
January 25, 2024 – Update for Employees:
Questions Regarding Pay and Employment Status
[ECF Dkt. No. 135-1] ............................................ A-1894

Defendants' Findings of Fact and Conclusions of Law,
dated February 6, 2024 [ECF Dkt. No. 137] ............ A-1897

Plaintiffs' Post-Hearing Memorandum of Law,
dated February 6, 2024 [ECF Dkt. No. 138] ......... A-1990

Annexed to Post-Hearing Memorandum of Law -
(i) Declaration of Karen Davis, dated
February 6, 2024 [ECF Dkt. No. 138-1]................ A-2019

(ii) Declaration of Joshua Lewis, dated
February 6, 2024 [ECF Dkt. No. 138-2]................ A-2023

(iii) Declaration of Jennifer Terranova, dated
February 5, 2024 [ECF Dkt. No. 138-3]................ A-2025

Plaintiffs' Proposed Findings of Fact and
Conclusions of Law, dated February 6, 2024
[ECF Dkt. No. 139] ................................................ A-2027

Annexed to Proposed Findings of Fact -
Proposed Preliminary Injunction
[ECF Dkt. No. 139-1] ............................................ A-2081

Minute Entry of Proceedings, dated
February 7, 2024 [ECF Dkt. No. 140] ................... A-2120

viii

**Page**

Transcript of Oral Argument, dated
    February 7, 2024.................................................. A-2121

Notices, Consents, and References of a Dispositive
    Motion to a Magistrate Judge, dated
    February 13, 2024[ECF Dkt. No. 158].................. A-2229

Text Order on Motion for Temporary Restraining
    Order, dated February 13, 2024
    [ECF Dkt. No. 159] ............................................. A-2238

Text Order on Extension of Temporary Restraining
    Order, dated February 14, 2024
    [ECF Dkt. No. 162] ............................................. A-2239

Text Order on Extension of Temporary Restraining
    Order, dated February 15, 2024
    [ECF Dkt. No. 164] ............................................. A-2240

Text Order on Extension of Temporary Restraining
    Order, dated February 16, 2024
    [ECF Dkt. No. 167] ............................................. A-2241

Text Order on Extension of Temporary Restraining
    Order, dated February 20, 2024
    [ECF Dkt. No. 169] ............................................. A-2242

Text Order on Extension of Temporary Restraining
    Order, dated February 21, 2024
    [ECF Dkt. No. 171] ............................................. A-2243

Text Order on Extension of Temporary Restraining
    Order, dated February 26, 2024
    [ECF Dkt. No. 178] ............................................. A-2244

ix

**Page**

Notice of Receiver's Emergency Motion for an
Order to Show Cause Why Receivership
Defendant Lit Def Strategies, LLC and Individual
Defendant Jason Blust Should not be Held in
Civil Contempt, dated February 26, 2024
[ECF Dkt. No. 179] ................................................. A-2245

Text Order on Extension of Temporary Restraining
Order, dated February 27, 2024
[ECF Dkt. No. 180] ................................................. A-2247

Text Order on Extension of Temporary Restraining
Order, dated February 29, 2024
[ECF Dkt. No. 181] ................................................. A-2248

Text Order on Extension of Temporary Restraining
Order, dated March 1, 2024 [ECF Dkt. No. 182] .. A-2249

Notice of Appeal by Defendant Ryan Sasson, dated
March 5, 2024 [ECF Dkt. No. 192] ...................... A-2250

Amended Notice of Appeal by Defendant Ryan
Sasson, dated March 6, 2024 [ECF Dkt. No. 193] ... A-2252

Notice of Appeal by Law Firm Defendants, dated
March 6, 2024 [ECF Dkt. No. 194] ...................... A-2254

Notice of Appeal by Defendant Jason Blust, dated
March 8, 2024 [ECF Dkt. No. 198] ...................... A-2256

Notice of Appeal by Defendant The Blust Family
2019 Irrevocable Trust, dated March 12, 2024
[ECF Dkt. No. 203] ................................................. A-2257

Notice of Appeal by Client Services Defendants,
dated March 13, 2024 [ECF Dkt. No. 206] ........... A-2258

x

**Page**

Decision and Order of the Honorable Michael J.
  Roemer, dated April 11, 2024
    [ECF Dkt. No. 281] ............................................... A-2260

So-Ordered Stipulation and Order Regarding the
  Asset Freeze Related to Defendants Sasson,
  Behar, and Blumkin and Non-Parties Birds and
  Timberline 1042, dated May 1, 2024
    [ECF Dkt. No. 349] ............................................... A-2270

**Plaintiffs' Trial Exhibits**

PX-002 – Documents Obtained by NYAG ............... A-2280

PX-003 – Declaration of Amy Wagar, dated
            September 10, 2021 .................................... A-2576

PX-005 – Documents Obtained from Minnesota
            Attorney General's Office ......................... A-2580

PX-006 – Transcript of Investigational Interview of
            Steven Pavlow, dated October 10, 2022.... A-2619

PX-009 – Declaration of Christopher Elkins, dated
            December 4, 2023, with Exhibits .............. A-2664

PX-010 – Declaration of Patricia Griffiths, dated
            May 12, 2023, with Exhibits .................... A-2665

PX-011 – Declaration of Elizabeth Salva, dated
            April 27, 2023, with Exhibits ................... A-2666

PX-012 – Additional Declarations ............................. A-2667

PX-013 – Deposition Transcript of Jeff Stone, dated
            January 25, 2024 ....................................... A-2816

PX-014 – Deposition Transcript of Mike Song,
            dated January 25, 2024 .............................. A-2882

xi

**Page**

PX-015 – Deposition Transcript of Danielle
Strengberg Winkleman, dated
January 25, 2024 ........................................ A-2908

PX-016 – Deposition Transcript of Heather Spitz,
dated January 25, 2024............................. A-2990

PX-017 – Deposition Transcript of Lisa Munyon,
dated January 25, 2024............................. A-3008

PX-018 – Deposition Transcript of Crystal Willis,
dated January 25, 2024............................. A-3072

PX-019 – Transcript of Deposition of Ryan Sasson,
dated January 28, 2024............................. A-3142

PX-020 – Transcript of Mary Lynn Clark, dated
January 29, 2024 ........................................ A-3322

PX-022 – Transcript of Phone Call, dated
January 17, 2024 ........................................ A-3424

PX-024 – Transcript of Phone Call, dated
January 17, 2024 ........................................ A-3461

PX-028 – Transcript of Phone Call, dated
January 17, 2024 ........................................ A-3488

PX-029 – Transcript of Phone Call, dated
January 17, 2024 ........................................ A-3507

PX-030 – Transcript of Phone Call, dated
June 8, 2023................................................. A-3557

PX-031 – Transcript of Phone Call, dated
January 26, 2024 ........................................ A-3581

PX-032 – Transcript of Phone Call, dated
January 26, 2024 ........................................ A-3633

xii

**Page**

PX-033 – Transcript of Phone Call, dated
January 26, 2024 ...................................... A-3665

PX-034 – Transcript of Phone Call, dated
January 17, 2024 ...................................... A-3708

PX-037 – Transcript of Phone Call, dated
January 17, 2024 ...................................... A-3711

PX-040 – Transcript of Phone Call, dated
January 17, 2024 ...................................... A-3753

PX-045 – Deposition Transcript of David Tsui,
dated January 26, 2024, with Exhibits ...... A-3809

PX-046 – Deposition Transcript of Willard Lee
Shirkey, dated January 26, 2024, with
Exhibits...................................................... A-3881

PX-047 – Deposition Transcript of John Accardo,
dated January 26, 2024, with Exhibits ...... A-3967

PX-048 – Deposition Transcript of Lorie Soule,
dated January 26, 2024, with Exhibits ...... A-4043

PX-049 – Deposition Transcript of Melissa Riley,
dated January 26, 2024............................... A-4146

PX-050 – Deposition Transcript of Eric Howell,
dated January 29, 2024............................... A-4229

PX-051 – Deposition Transcript of Olga
Vrzhezhevska, dated January 26, 2024 ..... A-4351

PX-052 – Deposition Transcript of Mark Roberts,
dated January 30, 2024............................... A-4431

PX-053 – Declaration of Michael Duhn, dated
January 25, 2024 ....................................... A-4563

**xiii**

Page

PX-054 – Deposition Transcript of James Agosto, dated January 24, 2024 ............................. A-4566

PX-055 – Deposition Transcript of Craig Horvath, dated January 26, 2024 ............................. A-4867

PX-056 – Deposition Transcript of Jason Blust, dated January 29, 2024 ............................. A-4999

PX-061 – NPN Debt Settlement Training .................. A-5144

PX-062 – Sunshine Signing Notary Instructions ....... A-5149

PX-063 – NPN Signing Terms, Requirements and Instructions ................................................ A-5154

PX-064 – Agreement for Legal Representative Signing Services, dated April 7, 2021 ....... A-5159

PX-068 – Deposition Transcript of Kimberly Brown, dated January 26, 2024 ................. A-5164

PX-069 – Consent Order of Discipline, in *The North Caroline State Bar v. Rufty* (Disciplinary Hearing Commission of the North Carolina State Bar), dated April 8, 2021 ............................................. A-5270

PX-070 – Deposition Transcript of Peter Fountain, dated January 26, 2024 ............................. A-5291

PX-071 – Report and Recommendation of the Hearing Board, *IMO Thomas George Macey and Jeffrey John Aleman* (Illinois Attorney Registration and Disciplinary Hearing Commission), dated December 10, 2014 ................................... A-5364

PX-076 – Preliminary Report of Temporary Receiver, dated January 31, 2024 .............. A-5375

xiv

**Page**

### Defendants' Trial Exhibits

DX-001 – Agreement for Legal Representative
Signing Services, dated
February 25, 2023 ................................... A-5424

DX-002 – Agreement for Legal Representative
Signing Services, dated August 4, 2021 .... A-5429

DX-003 – Agreement for Legal Representative
Signing Services, dated January 13, 2022 . A-5434

DX-004 – Agreement for Legal Representative
Signing Services, dated May 14, 2019 ...... A-5439

DX-005 – Agreement for Legal Representative
Signing Services, dated
November 1, 2019 ................................... A-5444

DX-006 – Agreement for Legal Representative
Services, dated June 5, 2018 .................... A-5449

DX-008 – NPN Signing Terms, Requirements and
Instructions ............................................... A-5454

DX-009 – NPN Training Tracking Spreadsheet ........ A-5458

DX-010 – NPN Training Access Link ....................... A-5599

DX-011 – NPN Debt Settlement Training ................. A-5600

DX-012 – Paralegal Training Video .......................... A-5605

DX-013 – Paralegal Online Training ......................... A-5606

DX-014 – Paralegal Debt Program Online Training
Test ............................................................ A-5611

DX-015 – Paralegal Debt Resolution Training
Refresher ................................................... A-5639

xv

**Page**

DX-016 – Whitestone Legal Group – Para-
    Professional Training – Quiz ..................... A-5651

DX-017 – Whitestone Legal Group – Para-
    Professional Training - Face to Face
    Documents ................................................ A-5655

DX-018 – Canyon Legal Group, LLC – Paralegal
    Script ......................................................... A-5658

DX-019 – Canyon Legal Group, LLC – Client
    Retainer Agreement ................................... A-5682

DX-020 – Hailstone Legal Group – Paralegal Script A-5721

DX-021 – Hailstone Legal Group – Client Retainer
    Agreement ................................................. A-5751

DX-022 – Harbor Legal Group – Paralegal Script .... A-5797

DX-023 – Harbor Legal Group – Client Retainer
    Agreement ................................................. A-5811

DX-024 – Monarch Legal Group – Paralegal Script . A-5842

DX-025 – Monarch Legal Group – Client Retainer
    Agreement ................................................. A-5870

DX-026 – Compliance Affidavits of Anchor Legal
    Group, LLC ............................................... A-5910

DX-027 – Compliance Affidavits of Bedrock Legal . A-6060

DX-028 – Compliance Affidavits of Boulder Legal
    Group, LLC ............................................... A-6124

DX-029 – Compliance Affidavits of Canyon Legal
    Group ........................................................ A-6274

DX-030 – Compliance Affidavits Great Lakes Law
    Firm, LLC ................................................. A-6425

xvi

**Page**

DX-031 – Compliance Affidavits of Guidestone
Law Group....................................... A-6548

DX-032 – Compliance Affidavits of Harbor Legal
Group, P.C. ................................. A-6703

DX-033 – Compliance Affidavits of Heartland
Legal Group.................................. A-6803

DX-034 – Compliance Affidavits of Newport Legal
Group........................................... A-6959

DX-035 – Compliance Affidavits of Northstar Legal
Group LLC ................................... A-7110

DX-036 – Compliance Affidavits of Option 1 Legal. A-7264

DX-037 – Compliance Affidavits of Pioneer Law
Firm, P.C..................................... A-7415

DX-038 – Compliance Affidavits of Rockwell
Legal Group PLLC ...................... A-7465

DX-039 – Compliance Affidavits of Royal Legal
Group........................................... A-7616

DX-040 – Compliance Affidavits of Stonepoint
Legal Group, PLLC .................... A-7717

DX-041 – Compliance Affidavits of Summit Law
Firm ............................................ A-7817

DX-042 – Compliance Affidavits of Whitestone
Legal Group.................................. A-7917

DX-043 – Compliance Affidavits of Monarch
Group........................................... A-8014

DX-044 – Monarch Group – Initial Consultation
Call Script.................................... A-8414

xvii

|  | Page |
|---|---|
| DX-045 – Monarch Group Welcome Guide .............. | A-8417 |
| DX-046 – Monarch Group Service Agreement, dated July 1, 2019................................... | A-8433 |
| DX-047 – Monarch Group Amended and Restated Service Agreement, dated October 1, 2022 ......................... | A-8452 |
| DX-048 – Anchor Law Firm, PLLC Service Agreement, undated.................................. | A-8482 |
| DX-049 – Anchor Law Firm, PLLC Amended and Restated Service Agreement, dated October 1, 2022 ......................... | A-8503 |
| DX-050 – Bedrock Law Firm Service Agreement, dated February 1, 2017 ............................ | A-8531 |
| DX-051 – Bedrock Law Firm Amended and Restated Service Agreement, dated October 1, 2022 ......................... | A-8552 |
| DX-052 – Boulder Legal Group, LLC Service Agreement, dated February 1, 2016 ......... | A-8580 |
| DX-053 – Boulder Legal Group, LLC Amended and Restated Service Agreement, dated October 1, 2022 ......................... | A-8604 |
| DX-054 – Heartland Legal Group Services Agreement, dated August 1, 2019 ............. | A-8632 |
| DX-055 – Heartland Legal Group Amended and Restated Services Agreement, dated October 1, 2022 ......................... | A-8651 |
| DX-056 – Northstar Legal Group LLC Services Agreement, dated August 1, 2019 ............. | A-8679 |

**xviii**

**Page**

DX-057 – Northstar Legal Group LLC Amended
and Restated Services Agreement, dated
September 6, 2023 .................................... A-8699

DX-058 – Option1 Legal Services Agreement,
dated March 1, 2019 ................................. A-8733

DX-059 – Option1 Legal Amended and Restated
Services Agreement, dated
October 1, 2022 ........................................ A-8752

DX-060 – Chinn Legal Group, LLC Services
Agreement, dated January 9, 2020 ........... A-8780

DX-061 – Chinn Legal Group, LLC Amended and
Restated Services Agreement, dated
October 1, 2022 ........................................ A-8800

DX-062 – Wyolaw LLC Amended and Restated
Services Agreement, dated
August 1, 2019 ......................................... A-8830

DX-063 – Wyolaw LLC Amended and Restated
Services Agreement, dated
October 1, 2022 ........................................ A-8851

DX-065 – Meadowbrook Legal Group Documents
and Protocols ............................................ A-8878

DX-066 – Hailstone Legal Group - All Policies and
Procedures ................................................ A-9005

DX-067 – Joanna Hughes Pleadings ........................ A-9181

DX-068 – Joanna Hughes "Court Call" E-mails........ A-9246

xix

Page

DX-069 – Stipulated Final Judgment and Consent
Order, in *Consumer Financial Protection
Bureau v. Global Client Solutions, LLC*
(U.S. District Court for the Central
District of California Case No. 14-cv-
6643), dated August 27, 2014 ................... A-9333

DX-070 – CFPB v. RAM Consent Order, Case No.
2022-CFPB-0003 (CFPB, May 11, 2022) . A-9358

DX-071 – Global Audit Due Diligence Verification -
Donald Norris (Stonepoint), January 2023 . A-9417

DX-072 – Global Audit Due Diligence Verification -
Chinn (Slate), January 2023 ...................... A-9419

DX-073 – Global Audit Due Diligence Verification -
Gustafson Consumer Law Group,
January 2023 ............................................. A-9421

DX-074 – Global Audit Due Diligence Verification -
Gustafson Consumer, December 2023 ....... A-9423

DX-075 – Global Audit Due Diligence Verification -
Chinn (Slate), December 2023 .................. A-9424

DX-076 – Global Audit Due Diligence Verification -
Gustafson Consumer, June 2023 ............... A-9425

DX-077 – Global Audit Due Diligence Verification -
Chinn (Slate), June 2023 ........................... A-9427

DX-078 – Global Audit Due Diligence Verification -
Boulder, July 2020 .................................... A-9429

DX-079 – Global Audit Due Diligence Verification -
Pioneer, July 2022 .................................... A-9431

DX-080 – Global Audit Due Diligence Verification -
Royal, January 2023 .................................. A-9433

xx

|  | Page |
|---|---|
| DX-082 – ProBank Austin Audit (January 2020)...... | A-9435 |
| DX-083 – ProBank Austin Audit (March 2022)........ | A-9463 |
| DX-084 – Response to Civil Investigative Demand in re: Harbor Legal Group, LLC, dated May 26, 2020............................................. | A-9485 |
| DX-085 – Response to Civil Investigative Demand in re: The Sands Law Group, LLP, dated May 26, 2020............................................. | A-9506 |
| DX-086 – Response to Civil Investigative Demand in re: Bedrock Legal, dated May 26, 2020 | A-9576 |
| DX-087 – Response to Civil Investigative Demand in re: Rockwell Legal Group, dated May 26, 2020............................................. | A-9621 |
| DX-088 – Declaration of Juan Aguilera, dated November 21, 2023 ................................... | A-9690 |
| DX-089 – Declaration of Adam Basey, dated October 30, 2023 ....................................... | A-9693 |
| DX-090 – Declaration of Darryl Beasley, dated November 1, 2023 ..................................... | A-9695 |
| DX-091 – Declaration of James J. Blaha, dated November 25, 2023 ................................... | A-9697 |
| DX-092 – Declaration of John A. Bondick, dated November 2, 2023 ..................................... | A-9699 |
| DX-093 – Declaration of Randall Burkiett, dated November 20, 2023 ................................... | A-9702 |
| DX-094 – Declaration of Nada Cagle, dated November 14, 2023 ................................... | A-9705 |

xxi

**Page**

DX-095 – Declaration of Linette Cheers, dated
October 26, 2023 ...................................... A-9707

DX-096 – Declaration of Edmund Chuprinskas,
dated October 24, 2023 ............................ A-9709

DX-097 – Declaration of Annie Cole, dated
October 30, 2023 ...................................... A-9711

DX-098 – Declaration of George Crawford, dated
November 7, 2023 ..................................... A-9713

DX-099 – Declaration of Michael Dukes, dated
November 1, 2023 ..................................... A-9715

DX-100 – Declaration of Debra Gander, dated
January 20, 2024 ...................................... A-9718

DX-101 – Declaration of Patrick Harris, dated
October 26, 2023 ...................................... A-9721

DX-102 – Declaration of Tracy L. Jacoby, dated
January 22, 2024 ...................................... A-9723

DX-103 – Declaration of James P. Kaczanowski, Jr.,
dated November 20, 2023 ....................... A-9725

DX-104 – Declaration of Garry Lewis, dated
November 29, 2023 ................................... A-9727

DX-105 – Declaration of Michelle Ludwig, dated
October 26, 2023 ...................................... A-9730

DX-106 – Declaration of Diane Paige, dated
October 30, 2023 ...................................... A-9732

DX-107 – Declaration of Jerome Peters, dated
November 1, 2023 ..................................... A-9735

DX-108 – Declaration of Sandra N. Rhoden-
Weathersby, dated November 29, 2023 ..... A-9737

xxii

**Page**

DX-109 – Declaration of Jordan Schultz, dated
October 26, 2023 ....................................... A-9740

DX-110 – Declaration of Dante Servin, dated
November 27, 2023 ................................... A-9742

DX-111 – Declaration of Carlos A. Soberon,
undated ..................................................... A-9745

DX-112 – Declaration of Cynthia D. Vamvakos,
dated November 28, 2023 ........................ A-9747

DX-113 – Declaration of Nereida Zarate, dated
November 21, 2023 ................................... A-9750

DX-116 – Signed Exemplar 1 .................................... A-9752

DX-117 – Signed Exemplar 2 .................................... A-9811

DX-122 – Signed Exemplar 3 .................................... A-9872

DX-127 – Declaration of Mary Lynn Clark, dated
January 16, 2024 ...................................... A-9933

DX-128 – Monarch Legal Group LLC In-Person
Presentation on Debt Negotiation
Program ..................................................... A-9938

DX-138 – Canyon Legal Group In-Person
Presentation on Debt Resolution Program ... A-9992

DX-139 – Canyon Legal Group Retainer Agreement .. A-10009

DX-149 – Declaration of Bryan Dilgard, dated
January 30, 2024 ...................................... A-10047

DX-150 – Answer of Defendant Christopher Elkins,
in *LVNV Funding v. Elkins* (Chillicothe
Municipal Court Case No. CVF-
2301210), dated September 18, 2023 ........ A-10049

xxiii

**Page**

DX-151 – Answer of Defendant Tracy Elkins, in
       *Cavalry SPV I, LLC v. Elkins* (Chillicothe
       Municipal Court Case No. CVG-
       2300641), dated May 29, 2023.................. A-10051

DX-152 – 10.10.19 Christopher Elkins Approval
       Call and Slipsheet..................................... A-10053

DX-157 – Declaration of Richard K. Gustafson, II,
       undated, with Exhibits.............................. A-10054

Defendants' Demonstrative Hearing Exhibit 1 ......... A-10163

A-2401

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 7. LOAN PAYABLE (CONTINUED)**

The minimum required payment schedule for the notes is as follows:

| | |
|---|---|
| 2019 | $ 9,500,000 |
| 2020 | 10,875,000 |
| 2021 | 12,000,000 |
| 2022 | 13,060,441 |
| 2023 | 13,060,441 |
| Subsequent to 2023 | 176,556,173 |
| | $ 235,052,055 |

**NOTE 8. COMPANY DIVIDENDS**

The Company paid a dividend to the ESOP of $35.92 per share or $1,972,120 during the eight month period ended December 31, 2017. The entire dividend related to unallocated shares and was applied in full to debt service. There were no dividends paid to the ESOP during the year ended December 31, 2018.

**NOTE 9. RELATED PARTY AND PARTY IN INTEREST TRANSACTIONS**

The Plan invests in Company common stock and as noted in Note 7 has indebtedness to the Company for the loan used to purchase the Company stock. These are related party and party in interest transactions. As described in Note 1, the Company pays all plan expenses. The Plan has a number of service providers. Such providers are parties in interest under ERISA.

**NOTE 10. RECONCILIATION TO 5500**

The following is a reconciliation of net assets available for benefit per the financial statements to the Form 5500:

| | 2018 | 2017 |
|---|---|---|
| Net deficit available for benefits per the financial statements | $ (130,981,197) | $ (122,994,355) |
| Differences in: | | |
| Accrued interest expense payable | (1,155,238) | (1,775,400) |
| Net deficit available for benefits per the Form 5500 | $ (132,136,435) | $ (124,769,755) |

The following is a reconciliation of the change in net assets available for benefits per the financial statements to the Form 5500:

| | 2018 | 2017 |
|---|---|---|
| Decrease in net assets per financial statements | $ (7,986,842) | $ (122,994,355) |
| Differences in: | | |
| Interest expense | 620,162 | (1,775,400) |
| Decrease in net assets per Form 5500 | $ (7,366,680) | $ (124,769,755) |

Exhibit 08-0122

**DSL 005421**

A-2402

**STRATEGIC ESOP**

**SCHEDULE H, LINE 4i - SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
EIN # ▐▐▐▐▐
Plan #: 002
December 31, 2018

| (a) | (b) Identity of Issuer | (c) Description of Investment | (d) Cost | (e) Fair Value |
|---|---|---|---|---|
| | Common Stock: | | | |
| * | Strategic Family, Inc. | 54,900 shares of common stock | $ 242,228,867 | $ 101,455,200 |
| | | | $ 242,228,867 | $ 101,455,200 |

\* Represents party in interest.

12

Exhibit 08-0123

DSL 005422

A-2403

| **Form 5500** | **Annual Return/Report of Employee Benefit Plan** | OMB Nos. 1210-0110 1210-0089 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code). | **2017** |
| Department of Labor Employee Benefits Security Administration | ▶ Complete all entries in accordance with the instructions to the Form 5500. | |
| Pension Benefit Guaranty Corporation | | **This Form is Open to Public Inspection** |

## Part I Annual Report Identification Information

For calendar plan year 2017 or fiscal plan year beginning 05/01/2017 and ending 12/31/2017

**A** This return/report is for:

- [ ] a multiemployer plan
- [ ] a multiple-employer plan (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)
- [X] a single-employer plan
- [ ] a DFE (specify) ____

**B** This return/report is:

- [X] the first return/report
- [ ] the final return/report
- [ ] an amended return/report
- [X] a short plan year return/report (less than 12 months)

**C** If the plan is a collectively-bargained plan, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ [ ]

**D** Check box if filing under:

- [X] Form 5558
- [ ] automatic extension
- [ ] the DFVC program
- [ ] special extension (enter description)

## Part II Basic Plan Information—enter all requested information

| **1a** Name of plan STRATEGIC ESOP | **1b** Three-digit plan number (PN) ▶ | 002 |
|---|---|---|
| | **1c** Effective date of plan 05/01/2017 | |

**2a** Plan sponsor's name (employer, if for a single-employer plan)
Mailing address (include room, apt., suite no. and street, or P.O. Box)
City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)

STRATEGIC FINANCIAL SOLUTIONS, LLC

711 3RD AVENUE
6TH FLOOR
NEW YORK, NY 10017

**2b** Employer Identification ████████

**2c** Plan Sponsor's telephone number 212-810-4537

**2d** Business code (see instructions) 523900

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | Filed with authorized/valid electronic signature. | 10/15/2018 | KIMBERLY CELIC |
|---|---|---|---|
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | Filed with authorized/valid electronic signature. | 10/15/2018 | KIMBERLY CELIC |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |
| SIGN HERE | | | |
| | Signature of DFE | Date | Enter name of individual signing as DFE |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.

Form 5500 (2017)
v. 170203

Exhibit 08-0124

DSL 005423

A-2404

| Form 5500 (2017) | | Page **2** |
|---|---|---|

| | | | | |
|---|---|---|---|---|
| **3a** | Plan administrator's name and address ☒ Same as Plan Sponsor | | **3b** | Administrator's EIN |
| | | | **3c** | Administrator's telephone number |
| **4** | If the name and/or EIN of the plan sponsor or the plan name has changed since the last return/report filed for this plan, enter the plan sponsor's name, EIN, the plan name and the plan number from the last return/report: | | **4b** | EIN |
| **a** | Sponsor's name | | **4d** | PN |
| **c** | Plan Name | | | |

| | | | |
|---|---|---|---|
| **5** | Total number of participants at the beginning of the plan year | **5** | 346 |
| **6** | Number of participants as of the end of the plan year unless otherwise stated (welfare plans complete only lines 6a(1), 6a(2), 6b, 6c, and 6d). | | |
| **a(1)** | Total number of active participants at the beginning of the plan year ................................... | **6a(1)** | 346 |
| **a(2)** | Total number of active participants at the end of the plan year ...................................... | **6a(2)** | 515 |
| **b** | Retired or separated participants receiving benefits.................................................. | **6b** | 0 |
| **c** | Other retired or separated participants entitled to future benefits...................................... | **6c** | 0 |
| **d** | Subtotal. Add lines 6a(2), 6b, and 6c................................................................ | **6d** | 515 |
| **e** | Deceased participants whose beneficiaries are receiving or are entitled to receive benefits............... | **6e** | 0 |
| **f** | Total. Add lines 6d and 6e....................................................................... | **6f** | 515 |
| **g** | Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item)................................................................ | **6g** | 333 |
| **h** | Number of participants who terminated employment during the plan year with accrued benefits that were less than 100% vested........................................................................ | **6h** | 0 |
| **7** | Enter the total number of employers obligated to contribute to the plan (only multiemployer plans complete this item)....... | **7** | |

**8a** If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristics Codes in the instructions:

2I    2P    3I

**b** If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristics Codes in the instructions:

| | | | | |
|---|---|---|---|---|
| **9a** | Plan funding arrangement (check all that apply) | | **9b** | Plan benefit arrangement (check all that apply) |
| **(1)** | ☐ Insurance | | **(1)** | ☐ Insurance |
| **(2)** | ☐ Code section 412(e)(3) insurance contracts | | **(2)** | ☐ Code section 412(e)(3) insurance contracts |
| **(3)** | ☒ Trust | | **(3)** | ☒ Trust |
| **(4)** | ☐ General assets of the sponsor | | **(4)** | ☐ General assets of the sponsor |

**10** Check all applicable boxes in 10a and 10b to indicate which schedules are attached, and, where indicated, enter the number attached. (See instructions)

**a** Pension Schedules

| | | |
|---|---|---|
| **(1)** | ☒ | **R** (Retirement Plan Information) |
| **(2)** | ☐ | **MB** (Multiemployer Defined Benefit Plan and Certain Money Purchase Plan Actuarial Information) - signed by the plan actuary |
| **(3)** | ☐ | **SB** (Single-Employer Defined Benefit Plan Actuarial Information) - signed by the plan actuary |

**b** General Schedules

| | | |
|---|---|---|
| **(1)** | ☒ | **H** (Financial Information) |
| **(2)** | ☐ | **I** (Financial Information – Small Plan) |
| **(3)** | ☐ | **A** (Insurance Information) |
| **(4)** | ☒ | **C** (Service Provider Information) |
| **(5)** | ☐ | **D** (DFE/Participating Plan Information) |
| **(6)** | ☐ | **G** (Financial Transaction Schedules) |

Exhibit 08-0125

DSL 005424

A-2405

Form 5500 (2017)                                                          Page **3**

| Part III | Form M-1 Compliance Information (to be completed by welfare benefit plans) |
|---|---|

**11a** If the plan provides welfare benefits, was the plan subject to the Form M-1 filing requirements during the plan year? (See instructions and 29 CFR 2520.101-2.) ....................................... ☐ Yes    ☐ No

   If "Yes" is checked, complete lines 11b and 11c.

**11b** Is the plan currently in compliance with the Form M-1 filing requirements? (See instructions and 29 CFR 2520.101-2.) ........... ☐ Yes    ☐ No

**11c** Enter the Receipt Confirmation Code for the 2017 Form M-1 annual report. If the plan was not required to file the 2017 Form M-1 annual report, enter the Receipt Confirmation Code for the most recent Form M-1 that was required to be filed under the Form M-1 filing requirements. (Failure to enter a valid Receipt Confirmation Code will subject the Form 5500 filing to rejection as incomplete.)

   Receipt Confirmation Code_____

Exhibit 08-0126

DSL 005425

A-2406

| SCHEDULE C | Service Provider Information | OMB No. 1210-0110 |
|---|---|---|
| **(Form 5500)** | | **2017** |
| Department of the Treasury<br>Internal Revenue Service | This schedule is required to be filed under section 104 of the Employee<br>Retirement Income Security Act of 1974 (ERISA). | |
| Department of Labor<br>Employee Benefits Security Administration | ▶ File as an attachment to Form 5500. | **This Form is Open to Public Inspection.** |
| Pension Benefit Guaranty Corporation | | |

For calendar plan year 2017 or fiscal plan year beginning  05/01/2017  and ending  12/31/2017

| **A** Name of plan<br>STRATEGIC ESOP | **B** Three-digit<br>plan number (PN)  ▶  002 |
|---|---|
| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>STRATEGIC FINANCIAL SOLUTIONS, LLC | **D** Employer Identification Number (EIN)<br>▮▮▮▮▮ |

| **Part I** | **Service Provider Information (see instructions)** |
|---|---|

You must complete this Part, in accordance with the instructions, to report the information required for **each person** who received, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of monetary value) in connection with services rendered to the plan or the person's position with the plan during the plan year. If a person received **only** eligible indirect compensation for which the plan received the required disclosures, you are required to answer line 1 but are not required to include that person when completing the remainder of this Part.

**1  Information on Persons Receiving Only Eligible Indirect Compensation**

**a** Check "Yes" or "No" to indicate whether you are excluding a person from the remainder of this Part because they received only eligible indirect compensation for which the plan received the required disclosures (see instructions for definitions and conditions)............... ☐ Yes ☒ No

**b** If you answered line 1a "Yes," enter the name and EIN or address of each person providing the required disclosures for the service providers who received only eligible indirect compensation. Complete as many entries as needed (see instructions).

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.

Schedule C (Form 5500) 2017
v.170203

Exhibit 08-0127

DSL 005426

A-2407

Schedule C (Form 5500) 2017                    Page **2**- 1

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

Exhibit 08-0128

DSL 005427

A-2408

Schedule C (Form 5500) 2017                                    Page **3** - 1

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions.)

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐  No ☐ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐  No ☐ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐  No ☐ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

Exhibit 08-0129

**DSL 005428**

A-2409

Schedule C (Form 5500) 2017      Page **3** - 2

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Exhibit 08-0130

DSL 005429

A-2410

Schedule C (Form 5500) 2017      Page **4** - 1

| **Part I** | **Service Provider Information** (continued) |
|---|---|

**3.** If you reported on line 2 receipt of indirect compensation, other than eligible indirect compensation, by a service provider, and the service provider is a fiduciary or provides contract administrator, consulting, custodial, investment advisory, investment management, broker, or recordkeeping services, answer the following questions for (a) each source from whom the service provider received $1,000 or more in indirect compensation and (b) each source for whom the service provider gave you a formula used to determine the indirect compensation instead of an amount or estimated amount of the indirect compensation. Complete as many entries as needed to report the required information for each source.

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

Exhibit 08-0131

DSL 005430

A-2411

Schedule C (Form 5500) 2017       Page **5** - 1

| **Part II** | **Service Providers Who Fail or Refuse to Provide Information** |

**4**   Provide, to the extent possible, the following information for each service provider who failed or refused to provide the information necessary to complete this Schedule.

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |

Exhibit 08-0132

DSL 005431

A-2412

Schedule C (Form 5500) 2017                                    Page **6** - ☐1

| Part III | Termination Information on Accountants and Enrolled Actuaries (see instructions) |
|---|---|
| | (complete as many entries as needed) |

**a** Name: | **b** EIN:
**c** Position:
**d** Address: | **e** Telephone:

Explanation:

---

**a** Name: | **b** EIN:
**c** Position:
**d** Address: | **e** Telephone:

Explanation:

---

**a** Name: | **b** EIN:
**c** Position:
**d** Address: | **e** Telephone:

Explanation:

---

**a** Name: | **b** EIN:
**c** Position:
**d** Address: | **e** Telephone:

Explanation:

---

**a** Name: | **b** EIN:
**c** Position:
**d** Address: | **e** Telephone:

Explanation:

Exhibit 08-0133

DSL 005432

A-2413

| **SCHEDULE H**<br>**(Form 5500)**<br><br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security Administration<br><br>Pension Benefit Guaranty Corporation | **Financial Information**<br><br>This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA), and section 6058(a) of the Internal Revenue Code (the Code).<br><br>▶ **File as an attachment to Form 5500.** | OMB No. 1210-0110<br><br>**2017**<br><br>**This Form is Open to Public Inspection** |
|---|---|---|

| For calendar plan year 2017 or fiscal plan year beginning 05/01/2017 | and ending 12/31/2017 |

| **A** Name of plan<br>STRATEGIC ESOP | **B** Three-digit<br>plan number (PN) ▶ | 002 |
|---|---|---|
| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>STRATEGIC FINANCIAL SOLUTIONS, LLC | **D** Employer Identification Number (EIN)<br>███████ | |

| **Part I** | **Asset and Liability Statement** |
|---|---|

**1** Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines 1c(9) through 1c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. **Round off amounts to the nearest dollar.** MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, and 1i. CCTs, PSAs, and 103-12 IEs also do not complete lines 1d and 1e. See instructions.

| Assets | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| **a** Total noninterest-bearing cash ....................................... | 1a | 0 | 0 |
| **b** Receivables (less allowance for doubtful accounts): | | | |
| (1) Employer contributions ......................................... | 1b(1) | 0 | 6000000 |
| (2) Participant contributions ..................................... | 1b(2) | 0 | 0 |
| (3) Other............................................................... | 1b(3) | 0 | 0 |
| **c** General investments: | | | |
| (1) Interest-bearing cash (include money market accounts & certificates of deposit) | 1c(1) | | |
| (2) U.S. Government securities .................................. | 1c(2) | | |
| (3) Corporate debt instruments (other than employer securities): | | | |
| (A) Preferred............................................... | 1c(3)(A) | | |
| (B) All other............................................... | 1c(3)(B) | | |
| (4) Corporate stocks (other than employer securities): | | | |
| (A) Preferred............................................... | 1c(4)(A) | | |
| (B) Common............................................... | 1c(4)(B) | | |
| (5) Partnership/joint venture interests ...................... | 1c(5) | | |
| (6) Real estate (other than employer real property) ..... | 1c(6) | | |
| (7) Loans (other than to participants) ....................... | 1c(7) | | |
| (8) Participant loans ............................................... | 1c(8) | | |
| (9) Value of interest in common/collective trusts .......... | 1c(9) | | |
| (10) Value of interest in pooled separate accounts ........ | 1c(10) | | |
| (11) Value of interest in master trust investment accounts ..... | 1c(11) | | |
| (12) Value of interest in 103-12 investment entities ...... | 1c(12) | | |
| (13) Value of interest in registered investment companies (e.g., mutual funds)........... | 1c(13) | | |
| (14) Value of funds held in insurance company general account (unallocated contracts)...... | 1c(14) | | |
| (15) Other ............................................................ | 1c(15) | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.

Schedule H (Form 5500) 2017
v.170203

Exhibit 08-0134
DSL 005433

A-2414

Schedule H (Form 5500) 2017      Page **2**

| | | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|---|
| **1d** | Employer-related investments: | | | |
| | (1) Employer securities | 1d(1) | 0 | 111282300 |
| | (2) Employer real property | 1d(2) | | |
| **e** | Buildings and other property used in plan operation | 1e | | |
| **f** | Total assets (add all amounts in lines 1a through 1e) | 1f | 0 | 117282300 |

**Liabilities**

| | | | | |
|---|---|---|---|---|
| **g** | Benefit claims payable | 1g | 0 | |
| **h** | Operating payables | 1h | 0 | |
| **i** | Acquisition indebtedness | 1i | 0 | |
| **j** | Other liabilities | 1j | 0 | 242052055 |
| **k** | Total liabilities (add all amounts in lines 1g through 1j) | 1k | 0 | 242052055 |

**Net Assets**

| | | | | |
|---|---|---|---|---|
| **l** | Net assets (subtract line 1k from line 1f) | 1l | 0 | -124769755 |

| **Part II** | **Income and Expense Statement** |
|---|---|

**2**   Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g.

**Income**

| | | | (a) Amount | (b) Total |
|---|---|---|---|---|
| **a** | **Contributions:** | | | |
| | (1) Received or receivable in cash from: (A) Employers | 2a(1)(A) | 6000000 | |
| | (B)   Participants | 2a(1)(B) | 0 | |
| | (C)   Others (including rollovers) | 2a(1)(C) | 0 | |
| | (2) Noncash contributions | 2a(2) | 0 | |
| | (3) Total contributions. Add lines 2a(1)(A), (B), (C), and line 2a(2) | 2a(3) | | 6000000 |
| **b** | **Earnings on investments:** | | | |
| | (1) Interest: | | | |
| | (A)   Interest-bearing cash (including money market accounts and certificates of deposit) | 2b(1)(A) | 0 | |
| | (B)   U.S. Government securities | 2b(1)(B) | 0 | |
| | (C)   Corporate debt instruments | 2b(1)(C) | 0 | |
| | (D)   Loans (other than to participants) | 2b(1)(D) | 0 | |
| | (E)   Participant loans | 2b(1)(E) | | |
| | (F)   Other | 2b(1)(F) | 0 | |
| | (G)   Total interest. Add lines 2b(1)(A) through (F) | 2b(1)(G) | | 0 |
| | (2) Dividends: (A) Preferred stock | 2b(2)(A) | 0 | |
| | (B)   Common stock | 2b(2)(B) | 1972121 | |
| | (C)   Registered investment company shares (e.g. mutual funds) | 2b(2)(C) | 0 | |
| | (D)   Total dividends. Add lines 2b(2)(A), (B), and (C) | 2b(2)(D) | | 1972121 |
| | (3) Rents | 2b(3) | | 0 |
| | (4) Net gain (loss) on sale of assets: (A) Aggregate proceeds | 2b(4)(A) | 0 | |
| | (B)   Aggregate carrying amount (see instructions) | 2b(4)(B) | 0 | |
| | (C)   Subtract line 2b(4)(B) from line 2b(4)(A) and enter result | 2b(4)(C) | | 0 |
| | (5) Unrealized appreciation (depreciation) of assets: (A) Real estate | 2b(5)(A) | 0 | |
| | (B)   Other | 2b(5)(B) | -130946567 | |
| | (C)   Total unrealized appreciation of assets. Add lines 2b(5)(A) and (B) | 2b(5)(C) | | -130946567 |

Exhibit 08-0135

DSL 005434

A-2415

Schedule H (Form 5500) 2017                                       Page **3**

| | | (a) Amount | (b) Total |
|---|---|---|---|
| **(6)** Net investment gain (loss) from common/collective trusts | **2b(6)** | | 0 |
| **(7)** Net investment gain (loss) from pooled separate accounts | **2b(7)** | | 0 |
| **(8)** Net investment gain (loss) from master trust investment accounts | **2b(8)** | | 0 |
| **(9)** Net investment gain (loss) from 103-12 investment entities | **2b(9)** | | 0 |
| **(10)** Net investment gain (loss) from registered investment companies (e.g., mutual funds) | **2b(10)** | | 0 |
| **c** Other income | **2c** | | 0 |
| **d** Total income. Add all **income** amounts in column (b) and enter total | **2d** | | -122974446 |

**Expenses**

| | | (a) Amount | (b) Total |
|---|---|---|---|
| **e** Benefit payment and payments to provide benefits: | | | |
| **(1)** Directly to participants or beneficiaries, including direct rollovers | **2e(1)** | 0 | |
| **(2)** To insurance carriers for the provision of benefits | **2e(2)** | 0 | |
| **(3)** Other | **2e(3)** | 0 | |
| **(4)** Total benefit payments. Add lines 2e(1) through **(3)** | **2e(4)** | | 0 |
| **f** Corrective distributions (see instructions) | **2f** | | 0 |
| **g** Certain deemed distributions of participant loans (see instructions) | **2g** | | |
| **h** Interest expense | **2h** | | 1795309 |
| **i** Administrative expenses: **(1)** Professional fees | **2i(1)** | 0 | |
| **(2)** Contract administrator fees | **2i(2)** | 0 | |
| **(3)** Investment advisory and management fees | **2i(3)** | 0 | |
| **(4)** Other | **2i(4)** | 0 | |
| **(5)** Total administrative expenses. Add lines 2i(1) through **(4)** | **2i(5)** | | 0 |
| **j** Total expenses. Add all **expense** amounts in column (b) and enter total | **2j** | | 1795309 |

**Net Income and Reconciliation**

| | | | |
|---|---|---|---|
| **k** Net income (loss). Subtract line 2j from line 2d | **2k** | | -124769755 |
| **l** Transfers of assets: | | | |
| **(1)** To this plan | **2l(1)** | | 0 |
| **(2)** From this plan | **2l(2)** | | |

---

| **Part III** | **Accountant's Opinion** |
|---|---|

**3** Complete lines 3a through 3c if the opinion of an independent qualified public accountant is attached to this Form 5500. Complete line 3d if an opinion is not attached.

**a** The attached opinion of an independent qualified public accountant for this plan is (see instructions):

(1) ☒ Unqualified   (2) ☐ Qualified   (3) ☐ Disclaimer   (4) ☐ Adverse

**b** Did the accountant perform a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 103-12(d)?          ☐ Yes   ☒ No

**c** Enter the name and EIN of the accountant (or accounting firm) below:

(1) Name: FREED MAXICK CPA'S P.C.          (2) EIN: ▮▮▮▮▮▮

**d** The opinion of an independent qualified public accountant is **not attached** because:

(1) ☐ This form is filed for a CCT, PSA, or MTIA.   (2) ☐ It will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50.

---

| **Part IV** | **Compliance Questions** |
|---|---|

**4** CCTs and PSAs do not complete Part IV. MTIAs, 103-12 IEs, and GIAs do not complete lines 4a, 4e, 4f, 4g, 4h, 4k, 4m, 4n, or 5. 103-12 IEs also do not complete lines 4j and 4l. MTIAs also do not complete line 4l.

During the plan year:

| | | | Yes | No | Amount |
|---|---|---|---|---|---|
| **a** | Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? Continue to answer "Yes" for any prior year failures until fully corrected. (See instructions and DOL's Voluntary Fiduciary Correction Program.) | **4a** | | X | 0 |
| **b** | Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollectible? Disregard participant loans secured by participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked.) | **4b** | | X | 0 |

Exhibit 08-0136

**DSL 005435**

A-2416

Schedule H (Form 5500) 2017      Page **4-** 1

| | | | Yes | No | Amount |
|---|---|---|---|---|---|
| c | Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) | 4c | | X | 0 |
| d | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.) | 4d | | X | 0 |
| e | Was this plan covered by a fidelity bond? | 4e | | X | 0 |
| f | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? | 4f | | X | |
| g | Did the plan hold any assets whose current value was neither readily determinable on an established market nor set by an independent third party appraiser? | 4g | | X | |
| h | Did the plan receive any noncash contributions whose value was neither readily determinable on an established market nor set by an independent third party appraiser? | 4h | | X | |
| i | Did the plan have assets held for investment? (Attach schedule(s) of assets if "Yes" is checked, and see instructions for format requirements.) | 4i | X | | |
| j | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? (Attach schedule of transactions if "Yes" is checked, and see instructions for format requirements.) | 4j | | X | |
| k | Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC? | 4k | | X | |
| l | Has the plan failed to provide any benefit when due under the plan? | 4l | | X | |
| m | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.) | 4m | | X | |
| n | If 4m was answered "Yes," check the "Yes" box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3. | 4n | | | |

**5a** Has a resolution to terminate the plan been adopted during the plan year or any prior plan year?........ ☐ Yes ☒ No
    If "Yes," enter the amount of any plan assets that reverted to the employer this year _____.

**5b** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.)

| 5b(1) Name of plan(s) | 5b(2) EIN(s) | 5b(3) PN(s) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**5c** If the plan is a defined benefit plan, is it covered under the PBGC insurance program (See ERISA section 4021.)? ...... ☐ Yes ☐ No ☐ Not determined
    If "Yes" is checked, enter the My PAA confirmation number from the PBGC premium filing for this plan year_____. (See instructions.)

Exhibit 08-0137

DSL 005436

A-2417

| **SCHEDULE R**<br>**(Form 5500)**<br>Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Employee Benefits Security Administration<br>Pension Benefit Guaranty Corporation | **Retirement Plan Information**<br><br>This schedule is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code).<br><br>▶ **File as an attachment to Form 5500.** | OMB No. 1210-0110<br><br>**2017**<br><br>**This Form is Open to Public Inspection.** |
|---|---|---|

| For calendar plan year 2017 or fiscal plan year beginning 05/01/2017 and ending 12/31/2017 |
|---|

| **A** Name of plan<br>STRATEGIC ESOP | **B** Three-digit<br>plan number<br>(PN) ▶ | 002 |
|---|---|---|

| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>STRATEGIC FINANCIAL SOLUTIONS, LLC | **D** Employer Identification Number (EIN)<br>▇▇▇▇▇▇ |
|---|---|

| **Part I** | **Distributions** |
|---|---|

All references to distributions relate only to payments of benefits during the plan year.

**1** Total value of distributions paid in property other than in cash or the forms of property specified in the instructions ...................................................................................................... | **1** | 0

**2** Enter the EIN(s) of payor(s) who paid benefits on behalf of the plan to participants or beneficiaries during the year (if more than two, enter EINs of the two payors who paid the greatest dollar amounts of benefits):

EIN(s): _____ _____

**Profit-sharing plans, ESOPs, and stock bonus plans, skip line 3.**

**3** Number of participants (living or deceased) whose benefits were distributed in a single sum, during the plan year ...................................................................................................... | **3** |

| **Part II** | **Funding Information** (If the plan is not subject to the minimum funding requirements of section 412 of the Internal Revenue Code or ERISA section 302, skip this Part.) |
|---|---|

**4** Is the plan administrator making an election under Code section 412(d)(2) or ERISA section 302(d)(2)? ........................... ☐ Yes ☐ No ☐ N/A

**If the plan is a defined benefit plan, go to line 8.**

**5** If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions and enter the date of the ruling letter granting the waiver. Date: Month _____ Day _____ Year _____

**If you completed line 5, complete lines 3, 9, and 10 of Schedule MB and do not complete the remainder of this schedule.**

**6 a** Enter the minimum required contribution for this plan year (include any prior year accumulated funding deficiency not waived) ...................................................................................................... | **6a** |

   **b** Enter the amount contributed by the employer for the plan for this plan year ......................................... | **6b** |

   **c** Subtract the amount in line 6b from the amount in line 6a. Enter the result (enter a minus sign to the left of a negative amount) ...................................................... | **6c** |

**If you completed line 6c, skip lines 8 and 9.**

**7** Will the minimum funding amount reported on line 6c be met by the funding deadline? .................................... ☐ Yes ☐ No ☐ N/A

**8** If a change in actuarial cost method was made for this plan year pursuant to a revenue procedure or other authority providing automatic approval for the change or a class ruling letter, does the plan sponsor or plan administrator agree with the change? ...................................................................................................... ☐ Yes ☐ No ☐ N/A

| **Part III** | **Amendments** |
|---|---|

**9** If this is a defined benefit pension plan, were any amendments adopted during this plan year that increased or decreased the value of benefits? If yes, check the appropriate box. If no, check the "No" box. ☐ Increase ☐ Decrease ☐ Both ☐ No

| **Part IV** | **ESOPs** (see instructions). If this is not a plan described under section 409(a) or 4975(e)(7) of the Internal Revenue Code, skip this Part. |
|---|---|

**10** Were unallocated employer securities or proceeds from the sale of unallocated securities used to repay any exempt loan? ................ ☐ Yes ☒ No

**11 a** Does the ESOP hold any preferred stock? ...................................................................................................... ☐ Yes ☒ No

   **b** If the ESOP has an outstanding exempt loan with the employer as lender, is such loan part of a "back-to-back" loan? (See instructions for definition of "back-to-back" loan.) ...................................................................................................... ☐ Yes ☒ No

**12** Does the ESOP hold any stock that is not readily tradable on an established securities market? ........................... ☒ Yes ☐ No

For Paperwork Reduction Act Notice, see the Instructions for Form 5500. **Schedule R (Form 5500) 2017**
v. 170203

Exhibit 08-0138

**DSL 005437**

A-2418

Schedule R (Form 5500) 2017

Page **2 -** ☐ 1

| **Part V** | **Additional Information for Multiemployer Defined Benefit Pension Plans** |
|---|---|

**13** Enter the following information for each employer that contributed more than 5% of total contributions to the plan during the plan year (measured in dollars). See instructions. *Complete as many entries as needed to report all applicable employers.*

**a** Name of contributing employer

**b** EIN       **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month   Day   Year

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1) Contribution rate (in dollars and cents) _____
   (2) Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer

**b** EIN       **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month   Day   Year

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1) Contribution rate (in dollars and cents) _____
   (2) Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer

**b** EIN       **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month   Day   Year

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1) Contribution rate (in dollars and cents) _____
   (2) Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer

**b** EIN       **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month   Day   Year

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1) Contribution rate (in dollars and cents) _____
   (2) Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer

**b** EIN       **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month   Day   Year

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1) Contribution rate (in dollars and cents) _____
   (2) Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer

**b** EIN       **c** Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month   Day   Year

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1) Contribution rate (in dollars and cents) _____
   (2) Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

Exhibit 08-0139

DSL 005438

A-2419

Schedule R (Form 5500) 2017                                              Page **3**

| 14 | Enter the number of participants on whose behalf no contributions were made by an employer as an employer of the participant for: | | |
|---|---|---|---|
| **a** | The current year | **14a** | |
| **b** | The plan year immediately preceding the current plan year | **14b** | |
| **c** | The second preceding plan year | **14c** | |
| 15 | Enter the ratio of the number of participants under the plan on whose behalf no employer had an obligation to make an employer contribution during the current plan year to: | | |
| **a** | The corresponding number for the plan year immediately preceding the current plan year | **15a** | |
| **b** | The corresponding number for the second preceding plan year | **15b** | |
| 16 | Information with respect to any employers who withdrew from the plan during the preceding plan year: | | |
| **a** | Enter the number of employers who withdrew during the preceding plan year | **16a** | |
| **b** | If line 16a is greater than 0, enter the aggregate amount of withdrawal liability assessed or estimated to be assessed against such withdrawn employers | **16b** | |
| 17 | If assets and liabilities from another plan have been transferred to or merged with this plan during the plan year, check box and see instructions regarding supplemental information to be included as an attachment. ...................................................................................................... ☐ | | |

| **Part VI** | **Additional Information for Single-Employer and Multiemployer Defined Benefit Pension Plans** |
|---|---|

18  If any liabilities to participants or their beneficiaries under the plan as of the end of the plan year consist (in whole or in part) of liabilities to such participants and beneficiaries under two or more pension plans as of immediately before such plan year, check box and see instructions regarding supplemental information to be included as an attachment ...................................................................................... ☐

19  If the total number of participants is 1,000 or more, complete lines (a) through (c)

    **a**  Enter the percentage of plan assets held as:

        Stock: _____ %  Investment-Grade Debt: _____%  High-Yield Debt: _____%  Real Estate: _____%  Other: _____%

    **b**  Provide the average duration of the combined investment-grade and high-yield debt:

        ☐ 0-3 years  ☐ 3-6 years  ☐ 6-9 years  ☐ 9-12 years  ☐ 12-15 years  ☐ 15-18 years  ☐ 18-21 years  ☐ 21 years or more

    **c**  What duration measure was used to calculate line 19(b)?

        ☐ Effective duration  ☐ Macaulay duration  ☐ Modified duration  ☐ Other (specify):

Exhibit 08-0140

**DSL 005439**

A-2420

**AUDITED**
**FINANCIAL STATEMENTS**

# STRATEGIC ESOP

**DECEMBER 31, 2017**

Exhibit 08-0141

**DSL 005440**

A-2421

**STRATEGIC ESOP**

**CONTENTS**

| | Page |
|---|---|
| **Independent Auditor's Report**........................................................................ | 1 - 2 |
| **Financial Statements:** | |
| Statement of Net Assets (Deficit) Available for Benefits............................ | 3 |
| Statement of Changes in Net Assets (Deficit) Available for Benefits ....................... | 4 |
| **Notes to Financial Statements**........................................................................ | 5 - 11 |
| **Supplemental Schedule:** | |
| Schedule H, Line 4i - Schedule of Assets (Held at End of Year)............................ | 12 |

Exhibit 08-0142

**DSL 005441**

A-2422



**INDEPENDENT AUDITOR'S REPORT**

To the Participants and Administrator of
Strategic ESOP

**Report on the Financial Statements**

We have audited the accompanying financial statements of Strategic ESOP (the Plan), which comprise the statement of net assets (deficit) available for benefits as of December 31, 2017, and the related statement of changes in net assets (deficit) available for benefits for the eight month period then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets (deficit) available for benefits of the Plan as of December 31, 2017, and the changes in net assets (deficit) available for benefits for the period then ended, in accordance with accounting principles generally accepted in the United States of America.

1

Exhibit 08-0143

DSL 005442

A-2423

**Other Matter - Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental schedule of Schedule H, Line 4i - Schedule of Assets (Held at End of Year), as of December 31, 2017 is presented for the purpose of additional analysis and is not a required part of the financial statements but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

*Freed Maxick CPAs, P.C.*

Buffalo, New York
October 15, 2018

FreedMaxick CPAs PC.

2

Exhibit 08-0144
DSL 005443

A-2424

**STRATEGIC ESOP**

**STATEMENT OF NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**December 31, 2017**

|  | Allocated | Unallocated | Total |
|---|---|---|---|
| **Assets:** |  |  |  |
| Investment in Strategic Family, Inc. common stock, at fair value | $ 589,713 | $ 110,692,587 | $ 111,282,300 |
| **Receivables:** |  |  |  |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| **Total assets** | 589,713 | 116,692,587 | 117,282,300 |
| **Liabilities:** |  |  |  |
| Notes payable | - | 240,276,655 | 240,276,655 |
| **Total liabilities** | - | 240,276,655 | 240,276,655 |
| **Net assets (deficit) available for benefits** | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.

3

Exhibit 08-0145

**DSL 005444**

A-2425

**STRATEGIC ESOP**

**STATEMENT OF CHANGES IN NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**For the Eight Month Period Ended December 31, 2017**

| | Allocated | Unallocated | Total |
|---|---|---|---|
| **Sources of net assets:** | | | |
| Dividend income | $ - | $ 1,972,121 | $ 1,972,121 |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | 589,713 | - | - |
| Total sources of net assets | 589,713 | 7,972,121 | 7,972,121 |
| **Applications of net assets:** | | | |
| Interest expense | - | 19,909 | 19,909 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | - | 589,713 | - |
| Net depreciation in fair value of investments | - | 130,946,567 | 130,946,567 |
| Total applications of net assets | - | 131,556,189 | 130,966,476 |
| **Increase (decrease) in net assets available for benefits** | 589,713 | (123,584,068) | (122,994,355) |
| **Net assets (deficit) available for benefits:** | | | |
| Beginning of year | - | - | - |
| End of year | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.

4

Exhibit 08-0146

**DSL 005445**

A-2426

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 1. DESCRIPTION OF PLAN**

The following brief description of Strategic ESOP (Plan) is provided for general information purposes only. Participants should refer to the Plan agreement for complete information.

**General:** Strategic Financial Services, LLC (the Plan Sponsor) established the Strategic ESOP effective as of May 1, 2017. The plan operates as a leveraged employee stock ownership plan (ESOP) and is designed to comply with Section 4975(e)(7) and the regulations thereunder of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Plan is administered by the Strategic ESOP Committee comprising of one or more persons appointed by the Plan Sponsor. The trust department of an independent third-party is the Plan's trustee.

On December 28, 2017, the Plan purchased 54,900 shares of the Strategic Family, Inc.'s (the Company) common stock at a price of approximately $4,412 per share for an aggregate purchase price of $242,228,867. The stock is held in the Strategic Employee Stock Ownership Trust (the Trust), established by the Plan. The purchase was funded by the Trust signing notes payable to the former stockholders (the Lenders).

The notes payable are collateralized by the unallocated shares of common stock and are guaranteed by Strategic Family, Inc. The Lenders have no rights against shares of common stock once they are allocated to participants in accordance with the terms of the ESOP. Accordingly, the financial statements of the Plan as of December 31, 2017 and for the period then ended, present separately the assets and liabilities and changes therein pertaining to:

    a) the accounts of employees with vested rights in allocated common stock (allocated), and
    b) common stock not yet allocated to employees (unallocated).

**Eligibility:** Employees of the Plan Sponsor and its participating subsidiaries are generally eligible to participate in the Plan after one year of service, providing they worked at least 1,000 hours during such Plan year, and are aged 21. Participants who do not have at least 1,000 hours of service during such Plan year or are not employed on the last working day of a Plan year are generally not eligible for an allocation of Company contributions for such year.

For the 2017 plan year, the first year of operation for the Plan, all employees who had attained age twenty-one and were employed on the last day of the plan year were eligible to enter the plan as of the later of their date of employment or May 1, 2017, regardless of service requirement.

**Contributions:** The Company is obligated to make contributions in cash or company stock to the Plan which, when aggregated with the Plan's dividends, equal the amount necessary to enable the Plan to make its regularly scheduled payments of principal and interest due on its notes payable. Employee contributions are not permitted.

**Payment of Benefits:** Distributions on account of death, disability, or retirement are made in a lump sum in the Plan year following the event. Distributions for other separations from service must commence no later than one year after the fifth Plan year following the separation from service. The amount to be distributed is based upon the immediately preceding valuation date. Distributions are made in cash or, if a participant elects, in the form of Company common stock plus cash for any fractional share of common stock. Under the provisions of the Plan, the Company is obligated to repurchase participant shares, which have been distributed under the terms of the Plan if the shares are not publicly traded or if the shares are subject to trading limitations.

**Administrative Expenses:** As provided in the Plan agreement, administrative expenses may be paid either by the Plan or by the Company. The Company paid the operating expenses for the Plan in 2017.

5

Exhibit 08-0147

**DSL 005446**

A-2427

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

---

**NOTE 1. DESCRIPTION OF PLAN (CONTINUED)**

**Voting Rights:** Each participant is entitled to exercise voting rights attributable to the shares allocated to his or her account and is notified by the Trustee prior to the time that such rights are to be exercised. The Trustee is not permitted to vote any allocated share for which instructions have not been given by a participant. The Trustee is required, however, to vote any unallocated shares on behalf of the collective best interest of plan participants and beneficiaries.

**Participant Accounts:** The Plan is a defined contribution plan under which a separate individual account is established for each participant. Each participant's account is credited as of the last day of each Plan year with an allocation of shares of the Company's common stock released by the Trustee from the unallocated account and forfeitures of terminated participants' non-vested accounts. Only those participants who are eligible employees of the Plan Sponsor and its subsidiaries as of the last day of the Plan year will receive an allocation. Allocations are based on a participant's eligible compensation, relative to total eligible compensation. Plan earnings are allocated to each participant's account based on the ratio of the participant's account balance.

**Plan Termination:** The Plan Sponsor reserves the right to terminate the Plan at any time, subject to Plan provisions. Upon termination of the Plan, the Strategic ESOP Committee directs the Trustee to pay all liabilities and expenses of the ESOP and to sell shares of financed common stock held as collateral to the extent it determines such sale is necessary in order to repay the loan. Subsequently, the interest of each participant in the trust fund will be distributed to such participant or his or her beneficiary at the time prescribed by the Plan terms and the Internal Revenue Code.

**Vesting:** If a participant's employment with the Plan Sponsor and its subsidiaries ends for any reason other than retirement, permanent disability, or death, he or she will vest in the balances in his or her account based on total years of services with the company. Vesting of ownership benefits is based on the following schedule:

| Years of Service | Percentage Vested |
|:---:|:---:|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

**Put Option:** Under Federal income tax regulations, the employer stock that is held by the Plan and its participants and is not readily tradable on an established market, or is subject to trading limitations, includes a put option. The put option is a right to demand that the Company buy any shares of its stock distributed to participants for which there is a limited or no market. The put price is representative of the current appraised value of the stock. The Company can pay for the purchase with interest over a period of five years. The purpose of the put option is to ensure that the participant has the ability to ultimately obtain cash.

**Diversification:** Diversification is offered to participants close to retirement so that they may have the opportunity to move part of the value of their investment in Company stock into investments that are more diversified. Participants who are at least age 55 with at least 10 years of participation in the Plan may elect to diversify a portion of their account. Diversification is offered to each eligible participant over a six-year period. In each of the first five years, a participant may diversify up to 25 percent of his or her account. In the sixth year, the participant may diversify up to 50 percent of the undiversified balance. Participants who elect to diversify receive a cash distribution. The election to diversify is made subsequent to year end based upon the shares of employer stock in the participant's account at year end.

**Forfeitures:** Plan forfeitures are held in a forfeiture account until the fifth anniversary of the participant's break in service. After this time, the forfeitures are allocated to current participants' account based on the ratio of the participant's compensation to total participants' compensation for the Plan year. There were no forfeitures allocated to participants during December 31, 2017.

6

Exhibit 08-0148

DSL 005447

A-2428

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Accounting:**  The financial statements of the Plan are prepared on the accrual basis of accounting.

**Use of Estimates:**  The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, and changes therein, and disclosure of contingent assets and liabilities. Actual results could differ from those estimates.

**Allocations:** The financial statements of the Plan present separately the assets and liabilities and changes therein pertaining to (a) the accounts of employees with rights in allocated stock ("allocated") and (b) stock not yet allocated to employees ("unallocated"), including shares that are committed to be released. Shares are released from collateral and become allocated generally in the period in which debt service is actually paid.

**Risks and Uncertainties**:  The Plan investments consist solely of the Strategic Family, Inc.'s common stock, which is exposed to various risks, such as interest rate, market, and credit risks, as well as valuation assumptions based on earnings, cash flows and/or other such techniques.  Due to the level of risk associated with the investment in the common stock and to uncertainties inherent in estimates and assumptions, it is at least reasonably possible that changes in the value of the common stock will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits.

**Investment Valuation and Income Recognition:**  The shares of Company common stock are reported at fair value.  See Note 5 for a discussion of fair value measurements. Dividend income is accrued on the ex-dividend date. Purchases and sales of securities are recorded on a trade-date basis. Realized gains and losses from security transactions are reported on the average cost method. Net depreciation in fair value of investments includes the Plan's gains and losses on investments bought and sold as well as held during the year.

**Payment of Benefits:**  Benefits are recorded when paid.

**NOTE 3. CONTRIBUTION RECEIVABLE**

In December 2017, the Plan Sponsor committed to making a contribution of $6,000,000 to the Plan with payment to be made on or before September 15, 2018.   As a result, the Plan accrued a contribution receivable to the Plan at December 31, 2017 which is presented as unallocated until paid.  Upon payment in 2018 the contribution was applied to the notes payable and released 885.125 shares to participants.  For financial reporting purposes, these shares are not released from serving as collateral for the Plan's debt until debt payment is actually made, and as such the shares are shown on the attached statement of net assets (deficit) available for benefits as unallocated. However, for participant accounting purposes, the shares are considered to be allocated to participants as the participants have a beneficial interest in the contribution receivable.  This results in a difference between the amount reported on the financial statements as net assets allocated to participants and the participant records.

**NOTE 4. TAX STATUS**

The Plan has been designed to be an employee stock ownership plan within the meaning of Section 4975(e) (7) of the Internal Revenue Code of 1986, as amended (the Code), and section 407(d) (6) of the Employee Retirement  Income Security Act of 1974, as amended (ERISA). The Plan is in the process of applying for a determination letter from the Internal Revenue Service (IRS) to obtain approval that a) the Plan is qualified, under the  Code and, therefore, b) that the related trust is exempt from taxation.  Once qualified, the Plan is required to operate in conformity with the Code to maintain its qualification.  The Strategic ESOP Committee believes that the Plan is currently designed, and being operated, in compliance with the applicable requirement of the Code.  Therefore Strategic ESOP Committee believes that the Plan was qualified, and the related trust was tax-exempt as of the financial statement date.

Exhibit 08-0149

**DSL 005448**

A-2429

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

---

**NOTE 4. TAX STATUS (CONTINUED)**

Accounting principles generally accepted in the United States of America require plan management to evaluate tax positions taken by the plan and recognize a tax liability if the organization has taken a significant uncertain position that more likely than not would not be sustained upon examination by the IRS. The Plan is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any tax periods in progress.

**NOTE 5. INVESTMENTS**

The Plan's investments, at December 31, 2017 are presented in the following table:

|                                      | **Allocated**  | **Unallocated**   |
|--------------------------------------|----------------|-------------------|
| Strategic Family, Inc. common stock: |                |                   |
| Number of shares                     | 290 929        | 54 609 071        |
| Cost                                 | $ 1,283,658    | $ 240,945,209     |
| Estimated fair value                 | $ 589,713      | $ 110,692,587     |

**NOTE 6. FAIR VALUE MEASUREMENTS**

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1) and the lowest priority to unobservable inputs (level 3). The three levels of the fair value hierarchy under FASB ASC 820 are described as follows:

Level 1: Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access.

Level 2: Inputs to the valuation methodology include
- Quoted prices for similar assets or liabilities in active markets;
- Quoted prices for identical or similar assets or liabilities in inactive markets;
- Inputs other than quoted prices that are observable for the asset or liability;
- Inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for substantially the full term of the asset or liability.

Level 3: Inputs to the valuation methodology are unobservable and significant in the fair value measurement.

The asset or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

8

Exhibit 08-0150

DSL 005449

A-2430

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)**

The following table sets forth by level, within the fair value hierarchy, the Plan's assets at fair value as of December 31, 2017:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | **Assets at Fair Value as of December 31, 2017** | | | |
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 111,282,300 | $ 111,282,300 |
| Investments at fair value | $ - | $ - | $ 111,282,300 | $ 111,282,300 |

**Changes in Fair Value of Level 3 Assets and Related Gains and Losses**

The following table sets forth a summary of changes in the fair value of the Plan's level 3 assets for the year ended December 31, 2017:

| | Level 3 Assets Investment in Strategic Family, Inc. Common Stock |
|---|---|
| Balance, May 1, 2017 | $ - |
| Purchases | 242,228,867 |
| Realized gains/losses | - |
| Unrealized (depreciation) in estimated fair value | (130,946,567) |
| Balance, December 31, 2017 | $ 111,282,300 |

Unrealized losses included in changes in net assets for the period above are reported in net depreciation in fair value of investments in the Statements of Changes in Net Assets (Deficit) Available for Benefits.

Following is a description of the valuation methodologies used for assets measured at fair value. There have been no changes in the methodologies used at December 31, 2017.

Strategic Family, Inc. common stock held by the Plan is valued at fair value based upon an independent appraisal. This appraised value was calculated using income based valuation techniques as illustrated in the following table.

| Instrument | Fair Value | Principal Valuation Technique | Unobservable Inputs |
|---|---|---|---|
| Strategic Family, Inc. common stock | $111,282,300 | Income Approach<br><br>- Discounted Cash Flow Method (1/3 weighting)<br><br>- Discounted Cash Flow (modified) (2/3 weighting) | EBITDA<br>Net income<br>Weighted average cost of capital<br>Discount rate<br>Discount for lack of marketability |

9

Exhibit 08-0151

DSL 005450

A-2431

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)**

The valuation process involves the selection of an independent appraiser. Plan management accumulates the data for the appraiser from the financial statements of the Company. The appraiser prepares a report of estimated per share value. Plan management, along with the ESOP trustee, reviews in detail, discusses and approves the appraiser's preliminary report.

The valuation methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, although the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

**NOTE 7. LOAN PAYABLE**

In December 2017, the Plan entered into multiple loan note agreements with the former stockholders of Strategic Family, Inc. for an aggregate value of $242,228,867 in exchange for 75% (54,900 shares) of the Company's outstanding common stock. The Company repurchased and cancelled the remaining 25% of its outstanding common stock. Unallocated shares held by the Plan are collateral for the notes payable. Shares are released from collateral and allocated to participants as payments of principal and interest are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year principal and interest payments divided by the total of all prior and future years' principal and interest payments.

This resulted in 290.929 shares being released and allocated for the Plan year ended December 31, 2017.

The loan note agreements provide for the loan to be repaid over 30 years and they bear interest at 3.00%.

The minimum required payment schedule for the notes is as follows:

| | |
|---|---:|
| 2018 | $ 7,000,000 |
| 2019 | 9,500,000 |
| 2020 | 10,875,000 |
| 2021 | 11,000,000 |
| 2022 | 12,000,000 |
| Subsequent to 2022 | 189,901,655 |
| | $ 240,276,655 |

**NOTE 8. COMPANY DIVIDENDS**

The Company paid a dividend to the ESOP of $35.92 per share or $1,972,120 during the period ended December 31, 2017. The entire dividend related to unallocated shares and was applied in full to debt service.

**NOTE 9. RELATED PARTY AND PARTY IN INTEREST TRANSACTIONS**

The Plan invests in Company common stock and has indebtedness to the former stockholders for the loan used to purchase the Company stock. These are related party and party in interest transactions. As described in Note 1, the Company pays all plan expenses. The Plan has a number of service providers. Such providers are parties in interest under ERISA.

Exhibit 08-0152

DSL 005451

A-2432

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 10. RECONCILIATION TO 5500**

|  | 2017 |
|---|---|
| Net assets (deficit) available for benefits per the financial statements | $ (122,994,355) |
| Differences in: Accrued interest expense payable | (1,775,400) |
| Net assets (deficit) available for benefits per the Form 5500 | $ (124,769,755) |

The following is a reconciliation of the change in net assets available for benefits per the financial statements for the years ended December 31, 2017 Form 5500:

|  | 2017 |
|---|---|
| Increase in net assets per financial statements | $ (122,994,355) |
| Less: Interest expense | (1,775,400) |
| Increase in net assets per Form 5500 | $ (124,769,755) |

**NOTE 11. SUBSEQUENT EVENTS**

**Refinancing of notes payable to former stockholders**: On April 30, 2018, under the terms of an Assumption Agreement signed by the Company in conjunction with the formation of the Plan, the Company unconditionally assumed all obligations of the ESOP Trust under the notes payable to former stockholders. In return, the ESOP Trust signed a refinanced (internal) note payable to the Company in the amount of $235,052,055 (the total amount of the notes payable to former stockholders at the date of signing). The terms of the refinanced (internal) note include a requirement to make 30 payments of principal and interest with certain minimum payments each year, with the balance of the notes being payable on December 31, 2046. Interest will accrue at 3.04% per annum.

Also pursuant to the Assumption Agreement, the Company issued notes payable to the former stockholders in the amount of $235,052,055. These terms of these notes payable require interest to accrue daily at an annual rate of 3.04%. There is no defined repayment term, but the notes mature and are payable in full on December 31, 2028.

These financial statements have not been updated for subsequent events occurring after October 15, 2018, which is the date these financial statements were available to be issued.

Exhibit 08-0153

DSL 005452

A-2433

**STRATEGIC ESOP**

**SCHEDULE H, LINE 4i - SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
**EIN #:** ▮▮▮▮
**Plan #:** 002
**December 31, 2017**

| (a) | (b)<br>Identity<br>of Issuer | (c)<br>Description of Investment | (d)<br>Cost | (e)<br>Fair<br>Value |
|---|---|---|---|---|
|   | Common Stock:<br>Strategic Family, Inc. |   |   |   |
| * |   | 54,900 shares of common stock | $ 242,228,867 | $ 111,282,300 |
|   |   |   | $ 242,228,867 | $ 111,282,300 |

\* Represents party in interest.

12

DSL 005453

Exhibit 08-0154

A-2434

**AUDITED**
**FINANCIAL STATEMENTS**

# STRATEGIC ESOP

**DECEMBER 31, 2017**

Exhibit 08-0155
DSL 005454

A-2435

**STRATEGIC ESOP**

**CONTENTS**

|  | Page |
|---|---|
| **Independent Auditor's Report**.................................................... | 1 - 2 |
| **Financial Statements:** | |
| Statement of Net Assets (Deficit) Available for Benefits........................... | 3 |
| Statement of Changes in Net Assets (Deficit) Available for Benefits ..................... | 4 |
| **Notes to Financial Statements**.................................................. | 5 - 11 |
| **Supplemental Schedule:** | |
| Schedule H, Line 4i - Schedule of Assets (Held at End of Year)............................ | 12 |

Exhibit 08-0156

**DSL 005455**

A-2436



## INDEPENDENT AUDITOR'S REPORT

To the Participants and Administrator of
Strategic ESOP

**Report on the Financial Statements**

We have audited the accompanying financial statements of Strategic ESOP (the Plan), which comprise the statement of net assets (deficit) available for benefits as of December 31, 2017, and the related statement of changes in net assets (deficit) available for benefits for the eight month period then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the net assets (deficit) available for benefits of the Plan as of December 31, 2017, and the changes in net assets (deficit) available for benefits for the period then ended, in accordance with accounting principles generally accepted in the United States of America.

1

Exhibit 08-0157

DSL 005456

A-2437

**Other Matter - Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental schedule of Schedule H, Line 4i - Schedule of Assets (Held at End of Year), as of December 31, 2017 is presented for the purpose of additional analysis and is not a required part of the financial statements but is supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974. Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

*Freed Maxick CPAs, P.C.*

Buffalo, New York
October 15, 2018

FreedMaxick CPAs PC

Exhibit 08-0158

DSL 005457

A-2438

**STRATEGIC ESOP**

**STATEMENT OF NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**December 31, 2017**

|  | Allocated | Unallocated | Total |
|---|---|---|---|
| **Assets:** |  |  |  |
| Investment in Strategic Family, Inc. common stock, at fair value | $ 589,713 | $ 110,692,587 | $ 111,282,300 |
| **Receivables:** |  |  |  |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| **Total assets** | 589,713 | 116,692,587 | 117,282,300 |
| **Liabilities:** |  |  |  |
| Notes payable | - | 240,276,655 | 240,276,655 |
| **Total liabilities** | - | 240,276,655 | 240,276,655 |
| **Net assets (deficit) available for benefits** | $ 589,713 | $ (123,584,068) | $ (122,994,355) |

The accompanying notes are an integral part of these financial statements.

3

Exhibit 08-0159

**DSL 005458**

A-2439

**STRATEGIC ESOP**

**STATEMENT OF CHANGES IN NET ASSETS (DEFICIT) AVAILABLE FOR BENEFITS**
**For the Eight Month Period Ended December 31, 2017**

| | Allocated | Unallocated | Total |
|---|---|---|---|
| **Sources of net assets:** | | | |
| Dividend income | $          - | $     1,972,121 | $     1,972,121 |
| Employer contributions | - | 6,000,000 | 6,000,000 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | 589,713 | - | - |
| Total sources of net assets | 589,713 | 7,972,121 | 7,972,121 |
| **Applications of net assets:** | | | |
| Interest expense | - | 19,909 | 19,909 |
| Allocation of 290.929 shares of common stock of Strategic Family, Inc. at fair value | - | 589,713 | - |
| Net depreciation in fair value of investments | - | 130,946,567 | 130,946,567 |
| Total applications of net assets | - | 131,556,189 | 130,966,476 |
| **Increase (decrease) in net assets available for benefits** | 589,713 | (123,584,068) | (122,994,355) |
| **Net assets (deficit) available for benefits:** | | | |
| Beginning of year | - | - | - |
| End of year | $      589,713 | $  (123,584,068) | $  (122,994,355) |

The accompanying notes are an integral part of these financial statements.

4

Exhibit 08-0160

DSL 005459

A-2440

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 1. DESCRIPTION OF PLAN**

The following brief description of Strategic ESOP (Plan) is provided for general information purposes only. Participants should refer to the Plan agreement for complete information.

**General:** Strategic Financial Services, LLC (the Plan Sponsor) established the Strategic ESOP effective as of May 1, 2017. The plan operates as a leveraged employee stock ownership plan (ESOP) and is designed to comply with Section 4975(e)(7) and the regulations thereunder of the Internal Revenue Code of 1986, as amended (IRC), and is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA). The Plan is administered by the Strategic ESOP Committee comprising of one or more persons appointed by the Plan Sponsor. The trust department of an independent third-party is the Plan's trustee.

On December 28, 2017, the Plan purchased 54,900 shares of the Strategic Family, Inc.'s (the Company) common stock at a price of approximately $4,412 per share for an aggregate purchase price of $242,228,867. The stock is held in the Strategic Employee Stock Ownership Trust (the Trust), established by the Plan. The purchase was funded by the Trust signing notes payable to the former stockholders (the Lenders).

The notes payable are collateralized by the unallocated shares of common stock and are guaranteed by Strategic Family, Inc. The Lenders have no rights against shares of common stock once they are allocated to participants in accordance with the terms of the ESOP. Accordingly, the financial statements of the Plan as of December 31, 2017 and for the period then ended, present separately the assets and liabilities and changes therein pertaining to:

    a) the accounts of employees with vested rights in allocated common stock (allocated), and
    b) common stock not yet allocated to employees (unallocated).

**Eligibility:** Employees of the Plan Sponsor and its participating subsidiaries are generally eligible to participate in the Plan after one year of service, providing they worked at least 1,000 hours during such Plan year, and are aged 21. Participants who do not have at least 1,000 hours of service during such Plan year or are not employed on the last working day of a Plan year are generally not eligible for an allocation of Company contributions for such year.

For the 2017 plan year, the first year of operation for the Plan, all employees who had attained age twenty-one and were employed on the last day of the plan year were eligible to enter the plan as of the later of their date of employment or May 1, 2017, regardless of service requirement.

**Contributions:** The Company is obligated to make contributions in cash or company stock to the Plan which, when aggregated with the Plan's dividends, equal the amount necessary to enable the Plan to make its regularly scheduled payments of principal and interest due on its notes payable. Employee contributions are not permitted.

**Payment of Benefits:** Distributions on account of death, disability, or retirement are made in a lump sum in the Plan year following the event. Distributions for other separations from service must commence no later than one year after the fifth Plan year following the separation from service. The amount to be distributed is based upon the immediately preceding valuation date. Distributions are made in cash or, if a participant elects, in the form of Company common stock plus cash for any fractional share of common stock. Under the provisions of the Plan, the Company is obligated to repurchase participant shares, which have been distributed under the terms of the Plan if the shares are not publicly traded or if the shares are subject to trading limitations.

**Administrative Expenses:** As provided in the Plan agreement, administrative expenses may be paid either by the Plan or by the Company. The Company paid the operating expenses for the Plan in 2017.

5

Exhibit 08-0161

**DSL 005460**

A-2441

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

### NOTE 1. DESCRIPTION OF PLAN (CONTINUED)

**Voting Rights:** Each participant is entitled to exercise voting rights attributable to the shares allocated to his or her account and is notified by the Trustee prior to the time that such rights are to be exercised. The Trustee is not permitted to vote any allocated share for which instructions have not been given by a participant. The Trustee is required, however, to vote any unallocated shares on behalf of the collective best interest of plan participants and beneficiaries.

**Participant Accounts:** The Plan is a defined contribution plan under which a separate individual account is established for each participant. Each participant's account is credited as of the last day of each Plan year with an allocation of shares of the Company's common stock released by the Trustee from the unallocated account and forfeitures of terminated participants' non-vested accounts. Only those participants who are eligible employees of the Plan Sponsor and its subsidiaries as of the last day of the Plan year will receive an allocation. Allocations are based on a participant's eligible compensation, relative to total eligible compensation. Plan earnings are allocated to each participant's account based on the ratio of the participant's account balance.

**Plan Termination:** The Plan Sponsor reserves the right to terminate the Plan at any time, subject to Plan provisions. Upon termination of the Plan, the Strategic ESOP Committee directs the Trustee to pay all liabilities and expenses of the ESOP and to sell shares of financed common stock held as collateral to the extent it determines such sale is necessary in order to repay the loan. Subsequently, the interest of each participant in the trust fund will be distributed to such participant or his or her beneficiary at the time prescribed by the Plan terms and the Internal Revenue Code.

**Vesting:** If a participant's employment with the Plan Sponsor and its subsidiaries ends for any reason other than retirement, permanent disability, or death, he or she will vest in the balances in his or her account based on total years of services with the company. Vesting of ownership benefits is based on the following schedule:

| Years of Service | Percentage Vested |
|:---:|:---:|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

**Put Option:** Under Federal income tax regulations, the employer stock that is held by the Plan and its participants and is not readily tradable on an established market, or is subject to trading limitations, includes a put option. The put option is a right to demand that the Company buy any shares of its stock distributed to participants for which there is a limited or no market. The put price is representative of the current appraised value of the stock. The Company can pay for the purchase with interest over a period of five years. The purpose of the put option is to ensure that the participant has the ability to ultimately obtain cash.

**Diversification:** Diversification is offered to participants close to retirement so that they may have the opportunity to move part of the value of their investment in Company stock into investments that are more diversified. Participants who are at least age 55 with at least 10 years of participation in the Plan may elect to diversify a portion of their account. Diversification is offered to each eligible participant over a six-year period. In each of the first five years, a participant may diversify up to 25 percent of his or her account. In the sixth year, the participant may diversify up to 50 percent of the undiversified balance. Participants who elect to diversify receive a cash distribution. The election to diversify is made subsequent to year end based upon the shares of employer stock in the participant's account at year end.

**Forfeitures:** Plan forfeitures are held in a forfeiture account until the fifth anniversary of the participant's break in service. After this time, the forfeitures are allocated to current participants' account based on the ratio of the participant's compensation to total participants' compensation for the Plan year. There were no forfeitures allocated to participants during December 31, 2017.

6

Exhibit 08-0162

**DSL 005461**

A-2442

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

---

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Accounting:** The financial statements of the Plan are prepared on the accrual basis of accounting.

**Use of Estimates:** The preparation of financial statements in accordance with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, and changes therein, and disclosure of contingent assets and liabilities. Actual results could differ from those estimates.

**Allocations:** The financial statements of the Plan present separately the assets and liabilities and changes therein pertaining to (a) the accounts of employees with rights in allocated stock ("allocated") and (b) stock not yet allocated to employees ("unallocated"), including shares that are committed to be released. Shares are released from collateral and become allocated generally in the period in which debt service is actually paid.

**Risks and Uncertainties**: The Plan investments consist solely of the Strategic Family, Inc.'s common stock, which is exposed to various risks, such as interest rate, market, and credit risks, as well as valuation assumptions based on earnings, cash flows and/or other such techniques. Due to the level of risk associated with the investment in the common stock and to uncertainties inherent in estimates and assumptions, it is at least reasonably possible that changes in the value of the common stock will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits.

**Investment Valuation and Income Recognition:** The shares of Company common stock are reported at fair value. See Note 5 for a discussion of fair value measurements. Dividend income is accrued on the ex-dividend date. Purchases and sales of securities are recorded on a trade-date basis. Realized gains and losses from security transactions are reported on the average cost method. Net depreciation in fair value of investments includes the Plan's gains and losses on investments bought and sold as well as held during the year.

**Payment of Benefits:** Benefits are recorded when paid.


**NOTE 3. CONTRIBUTION RECEIVABLE**

In December 2017, the Plan Sponsor committed to making a contribution of $6,000,000 to the Plan with payment to be made on or before September 15, 2018. As a result, the Plan accrued a contribution receivable to the Plan at December 31, 2017 which is presented as unallocated until paid. Upon payment in 2018 the contribution was applied to the notes payable and released 885.125 shares to participants. For financial reporting purposes, these shares are not released from serving as collateral for the Plan's debt until debt payment is actually made, and as such the shares are shown on the attached statement of net assets (deficit) available for benefits as unallocated. However, for participant accounting purposes, the shares are considered to be allocated to participants as the participants have a beneficial interest in the contribution receivable. This results in a difference between the amount reported on the financial statements as net assets allocated to participants and the participant records.


**NOTE 4. TAX STATUS**

The Plan has been designed to be an employee stock ownership plan within the meaning of Section 4975(e) (7) of the Internal Revenue Code of 1986, as amended (the Code), and section 407(d) (6) of the Employee Retirement Income Security Act of 1974, as amended (ERISA). The Plan is in the process of applying for a determination letter from the Internal Revenue Service (IRS) to obtain approval that a) the Plan is qualified, under the Code and, therefore, b) that the related trust is exempt from taxation. Once qualified, the Plan is required to operate in conformity with the Code to maintain its qualification. The Strategic ESOP Committee believes that the Plan is currently designed, and being operated, in compliance with the applicable requirement of the Code. Therefore Strategic ESOP Committee believes that the Plan was qualified, and the related trust was tax-exempt as of the financial statement date.

7

Exhibit 08-0163

**DSL 005462**

A-2443

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

---

## NOTE 4. TAX STATUS (CONTINUED)

Accounting principles generally accepted in the United States of America require plan management to evaluate tax positions taken by the plan and recognize a tax liability if the organization has taken a significant uncertain position that more likely than not would not be sustained upon examination by the IRS. The Plan is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any tax periods in progress.

## NOTE 5. INVESTMENTS

The Plan's investments, at December 31, 2017 are presented in the following table:

|  | **Allocated** | **Unallocated** |
|---|---|---|
| Strategic Family, Inc. common stock: |  |  |
| Number of shares | 290 929 | 54 609 071 |
| Cost | $ 1,283,658 | $ 240,945,209 |
| Estimated fair value | $ 589,713 | $ 110,692,587 |

## NOTE 6. FAIR VALUE MEASUREMENTS

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1) and the lowest priority to unobservable inputs (level 3). The three levels of the fair value hierarchy under FASB ASC 820 are described as follows:

Level 1: Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Plan has the ability to access.

Level 2: Inputs to the valuation methodology include
- Quoted prices for similar assets or liabilities in active markets;
- Quoted prices for identical or similar assets or liabilities in inactive markets;
- Inputs other than quoted prices that are observable for the asset or liability;
- Inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the Level 2 input must be observable for substantially the full term of the asset or liability.

Level 3: Inputs to the valuation methodology are unobservable and significant in the fair value measurement.

The asset or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

8

Exhibit 08-0164

**DSL 005463**

A-2444

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)**

The following table sets forth by level, within the fair value hierarchy, the Plan's assets at fair value as of December 31, 2017:

| | Assets at Fair Value as of December 31, 2017 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Investment in Strategic Family, Inc. common stock | $ - | $ - | $ 111,282,300 | $ 111,282,300 |
| Investments at fair value | $ - | $ - | $ 111,282,300 | $ 111,282,300 |

**Changes in Fair Value of Level 3 Assets and Related Gains and Losses**

The following table sets forth a summary of changes in the fair value of the Plan's level 3 assets for the year ended December 31, 2017:

| | Level 3 Assets Investment in Strategic Family, Inc. Common Stock |
|---|---|
| Balance, May 1, 2017 | $ - |
| Purchases | 242,228,867 |
| Realized gains/losses | - |
| Unrealized (depreciation) in estimated fair value | (130,946,567) |
| Balance, December 31, 2017 | $ 111,282,300 |

Unrealized losses included in changes in net assets for the period above are reported in net depreciation in fair value of investments in the Statements of Changes in Net Assets (Deficit) Available for Benefits.

Following is a description of the valuation methodologies used for assets measured at fair value. There have been no changes in the methodologies used at December 31, 2017.

Strategic Family, Inc. common stock held by the Plan is valued at fair value based upon an independent appraisal. This appraised value was calculated using income based valuation techniques as illustrated in the following table.

| Instrument | Fair Value | Principal Valuation Technique | Unobservable Inputs |
|---|---|---|---|
| Strategic Family, Inc. common stock | $111,282,300 | Income Approach<br><br>- Discounted Cash Flow Method (1/3 weighting)<br><br>- Discounted Cash Flow (modified) (2/3 weighting) | EBITDA<br>Net income<br>Weighted average cost of capital<br>Discount rate<br>Discount for lack of marketability |

9

Exhibit 08-0165

DSL 005464

A-2445

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 6. FAIR VALUE MEASUREMENTS (CONTINUED)**

The valuation process involves the selection of an independent appraiser. Plan management accumulates the data for the appraiser from the financial statements of the Company. The appraiser prepares a report of estimated per share value. Plan management, along with the ESOP trustee, reviews in detail, discusses and approves the appraiser's preliminary report.

The valuation methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, although the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

**NOTE 7. LOAN PAYABLE**

In December 2017, the Plan entered into multiple loan note agreements with the former stockholders of Strategic Family, Inc. for an aggregate value of $242,228,867 in exchange for 75% (54,900 shares) of the Company's outstanding common stock. The Company repurchased and cancelled the remaining 25% of its outstanding common stock. Unallocated shares held by the Plan are collateral for the notes payable. Shares are released from collateral and allocated to participants as payments of principal and interest are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year principal and interest payments divided by the total of all prior and future years' principal and interest payments.

This resulted in 290.929 shares being released and allocated for the Plan year ended December 31, 2017.

The loan note agreements provide for the loan to be repaid over 30 years and they bear interest at 3.00%.

The minimum required payment schedule for the notes is as follows:

| | |
|---|---:|
| 2018 | $ 7,000,000 |
| 2019 | 9,500,000 |
| 2020 | 10,875,000 |
| 2021 | 11,000,000 |
| 2022 | 12,000,000 |
| Subsequent to 2022 | 189,901,655 |
| | $ 240,276,655 |

**NOTE 8. COMPANY DIVIDENDS**

The Company paid a dividend to the ESOP of $35.92 per share or $1,972,120 during the period ended December 31, 2017. The entire dividend related to unallocated shares and was applied in full to debt service.

**NOTE 9. RELATED PARTY AND PARTY IN INTEREST TRANSACTIONS**

The Plan invests in Company common stock and has indebtedness to the former stockholders for the loan used to purchase the Company stock. These are related party and party in interest transactions. As described in Note 1, the Company pays all plan expenses. The Plan has a number of service providers. Such providers are parties in interest under ERISA.

10

Exhibit 08-0166

DSL 005465

A-2446

**STRATEGIC ESOP**

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 10. RECONCILIATION TO 5500**

|  | 2017 |
|---|---|
| Net assets (deficit) available for benefits per the financial statements | $ (122,994,355) |
| Differences in: Accrued interest expense payable | (1,775,400) |
| Net assets (deficit) available for benefits per the Form 5500 | $ (124,769,755) |

The following is a reconciliation of the change in net assets available for benefits per the financial statements for the years ended December 31, 2017 Form 5500:

|  | 2017 |
|---|---|
| Increase in net assets per financial statements | $ (122,994,355) |
| Less: Interest expense | (1,775,400) |
| Increase in net assets per Form 5500 | $ (124,769,755) |

**NOTE 11. SUBSEQUENT EVENTS**

**Refinancing of notes payable to former stockholders**: On April 30, 2018, under the terms of an Assumption Agreement signed by the Company in conjunction with the formation of the Plan, the Company unconditionally assumed all obligations of the ESOP Trust under the notes payable to former stockholders. In return, the ESOP Trust signed a refinanced (internal) note payable to the Company in the amount of $235,052,055 (the total amount of the notes payable to former stockholders at the date of signing). The terms of the refinanced (internal) note include a requirement to make 30 payments of principal and interest with certain minimum payments each year, with the balance of the notes being payable on December 31, 2046. Interest will accrue at 3.04% per annum.

Also pursuant to the Assumption Agreement, the Company issued notes payable to the former stockholders in the amount of $235,052,055. These terms of these notes payable require interest to accrue daily at an annual rate of 3.04%. There is no defined repayment term, but the notes mature and are payable in full on December 31, 2028.

These financial statements have not been updated for subsequent events occurring after October 15, 2018, which is the date these financial statements were available to be issued.

11

Exhibit 08-0167

**DSL 005466**

A-2447

**STRATEGIC ESOP**

**SCHEDULE H, LINE 4i - SCHEDULE OF ASSETS (HELD AT END OF YEAR)**
EIN #: ▮▮▮▮▮
Plan #: 002
December 31, 2017

| (a) | (b)<br>Identity<br>of Issuer | (c)<br>Description of Investment | (d)<br>Cost | (e)<br>Fair<br>Value |
|---|---|---|---|---|
| * | Common Stock:<br>Strategic Family, Inc. | 54,900 shares of common stock | $ 242,228,867 | $ 111,282,300 |
| | | | $ 242,228,867 | $ 111,282,300 |

\*    Represents party in interest.

12

Exhibit 08-0168

DSL 005467

A-2448

Page 1

1                    JAMS ARBITRATION
                  JAMS CASE NO. 1400018052
2

3

4   CHRISANNE PROULX,              )
                                   )
5            Claimant,             )    DEPOSITION OF:
                                   )
6        v.                        )    LAUREN MONTANILE
                                   )
7   ANCHOR LAW FIRM, PLLC, STACY   )
    ROBINSON, CORY MATTOCKS,       )
8                                  )
             Respondents.          )
9   _____

10

11            TRANSCRIPT of the stenographic notes of

12   the proceedings in the above-entitled matter as taken

13   by and before MARY ANN ADAMS, a Certified Court

14   Reporter and Notary Public of the State of New Jersey,

15   held at the office of SAUL, EWING, ARNSTEIN & LEHR,

16   LLP, One Riverfront Plaza, Newark, New Jersey, on

17   Thursday, January 9, 2020, commencing at 9:00 a.m.

18

19

20

21

22

23

24

25

Exhibit 08-0169

A-2449

```
                                              Page 6
 1   LAUREN MONTANILE, having been duly sworn by the
 2   Notary Public, testified as follows:
 3              MR. ICE:  Could I guess everyone make
 4   their appearances, please.
 5              Tom Ice on behalf of Plaintiff -- or
 6   Claimant, I should say.  It's an arbitration.
 7              MS. ICE:  Yes.  Ariane Ice on behalf of
 8   Chrisanne Proulx.
 9              MS. SHUPE:  Emily Shupe on behalf of the
10   Respondents.
11              MR. ICE:  Just so the court reporter
12   knows, the exhibits are already pre-marked, so that
13   should speed handing them over.
14   EXAMINATION BY MR. ICE:
15       Q.    All right.  I know you stated your name,
16   but could you state your full name for the record,
17   please?
18       A.    Sure.  Lauren Montanile.
19       Q.    No middle name?
20       A.    Ashley.
21       Q.    Have you ever been deposed before?
22       A.    No.
23       Q.    Your business address is 711 3rd Avenue,
24   6th Floor, New York, New York 10017?
25       A.    Yes.
```

Exhibit 08-0170

A-2450

Page 7

```
 1          Q.      You're a member of the New Jersey bar as
 2   of December 1st, 2015?
 3          A.      Yes.
 4          Q.      You're a member of the New York bar as
 5   of January 21st, 2016?
 6          A.      Yes.
 7          Q.      You are employed by Strategic Financial
 8   Solutions, LLC?
 9          A.      Yes.
10          Q.      When did you start there?
11          A.      May of 2017.
12          Q.      What was your title when you started?
13          A.      I believe it was just attorney.  My
14   title has changed a couple times.
15          Q.      How did you get that job?
16          A.      I responded to an ad on -- I believe it
17   was on Indeed.
18          Q.      On I'm sorry?
19          A.      On Indeed.
20          Q.      Who interviewed you?
21          A.      My former bosses at the time, it was
22   Rendi Yamashuka (ph.), I'm not sure if that's how
23   you pronounce his last name, and Shelby Tuszynski.
24          Q.      Were you interviewed for a particular
25   position?
```

Exhibit 08-0171

A-2451

Page 10

1   now we're talking about the LLC?

2       A.      Uh-hum.

3       Q.      Okay.

4               MS. SHUPE:  You have to answer with a

5   yes or no.

6       A.      Yes.  Sorry.

7       Q.      So in your first job, you were

8   considered an in-house attorney at Strategic?

9       A.      I believe -- as I stated, I believe the

10  title was just attorney.

11      Q.      Then were you promoted from that

12  position?

13      A.      Yes.

14      Q.      Okay.  When was that?

15      A.      Well, I don't know if I would actually

16  consider it a promotion.  I had the opportunity to

17  join Anchor Law Firm as a supervising attorney

18  there.

19      Q.      And how did that come about?

20      A.      Okay.  So I -- after I learned the

21  business, was there for a few months, around May of

22  2017 it was presented to me that I can join Anchor

23  Law Firm to better service our clients.

24      Q.      When you say it was presented to you,

25  who presented it?

A-2452

Page 11

```
 1        A.      Jason Blust and Shelby Tuszynski.

 2        Q.      Did you know Jason Blust before then?

 3        A.      I believe I had some interaction with

 4   him before then.

 5        Q.      And what did you know him to be, what

 6   was his function?

 7                MS. SHUPE:  Objection, form.

 8        A.      To my knowledge, he was counsel that

 9   Shelby often spoke with.

10        Q.      Okay.  And I know you said the last

11   name, but I didn't catch it.

12        A.      Tuszynski.  She also goes by Shelby Katz

13   now, her married name.

14        Q.      Okay.  Can you spell the Tuszynski?

15        A.      Tuszynski?

16        Q.      Yes.

17        A.      I can try.  T-U-S-Z-Y-N-S-K-I.

18        Q.      What was -- is that a man or a woman?

19        A.      Woman.

20        Q.      What was her role?

21        A.      Her role --

22                MS. SHUPE:  Objection, form.  You're

23   talking about with Strategic?

24                MR. ICE:  If she -- well, let's back up.

25        Q.      She worked for Strategic?
```

Exhibit 08-0173

A-2453

Page 12

1          A.      Yes.

2          Q.      Okay.  What was her role at Strategic?

3          A.      Her role at Strategic, to my knowledge,

4    was making sure that they follow -- that Strategic

5    employees follow policies and procedures.

6          Q.      Do you remember her title?

7          A.      I do not.

8          Q.      And Jason Blust did not work for

9    Strategic?

10         A.      No.

11         Q.      Okay.  When he came to you, what did he

12   say that -- who did he say he worked for?

13         A.      I don't recall.

14         Q.      Okay.  But he presented you with the

15   idea of working for Anchor?

16         A.      Correct.

17         Q.      Did you interview with him?

18         A.      No.

19         Q.      Did you interview with anyone else for

20   the Anchor job?

21         A.      No.

22         Q.      What was your understanding of what

23   Anchor was?

24         A.      My understanding was that Anchor Law

25   Firm serviced clients that were enrolling in their

Exhibit 08-0174

A-2454

Page 13

```
 1   debt resolution program.
 2        Q.    Anything else?
 3        A.    No.
 4        Q.    Did you do any kind of research to see
 5   what Anchor was?
 6        A.    I don't recall.
 7        Q.    Have you since that day done any
 8   research to see what Anchor was or is?
 9        A.    No.
10        Q.    Do you know who owns Anchor?
11        A.    Owns Anchor?  No.
12        Q.    Well, let me rephrase that.  Do you know
13   who the members of Anchor are?
14        A.    I know the main member.  Her name is
15   Stacy Robinson.
16        Q.    I'm sorry, say that again?
17        A.    Stacy Robinson.
18        Q.    Okay.  And who else?
19        A.    I don't know.
20        Q.    When you say main member, is it your
21   understanding that Stacy Robinson is the majority
22   member of Anchor?
23        A.    Yes.
24        Q.    Are you also a member of Anchor?
25        A.    Yes.
```

Exhibit 08-0175

A-2455

Page 15

```
 1        A.     No.
 2        Q.     Who else is a member of Anchor?
 3        A.     That I can think of names right now,
 4   that's what comes to my head, but I know there are
 5   others.
 6        Q.     So -- I'm sorry, did you tell me when
 7   you joined Anchor?
 8        A.     May of 2017.
 9        Q.     Oh, yes.  Okay.
10        A.     Oh, I'm sorry, September.  My apologies.
11        Q.     May was when you started at --
12        A.     Yes.
13        Q.     -- Strategic.
14        So you became a supervising attorney at Anchor
15   as your first job with Anchor.
16        A.     Yes.
17        Q.     You didn't start as an underling
18   attorney.
19        A.     No.
20        Q.     Did Jason Blust say why he needed a
21   supervising attorney?
22        A.     Yes.
23        Q.     Why?
24        A.     To make sure that Anchor client support
25   was following the policies and procedures that
```

Exhibit 08-0176

A-2456

Page 16

1    Anchor Law Firm had vetted and approved.

2         Q.    Are there any other supervising

3    attorneys of Anchor?

4         A.    Not that I'm aware of.

5         Q.    Have you ever met Stacy Robinson?

6         A.    No.

7         Q.    Where is Anchor registered as a PLLC?

8         A.    I believe it's in Arkansas.

9         Q.    Have you ever been to Arkansas?

10        A.    No.

11        Q.    So you haven't seen their offices in

12   Bentonville?

13        A.    No.

14        Q.    Is it your understanding that there are

15   offices there?

16        A.    Yes.

17        Q.    Are there attorneys that work there?

18        A.    I don't know.

19        Q.    And you've worked continuously for

20   Anchor since then.

21        A.    Yes.

22        Q.    And did there come a time when you were

23   promoted at Strategic?

24        A.    Yes.

25        Q.    Okay.  And when was that?

Exhibit 08-0177

A-2457

```
                                              Page 21
 1   of the debt.
 2        A.    Yes.
 3        Q.    So you don't supervise anyone who
 4   settles debt for Anchor?
 5        A.    I do.
 6        Q.    Okay.  What is that department called?
 7        A.    Anchor Client Services.
 8        Q.    When you first met with Jason Blust to
 9   talk about this job, did you and he discuss how you
10   would be performing -- how you would be working for
11   both Anchor and Strategic at the same time?
12        A.    Yes.
13        Q.    And how that would not represent a
14   conflict for you?
15              MS. SHUPE:  Objection, form.
16        A.    I don't recall.
17        Q.    Do you recall discussing the possibility
18   of a conflict with anyone?
19        A.    No.
20        Q.    Did it strike you as being a conflict
21   just to work for -- as in-house counsel for
22   Strategic while at the same time working as an
23   attorney for one of the people they -- one of the
24   firms they deal with?
25              MS. SHUPE:  Objection, form, calls for a
```

Exhibit 08-0178

A-2458

Page 25

1     Q.     What do you do to supervise that

2  department?

3     A.     Sure.  So Anchor Law Firm provides

4  Anchor Client Services with the law firm's policies

5  and procedures that have been vetted by the firm.

6  My job is to supervise the day-to-day to make sure

7  those negotiators and client services

8  representatives are following those rules.  So while

9  I personally cannot obviously be a part of every

10  phone call or listen to every phone call, I do

11  listen to the ones I can.  I'm available if anyone

12  needs me.  I walk the floor.  I'm a part of very

13  regular meetings.  And I do troubleshoot if a

14  representative does need me to speak to a client.

15  If I personally am not able to resolve it, I will

16  either send that over to our office in Chicago or,

17  if it's a state-specific issue, I will get that over

18  to the appropriate attorney there.

19     Q.     What is the office in Chicago?

20     A.     That's where Jason Blust is located.

21     Q.     Okay.  So things that are escalated

22  beyond you go to Jason Blust in Chicago?

23     A.     Yes.

24     Q.     And what is in Chicago, is that another

25  Anchor office?

A-2459

Page 26

```
 1        A.    I don't know.

 2        Q.    Do you call him there?

 3        A.    Yes.

 4        Q.    And how do they answer the phone?

 5        A.    He just says his name.

 6        Q.    You have a direct line to --

 7        A.    Yes.

 8        Q.    -- Jason Blust?

 9        A.    Uh-hum.

10        Q.    Is that a yes?

11        A.    Yes.  Sorry.

12        Q.    Okay.  On the sixth floor where you

13   work, is there a section that is just Anchor Client

14   Services?

15        A.    No.

16        Q.    Is there a section that's just the

17   Timberline Financial?

18        A.    Yes.

19        Q.    And it's physically separated from the

20   other group.

21        A.    Yes.

22        Q.    Is there an Anchor office on the sixth

23   floor where you work?

24        A.    Can you rephrase the question?

25        Q.    You work on the sixth floor of your
```

Exhibit 08-0180

A-2460

Page 27

1  building.  Is there a separate office that's
2  designated as Anchor?
3      A.     No.
4      Q.     You have one desk that you sit at when
5  you're doing your job?
6      A.     Yes.
7      Q.     Whether you're doing that as an Anchor
8  attorney or as a Strategic attorney?
9      A.     Yes.
10     Q.     Who pays the lease on the building where
11 you work?
12     A.     I don't know.
13     Q.     Do you think it's Anchor?
14     A.     I don't know.
15     Q.     Who paid for the desk that you sit at?
16     A.     I don't know.
17     Q.     Who paid for the computer you work at?
18     A.     I don't know.
19     Q.     It's the same equipment and desk that
20 you had before you started your job at Anchor.
21 Correct?
22     A.     Yes.  I have moved locations a couple of
23 times though.
24     Q.     Okay.  But when you got your job at
25 Anchor, the discussion was, okay, now you're going

A-2461

```
1    to move over here to this separate room and this is
2    Anchor offices inside the sixth floor.
3         A.    No.
4         Q.    Okay.  You continued to work the way you
5    were working before.  Correct?
6              MS. SHUPE:  Objection.
7         Q.    Same computer, same desk, same office?
8              MS. SHUPE:  Objection, form.
9         A.    Yes.
10             MR. ICE:  Exhibit 2, please.
11             MS. SHUPE:  Are you done with this?
12             MS. ICE:  Yes.
13             MS. SHUPE:  Okay.
14             MS. ICE:  Are you done with 1?
15             MR. ICE:  Yes.  Well, you say done.  I
16   mean, we may go back to it.
17             MS. ICE:  Well, she wants to give it to
18   the court reporter.
19             MS. SHUPE:  Yeah, I just want to hand
20   this to the court reporter so we can keep the stuff
21   together.
22             MR. ICE:  Hopefully we're done.
23             MS. ICE:  Thank you.
24        Q.    Do you recognize that document?
25        A.    Yes.
```

A-2462

Page 40

1 ████████████████████████████

2 ████ ████████████████

3    Q.    Well, you were always hired as a

4 supervising attorney, that was your first job.

5 Correct?

6    A.    Yes.

7    Q.    Okay.  I believe you said you don't know

8 if there's any attorneys at the Bentonville office?

9    A.    I don't know.

10    Q.    Okay.  So you don't supervise anybody

11 there.

12    A.    No.

13    Q.    The only place you supervise people is

14 on the sixth floor of your building.

15    A.    No.

16    Q.    Okay.  Who else do you supervise?

17    A.    We have an -- Anchor Client Services

18 also has an office in Buffalo, New York.

19    Q.    Now, the Buffalo office is also a

20 Strategic Financial Solutions, LLC, office?

21       MS. SHUPE:  Objection, form.  You can

22 answer if you know.

23    A.    I don't know.

24    Q.    Do you know if it's a Finance Solutions,

25 LLC, office?

Exhibit 08-0183

A-2463

Page 41

1          A.      I don't know.

2          Q.      What's the difference between Finance

3     Solutions and Strategic Financial Solutions?

4                  MS. SHUPE:  Objection, form.

5          A.      I don't know.

6          Q.      What goes on in the Buffalo office?

7                  MS. SHUPE:  Objection, form.

8          A.      Can you rephrase the question?

9          Q.      Well, what are the -- let's start with

10    Anchor.  What functions are the Anchor employees in

11    the Buffalo office doing?

12         A.      Sure.

13                 MS. ICE:  Can I just clarify for a

14    minute?  Because we clarified Strategic, but we seem

15    to be using Anchor Law Firm, LLC, and Anchor Client

16    Services interchangeably now, and I think we need to

17    be clear which Anchor we're talking about, because

18    she testified that Anchor Client Services has an

19    office in Buffalo.

20                 MR. ICE:  Correct.  So let me rephrase

21    the question.

22         Q.      What work is being performed by people

23    working for Anchor Client Services in Buffalo?

24         A.      There's a team of negotiators there that

25    negotiate on the phone with creditors on behalf of

Exhibit 08-0184

A-2464

Page 42

1    clients, and there's also a client services function

2    that answers the phone for general questions that

3    clients may have.

4        Q.    Is any of the debt negotiation done in

5    the New York office?

6        A.    Yes.

7        Q.    So what is the distinction, why is some

8    in Buffalo?

9        A.    To my knowledge, it's just another

10   location.

11       Q.    Okay.  Do both locations share the same

12   phone system?

13       A.    Yes.

14       Q.    And when we were talking earlier about

15   the Anchor offices in the New York location and the

16   Strategic offices all on the sixth floor, those all

17   share the same phone system?

18       A.    I don't know.

19       Q.    Where is the Anchor headquarters?

20       A.    Arkansas.

21       Q.    Where in Arkansas?

22       A.    I don't know.

23       Q.    How many employees work for Anchor

24   Client Services?

25       A.    I don't know.

Exhibit 08-0185

A-2465

Page 43

1      Q.      More than ten?

2      A.      Yes.

3      Q.      More than a hundred?

4      A.      I don't know.

5      Q.      But you supervise them.

6      A.      Yes.

7      Q.      All of them.

8      A.      Yes.

9      Q.      But you don't know how many there are.

10     A.      No.

11     Q.      You can't estimate how many there are?

12     A.      No.

13     Q.      Does Jason Blust work for Anchor?

14     A.      I don't know.

15             MS. SHUPE:  Objection, asked and

16     answered.

17     Q.      Why do you call him regarding escalated

18     issues if you don't know if he works for Anchor?

19     A.      In my opinion, he's just counsel I go to

20     for issues that I can't resolve on my own.

21     Q.      Do you think he's counsel for Anchor?

22     A.      I don't know.

23     Q.      Well, as an attorney, you're talking

24     about your own clients.  Right?  Anchor clients.

25     Your clients.  Shouldn't you know who you're talking

Exhibit 08-0186

A-2466

Page 55

```
 1        A.     No.
 2        Q.     Do you wish to change any of your
 3   testimony based on that conversation?
 4        A.     No.
 5        Q.     I want to jump back for a moment to how
 6   you get paid by Anchor and ask you if Anchor gives
 7   you a W-2?
 8        A.     Yes.
 9        Q.     Do you get -- when they make those
10   electronic deposits, do you get a paper copy of that
11   transaction, other than your bank statement?
12        A.     It's available digitally, not actual
13   paper form.
14        Q.     I'm sorry?
15        A.     It's available digitally, not actual
16   paper form.
17        Q.     And how do you retrieve that digitally?
18        A.     Through ADP.
19        Q.     So what was your W-2 salary for 2018 for
20   Anchor?
21        A.     I don't recall.
22        Q.     But your W-2 would have that information
23   on it.  Correct?
24        A.     Yes.
25        Q.     Who is your supervisor at Anchor Law
```

Exhibit 08-0187

A-2467

Page 56

1   Firm, PLLC?

2        A.    I don't believe I have a direct

3   supervisor.

4        Q.    Who do you report to?

5        A.    Jason Blust.

6        Q.    What's Jason Blust's phone number?

7        A.    I don't know off the top of my head.

8        Q.    Is it in your phone or anything?

9        A.    It should be.

10            MR. ICE:  Does counsel have a problem

11   with retrieving that?

12            MS. SHUPE:  You guys can -- we're not

13   going to do that here, but you can make a request.

14            MR. ICE:  I'll make the request now

15   informally.

16        Q.    How about Mr. Rogus' phone number, do

17   you remember that?

18        A.    No.

19        Q.    Is that also available for you to look

20   up on your phone?

21        A.    Not on my cell phone.

22        Q.    Okay.  You said earlier you didn't know

23   if Rogus was an attorney with Anchor, █████████

█   ███████████████████████████████████████

█   ██████████████████  ██████?

Exhibit 08-0188

A-2468

Page 72

1    ███████

2         ████████  ██████████

█    ██      ██     ████████████████

█    ██      ██     ████████████████

█    ██████████████████████████

█         ████████  █████████████████

█    ██      ██  ██████████████  ██████████

█    █████████████████

9         Q.     So your office on the sixth floor has

10   people who work for Anchor Law Firm, PLLC, people

11   who work for ███████████████, people who work

12   for Finance Solutions, people who work for

13   Timberline, and people who work for Strategic

14   Financial Solutions.  Correct?

15        A.     Yes.

16        Q.     Do you all have little name tags that

17   tell you who's working for who?

18        A.     No.

19        Q.     Are there separate areas on the sixth

20   floor for all of these different organizations?

21             MS. SHUPE:  Objection, asked and

22   answered.

23        A.     Finance Solutions is in a separate area.

24        Q.     Does Finance Solutions share the same

25   phone system with the other organizations we just

Exhibit 08-0189

A-2469

Page 73

1    talked about?

2          A.    I don't know.

3          Q.    Do you know if there's more than one

4    phone system on the sixth floor where you work?

5          A.    I don't know.



Exhibit 08-0190

A-2470

Page 78

1      A.      Correct.

2      Q.      Okay.

3              MS. ICE:  When she says their approval,

4      who is she talking about?

5              MR. ICE:  Well, it has to be Anchor

6      under this.

7      Q.      Do you agree with that, when you say

8      their approval, you're talking about somebody at

9      Anchor Law Firm, PLLC?

10     A.      Yes.

11     Q.      And, in fact, you are an attorney at

12     other law firms besides Anchor.

13     A.      Correct.

14     Q.      All of whom have some relationship with

15     Strategic Financial Solutions.

16             MS. SHUPE:  Objection, form.

17     A.      I don't believe that's correct.

18     Q.      Okay.  All of whom are clients who are

19     served by people on the sixth floor of your office.

20             MS. SHUPE:  Objection, form.

21     A.      Can you repeat the question?

22     Q.      You work for other law firms.

23     A.      Yes.

24     Q.      Okay.  Let's just go through them.  Do

25     you work for Bedrock Legal?

Exhibit 08-0191

A-2471

Page 79

```
 1        A.    Yes.
 2        Q.    Okay.  What is Bedrock Legal?
 3        A.    They are a law firm that provides
 4   similar services to Anchor Law Firm.
 5        Q.    It's actually a fictitious name of
 6   A. Florio & Associates, PLLC.  Correct?
 7        A.    Yes.
 8        Q.    That's a Texas limited liability
 9   partnership, the A. Florio.
10        A.    I don't recall.
11        Q.    Okay.  Have you ever met an attorney at
12   A. Florio & Associates?
13        A.    I don't recall.
14        Q.    You have a contract that looks just like
15   the one you produced here for Anchor.
16        A.    Yes.
17              MS. SHUPE:  Objection, form.
18        A.    Yes.
19        ▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
21        A.    Yes.
22        Q.    When you get paid by Anchor, by the way,
23   is that just a flat rate or is that based on some
24   sort of performance criteria?
25        A.    I believe it's a flat rate.
```

Page 80

1      Q.      You don't have to handle so many cases

2   or so much debt to get paid by Anchor.

3      A.      No.

4      Q.      And is that the same with Bedrock?

5      A.      Yes.

6      Q.      Are you an attorney with Boulder Legal

7   Group?

8      A.      Yes.

9      Q.      And that's a Missouri limited liability

10  company.

11     A.      I don't recall.

12     Q.      Let's go back to Bedrock, 'cause you

13  said you had a similar contract.  ██████████████

██  ██████████████

██  ████  ████████████.

16     Q.      But you have that contract around, you

17  could take a look.  Right?

18     A.      Yes.

19     Q.      Okay.  Do you know of any of the other

20  law firm contracts that are signed by somebody

21  different ██████████████?

22             MS. SHUPE:  Objection, form.  You're

23  talking about her contracts?

24             MR. ICE:  Yes.

25             MS. SHUPE:  Okay.

A-2473

Page 81

```
 1        A.     I don't recall.
 2        Q.     Are you an attorney with Canyon Legal
 3   Group, LLC?
 4        A.     I'm a Class B member, not a supervising
 5   attorney of Canyon, yes.
 6        Q.     So with Boulder and Bedrock, you're a
 7   supervising attorney?
 8        A.     Correct.
 9        Q.     Okay.  Who signed that contract for
10   Canyon?
11        A.     I don't recall.
12        Q.     Are you an attorney with Carolina Legal
13   Services?
14        A.     Yes.
15        Q.     That's a fictitious name of Daniel Rufty
16   Legal, PLLC?
17        A.     Yes.
18        Q.     Which is a North Carolina professional
19   limited liability company?
20        A.     Yes.
21        Q.     Are you a supervising attorney or a
22   regular attorney?
23        A.     I'm a supervising attorney of Carolina.
24        Q.     Who signed that contract?
25        A.     I don't recall.
```

Exhibit 08-0194

A-2474

Page 82

```
 1        Q.    When did you sign the contracts for --
 2   with these other firms?
 3             MS. SHUPE:  Objection, form.
 4        A.    I don't recall.
 5             MR. ICE:  Because it's compound or what?
 6             MS. SHUPE:  Yeah, 'cause you just asked
 7   her about a bunch of different firms --
 8             MR. ICE:  Okay.
 9             MS. SHUPE:  -- and now you're asking her
10   when she signed contracts.
11             MR. ICE:  Okay.  I'm just trying to
12   speed things along, but we'll go on.
13             MS. SHUPE:  I understand.
14        Q.    Bedrock.
15             MS. SHUPE:  I just want to make sure
16   it's clear.
17        Q.    Bedrock, when did you sign the contract
18   with Bedrock?
19        A.    I believe it was in 2017.
20        Q.    Well, let me ask it this way.  Which
21   contract for the firms that you work for were signed
22   first?
23        A.    I know Anchor was first.  Boulder and
24   Bedrock were early on, I just don't remember the
25   exact time.
```

A-2475

Page 83

1    Q.    Okay.  But in any event, they weren't
2    all signed at the same time.
3    A.    No.
4    Q.    Okay.  Who approached you to work for
5    Bedrock?
6    A.    Jason Blust and Shelby Katz.
7    Q.    Okay.  And there would be an e-mail that
8    has when you signed that contract.
9    A.    Yes.
10   Q.    Who approached you to become an attorney
11   with Boulder?
12   A.    Jason Blust and Shelby Katz.
13   Q.    And there would be an e-mail that would
14   say when you signed that contract.
15   A.    There should be.
16   Q.    And each time you send the whole
17   contract back, not just the signature page?
18   A.    I don't recall.
19   Q.    Who approached you with respect to
20   working as an attorney with Canyon?
21   A.    Jason Blust.
22   Q.    Who approached you to be an attorney
23   with Carolina Legal Services?
24   A.    Jason Blust.
25   Q.    Are you an attorney with the Chinn Legal

Exhibit 08-0196

A-2476

Page 84

1    Group?

2        A.    No.

3        Q.    Have you ever heard of Chinn Legal

4    Group?

5        A.    Yes.

6        Q.    Is that a firm whose clients -- strike

7    that.

8        Is that a firm who retains through an

9    intermediary but ultimately Strategic Financial

10   Solutions' services for debt settlement?

11              MS. SHUPE:  Objection, form, foundation.

12       A.    I don't know.

13       Q.    In what context did you hear about them?

14       A.    I have spoken with I believe her name is

15   Valerie Chinn via e-mail regarding -- I don't

16   remember what it was regarding, but I know I've

17   spoken to her via e-mail.

18       Q.    Are you an attorney with Colonial Law

19   Group?

20       A.    No.

21       Q.    Are you an attorney with The

22   Commonwealth Law Group?

23       A.    No.

24       Q.    Do you know Amber Florio?

25       A.    No.

A-2477

Page 85

 1          Q.      Are you an attorney with Cornerstone
 2    Legal Group?
 3          A.      No.
 4          Q.      Are you an attorney with Credit
 5    Advocates Law Firm?
 6          A.      Yes, I'm a Class B member.
 7          Q.      Again, you have a contract similar to
 8    the one in Anchor?
 9          A.      Yes.
10          Q.      And there's --
11          A.      Similar -- well, Anchor -- let me revise
12    that.  Anchor, the agreement I signed is for a
13    supervising role, whereas that was a Class B.
14          Q.      Okay.  Who approached you to be an
15    attorney there?
16          A.      I don't recall.
17          Q.      And when did you sign that?
18          A.      I don't recall.
19          Q.      Are you an attorney with Crimson Legal
20    Group?
21          A.      No.
22          Q.      Are you an attorney with Dubin Legal
23    Group?
24          A.      No.
25          Q.      Do you know anyone in your office that

A-2478

```
                                              Page 86
 1   is?

 2        A.    No.

 3        Q.    Are you an attorney with Frontier

 4   Consumer Law Group?

 5        A.    No.

 6        Q.    Do you know anyone in your office that

 7   is?

 8        A.    No.

 9        Q.    Are you an attorney with Gardner Legal,

10   LLC?

11        A.    I don't recall.

12        Q.    You might be.

13        A.    I might be.

14        Q.    Okay.  The truth is you're an attorney

15   for so many firms you can't even remember them all

16   while you're sitting here today.

17              MS. SHUPE:  Objection, form.

18        A.    There might be a trade name.

19        Q.    What do you mean there might be a trade

20   name?

21        A.    Gardner may be the in-state attorney's

22   name for that firm.

23        Q.    For what firm?

24        A.    For a firm.

25        Q.    Okay.  Do you know Lori Leigh?
```

A-2479

Page 87

```
 1        A.      No.
 2        Q.      Are you an attorney with Glacier Bay
 3   Law?
 4        A.      No.
 5        Q.      Or Heiser Legal Group?
 6        A.      No.
 7        Q.      Is anybody in your office an attorney
 8   for either of those firms?
 9        A.      Not to my knowledge.
10        Q.      Are you an attorney with Great Lakes Law
11   Firm?
12        A.      Yes.
13        Q.      Supervising attorney or regular
14   attorney?
15        A.      Class B attorney.
16        Q.      Okay.  Who approached you to become an
17   attorney for them?
18        A.      Jason Blust.
19        Q.      And when did you sign with them?
20        A.      I don't recall.
21        Q.      But you have an e-mail that would
22   establish that.  Correct?
23        A.      I should.
24        Q.      Are you an attorney with Harbor Legal
25   Group?
```

Exhibit 08-0200

A-2480

Page 88

```
 1        A.     Yes, Class B attorney.
 2               MR. ICE:  Did I just ask that?  I'm
 3   getting confused myself.  Did I ask Harbor Legal?
 4               MS. ICE:  No.
 5        Q.     Okay.  Then same questions, who
 6   approached you?
 7        A.     Jason Blust.
 8        Q.     And it's a contract -- except for the
 9   supervising part, it's a contract similar to what
10   you have for Anchor?
11        A.     Yes.
12        Q.     Are you an attorney member of Heartland
13   Legal Group?
14        A.     Class B member, yes.
15        Q.     And who approached you to be an attorney
16   there?
17        A.     Jason Blust.
18        Q.     When did you sign with them?
19        A.     I don't recall, but I -- to my
20   knowledge, that was fairly recently.
21        Q.     Have you ever asked Jason Blust why he
22   needs a supervising attorney or an attorney for so
23   many different law firms?
24        A.     I don't recall.
25        Q.     That didn't strike you as unusual?
```

A-2481

Page 89

```
 1        A.      No, because policies and procedures on

 2    the sixth floor, regardless of the servicing entity

 3    attached to the law firm, they need to make sure

 4    that the policies and procedures itself are

 5    followed.

 6        Q.      Why would Jason Blust need to be

 7    involved with so many law firms?

 8            MS. SHUPE:  Objection, form, foundation,

 9    calls for speculation.

10        A.      I don't know.

11        Q.      You never asked him that?

12        A.      No.

13        Q.      And do you get separate deposits in your

14    account every month from each of these firms?

15        A.      For the firms that I'm a supervising

16    attorney for, yes.

17        Q.      You don't get paid to be just a

18    Class B -- regular Class B member?

19        A.      No.  My work for those firms are very

20    limited, so no.

21        Q.      Are you a member of Henry Legal Group,

22    LLP?

23        A.      No.

24        Q.      Are you a member of Hinds Law, LLC?

25        A.      No.
```

Exhibit 08-0202

A-2482

```
 1        Q.      Have you ever heard of Michelle Hinds?
 2        A.      I don't recall.
 3        Q.      Are you a member of Monarch Legal Group?
 4        A.      Yes, Class B member.
 5        Q.      Who asked you to be a member?
 6        A.      Jason Blust.
 7        Q.      When did you sign?
 8        A.      I don't recall.
 9        Q.      Do you still have that contract?
10        A.      I should.
11        Q.      And an e-mail that would date that
12   contract?
13        A.      I should.
14        Q.      Is my assumption correct that just like
15   the Anchor one, they don't have a date on the
16   contracts?
17                MS. SHUPE:  Objection, form.  You can
18   answer if you know.
19        A.      I don't know.
20        Q.      Are you a member of Phoenix Legal Group?
21        A.      No.
22        Q.      Are you a member of Pioneer Law Firm,
23   P.C.?
24        A.      Yes, Class B member.
25        Q.      Who asked you to be a member?
```

Exhibit 08-0203

A-2483

Page 91

```
 1        A.      I don't recall.
 2        Q.      Do you think it was somebody different
 3   than Mr. Rogus?
 4              MS. SHUPE:  Objection, form.
 5        A.      I don't recall.
 6        Q.      Let me rephrase that.  Somebody
 7   different than Jason Blust?
 8              MS. SHUPE:  Same objection.
 9        A.      I don't recall.
10        Q.      Are you -- I already know you're a
11   member of Rockwell Legal Group.  That's correct.
12   Right?
13        A.      Correct.  Class B member.
14        Q.      Okay.  Who asked you to be a member?
15        A.      I don't recall.
16        Q.      And when did you sign that?
17        A.      Don't recall.
18        Q.      When you say you don't recall who asked
19   you, is the contract the same though from firm to
20   firm?
21              MS. SHUPE:  Objection, form.
22        A.      I don't recall.
23        Q.      How about Royal Legal Group, are you a
24   member of that?
25        A.      I am a Class B member.
```

A-2484

Page 92

```
 1        Q.      Who asked you to be?
 2        A.      Jason Blust.
 3        Q.      And when did you sign that?
 4        A.      Actually, I revise that.  I don't
 5   recall.
 6        Q.      Okay.  And do you recall when you signed
 7   it?
 8        A.      I don't.
 9        Q.      When you say you don't recall who asked
10   you, do you recall who signed the contract with you?
11               MS. SHUPE:  Objection.  Are you talking
12   specifically about the Royal contract or are you
13   talking about --
14               MR. ICE:  Right now I'm talking about
15   Royal.
16               MS. SHUPE:  Okay.
17               MR. ICE:  But we're going to go back and
18   pick up all the others.
19        A.      I don't.  I believe I signed first, so I
20   don't know who signed after.
21
```

Exhibit 08-0205

A-2485

Page 93

██████████████████████████████

██    ██    ████████

██    ██    ███████████████████

██    ██    ████████

5      Q.      You may not have that.

6      A.      I may or may not.  I don't recall.

7      Q.      For all the firms that we've talked

8  about so far that you are a member, you have

9  described it as a Class B membership or a

10  supervising Class B membership.  Correct?

11      A.      Correct.

12      Q.      So they're all using the same

13  terminology.

14      A.      Correct.

15      Q.      But you don't recall whether all the

16  ones where you're a supervising attorney are like

17  the one in Anchor.

18              MS. SHUPE:  Objection, form.

19      A.      Can you repeat the question?

20      Q.      Well, if I were to get all of these

21  where you're a supervising attorney and lay them

22  side by side with the Anchor one, would they all

23  look the same?

24              MS. SHUPE:  Same objection.

25      A.      I don't recall.

A-2486

Page 94

1    Q.    And all the ones that are just regular

2    Class B, if I were to take all those and lay them

3    side by side, would they all look the same?

4          MS. SHUPE:  Objection, form.

5    A.    I don't recall.

6    Q.    Do you recall any that struck you as,

7    wow, this one is really different than all the

8    others.

9    A.    No.

10   Q.    Okay.

11         THE WITNESS:  Can we just break so I can

12   get some water?

13         MR. ICE:  Sure.

14         (A break was taken at 11:10 a.m.)

15         (Resumed at 11:19 a.m.)

16   BY MR. ICE:

17   Q.    Are you a member of Stonepoint Legal

18   Group?

19   A.    Yes.

20   Q.    What kind of member?

21   A.    I am a supervising attorney.

22   Q.    Who asked you to be that?

23   A.    I don't recall.

24   Q.    Who signed your contract?

25   A.    I don't know.

Exhibit 08-0207

A-2487

1    Q.    When did you sign your contract?

2    A.    I don't recall.

3    Q.    Do you know who Donald Norris is?

4    A.    Personally, no?

5    Q.    What do you know of him?

6    A.    That he's an attorney associated with

7    Stonepoint.

8    Q.    Are you an attorney with The Sands Law

9    Group?

10   A.    No.

11   Q.    Are you an attorney with Whitestone

12   Legal Group?

13   A.    Yes, I'm a Class B member.

14   Q.    Who asked you to be?

15   A.    I don't recall.

16   Q.    Who signed your contract?

17   A.    I don't know.

18   Q.    Is the contract similar to the other

19   Class B contracts?

20         MS. SHUPE:  Objection, form.

21   A.    I don't recall.

22   Q.    Are you an attorney with Wyolaw, LLC?

23   A.    Yes, I'm a Class B member?

24   Q.    Who asked you to be?

25   A.    I don't recall.

Exhibit 08-0208

A-2488

Page 96

1       Q.     Who signed your contract?

2       A.     I don't know.

3       Q.     When did you sign the contract?

4       A.     I don't recall.

5       Q.     Is it similar to the other Class B

6  contracts?

7       A.     I don't recall.



A-2489

Page 97

1 ███ ████████████

2      Q.     In those meetings, is Jason Blust also

3 there?

4             MS. SHUPE:  Objection, form, asked and

5 answered.

6             MR. ICE:  Well, I was talking earlier

7 about Anchor.

8      Q.     I mean these meetings with the other

9 firms, is Jason Blust also on the phone as well?

10      A.     A lot of the ones that I'm a part of,

11 yes.

12      Q.     All right.  And is he a member of all

13 those firms?

14      A.     I don't recall.

15      Q.     Now, as an attorney, you know what

16 attorney/client privilege is.  Correct?

17      A.     Yes.

18      Q.     And in these meetings, you sometimes

19 talk about escalated problems with clients.

20 Correct?

21      A.     Yes.

22      Q.     So you as an attorney are talking to

23 somebody on the other end of that phone who you

24 don't know whether they're a member of the firm?

25      A.     Yes.

A-2490

Page 98

1          MS. SHUPE:  Objection, form.

2     Q.    And you're discussing attorney/client

3  privileged matters?

4          MS. SHUPE:  Objection, form.

5     A.    I don't recall.

6     Q.    ████████████████████████████████

   █████████████████████████████████████████

   █████████████████████████████████████████

   ████████████████████████████████████

   ████  ██  ████████████████████████

11    ████  ██  ██████████████████████████████

   ████  ████████████████████████████████

   ████  ██  ██████████████████████

14    Q.    The -- and is it true that for each of

15  them, they're not paying you anything to be an

16  attorney for those firms.

17    A.    Correct.

18    Q.    As opposed to when you're a supervising

19  attorney, you do get paid for that.

20    A.    Correct.

21    Q.    How much do you get paid for that?

22    A.    Are you asking the total or --

23    Q.    Well, if you can remember individual,

24  we'll start there.

25    A.    I don't recall.

Exhibit 08-0211

A-2491

Page 101

1  for 2018?

2      A.    Yeah.  For 2019?

3      Q.    '18.

4      A.    Oh, yes.

5      Q.    Well, maybe not obviously.  You could

6  have gotten an extension.  But you did file them.

7  Correct?

8      A.    Yes.

9      Q.    And you don't recall what was on your

10  return?

11      A.    I don't.

12      Q.    Would it be easier to recall if you put

13  the gym back into the mix?

14      A.    No.

15      Q.    Okay.  Earlier we talked about the

16  people on your floor who worked for Anchor Law Firm,

17  PLLC.

18      A.    Yes.

19      Q.    Do those same people work for Rockwell?

20      A.    I don't know.

21      Q.    Well, does Rockwell have any employees

22  on your floor?

23      A.    Yes.

24      Q.    Okay.  But you don't know if they're the

25  same people?

Exhibit 08-0212

A-2492

Page 102

| | | |
|---|---|---|
| 1 | A. | I don't. |
| 2 | Q. | Rockwell doesn't have a separate place |
| 3 | in the building? | |
| 4 | A. | No. |
| 5 | Q. | How about Bedrock? |
| 6 | A. | No. |
| 7 | Q. | Do any of the firms that we just talked |
| 8 | about have a separate location in the building? | |
| 9 | A. | No. |
| 10 | Q. | Can you -- for any of the firms that we |
| 11 | talked about, can you identify someone who works for | |
| 12 | one firm but not the other? | |
| 13 | MS. SHUPE: Objection, form. | |
| 14 | A. | No. |
| 15 | Q. | Do you know whether these people are -- |
| 16 | that are there in your building who work for Anchor | |
| 17 | also work for all of the firms that you've listed? | |
| 18 | MS. SHUPE: Objection, form. | |
| 19 | A. | I don't know. |
| 20 | Q. | Let me -- are there others like yourself |
| 21 | who work for multiple law firms? | |
| 22 | A. | Yes. |
| 23 | Q. | Who are you thinking of when you say |
| 24 | that? | |
| 25 | A. | The attorneys I listed earlier in my |

Exhibit 08-0213

A-2493

Page 103

1   office.

2       Q.   Okay.  What about negotiators, do they

3   work for multiple law firms?

4       A.   I know some of them do.  I'm not sure if

5   all.

6       Q.   Does it matter to you when you're

7   supervising them what firms they're actually

8   employed by?

9       A.   I wouldn't say it doesn't matter;

10  however, since a lot of the policies and procedures

11  for each firm that I am a supervising attorney for

12  are similar regarding the day-to-day, I do think

13  there are certain things that would stand out if

14  someone wasn't following that would be a red flag

15  regardless to me.

16      Q.   When someone -- an Anchor client calls

17  in and wants to talk to an Anchor attorney, how --

18  and you are the one who is the lucky one who gets

19  that call, how do you know whether that person is an

20  Anchor client or a Rockwell client or one of the

21  other firm client?

22           MS. SHUPE:  Objection, form.  Do you

23  understand the question?

24      A.   Can you rephrase the question?

25      Q.   Well, somebody comes in and wants -- not

Exhibit 08-0214

A-2494

Page 111

```
 1   compliance calls?
 2        A.    Yes.
 3        Q.    But not every call.
 4        A.    I don't know.
 5        Q.    If it's not a compliance call, if it's
 6   just a client calling up and complaining, you may or
 7   may not have a recording of that?
 8             MS. SHUPE:  Objection, form.
 9        A.    Where is the client calling?  Is the
10   client calling me or --
11        Q.    Well, let's start with --
12             MS. SHUPE:  Do you understand the
13   question?
14             THE WITNESS:  No.
15             MS. SHUPE:  Okay.  If you don't
16   understand the question, just say you don't
17   understand the question.
18        Q.    Let's say this kind of a call where
19   you're calling a client back for Rockwell.  Are
20   those phone calls recorded?
21        A.    I don't know.
22        Q.    Would you have the same answer to the
23   same question with respect to Anchor?
24        A.    Yes.  I don't know.
25        Q.    And it's your job duty to make sure the
```

Exhibit 08-0215

A-2495

Page 112

1   policies and procedures are followed?

2        A.    Yes.

10       Q.    Do you agree that William Harrington is

11   not an attorney with Rockwell but is associated

12   somehow with Rockwell through an attorney network?

13             MS. SHUPE:  Objection, form, foundation.

14       A.    I don't recall.

15       Q.    Is William Harrington an in-state

16   attorney for Rockwell?

17       A.    I don't recall.

18       Q.    Does Rockwell typically refer legal

19   issues outside?

20       A.    Can you rephrase the question?

21       Q.    Does Rockwell attorneys, such as

22   yourself, typically refer legal issues to outside

23   attorneys?

24       A.    I don't know.

25       Q.    Is that something you would tell

A-2496

Page 120

```
 1        A.      Can you rephrase the question?
 2        Q.      Well, there's -- you're not the only
 3   supervising attorney that works on the sixth floor.
 4   Correct?
 5        A.      Correct.
 6        Q.      And you're not the only one who is a
 7   supervising attorney of a law firm.
 8        A.      Correct.
 9        Q.      And not the only one who's a supervising
10   attorney in multiple law firms.
11        A.      Correct.
12        Q.      Are all the supervising attorneys
13   supervising attorneys of all the same firms or do
14   one of the other supervising attorneys have some
15   firm -- are supervising attorneys of firms that you
16   are not?
17              MS. SHUPE:  Objection, form.
18        A.      There are attorneys in my office that
19   are supervising attorneys of other firms.  In
20   regards to if some of them are the same or not, I
21   don't know.
22        Q.      And do you know if those other firms
23   that they are supervisors -- supervising attorneys
24   for that you are not are also associated with Jason
25   Blust?
```

Exhibit 08-0217

A-2497

1     A.     Yes.

2     Q.     Do you know why you weren't chosen to be

3 the supervising attorney for those firms?

4     A.     No.

5     Q.     So if there's some rationale behind

6 divvying up who's going to be the supervising

7 attorney for a particular firm associated with Jason

8 Blust, you don't know what that is.

9     A.     No.

10     Q.     Who is Chantel in the litigation

11 department?

12     A.     I don't recall.

13     Q.     Do you know anybody named Chantel in the

14 litigation department?

15     A.     I believe I know a Chantol (ph.).  I

16 don't know if that's the same person.

17     Q.     What's her last name?

18     A.     I don't recall.

19     Q.     Is that somebody you supervise?

20     A.     She would be in the litigation support

21 department, so indirectly supervise, yes.

22     Q.     Who is Emily Butler?

23     A.     I don't know.

24     Q.     Never heard that name?

25     A.     I don't recall.

Exhibit 08-0218

A-2498

Page 125

1      Q.     And Royal.

2             MS. SHUPE:  Same objection.

3      A.     I don't recall.

4      Q.     Okay.  Did Shelby Katz, who's now Katz,

5  I guess --

6      A.     Yes.

7      Q.     -- did she have the relationship with

8  these firms before you?

9      A.     I don't know.

10            MS. SHUPE:  Objection, foundation.

11     A.     I don't know.

12     Q.     Do you know whether you were groomed to

13  basically take over what she was doing?

14            MS. SHUPE:  Objection, form.

15     A.     No.

16     Q.     No, you don't recall?

17     A.     I don't recall.

18     Q.     Okay.  We talked about whether you had

19  malpractice insurance.  You said you didn't have

20  your own personal insurance, and you didn't know

21  whether someone else -- some other entity had

22  malpractice insurance for you.  Do you recall that

23  testimony?

24     A.     Yes, that's correct.

25     Q.     If the bar called and said, do you have

A-2499

Page 126

1  malpractice insurance, who would you talk to to find

2  out?

3         A.      Jason Blust.

4         Q.      Do you get any K-1s?

5         A.      I do not.

6         Q.      So the only kind of documents you get

7  for your tax return are the W-2s.

8         A.      Correct.

9                 MR. ICE:  Okay.  Go ahead with

10  Exhibit -- whatever that is.

11                MS. ICE:  9?

12                MR. ICE:  It is 9.

13                MS. ICE:  Okay.

14         Q.     And unless you've been on the Internet

15  lately just searching people you don't know, I

16  assume you don't recognize that document.

17         A.     No.

18         Q.     I will represent to you it is a LinkedIn

19  for Emily Butler who you just testified before lunch

20  that you did not know.

21         A.     Correct.

22         Q.     Does the picture there of Emily Butler

23  refresh your recollection about her?

24         A.     No.

25         Q.     Okay.  You see that she says down below

A-2500

Page 157

1    telemarketing sales rule?

2         A.    Yes.

3         Q.    Okay.  What do you know about that?

4               MS. SHUPE:  Objection, form.

5         A.    I've heard of it in the rule.  I don't

6    know what it says.

7         Q.    Okay.  In your mind, you don't connect

8    that with the hiring of a mobile notary?

9               MS. SHUPE:  Objection, form.

10        A.    Could you repeat the question?

11        Q.    You don't connect what little you know

12   of the face-to-face meeting requirement with the

13   fact that a mobile notary is sent out to sign up

14   Anchor clients.

15              MS. SHUPE:  Objection, form.

16        A.    I don't know.

17        Q.    Are you aware that the FTC has

18   specifically disapproved using mobile notaries for a

19   face-to-face meeting?

20        A.    No.

21        Q.    That's never come up in any of your

22   weekly or monthly meetings?

23        A.    Not that I can recall.

24        Q.    Now, the mobile notaries themselves have

25   a script to follow.  Correct?

Exhibit 08-0221

A-2501

Page 158

```
1       A.      I believe so.

2       Q.      Have you seen that script?

3       A.      I don't recall.

4       Q.      So you had no input on what it says?

5       A.      No.

6               MR. ICE:  Exhibit 15, please.

7       Q.      You've now been handed Exhibit 15.  Do

8  you recognize that document?

9       A.      It appears to be the notary script.

10      Q.      Okay.  Now, that you see it, have you

11  seen that one before?

12      A.      I might have seen it in passing.

13      Q.      Does that look familiar where they talk

14  about slide 2 and slide 3, do you know what that's

15  referring to?

16      A.      From my understanding, it's referring to

17  the presentation that is part of the in-person

18  document signing.

19      Q.      And by presentation, you mean that

20  PowerPoint presentation?

21      A.      Correct.

22      Q.      Now, do you know whether this is an

23  Anchor script -- or let me rephrase that.

24      Did the law firms have different paralegal

25  scripts?
```

Exhibit 08-0222

A-2502

Page 159

```
1          A.     I don't know.

2          Q.     Okay.  Do you know whether this one is

3    an Anchor script?

4          A.     It appears to be based on the document.

5          Q.     When you say based on the document,

6    where are you referring to?

7          A.     Under Turn to Slide 4, it mentions

8    Anchor.

9          Q.     Doesn't the document also mention

10   Rockwell?

11         A.     Where are you referring to?

12         Q.     Well, I see one on page 4, second

13   paragraph, next to the bottom line.

14         A.     Yes.

15         Q.     Okay.  And the following paragraph

16   talking about Rockwell's litigation department.

17         A.     Yes.

18         Q.     Do you have any explanation for why that

19   says both Anchor and Rockwell?

20         A.     No.

21                MR. ICE:  All right.  Let's move to

22   Exhibit 16.

23                THE WITNESS:  Can I just grab some water

24   real quick?

25                MR. ICE:  Yes.
```

Exhibit 08-0223

A-2503

Page 173

```
1    that question several times and she's answered it,
2    but you can answer it again.
3              MR. ICE:  And she did know when it came
4    to Rockwell that that was just a facade as well.
5              MS. SHUPE:  I don't -- I'll object to
6    that.  I don't think that's what she said.
7              You can answer the question as to the
8    Arkansas office.
9              Can you read the question back?
10             THE COURT REPORTER:  "QUESTION:  Well,
11   you do know it's one of those virtual offices where
12   there's a mailing address and nothing else.
13   Correct?"
14        A.    I do not know.
15        Q.    Okay.  You don't know that the standard
16   procedure when you send something to the Bentonville
17   office of Anchor is that Excela -- no, Regus, who
18   rents the office space to Anchor, gathers up all the
19   mail and forwards it to Excela to be scanned and
20   sent to Strategic Financial Solutions.  Correct?
21        A.    I do know that Excela scans mail for
22   Anchor Law Firm clients into the system.  The
23   process of how that's done I do not know.
24        Q.    So you haven't read in any of our
25   complaints that there are no attorneys at the
```

A-2504

Page 212

1      A.      Yes.

2      Q.      And do you know what API stands for,

3  does it stand for application something?  But it's

4  when computer systems talk to each other, it's their

5  way of talking, they use an API, are you familiar

6  with that?

7      A.      I'm not.

8      Q.      Okay.  Would you agree that from your

9  knowledge of using this, that what that refers to is

10  an upload of correspondence from Excela?

11      A.      Correct.

12      Q.      We talked about that before, that's the

13  third-party company that's scanning things like

14  creditor correspondence that was sent to

15  Bentonville, Arkansas.

16      A.      Correct.

17      Q.      And this entry is at the end of that

18  process where it finally gets into the system.  And

19  by system, would you characterize that as Anchor's

20  system or Strategic Financial Solutions' system?

21      A.      Anchor's system.

22      Q.      Okay.  And this is actually some sort of

23  payment reminder from Santander?

24      A.      It appears to be.

25      Q.      Once it's in the system, who reads that?

Exhibit 08-0225

A-2505

Page 217

```
 1    Solutions is doing here.
 2         A.    Correct.
 3         Q.    But you as the supervising attorney have
 4    had no input in this script.
 5         A.    No.
 6         Q.    In fact, you don't even know about the
 7    script.
 8         A.    I haven't seen it, no.
 9         Q.    Okay.  You know that there is a script.
10         A.    Correct.
11         Q.    Okay.  But you don't know enough to say
12    whether this is the script.
13         A.    I don't know.
14         Q.    Do you know if someone at Anchor
15    approved of this script?
16         A.    I don't know.
17         Q.    Who would know that?
18         A.    I don't know for sure, but if I needed
19    the answer, I would start with Jason Blust.
20         Q.    You see on page 35, the script requires
21    the person reading it to say that the customer, the
22    potential client they're talking to, was not
23    approved for a debt consolidation loan?
24         A.    Yes.
25         Q.    And then they start talking about
```

Exhibit 08-0226

A-2506

Page 248

1              J U R A T

2

3

4       I DO HEREBY CERTIFY that I have read

5   the foregoing transcript of my deposition testimony

6   and I certify that it is true and correct to the

7   best of my knowledge.

8

9

10

11    _____

12          LAUREN MONTANILE

13

14

15

16

17   SWORN AND SUBSCRIBED

18   BEFORE ME ON THIS _____

19   DAY OF _____2020

20   _____

     Notary Public of the State of

21

22

23

24

25

Exhibit 08-0227

A-2507

Page 249

1         VERITEXT LEGAL SOLUTIONS

        One Biscayne Tower, Suite 2250

2       2 South Biscayne Boulevard

         Miami, Florida 33131

3         305-376-8800

4  1/27/2020

5  EMILY A. SHUPE, ESQ.

   RATHJE WOODWARD, LLC

6  300 East Roosevelt Road, Suite 300

   Wheaton, Illinois  60187

7  eshupe@rathjewoodward.com

8  Dear EMILY A. SHUPE, ESQ.,

9  With reference to the deposition of LAUREN MONTANILE

   taken on 1/9/2020  in connection

10  with the above-captioned case, please be advised

    that the transcript of the deposition has been

11  completed and is awaiting signature.

12  Please call to make an appointment so that the

    deponent can stop by our nearest office, for the

13  the purpose of reading and signing the transcript.

14

15  If this is not taken care of, however, within the

16  next 30 days, we shall conclude that the reading

17  and signing of the deposition has been waived and

18  the original, which has already been forwarded to

19  the ordering attorney, may be filed with the Clerk

20  of the Court without further notice.

21

22  Sincerely,

23

24  Production Department

25  Veritext Florida

A-2508

1    ATTACH TO DEPOSITION OF:  LAUREN MONTANILE

2    IN THE MATTER OF:  PROULX vs. ANCHOR LAW FIRM

3    DATE TAKEN:  JANUARY 9, 2020

4            E R R A T A   S H E E T

5       INSTRUCTIONS:  After reading the transcript of

     testimony, please note any change, addition or

6    deletion on this sheet.  DO NOT make any marks or

     notations on the transcript        itself.

7

        Please sign and date this errata sheet

8    and return it to the court reporter whose name is

     shown below.

9

     PAGE        LINE                CHANGE

10

11

12

13

14

15

16

17

18

19

20   DATE and SIGNATURE:  _____

21   RETURN TO:   MARY ANN ADAMS, C.C.R.

                Veritext & Goldberg, Inc.

22               290 West Mt. Pleasant Avenue

                Livingston

23

24

25

Exhibit 08-0229

A-2509

Page 251

CERTIFICATE

1
2
3       I, MARY ANN ADAMS, a Certified Court Reporter
4   and Notary Public of the State of New Jersey, License
5   No. X101026, do hereby certify that prior to the
6   commencement of the examination, LAUREN MONTANILE was
7   duly sworn by me to testify as to the truth, the
8   whole truth, and nothing but the truth.
9       I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place, and on the date hereinbefore set forth.
13      I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither
16  a relative nor employee of such attorney or counsel,
17  and that I am not financially interested in the
18  action.
19
20
21      *Mary Ann Adams, C.C.R.*
22
        Notary Public of the State of New Jersey
23      My Commission expires August 10, 2024
24
25

Exhibit 08-0230

A-2510

Page 248

| | |
|---|---|
| 1 | J U R A T |
| 2 | |
| 3 | |
| 4 | I DO HEREBY CERTIFY that I have read |
| 5 | the foregoing transcript of my deposition testimony |
| 6 | and I certify that it is true and correct to the |
| 7 | best of my knowledge. |
| 8 | |
| 9 | |
| 10 | |
| 11 | _Lauren Montanile_ |
| 12 | LAUREN MONTANILE |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | SWORN AND SUBSCRIBED |
| 18 | BEFORE ME ON THIS 12th |
| 19 | DAY OF February 2020 |
| 20 | Notary Public of the State of New York |
| 21 | |
| 22 | GARCELLE BELINDA ARTIS |
| 23 | Notary Public - State of New York |
| 24 | NO. 01AR6252252 |
| 25 | Qualified in Kings County |

GARCELLE BELINDA ARTIS
Notary Public - State of New York
NO. 01AR6252252
Qualified in Kings County
My Commission Expires 12-5-2023

Veritext Legal Solutions

800-726-7007                                              305-376-8800

Exhibit 08-0231

A-2511

**\*\*Script Paralegal Must Read To Client\*\***

## THE DEBT RESOLUTION PROCESS



15

[TURN TO SLIDE 2]

DEBT RESOLUTION IS A PROGRAM DESIGNED TO PAY OFF YOUR DEBTS THROUGH A NEGOTIATION STRATEGY. THE LAW FIRM NEGOTIATES WITH YOUR CREDITORS ON YOUR BEHALF TO PAY BACK YOUR DEBT, IN A LUMP SUM OR TERM PAYMENTS, LESS THAN THE AMOUNT OWED ON YOUR ACCOUNTS. YOUR INVOLVEMENT IN THESE NEGOTIATIONS AND CONVERSATIONS MAY BE NECESSARY AND IMPORTANT.

As your attorneys, it's our job to notify your creditors that you seek to negotiate a reduction of your debt, instead of filing for bankruptcy. To do this, you must reduce payments to your creditors or stop paying them completely. This will allow you to save sufficient funds, which we will then use to negotiate your debts.

[TURN TO SLIDE 3]

THE DEBT RESOLUTION PROCESS, WHAT WE DO AND WHAT WE NEED FROM YOU

Upon signing your enrollment paperwork today you will stop making payments on the accounts you have enrolled in the program. We begin using the money building in the trust account to reach settlements with your creditors. Please make sure you forward any communication from your creditors directly to us. In addition, we set our clients up with a Google voice phone number to further deter any communication from your creditors.

[TURN TO SLIDE 4]

WE NOTIFY YOUR CREDITORS

While Anchor is representing you, based on its prior experience with your creditors, its personnel will notify some or all of your creditors that you are represented by an attorney and they should stop any communication with you regarding your debts. If the Law Firm has made the determination that sending LORs (Letters of Representation) to certain creditors will make them more aggressive, strategically, we do not send LORs to them.

[TURN TO SLIDE 5]

SPECIAL PURPOSE SAVINGS ACCOUNT

After signing your enrollment paperwork to retain the law firm, you will be saving money in a Special Purpose Savings Account. As your funds are accumulating, we are working to resolve your debts through our negotiation process. The Special Purpose Savings Account is set up through an FDIC insured

EXHIBIT 15 (p. 1)
Exhibit 08-0232
P000015

A-2512

program separate from your checking account. Funds are drawn monthly from your specified bank account, in accordance with an agreed payment plan.

This account is a transparent online banking system and is strictly under your control. The funds in your Special Purpose Savings Account belong to you, and you may withdraw any funds that have not previously been earned by Anchor at any time.

[TURN TO SLIDE 6]

YOUR DEBT RESOLUTION STRATEGY AND HOW DEBTS ARE NEGOTIATED WITH YOUR CREDITORS

You hired our Law Firm to get your debts resolved as quickly and for as little money as possible. Our strategy is based on saving up funds in your GCS Account, which is why sticking to your payment plan is so important. As the funds build in your account, we will contact your creditors to attempt to negotiate settlements on your behalf. When we reach an agreement with one of your creditors to resolve a debt, the local attorney will review and approve all settlements. We then present you with the details of the debt resolution offer in writing and either the attorney or the negotiator will contact you to confirm your authorization of the settlement and how you wish to proceed. If you approve, then you will provide your written or verbally recorded approval of the offer and also authorize the funds that will be sent to your creditor. This process is repeated until all of your debts are negotiated and resolved with your creditors.

It is important to understand that Anchor cannot force a creditor to negotiate your debt. Although Anchor will not accept a debt into the program from creditors it knows will not negotiate debts, there are times when a creditor that has negotiated with Anchor in the past will refuse to negotiate a debt. In such instances, the Anchor attorneys or negotiators may require your assistance in participating in the negotiation process. Anchor personnel will provide you with the information you will need in order to contact your creditor directly in an effort to reach a satisfactory settlement. If Anchor cannot successfully negotiate a debt for you, even with your assistance, it will refund to you the portion of your fees associated with that debt.

[TURN TO SLIDE 7]

WHAT YOU NEED TO KNOW

You may experience an increase in collection activity, including calls or letters from creditors or collectors. As we mentioned on slide 4, we have measures in place to deter these calls (i.e. Google Voice and LOR's).

IN APPROPRIATE CASES, ANCHOR ATTORNEYS CAN SEEK DAMAGES FOR YOU AS A RESULT OF ABUSIVE COLLECTION PRACTICES

THE LAW FIRM CANNOT STOP INTEREST, LATE FEES, OR PENALTIES, BUT REDUCTION OF THESE EXPENSES IS TYPICALLY INCLUDED IN ANY SETTLEMENT NEGOTIATED ON YOUR BEHALF.



A-2513

ANCHOR ALSO CANNOT PREVENT CREDITORS OR COLLECTORS FROM FILING A LAWSUIT AGAINST YOU ARISING FROM YOUR DEBTS. HOWEVER, IF YOU ARE SUED, ANCHOR ATTORNEYS WILL REPRESENT YOU IN COURT AND ASSERT ANY VALID DEFENSES ON YOUR BEHALF AS PROVIDED BY THE TERMS OF THE RETAINER AGREEMENT.

THE LAW FIRM DOES NOT CONTACT CREDIT BUREAUS TO CLEAN UP OR REPAIR YOUR CREDIT

IT TYPICALLY TAKES THE LAW FIRM 6 TO 9 MONTHS TO REACH THE FIRST SETTLEMENT.

THE LAW FIRM DOES NOT PROVIDE ANY TAX ADVICE AND ANY REDUCTIONS IN DEBT MAY BE TAXABLE BY THE IRS

YOUR CREDIT SCORE WILL LIKELY BE NEGATIVELY IMPACTED WHILE YOU ARE IN THE PROGRAM

[TURN TO SLIDE 8]

WE SUPPORT YOU THROUGHOUT THE PROGRAM

The law firm is prepared to do what is necessary to represent you and, if appropriate, defend you against creditor or collector lawsuits. This may include work done on your behalf in or out of court. A local attorney in the state where the complaint was filed will represent you in asserting any reasonable defenses to the suit, or any other viable means of resolving the suit. This may include negotiations with the creditors' attorney, preparation of responsive documents and/or appearances at court hearings on your behalf. Although the legal fees for your defense are covered by your retainer payments, you would have to pay a $350 fee for trial costs if the action were to go to trial.

[TURN TO SLIDE 9]

IF CIRCUMSTANCES CHANGE, CONTACT US IMMEDIATELY TO DISCUSS ALL YOUR OPTIONS

If at any time your circumstances change and you have more funds available to resolve your debt or you experience an increased hardship, such as loss of your job, please contact our client services team. If you have experienced increased hardships, we will discuss options with you, including our law firm representing you in bankruptcy.

[TURN TO SLIDE 10]

ONCE YOU BECOME OUR CLIENT

WE ARE AVAILABLE FOR QUESTIONS AND SUPPORT THROUGHOUT THE PROGRAM

Our client services team is available to answer any non-legal questions and help you throughout the debt resolution process. It is important to understand that only an Anchor attorney can provide you with any legal advice or respond to any legal questions you may have. The client services team will assist you in arranging to speak with an attorney to address such issues.

PLEASE MAKE SURE YOU ARE AVAILABLE TO SPEAK WITH OUR SUPPORT TEAM REGARDING YOUR PROGRAM WHEN WE CALL

Within a week of your enrollment with Anchor, an Anchor attorney, licensed to practice in your state, will reach out to confirm program details and review key aspects of your representation. The attorney will be

**EXHIBIT 15 (p. 3)**
Exhibit 08-0234

**P000017**

A-2514

able to answer any legal questions you may have during this presentation. Please remember that you must speak with your local attorney before you can be represented by the firm, so the attorney will continue to try and contact you until a conversation takes place.

The client support team will also reach out to you by phone to confirm your personal information and to answer any non-legal questions you have about the program. Your welcome package will be mailed to you within one week of Rockwell receiving a copy of your executed agreement. A copy of your executed agreement will be e-mailed to you within twenty-four hours of enrollment.

Included in your welcome package will be some important documents such as creditor logs, information on the laws that protect you from collection agencies as well as what to do if you need help from Rockwell's Litigation Department.

The client support team is always ready to assist you with any non-legal questions you have throughout your program. This is often the quickest way to get your questions answered, particularly when the question does not require legal advice. However, you are always welcome and encouraged to contact your local attorney directly, or ask the client services team to facilitate a conversation between you and the attorney.

[TURN TO SLIDE 11]

DOCUMENTS TO BE SIGNED TODAY

The Letter of Engagement is your contract with our law firm which outlines the terms and conditions of the program.

The Payment schedule clearly outlines all payments of fees and savings.

The Power of Attorney (limited to this transaction only) permits us to act on your behalf to negotiate with your creditors.

The Compliance Affidavit acknowledges our legal staff's compliance with all federal and state regulations. Your signature confirms your attendance at this meeting today.

The Banking Platform Documents gives your consent to establish and authorize electronic payment to a Special Purpose Savings Account with Global Client Solutions.

The in – Person Client Presentation is your acknowledgment that you have received this presentation in person.

**Now that you have read and understand your Account Servicing Agreement, if you would like to proceed, I can take your financial information to assist you in completing the application.**

EXHIBIT 15 (p. 4)
Exhibit 08-0235
P000018

A-2515

32

42

# FS Closing Call Script 5.0

## Including Sales Tool References

This is the call guide for completing a successful second call, including a structure to present relevant benefits, effectively explain the logistics of the program and close your prospect to enter the program. It includes a skills guide to help reinforce the specific skills you will use to complete the call.

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

© 2016 Strategic Financial Solutions, LLC.

EXHIBIT 42 (p. 1)
Exhibit 08-0286

A-2516

# Intro/Review Goals (Discussion)

Hello, this is (Your First Name, Last Name), and I'm calling from Finance Solutions. Is (Mr. /Mrs. Last Name) available? Is this (still) a good time to speak? Great! How is your day/week going? (*Build rapport based on response*) As we discussed, I've emailed you a link; were you able to pull that up? Great! Once you've entered the meeting, you should see a slide with your name on it. Please let me know when you see it.

I'm happy to say that I have some great news for you! **We have approved** you for some great **terms**. You'll need to take down some numbers in a few minutes, so please have a pen and paper handy.

Before we go into the numbers, let me make you aware that this call may be monitored or recorded for quality assurance purposes.

**MOVE ON TO SLIDE TWO – YOUR OVERVIEW – AND CLICK "SHOW USER"**
**WHEN THE "SHOW USER" DOT TURNS GREEN, YOUR CLIENT WILL BE ABLE TO SEE THE SLIDE.**
Let's start by reviewing your income and expenses to ensure that we have all the correct information.
(*Emphasize the high expense load resulting from the burden of the credit card payments*)

Next, let's discuss the goals you shared with me during our last call.

*Review the lifestyle and financial goals the prospect shared with you during your 'Qualification Call' and shown on "Your Overview." The goals in Velocify are generic. Personalize them by referencing back – in detail – to the previous call. For example:*
*Generic Velocify Goal = "You want to help a loved one."*
*Personalized Goal = "One of the goals you shared was that you want to help a loved one. You mentioned that your brother is experiencing poor health and you would love to be able to be there for him and help his family out with expenses during this difficult time."*
*The four financial goals that are consistent with all clients are:*

1. *Get out of debt in 3-4 years*
2. *Consolidate into 1 monthly payment*
3. *Pass less interest*
4. *Lower the monthly payment*

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

39

© 2016 Strategic Financial Solutions All Rights Reserved **EXHIBIT** Exhibit 206.0237

A-2517

34

I am excited to tell you about a few options that we have which will help you to greatly reduce your monthly expenses and accomplish your goals. Before I get into the terms of your offer, let me confirm that we have all your debt information correctly entered in our system. I understand you may still be using some of these cards and making payments on others, so this is just an estimate.

## Current Situation (Discussion)

*Go through the names of the creditors and verify all the information is correct and that no cards have been left out; also giving notice that we may have not included all their cards due to some of them not qualifying for the program.* Your total debt on all these accounts totals approximately $_____. Does that sound, about right?

**If the client wishes to change amounts, remove cards, etc. proceed to the next page.**
1) Go to the client's record in Velocify and make the changes.
2) Activate the menu at the client's name.
3) Press the "REFRESH NOW" button
4) Click on the Your Overview slide.
5) The client's debt listing will instantly update.

**.MOVE TO SLIDE THREE – MINIMUM PAYMENTS – AND CLICK "SHOW USER"**
We did an analysis of your current situation. As we can see, you are paying $_____ in total every month on all your accounts. At that rate, it will take you over _____ years to pay off this debt.

This means that you will pay the credit card companies $_____, while being in debt for _____years.

Were you aware of that? It certainly doesn't sound like the most ideal payment plan, wouldn't you agree? imagine this is the type of plan you are looking to avoid?

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

39

© 2016 Strategic Financial Solutions All Rights Reserved EXHIBIT 120 p 0238

A-2518

35

# DQ/Approval and Program Overview (Presentation)

**MOVE TO SLIDE FOUR –YOU ARE ALREADY APPROVED – AND CLICK "SHOW USER"**

That's great, because although your file was not approved for a debt consolidation loan (due to your credit score and/or debt to income ratio). **We have approved you for a great option** which is perfectly in line with the goals we previously discussed. I personally feel it is a lot better for your situation. It's better because through this option…

- Our program will resolve your unsecured debt within two to four years – obviously up to 10 times faster than continuing to make just your minimum payments.

- It offers immediate significant savings each month versus your current payment

- It still involves that one convenient monthly payment you were looking for. So, no more scrambling around to write multiple checks to different creditors each month.

- There's absolutely no prepayment penalties

- Also, through our program, we do not charge our clients interest. There are fees involved which I will break down for you when we go through the payment terms.

This program is a popular option called Credit Card Modification. Are you familiar with this program? *(If not, brief explanation of program before showing client the video)*
*(IF client has heard of the program)* Great! What have you heard? *(Deal with concerns and/or objections, if any. Probe for acceptance to move on)*

Credit Card Modification is a restructuring of credit card debt. We partner with a law firm who specializes in working with creditors to reach agreements to reduce your principal balances. This program features one monthly payment that is a reduction to your current total monthly payments.

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

39

© 2016 Strategic Financial Solutions All Rights Reserved   EXHIBIT 120-0039

A-2519

36

**Show Video**

**MOVE TO SLIDE FIVE –PROGRAM OVERVIEW – AND CLICK "SHOW USER"**

We have put together a great 3 minute video that really helps our clients to understand this program, so I would like to play it for you now.

Grab a pen and paper so you can write down any questions that may come up which I will be more than happy to answer. Sound good? If you will just press the play arrow in the center of your screen; your video will begin. Enjoy the show and I'll speak to you in three minutes.

*Once video is complete...*What did you think of the video? What questions do you have?

*Handle concerns by answering them and probing for acceptance. If a concern turns into an objection, use the appropriate Rebuttal at the left side of your screen (Sales Tool) to assist you in handling it.*

**MOVE TO SLIDE SIX – CREDIT CARD MODIFICATION – AND CLICK "SHOW USER"**

Credit Card Modification is a restructuring of your credit card debt, where you will work with (Law Firm Name). (Law Firm Name) is licensed and accredited in your state to represent you to your creditors and negotiate agreements to reduce your principal balances. This program features one monthly payment that is a reduction of your current total monthly payments.

In this program, you will no longer make monthly payments to each of your creditors. Instead, you will make one convenient monthly payment directly into a new savings account which is open in your name, only. This account is FDIC insured. We have no access to your savings other than for our fees, which are already included in your monthly payment.

"How does everything sound so far?"

# Program Terms (Discussion)

**MOVE TO SLIDE SEVEN –RECOMMENDATIONS – AND CLICK "SHOW USER"**

Great! Before I review your options let me emphasize two things about the figures I'm about to give you:

1. The term is an estimate based on our past results.

2. These are bottom line figures, so all costs – including our fees – are already built in and included in all the program monthly payments.

Great! Now your unsecured debt currently totals $_____ and through our program we estimate that we can have that reduced to around $_____. We can reach those significant savings through either of these 2 term options:

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

39

© 2016 Strategic Financial Solutions All Rights Reserved

EXHIBIT 42 (p. 5) Exhibit 108-0240

A-2520

37

Your first approved term is 48 months, which would require a monthly payment of $_____. This would give you a monthly payment reduction of $_____, compared to your current credit card payments.

However, if you would like a bit more payment relief, we do have a shorter 36-month program which requires a payment of $_____. This would give you a monthly payment reduction of $_____, compared to making your current credit card payments. And again, there are no prepayment penalties. But let me ask you, which option works best for you? *(Wait for client to pick a term.)*
Great! I think that's a smart decision. We'll go with the _____ month program.

## Program Basics (Presentation)

I am very excited about this program for you.
Before I move forward with getting you set-up, there are a few things you should understand about Credit Card Modification. As we discussed, you will stop making your regularly scheduled monthly payments on all the accounts you elect to enroll. This tactic allows us to secure the best possible settlements on your behalf. As a result of not making those payments, you may see your balances increase. Remember, we account for this in the agreements that we reach with your creditors and this should not impact your monthly payment.

Because of this you will experience a dip in your credit score while we are working to reach agreements with your creditors. I want you to be aware that the most recent FICO scoring method states that any debts that are settled will no longer be factored into the credit score. Our goal is to settle your accounts so that you can experience a rebound in your score as you progress through the program. Additionally, by paying your other obligations that are not included in the program on time, it should help offset some of the negative impact.
Lastly, the credit cards you include in the program will be closed. However, it is not all or nothing as you can hold onto a credit card. Is there a card you would like to remove from the program or are you looking to maximize the savings this program will allow and just enroll them all?
Perfect! Now I just need to verify some information in your file in order to generate your enrollment paperwork. You decided on the (36/48 Month) program, which requires a monthly payment of $_____. I can set your payment date for the (Day) of the month. Does that day work for you?

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

39

© 2016 Strategic Financial Solutions All Rights Reserved **EXHIBIT 42 (p. 6)** Exhibit 08-0241

A-2521

38

### If client needs time to think, use these closing tactics:

1. Usually, when I've reviewed how well the program terms suit a client's needs and they want to think things over, it's because there's a misunderstanding or I haven't spent enough time on an issue to clarify it. Before you go, would you please share with me the one thing, more than anything else that is causing you to hesitate with moving forward? *(Handle objection or concern and close)*

2. *If there is no "one thing" than:* Before you go, let's take a moment to review the program terms so you have them fresh in your mind and can think them though. *(Review and summarize benefits and tie them to original needs shared during QC.)*

3. I will also follow up with an email so you have these terms as well as all the cards that are eligible for the program. Think about this tonight and I will give you a call back tomorrow to answer any additional questions and discuss next steps. Does tomorrow morning, afternoon, or evening work better for you?

"Thank you for that information, I am updating your information now so that we can review the enrollment documents together. This review should take about 10 minutes and we will discuss all the details of the program."

*Request enrollment documents in Velocify and review them with the client in sales tool. Use the attorney firm specific enrollment documents script.*

**If the client wishes to change amounts, remove cards, etc.:**

1) Go to the client's record in Velocify and make the changes.
2) Activate the menu at the client's name.
3) Press the "REFRESH NOW" button/
4) Click on the Your Overview slide.
5) The client's debt listing will instantly update.

- Again, this will reduce your monthly payment by_____and get you out of your enrolled debt in 4 years instead of_____years.
  **"Can you see how this would really help you out?"**

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

39

© 2016 Strategic Financial Solutions All Rights Reserved EXHIBIT 206-0242

A-2522

39

- Each month, your funds will accrue in your trust account and the attorneys will use those funds to complete the settlements.

- We typically work the lowest balance cards first and then move to the higher balance cards. If there is a situation where a creditor is being more aggressive than the others, we will move that creditor to the front of the list to work with them first.

These materials are *CONFIDENTIAL*, belong solely to Strategic Financial Solutions, Inc. and should not be used, copied or removed from the Company's premises without the express written permission of an authorized Company representative. These materials provide important guidance for the performance of your work functions and should not be deviated from unless you have been expressly instructed to do so by a member of your management team.

39

© 2016 Strategic Financial Solutions All Rights Reserved  EXHIBIT 42 (p. 8)

Exhibit 08-0343

A-2523

MC

# PERSONNEL

## ABBAS,HARIS S

Mailing & Home Address

NJ 07102

eVoucher
Status: TERM
**File: 003418**
Dept 002241   Sex: M
SSN On File   Race: 4
Title: NEOGO

Dates
Hire: 03/20/2017   Birth:
Term: 04/05/2017   Date 5: 03/20/2017
Employee & Dependents Health Care Coverage

| PAY | | |
|---|---|---|
| Gross: | 0.00 | |
| Hourly Rate: | 18.00/00 | Semi-Mon |
| Rate Calc: | 3 | |
| LWW: 15 | NWW: 06 | |

| TAX STATUS | |
|---|---|
| Marital Status: | |
| Federal: | |
| 00 Exemptions | |
| 01 NY | |
| 19 NY SUIDI | |
| NY FLI | |
| 3305 Local | |
| NY METRO - M | |

16.00 Ac  0A PERSO
0F REGUL  0G REGUL

| SCHEDULED AMOUNTS | | |
|---|---|---|
| Direct Deposits | | |
| Acct #: XXXXXX6777 | Code CK1 | |
| Tran/ABA XXXXXXXX X | Full Deposit | |

| ACCUMULATIONS TO DATE | |
|---|---|
| 1,285.20 Y Gross | 125.16 Y FIT |
| 79.68 Y SS | 18.64 Y MED |
| 26.74 Y State 1 | 2.60 Y SUIDI |
| 1,285.20 Y NYMCT TXB | 4.37 Y NYMCT TAX |
| 4.34 Y TAXFRQCT | 1,285.20 Ac 20 ELIGI |
| 1,285.20 Ac 21 YTD G | 71.40 Ac 22 YTD T |
| 71.40 Ac 0E REGUL | 1,285.20 0G REGUL |

## ABDELSALAM,CINDY T

Mailing & Home Address

NY 11756

eVoucher
Status: TERM
**File: 001032**
Dept 002240   Sex: F
SSN On File   Race: 1
Title: NEGADMIN

Dates
Hire: 03/20/2017   Birth:
Term: 09/08/2017   Date 5: 03/20/2017
Employee & Dependents Health Care Coverage

| PAY | | |
|---|---|---|
| Gross: | 0.00 | |
| Hourly Rate: | 17.00/00 | Semi-Mon |
| Rate Calc: | 3 | |
| LWW: 37 | NWW: 28 | |

| TAX STATUS | |
|---|---|
| Marital Status: | |
| Federal: | |
| 00 Exemptions | |
| 01 NY | |
| 19 NY SUIDI | |
| NY FLI | |
| 3305 Local | |
| NY METRO - M | |

| SCHEDULED AMOUNTS | | |
|---|---|---|
| Direct Deposits | | |
| Acct #: XXXXXX0938 | Code CK1 | |
| Tran/ABA XXXXXXXX X | Full Deposit | |

| ACCUMULATIONS TO DATE | |
|---|---|
| 17,491.60 Y Gross | 2,264.46 Y FIT |
| 1,084.48 Y SS | 253.63 Y MED |
| 727.32 Y State 1 | 15.60 Y SUIDI |
| 17,491.60 Y NYMCT TXB | 59.46 Y NYMCT TAX |
| 26.04 Y TAXFRQCT | 1.20 Y PTO |
| 17,491.60 Ac 20 ELIGI | 17,491.60 Ac 21 YTD G |
| 992.85 Ac 22 YTD T | 544.45 Ac 37 BONUS |
| 32.00 Ac 47 HOLD | 544.00 Ac 48 HOLID |
| 8.00 Ac 55 SWING | 136.00 Ac 56 SWING |
| 8.00 Ac 57 FMLA | 8.08 Ac 78 OVERT |
| 206.06 Ac 91 OVERT | 35.37 Ac 0A PERSO |
| 601.29 Ac 0C PERSO | 909.40 Ac 0E REGUL |
| 15,459.80 Ac 0G REGUL | |

## ABDUL-AZIM,MIKYLA

Mailing & Home Address

NY 10566

eVoucher
Status: ACTIVE
**File: 004686**
Dept 002240   Sex: F
SSN On File   Race: 2
Title: LITSUP

Dates
Hire: 08/21/2017   Birth:
Date 5: 08/21/2017
Employee & Dependents Health Care Coverage

| PAY | | |
|---|---|---|
| Gross: | 0.00 | |
| Hourly Rate: | 15.00/00 | Semi-Mon |
| Rate Calc: | 3 | |
| LWW: 52 | NWW: 21 | |
| Paid 12 h of Mon h | 1 2 3 | |
| Prior Qtr Mon h 3 | | |

| TAX STATUS | |
|---|---|
| Marital Status: | |
| Federal: | |
| 00 Exemptions | |
| 01 NY | |
| 19 NY SUIDI | |
| NY FLI | |
| 3305 Local | |
| NY METRO - M | |

16.00 Ac  99 PERSO
0F REGUL  0G REGUL

| SCHEDULED AMOUNTS | | |
|---|---|---|
| Direct Deposits | | |
| Acct #: XXXXXX081 | Code CK1 | |
| Tran/ABA XXXXXXXX X | Full Deposit | |

240.00 Ac  0B PERSO

| ACCUMULATIONS TO DATE | |
|---|---|
| 17,159.75 Y Gross | 1,369.70 Y FIT |
| 691.90 Y SS | 161.82 Y MED |
| 422.58 Y State 1 | 11.70 Y SUIDI |
| 11,159.75 Y NYMCT TXB | 37.95 Y NYMCT TAX |
| 19.53 Y TAXFRQCT | 16.00 Tkn   1 PTO |
| 7,281.26 Ac 20 ELIGI | 11,159.75 Ac 21 YTD G |
| 720.21 Ac 22 YTD T | 325.00 Ac 36 BONUS |
| 325.00 Ac 37 BONUS | 8.00 Ac 46 HOLID |
| 16.00 Ac 47 HOLD | 120.00 Ac 48 HOLID |
| 240.00 Ac 49 HOLID | 8.00 Ac 55 SWING |
| 120.00 Ac 56 SWING | 8.00 Ac 57 FMLA |
| 4.08 Ac 77 OVERT | 4.21 Ac 78 OVERT |
| 91.82 Ac 90 OVERT | 94.75 Ac 91 OVERT |
| 488.56 Ac 0D REGUL | 676.00 Ac 0E REGUL |

## ABRAHAM,KESHIA

Mailing & Home Address

NY 10475

| PAY | | |
|---|---|---|
| Gross: | 0.00 | |
| Hourly Rate: | 19.02/00 | Semi-Mon |
| Rate Calc: | 3 | |
| LWW: 52 | NWW: 58 | |

| TAX STATUS | |
|---|---|
| Marital Status: | |
| Federal: | |
| 02 Exemptions | |
| 01 NY | |
| 02 Exemptions | |

22.90 DEN DENTAL

| ACCUMULATIONS TO DATE | |
|---|---|
| 40,214.23 Y Gross | 4,006.23 Y FIT |
| 2,473.41 Y SS | 578.46 Y MED |
| 1,624.41 Y State 1 | 31.20 Y SUIDI |
| 1,106.89 Y Local 2 | 39,893.63 Y NYMCT TXB |
| 135.62 Y NYMCT TAX | 54.25 Y TAXFRQCT |

Additional Accumulations to Date

# STRATEGIC CLIENT SUP
Company Code: WKS

Batch: 6862-020   Period Ending: 12/31/2017   Week 52
Service Center: 020   Pay Date: 12/29/2017   Page 6

© 1999, Automatic Data Processing, Inc.   **ADP** Master Control

A-2524

MC

## PERSONNEL

**ABRAHAM,KESHIA**
File: 007100 (continued)

| PERSONNEL | PAY | TAX STATUS | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE |
|---|---|---|---|---|

**ABRAHAM,KESHIA**
File: 007100
eVoucher
Status: ACTIVE
Sex: F
Race: 2
Dept: 002240
SSN: On File
Title: LITSUP
Hire: 04/24/2013   Birth:
Date 5: 05/11/2017   Date 7: 04/24/2013
No Health Care Coverage Available

Paid 12h of Mon h: 1 2 3
Prior Qtr Mon h 3

19 NY SUIDI
NY FLI
3301 Local 2
NEW YORK CIT
3305 Local
NY METRO - M

308.00 Thn   1 PTO   35 689.00 Ac   20 ELIGI
40 214.23 Ac   21 YTD G   2 070.43 Ac   22 YTD T
100.00 Ac   36 BONUS   1 025.00 Ac   37 BONUS
8.00 Ac   46 HOLD   64.00 Ac   47 HOLD
152.16 Ac   48 HOLD   1 195.20 Ac   49 HOLD
8.00 Ac   55 SWING   152.16 Ac   56 SWING
8.00 Ac   57 FMLA   16.47 Ac   77 OVERT
33.42 Ac   78 OVERT   469.88 Ac   90 OVERT
938.27 Ac   91 OVERT   16.00 Ac   99 PERSO
1 841.10 Ac   0E REGUL   8 875.11 Ac   0F REGUL

124.00 Ac   0A PERSO
34 397.84 Ac   0G REGUL

304.32 Ac   0B PERSO
137.40 Ac   0U DENTA

466.62 Ac   0D REGUL

*Additional Accumulations to Date*
2 505.76 Ac   0C PERSO
320.60 Ac   0V DENTA

## ACOFF,DOMONIQUE
File: 006746
eVoucher
Status: ACTIVE
Sex: F
Race: 2
Dept: 002801
SSN: On File
Title: ADMASTOP
Hire: 10/30/2017   Birth:
Date 5: 10/30/2017
Employee & Dependents Health Care Coverage

Gross:   0.00
Hourly Rate: 12.5000   Semi-Mon
Rate Calc:   3
LWW: 52   NWW: 09
Paid 12h of Mon h: 2 3

Marital Status:
Federal:
  03 Exemptions
01 NY
  03 Exemptions
01 NY (Lived in)
19 NY SUIDI
NY FLI

10.00 GYM GYM

154.83 Y FIT
3 927.44 Y Gross   56.95 Y MED
243.50 Y SS   5.20 Y SUIDI
93.80 Y State 1   999.06 Ac   20 ELIGI
8.69 Y TAXFROCT   313.21 Ac   22 YTD T
3 927.44 Ac   21 YTD G   8.00 Ac   47 HOLD
8.00 Ac   46 HOLD   100.00 Ac   49 HOLD
100.00 Ac   48 HOLD   1.97 Ac   78 OVERT
1.97 Ac   77 OVERT   36.94 Ac   91 OVERT
36.94 Ac   90 OVERT   303.24 Ac   0E REGUL
303.24 Ac   0D REGUL   3 790.50 Ac   0G REGUL
3 790.50 Ac   0F REGUL   40.00 Ac   1N GYM M
40.00 Ac   1M GYM M

## ACOSTA,RAINIERO
File: 001122
eVoucher
Status: ACTIVE
Sex: M
Race: 3
Dept: 002220
SSN: On File
Title: CSRLEAD
Hire: 05/02/2016   Birth:
Date 5: 03/13/2017
No Health Care Coverage Available

Gross:   0.00
Hourly Rate: 19.0000   Semi-Mon
Rate Calc:   3
LWW: 52   NWW: 56
Paid 12h of Mon h: 1 2 3
Prior Qtr Mon h 3

Marital Status:
Federal:
  03 Exemptions
01 NY
  00 Exemptions
19 NY SUIDI
3301 NEW YORK CIT
3301 Local 2
NEW YORK CIT
3305 Local
NY METRO - M

2161.62   71 TAXLUV   13.07 GYM GYM
*Calc Factors*
013.0000   87 ROTH%   006.0000   88   401K%
*Direct Deposits*
Acct #   XXXXXXXXXX6488   CodeCK1
Tran/ABA   XXXXXXXX X   Full Deposit

3 441.81 Y FIT
46 142.79 Y Gross   669.07 Y MED
2 860.85 Y SS   31.20 Y SUIDI
2 019.44 Y State 1   46 142.79 Y NYMCT TXB
1 361.72 Y Local 1   2 201.96 Y 401K
156.90 Y NYMCT TAX   52.08 Y TAXFROCT
690.41 Y Special 1   891.51 Ac   19 CMP M
117.88 Thn   1 PTO   46 142.79 Ac   21 YTD G
40 867.51 Ac   20 ELIGI   1 100.00 Ac   36 BONUS
2 214.99 Ac   22 YTD T   8.00 Ac   46 HOLD
3 734.25 Ac   37 BONUS   152.00 Ac   48 HOLD
64.00 Ac   47 HOLD   8.00 Ac   55 SWING
176.00 Ac   49 HOLD   8.00 Ac   57 FMLA
152.00 Ac   56 SWING   1 332.41 Ac   62 ROTH
4 714.74 Ac   61 ROTH

*Additional Accumulations to Date*
218.03 Ac   67 401K   137.23 Ac   78 OVERT   794.02 Ac   90 OVERT
66.63 Ac   0A PERSO   1 243.77 Ac   0C PERSO   494.00 Ac   0D REGUL
36 983.78 Ac   0G REGUL   313.66 Ac   1M GYM M   3 593.62 Ac   9B TAX L

90.84 Ac   65 ER MA   218.03 Ac   66 401K   27.85 Ac   77 OVERT
3 852.99 Ac   91 OVERT   16.15 Ac   99 PERSO   306.85 Ac   0B PERSO
1 939.13 Ac   0E REGUL   9 366.00 Ac   0F REGUL   78.42 Ac   1N GYM M

**STRATEGIC CLIENT SUP**
Company Code: WKS

ADP Master Control
© 1995 Automatic Data Processing, Inc.

A-2525



| PERSONNEL | PAY | TAXS .. US | SCHEDULED AMOUNTS | ACCUMULATIONS TO DATE |
|---|---|---|---|---|

**ZAPATA,MILAGROS**
File: 007664
(continued)

Paid 12h of Mon h: 1 2 3 01 NY (Lived in)
Prior Qtr Mon h 3

| | |
|---|---|
| 178.98 Thn 1 PTO | 31 510.70 Ac 20 ELIGI |
| 35 819.13 Ac 21 YTD G | 2 068.75 Ac 22 YTD T |
| 363.00 Ac 23 Commu | 1 443.00 Ac 24 Commu |
| 400.00 Ac 36 BONUS | 2 000.00 Ac 37 BONUS |
| 8.00 Ac 46 HOLD | 64.00 Ac 47 HOLD |
| 131.04 Ac 48 HOLD | 1 033.20 Ac 49 HOLD |
| 20.85 Ac 77 OVERT | 50.06 Ac 78 OVERT |
| 512.28 Ac 90 OVERT | 1 212.08 Ac 91 OVERT |
| 9.43 Ac 99 PERSO | 81.43 Ac 0A PERSO |

File: 007664
**Hire:** 09/28/2015 Birth:
Date 5: 05/11/2017
No Health Care Coverage Available

eVoucher
Status: ACTIVE
Sex: F
Race: 3

Dept: 002220
SSN: On File
Title: CSR

Additional Accumulations to Date

1 303.59 Ac 0C PERSO 1 443.00 Ac 1J COMMU

154.47 Ac 08 PERSO
363.00 Ac 1H COMMU

503.93 Ac 0D REGUL 1 873.26 Ac 0E REGUL 30 270.26 Ac 0G REGUL

---

**ZEYNALI,DARIUS**
File: 008164

**Marital Status:**
Federal:
02 Exemptions
01 NY
02 Exemptions
19 NY SUIDI
NY FLI
3301 Local 2
3305 Local
NY METRO - M

Gross: 0.00
Salary: 2637.50
 Semi-Mon
Rate 2: 30.4315
Rate Calc: 3
LWW: 35 NWW: 37

Calc Factors
006.0000 88 401K%

Acct #: XXXXXX3490 Code:CK1
Tran/ABA: XXXXXXXX X Full Deposit

Direct Deposits

| | |
|---|---|
| 6 662.74 Y FIT | 47 555.68 Y Gross |
| 688.19 Y MED | 2 942.62 Y SS |
| 20.80 Y SUIDI | 2 296.45 Y State 1 |
| 47 461.59 Y NYMCT TXB | 1 451.95 Y Local 2 |
| 2 853.34 Y 401K | 161.40 Y NYMCT TAX |
| 248.00 Thn 1 PTO | 34.72 Y TAXFROCT |
| 47 555.68 Ac 20 ELIGI | 1 188.91 Ac 19 CMP M |
| 120.00 Ac 22 YTD G | 47 555.68 Ac 21 YTD G |
| 48.00 Ac 47 HOLD | 4 514.00 Ac 37 BONUS |
| 8.00 Ac 57 FMLA | 8.00 Ac 55 SWING |
| 2 637.50 Ac 0C PERSO | 64.00 Ac 0A PERSO |
| 94.09 Ac 0T STD-Y | 40 404.18 Ac 0G REGUL |

eVoucher
Status: TERM
Sex: M
Race: 1

Dept: 002241
SSN: On File
Title: NEGMGR

**Hire:** 08/26/2014 Birth:
**Term:** 03/18/2017 Date 5: 04/10/2017
Date 7: 08/26/2014

NY 11385

No Health Care Coverage Available

---

**ZUBEROVIC,ARIANA**
File: 008305

**Marital Status:**
Federal:
00 Exemptions
01 NY
00 Exemptions
19 NY SUIDI
NY FLI
3301 NEW YORK CIT
3301 Local 2
3305 Local
NY METRO - M

Gross: 0.00
Salary: 2208.34
 Semi-Mon
Rate 2: 25.4799
Rate Calc:
LWW: 13 NWW: 14

185.00 TRC COMMUT

Acct #: XXXXX3368 Code:CK1
Tran/ABA: XXXXXXXX X Full Deposit

Direct Deposits

| | |
|---|---|
| 1 417.75 Y FIT | 10 545.05 Y Gross |
| 144.86 Y MED | 619.38 Y SS |
| 7.80 Y SUIDI | 442.04 Y State 1 |
| 9 990.05 Y NYMCT TXB | 281.80 Y Local 1 |
| 13.02 Y TAXFROCT | 33.96 Y NYMCT TAX |
| 10 545.05 Ac 20 ELIGI | 56.00 Thn 1 PTO |
| 530.89 Ac 22 YTD T | 10 545.05 Ac 21 YTD G |
| 267.12 Ac 37 BONUS | 555.00 Ac 24 Commu |
| 446.16 Ac 49 HOLD | 24.00 Ac 47 HOLD |
| 313.45 Ac 91 OVERT | 10.23 Ac 78 OVERT |
| 692.80 Ac 0C PERSO | 24.00 Ac 0A PERSO |
| 8 835.52 Ac 0G REGUL | 472.66 Ac 0E REGUL |
| | 555.00 Ac 1J COMMU |

eVoucher
Status: TERM
Sex: F
Race: 1

Dept: 002510
SSN: On File
Title: JRANLST

**Hire:** 06/20/2016 Birth:
**Term:** 03/26/2017 Date 5: 03/27/2017

D NY 10302

Employee & Dependents Health Care Coverage



**Master Control** © 1995 Automatic Data Processing, Inc.

**STRATEGIC CLIENT SUP**
Company Code: WKS

Batch: 6862-020 Period Ending: 12/31/2017 Week 52
Service Center: 020 Pay Date: 12/29/2017 Page 166

A-2526

MC

## COMPANY TOTALS

| | |
|---|---|
| Hourly Rates (Active EE's): | 4 687.7400 |
| Salary Rates (Active EE's): | 71 822.3200 |
| Total Rates (All EE's): | 183 664.3600 |
| All Employees: | 484 |
| Active Employees: | 288 |
| New Hires: | 0 |
| Changes: | 12 |
| Entries: | 0 |
| Pays: | 45 |

## PAY — Current Payroll:

| | |
|---|---|
| Hours 1: | 0.00 |
| Hours 2: | 0.00 |
| Hours 3: | 0.00 |
| Hours 4: | 0.00 |
| Earnings 1: | 0.00 |
| Earnings 2: | 0.00 |
| Earnings 3: | 0.00 |
| Earnings 4: | 0.00 |
| Earnings 5: | 0.00 |
| Federal Tax: | 0.00 |
| Soc. Sec. Tax: | 332.81- |
| Medicare Tax: | 77.63- |
| Medicare Surtax: | 0.00 |
| SUI/SDI Tax: | 0.00 |
| State Tax: | 0.00 |
| Local Tax: | 0.00 |
| EIC Advances: | 0.00 |
| Vol Deductions: | 5 367.86 |
| Gross: | 0.00 |
| Net: | 4 957.42- |
| Male Pays > 100: | 0.00 |
| Male Pays > 300: | 0.00 |
| Total Male Pays: | 15 |
| Female Pays > 100: | 0.00 |
| Female Pays > 300: | 0.00 |
| Total Female Pays: | 22 |

## SCHEDULED AMOUNTS

| | | | |
|---|---|---|---|
| 340.84 R | 61.28 VH | | |
| 3 344.32 71 | 6 281.36 73 | | |
| 2 072.14 75 | 42.00 76 | | |
| 250.25 77 | 2 220.00 CK1 | | |
| 109.00 CK4 | 1 200.00 CK3 | | |
| 982.39 DEN | 1 093.00 COM | | |
| 103.65 LIF | 733.29 GYM | | |
| 5 852.90 MED | 6 398.33 LNR | | |
| 77.49 STD | 55.00 PAR | | |
| 19 008.10 TRC | 4 039.34 SV1 | | |
| | 48.00 VIS | | |

### Calc Factors

| | |
|---|---|
| 64.0000 87 | 162.0000 88 |
| 40.0000 91 | 10.0000 92 |
| 10.0000 93 | |

### Goal Deductions

| | |
|---|---|
| 40 205.91 Goal 1 | 32 134.67 Bal 1 |
| 3 239.69 Goal 2 | 2 409.49 Bal 2 |

### Additional Accumulations to Date

| | |
|---|---|
| 429 213.91 Ac 0E | 2 538 162.40 Ac 0F |
| 430.38 Ac 0R | 1 507.93 Ac 0T |
| 592.10 Ac 1B | 2 519.50 Ac 1C |
| 40 234.20 Ac 1H | 142 977.88 Ac 1J |
| 361.00 Ac 1P | 39.45 Ac 1Q |
| 630.23 Ac 9D | 1 160.65 Ac 9E |

## ACCUMULATIONS TO DATE

| | |
|---|---|
| 10 647 730.54 Y Gross | 1 147 496.95 Y FIT |
| 843 980.38 Y SS | 150 608.71 Y MED |
| 438 423.89 Y State 1 | 7 991.05 Y SUIDI |
| 141 019.24 Y Local 1 | 44 856.95 Y Local 2 |
| 9 712 695.92 Y NYMCT TXB | 33 023.14 Y NYMCT TAX |
| 48 668.57 Y 401K | 4 882.75 Y Special 1 |
| 13 414.56 Y TAXFROCT | 37 935.50 Ton  1 PTO |
| 21 138.25 Ac 19 | 9 284 147.87 Ac 20 |
| 10 647 730.54 Ac 21 | 479 304.39 Ac 22 |
| 40 234.20 Ac 23 | 142 977.88 Ac 24 |
| 165.00 Ac 25 | 96.00 Ac 30 |

| | | | |
|---|---|---|---|
| 288.00 Ac 31 | 1 294.00 Ac 32 | 9 015 128.95 Ac 0G | 86.73 Ac 0J |
| 4 526.32 Ac 33 | 143 250.88 Ac 36 | 5 719.48 Ac 0U | 18 103.81 Ac 0V |
| 660 565.86 Ac 37 | 750.00 Ac 40 | 1 075.50 Ac 1D | 7 304.62 Ac 1E |
| 750.00 Ac 41 | 2 160.00 Ac 46 | 3 000.00 Ac 1K | 9 600.00 Ac 1L |
| 14 936.00 Ac 47 | 34 834.24 Ac 48 | 7 830.00 Ac 1R | 26 926.95 Ac 1T |
| 237 222.82 Ac 49 | 240.00 Ac 50 | 26 376.75 Ac 9F | 963.00 Ac 9G |
| 1 945.00 Ac 55 | 33 628.88 Ac 56 | | |
| 1 945.00 Ac 57 | 3 177.45 Ac 58 | | |
| 19 173.92 Ac 61 | 3 816.00 Ac 62 | | |
| 1 656.32 Ac 65 | 3 675.02 Ac 66 | | |
| 3 675.02 Ac 67 | 8.00 Ac 73 | | |
| 152.00 Ac 74 | 2 602.32 Ac 76 | | |
| 3 233.08 Ac 77 | 12 028.65 Ac 78 | | |
| 87 657.19 Ac 90 | 320 068.28 Ac 91 | | |
| 1 046.84 Ac 98 | 6 294.00 Ac 99 | | |
| 274.88 Ac V1 | 856.64 Ac V2 | | |
| 313.76 Ac V3 | 1 289.52 Ac V4 | | |
| 20 454.10 Ac 0A | 99 594.38 Ac 0B | | |

| | |
|---|---|
| 346 007.69 Ac 0C | 123 750.68 Ac 0D |
| 1 647.13 Ac 0K | 4 975.61 Ac 0L |
| 30 496.99 Ac 0Y | 88 670.92 Ac 1A |
| 165.00 Ac 1F | 240.00 Ac 1G |
| 3 171.41 Ac 1M | 12 260.06 Ac 1N |
| 6 893.07 Ac 9B | 146.31 Ac 9C |
| 6 006.00 Ac 9H | |

Next Available File Numbers: 000054, 000055, 000056, 000057, 000058, 000059, 000060, 000061, 000062, 000063
Highest Available File Number: 018992

**ADP Master Control** — Company Totals

STRATEGIC CLIENT SUP
Company Code: WKS

Batch: 6862-020  Period Ending 12/31/2017  Week 52
Service Center: 020  Pay Date 12/29/2017  Page 167

© 1995 Automatic Data Processing, Inc.

**Payroll Register** — STRATEGIC CLIENT SUP

Company Code: WKS

Batch: 8694-020   Period Ending: 04/15/2018   Week 15
Service Center: 020   Pay Date: 04/16/2018   Page 1

| PERSONNEL | HOURS Reg OT Hours 3&4 | EARNINGS Reg OT Earnings 3&4 Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal / State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|
| BASDEO,AVINDRA<br>File: 003432<br>Dept: 002220<br>Rate: 20.7000 | 104.20  2.12 | 2,166.94  65.83<br>1,225.00 BLU<br>500.00 BLU | 3,947.77 | 566.57 FIT<br>244.76 SS<br>57.25 MED<br>197.22 NY 01 S<br>1.30 NY 19<br>SUI/DI<br>4.97 NY FLI<br>132.33 3301 L1 | 276.34   K 401KS<br>98.69 N-  EM  ERMAT<br>13.42 N-  M  MCTTAX<br>2467.03 CK1 CHKCK1 | Voucher#<br>**150001**<br>eVoucher  .00 |
| BEAUBRUN,<br>REGINALD<br>File: 001187<br>Dept: 002220<br>Rate: 16.5000 | 88.47  .57 | 1,459.76  14.11<br>50.00 BON | 1,523.87 | 158.43 FIT<br>94.48 SS<br>22.09 MED<br>63.92 NY 01<br>1.30 NY 19<br>SUI/DI<br>1.92 NY FLI<br>44.00 3301 L1 | 1139.73 CK1 CHKCK1<br>5.18 N-  M  MCTTAX | Voucher#<br>**150002**<br>eVoucher  .00 |
| BERRY,GERARD<br>File: 003549<br>Dept: 002220<br>Rate: 23.2500 | 101.80  3.72 | 2,366.85  129.74<br>575.00 BON<br>500.00 BLU | 3,571.59 | 354.42 FIT<br>221.44 SS<br>51.79 MED<br>177.72 NY 01<br>1.30 NY 19<br>SUI/DI<br>4.50 NY FLI<br>119.23 3301 L2 | 2841.19 CK1 CHKCK1<br>12.14 N-  M  MCTTAX | Voucher#<br>**150003**<br>eVoucher  .00 |
| BLANDINO,CLARETT<br>J<br>File: 009327<br>Dept: 002220<br>Rate: 16.9300 | 95.27  1.78  9.00 PTO | 1,612.92  45.20<br>152.37 PTO<br>100.00 BON | 1,910.49 | 182.08 FIT<br>118.45 SS<br>27.70 MED<br>85.76 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.41 NY FLI<br>56.31 3301 L1 | 1434.48 CK1 CHKCK1<br>6.50 N-  M  MCTTAX | Voucher#<br>**150004**<br>eVoucher  .00 |
| BOWERS,ERIC<br>File: 007989<br>Dept: 002220<br>Rate: 17.0800 | 104.02  .60 | 1,776.66  15.37<br>200.00 BON | 1,992.03 | 154.13 FIT<br>114.73 SS<br>26.83 MED<br>79.32 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.51 NY FLI<br>54.09 3301 L2 | 1417.60 CK1 CHKCK1<br>6.29 N-  M  MCTTAX<br>141.52 MED MEDICA | Voucher#<br>**150005**<br>eVoucher  .00 |
| BRAGTON,KWESI  S<br>File: 005124<br>Dept: 002220<br>Rate: 15.5000 | 4.28 PTO | 45.00 BLU<br>66.34 PTO | 111.34 | 30.00 FIT<br>6.90 SS<br>1.62 MED<br>40.00 NY 01<br>.56 NY 19<br>SUI/DI<br>.14 NY FLI | 32.12 CK1 CHKCK1<br>.38 N-  M  MCTTAX | Voucher#<br>**150006**<br>eVoucher  .00 |



© 1996 Automatic Data Processing, Inc.

# Payroll Register — STRATEGIC CLIENT SUP

| PERSONNEL | HOURS Reg / OT / Hours 3&4 | EARNINGS Reg / OT / Earnings 3&4 / Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | STATUTORY DEDUCTIONS State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| **CARTER, TONA** File: 002073 Dept: 002220 Rate: 15.5000 | 95.98 / .93 | 1,487.69 / 21.62 / 100.00 BON | 1,609.31 | 125.19 FIT 99.77 SS 23.34 MED | 64.06 NY 01 1.30 NY 19 SU/IDI 2.03 NY FLI 44.08 3301 L1 | 1249.54 CK1 CHKCK1 | 5.47 N- M MCTTAX ERMAT Voucher# **150007** eVoucher ** ☐ 00 |
| **CEPHUS, EDDIE** File: 004881 Dept: 002220 Rate: 19.7400 | 100.27 / 4.53 / 8.00 PTO | 1,979.33 / 134.13 / 157.92 PTO 1,200.00 BON 500.00 BLU | 3,971.38 | 284.20 FIT 246.22 SS 57.59 MED | 188.00 NY 01 1.30 NY 19 SU/IDI 5.00 NY FLI 126.22 3301 L2 | 99.28 N- EM ERMAT 13.50 N- M MCTTAX | 00 |
| **CHATELAIN-FLEMING, ISABEL C** File: 006287 Dept: 002220 Rate: 2912.54 | 40.00 PTO | 2,912.54 | 2,912.54 | .00 FIT 159.16 SS 37.22 MED | 112.29 NY 01 1.30 NY 19 SU/IDI 3.67 NY FLI | 2046.44 CK1 CHKCK1 397.14 71 TAXLUV 42.00 76 SUPPRT 10.45 GYM GYM | 14.57 N- EM ERMAT 8.73 N- M MCTTAX 297.85 K 401KS 18.72 75 SUPPRT 250.25 77 SUPPRT Voucher# **150008** eVoucher ** ☐ 00 |
| **CLARK, CODY** File: 004456 Dept: 002220 Rate: 16.0000 | 96.07 / .37 | 1,537.12 / 8.88 / 150.00 BON | 1,696.00 | 135.59 FIT 105.16 SS 24.60 MED | 69.54 NY 01 1.30 NY 19 SU/IDI 2.14 NY FLI | 1876.57 CK1 CHKCK1 347.74 75 SUPPRT 291.08 MED MEDICA | 29.13 K 401KS 48.62 DEN DENTAL 5.76 VIS VISION Voucher# **150009** eVoucher ** ☐ 00 |
| **CLARK, TIA S** File: 000638 Dept: 002220 Rate: 17.0000 | 101.92 / .63 | 1,732.64 / 16.07 / 200.00 BON | 1,948.71 | 121.68 FIT 119.40 SS 27.92 MED | 81.45 NY 01 1.30 NY 19 SU/IDI 2.46 NY FLI | 1357.67 CK1 CHKCK1 | 5.77 N- M MCTTAX Voucher# **150010** eVoucher ** ☐ 00 |
| **DE LA CRUZ, JUAN** File: 009371 Dept: 002220 Rate: 16.2500 | 85.72 | 1,392.95 | 1,392.95 | 140.72 FIT 86.36 SS 20.20 MED | 55.63 NY 01 1.30 NY 19 SU/IDI 1.76 NY FLI 38.56 3301 L1 | 22.90 DEN DENTAL | 6.55 N- M MCTTAX NY Check# ** ☐ **1,571.60** |
| | | | | | | | 4.74 N- M MCTTAX NY Check# ** ☐ **1,048.42** |

**STRATEGIC CLIENT SUP**  Company Code: WKS

Batch: 8694-020  Period Ending: 04/11/2018  Week 15
Service Center: 020  Pay Date: 04/16/2018  Page 2

© 1996 Automatic Data Processing, Inc.



# Payroll Register

| PERSONNEL | HOURS | | | EARNINGS | | | | GROSS | STATUTORY DEDUCTIONS | | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reg / OT | Hours 3&4 | | Reg / OT | Earnings 3&4 | Earnings 5 | | | Federal | State/Local | | |
| **LAMBERTO,ALISA** File: 001789 Dept: 002290 Rate: 5000.00 | 8.00 PTO 8.00 SWG | | | 5,000.00 | | | | 5,000.00 | 674.29 FIT 301.01 SS 70.40 MED | 218.82 NY 01 1.30 NY 19 SUIDI 6.30 NY FLI 146.15 3301 L1 | 2537.13 CK1 CHKCK1 144.90 MED MEDICA | 125.00 N- EM ERMAT 16.51 N- M MCTTAX 900.00 K 401KS Voucher# 150178 eVoucher .00 |
| **MIGNONE,KIMBERLY** File: 008397 Dept: 002290 Rate: 20.0000 | 105.33 | | | 2,106.60 | | | | 2,106.60 | 164.12 FIT 130.61 SS 30.54 MED | 92.90 NY 01 1.30 NY 19 SUIDI 2.65 NY FLI | 1684.48 CK1 CHKCK1 | 7.16 N- M MCTTAX Voucher# 150179 ** eVoucher .00 |
| **MITCHELL,MICHAEL J** File: 000874 Dept: 002290 Rate: 8500.00 | | | | 8,500.00 | | | | 8,500.00 | 1,284.74 FIT 527.00 SS 123.25 MED | 535.13 NY 01 1.30 NY 19 SUIDI 10.71 NY FLI | 5607.87 CK1 CHKCK1 | 212.50 N- EM ERMAT 28.90 N- M MCTTAX 510.00 K 401KS Voucher# 150180 eVoucher .00 |
| **PYNE,ANDREW M** File: 008453 Dept: 002290 Rate: 6250.00 | | | | 6,250.00 | | | | 6,250.00 | 588.09 FIT 380.31 SS 88.94 MED | 312.66 NY 01 1.30 NY 19 SUIDI 7.88 NY FLI | 4004.78 CK2 CHKCK2 12.24 VH VISHG | 156.65 N- EM ERMAT 750.00 K 401KS 103.80 DEN DENTAL Voucher# 150181 eVoucher .00 |
| **TIGHE,JESSICA** File: 004015 Dept: 002290 Rate: 6345.83 | | | | 6,345.83 | | | | 6,345.83 | 1,138.22 FIT 392.61 SS 91.82 MED | 366.59 NY 01 1.30 NY 19 SUIDI 8.00 NY FLI | 3384.58 CK1 CHKCK1 5.00 LIF LIFE | 158.85 N- EM ERMAT 21.53 N- M MCTTAX 444.21 K 401KS 13.50 STD STD Voucher# 150182 eVoucher .00 |
| **TUSZYNSKI,SHELBY** File: 001085 Dept: 002290 Rate: 3729.17 | | | | 3,729.17 | | | | 3,729.17 | 535.19 FIT 230.35 SS 53.87 MED | 188.19 NY 01 1.30 NY 19 SUIDI 4.70 NY FLI 126.27 3301 L1 | 2309.33 CK1 CHKCK1 74.58 6 ROTHS 5.00 LIF LIFE | 93.23 N- EM ERMAT 12.63 N- M MCTTAX 186.46 K 401KS 4.64 VH VISHG 9.29 STD STD Voucher# 150183 eVoucher .00 |
| **WILSON,CHRIS** File: 001901 Dept: 002290 Rate: 3013.70 | 8.00 PTO | | | 3,013.70 | | | | 3,013.70 | 121.08 FIT 186.85 SS 43.70 MED | 129.51 NY 01 1.30 NY 19 SUIDI 3.80 NY FLI | 2310.64 CK1 CHKCK1 36.00 LIF LIFE | 75.34 N- EM ERMAT 10.25 N- M MCTTAX 180.82 K 401KS Voucher# 150184 eVoucher .00 |

ADP Payroll Register

STRATEGIC CLIENT SUP
Company Code: WKS

Batch: 8694-020   Period Ending 04/11/2018   Week 15
Service Center: 020   Pay Date: 04/16/2018   Page 38

Exhibit 5

© 1996 Automatic Data Processing, Inc.



**A-2530**

# Payroll Register — ADP

**STRATEGIC CLIENT SUP**
Company Code: **WKS**

Batch: **8694-020**  Period Ending: **04/11/2018**  Week **15**
Service Center: **020**  Pay Date: **04/16/2018**  Page **45**

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WEYMOUTH, JOANNA** R File: 000837 Dept: 002801 Rate: 17.0000 | 104.97 | 2.43 | | 1,784.49 | 61.97 | 70.00 BON | | 1,916.46 | 182.80 FIT 118.82 SS 27.79 MED | 86.13 NY 01 S 1.30 NY 19 SUI/DI 2.41 NY FLI | | NY Check# ** ☐ **1,497.21** |
| **DEPT TOTAL** 002801 | 3,081.95 REG 45.80 O/T 133.58 HOURS 3 .00 HOURS 4 | | | 54,770.30 REG 4,651.06 EARNINGS 3 .00 EARNINGS 5 | | 1,028.08 OT EARNINGS 4 | 60,449.44 GROSS | | 5,737.63 FIT 3,701.86 SS 865.77 MED 2,536.81 STATE 46.80 SUI/DI 76.14 FLI | | 41,199.84 TOTAL DEDUCTIONS | 36 Pays ☐ **6,284.59** |

### HOURS ANALYSIS:
117.58 PTO  PERSNL 16.00 SWG SWING

### EARNINGS ANALYSIS:
75.00 BLU  2,930.00 BON BONUS  222.40 SWG SWING

### MEMO ANALYSIS:
44.84 EM ERMAT

### STATUTORY DED. ANALYSIS:
2,536.81 01 NY* SUI/DI  46.80 01 NY* FLI  76.14 01 NY FLI

### VOLUNTARY DED. ANALYSIS:
89.67 K 401KS  35,532.91 CK1 CHKCK1  1,773.82 CK3 CHKCK3
97.64 DEN DENTAL  40.00 GYM GYM  631.52 MIH HBU/FM
5.71 STD STD  7.04 VIS VISION

1,423.66 PTO PERSNL  3,016.53 CK2 CHKCK2  303.95
5.00 LIF LIFE  341.08
303.95

| **CATALANO, RUSSELL** File: 000791 Dept: 002803 Rate: 16.5000 | 21.50 | | | 354.75 | | | | 354.75 | 20.06 FIT 21.99 SS 5.14 MED | 1.86 NY 01 S 1.30 NY 19 SUI/DI .45 NY FLI | | NY Check# ☐ 303.95 |
| **DANSER, CHRISTINA** File: 000791 Dept: 002803 Rate: 16.5000 | 22.50 | | | 371.25 | | | | 371.25 | .00 FIT 23.02 SS 5.38 MED | 1.30 NY 19 SUI/DI .47 NY FLI | | NY Check# ☐ 341.08 |
| **DIEDRICH, JOHNATHAN** File: 002405 Dept: 002803 Rate: 16.5000 | 21.50 | | | 354.75 | | | | 354.75 | 20.06 FIT 21.99 SS 5.14 MED | 1.86 NY 01 S 1.30 NY 19 SUI/DI .45 NY FLI | | NY Check# ☐ 303.95 |
| **FORPAHL, MICHAEL** File: 000501 Dept: 002803 Rate: 17.0000 | 104.62 | 1.35 | | 1,778.54 | 34.43 | 352.80 BON | | 2,165.77 | 283.36 FIT 134.28 SS 31.40 MED | 114.55 NY 01 S 1.30 NY 19 SUI/DI 2.73 NY FLI | 1598.15 CK1 CHKCK1 | Voucher# ** 150218 eVoucher .00 |

© 1996 Automatic Data Processing, Inc.

# Payroll Register

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BASDEO,AVINDRA File: 003432 Dept: 002220 Rate: 20.7000 | 79.00 | 1.47 | | 1,635.30 | 45.64 | | | 1,680.94 | FIT 140.41 SS 104.22 MED 24.37 | NY 01 63.78 S NY 19 1.30 SUI/DI 2.12 NY FLI 43.90 3301 L1 | 117.67 K 401KS · 42.02 N- EM ERMAT · 5.72 N- M MCTTAX · 1183.17 CK1 CHKCK1 | .00 Voucher# 170001 eVoucher |
| BEAUBRUN, REGINALD File: 001187 Dept: 002220 Rate: 16.5000 | 79.98 | .37 | | 1,319.67 | 9.16 | | | 1,328.83 | FIT 133.03 SS 82.39 MED 19.27 | NY 01 51.58 NY 19 1.30 SUI/DI 1.67 NY FLI 35.90 3301 L1 | 1003.69 CK1 CHKCK1 · 4.62 N- M MCTTAX | .00 Voucher# 170002 eVoucher |
| BERRY,GERARD File: 003949 Dept: 002220 Rate: 23.2500 | 71.63 | | 8.00 PTO | 1,665.40 | | 186.00 PTO | | 1,851.40 | FIT 71.25 SS 114.78 MED 26.84 | NY 01 68.83 NY 19 1.30 SUI/DI 2.33 NY FLI 47.21 3301 L2 | 1518.86 CK1 CHKCK1 · 6.29 N- M MCTTAX | .00 Voucher# 170003 eVoucher |
| BLANDINO,CLARETT J File: 009327 Dept: 002220 Rate: 16.9300 | 74.03 | | 7.00 PTO | 1,253.33 | | 118.51 PTO | | 1,371.84 | FIT 117.44 SS 85.06 MED 19.89 | NY 01 51.66 NY 19 1.30 SUI/DI 1.73 NY FLI 35.96 3301 L1 | 1058.80 CK1 CHKCK1 · 4.66 N- M MCTTAX | .00 Voucher# 170004 eVoucher |
| BOWERS,ERIC File: 007889 Dept: 002220 Rate: 17.0800 | 80.07 | .12 | | 1,367.60 | 3.07 | | | 1,370.67 | FIT 79.57 SS 76.21 MED 17.82 | NY 01 40.24 NY 19 1.30 SUI/DI 1.73 NY FLI 28.51 3301 L2 | 983.77 CK1 CHKCK1 · 141.52 MED MEDICA · 4.18 N- M MCTTAX | .00 Voucher# 170005 eVoucher |
| CARTER,TONA File: 002073 Dept: 002220 Rate: 15.5000 | 72.13 | .40 | | 1,118.02 | 9.30 | | | 1,127.32 | FIT 67.35 SS 69.90 MED 16.34 | NY 01 34.24 NY 19 1.30 SUI/DI 1.42 NY FLI 24.49 3301 L1 | 912.28 CK1 CHKCK1 · 3.83 N- M MCTTAX | .00 Voucher# 170006 eVoucher |
| CEPHUS,EDDIE File: 004881 Dept: 002220 Rate: 19.7400 | 74.02 | 3.70 | | 1,461.15 | 109.56 | | | 1,570.71 | FIT 28.01 SS 97.39 MED 22.77 | NY 01 47.43 NY 19 1.30 SUI/DI 1.98 NY FLI 33.27 3301 L2 | 875.67 CK1 CHKCK1 · 23.67 71 TAXLVY · 42.00 76 SUPPRT · 10.45 GYM GYM · 39.27 N- EM ERMAT · 5.34 N- M MCTTAX · 117.80 K 401KS · 18.72 75 SUPPRT · 250.25 77 SUPPRT | .00 Voucher# 170007 eVoucher |



ADP Payroll Register

© 1996 Automatic Data Processing, Inc.

**A-2532**

# Payroll Register

**STRATEGIC CLIENT SUP**
Company Code: WKS

Batch: 8038-020   Period Ending: 06/24/2018   Week 26
Service Center: 020   Pay Date: 06/29/2018   Page 49

| PERSONNEL | HOURS |  |  | EARNINGS |  |  |  |  | GROSS | STATUTORY DEDUCTIONS |  | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Reg | O/T | Hours 3&4 | Reg | O/T | Earnings 3&4 | Earnings 5 |  |  | Federal | State/Local |  |  |

**WILLIAMS,TRAONNA**
File: 001587
Dept: 002803
Rate: 16.5000

Reg 80.00   O/T .05

Reg 1,320.00   O/T 1.24   GROSS 1,321.24

Federal: 111.37 FIT   81.92 SS   19.15 MED
State/Local: 48.46 NY 01 SI   1.30 NY 19 SUI/DI   1.66 NY FLI

NY Check# **
NET PAY 1,057.38

**DEPT TOTAL 002803**

Reg 2,954.53   O/T 14.29   HOURS 3 15.00   HOURS 4 .00

REG 54,001.18   O/T 497.50   EARNINGS 3 .00   EARNINGS 5 .00

O/T 361.91   EARNINGS 4 .00   GROSS 54,860.59

Federal: 3,754.51 FIT   3,386.78 SS   792.02 MED   2,004.01 STATE   53.30 SUI/DI   69.09 FLI

TOTAL DEDUCTIONS 38,512.83

41 Pays
6,288.05

**HOURS ANALYSIS:** 15.00 PTO PERSNL
**EARNINGS ANALYSIS:** 247.50 PTO PERSNL   250.00 REF REF
**STATUTORY DED. ANALYSIS:** 2,004.01 01 NY   53.30 01 NY SUI/DI   69.09 01 NY FLI
**VOLUNTARY DED. ANALYSIS:** 4.43 VH VISHG   97.64 DEN DENTAL   11.01 STD STD   32,083.95 CK1 CHCK1   30.00 GYM GYM   3.36 VIS VISION

4,245.62 CK2 CHCK2   28.05 LIF LIFE
1,889.47 CK3 CHCK3   119.30 MIH HIBU FM
.00

**EMBRY,PAUL**
File: 009317
Dept: 002804
Rate: 16.5000

Reg 57.68

PTO 16.00 PTO

Reg 951.72   PTO 264.00 PTO   GROSS 1,215.72

Federal: 98.71 FIT   75.38 SS   17.63 MED
State/Local: 41.91 NY 01 SI   1.30 NY 19 SUI/DI   1.53 NY FLI

979.26 CK1 CHCK1

Voucher# 260275
eVoucher
.00

**SURDEJ,KRISTA**
File: 007784
Dept: 002804
Rate: 16.5000

Reg 71.73

Reg 1,183.55   GROSS 1,183.55

Federal: 115.59 FIT   73.38 SS   17.16 MED
State/Local: 42.47 NY 01 SI   1.30 NY 19 SUI/DI   1.49 NY FLI

932.16 CK1 CHCK1

Voucher# 260276
eVoucher
.00

**WALDHAUSER,CORY**
File: 006163
Dept: 002804
Rate: 16.5000

Reg 79.75

Reg 1,315.88   GROSS 1,315.88

Federal: 128.73 FIT   80.16 SS   18.74 MED
State/Local: 49.31 NY 01 SI   1.30 NY 19 SUI/DI   1.66 NY FLI

22.90 DEN DENTAL   1013.08 CK1 CHCK1

Voucher# 260277
eVoucher **
.00

**DEPT TOTAL 002804**

Reg 209.16   O/T .00   HOURS 3 16.00   HOURS 4 .00

REG 3,451.15   O/T .00   EARNINGS 3 264.00   EARNINGS 5 .00

O/T .00   EARNINGS 4 .00   GROSS 3,715.15

Federal: 343.03 FIT   228.92 SS   53.53 MED   133.69 STATE   3.90 SUI/DI   4.68 FLI

TOTAL DEDUCTIONS 2,947.40

3 Pays
.00

**HOURS ANALYSIS:** 16.00 PTO PERSNL
**EARNINGS ANALYSIS:** 264.00 PTO PERSNL
**STATUTORY DED. ANALYSIS:** 133.69 01 NY   3.90 01 NY SUI/DI   4.68 01 NY FLI
**VOLUNTARY DED. ANALYSIS:** 2,924.50 CK1 CHCK1   22.90 DEN DENTAL

© 1996 Automatic Data Processing, Inc.

A-2533

**ADP Payroll Register — Company Totals**

Company Code: WKS

STRATEGIC CLIENT SUP

Batch: 8038-020   Period Ending: 06/24/2018   Week 26
Service Center: 020   Pay Date: 06/29/2018   Page 50

| COMPANY TOTAL | HOURS | EARNINGS | STATUTORY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| COMPANY CODE | | | | | |
| WKS | 20,926.60 REG | 464,759.61 REG | 37,733.52 FIT | 358,196.82 TOTAL DEDUCTIONS | 323 Pays |
| | 482.85 OT | 20,513.67 OT | 29,081.87 SS | | 40,764.34 |
| | 1,089.83 HOURS 3 | .00 EARNINGS 3 | 6,920.85 MED | | |
| | .00 HOURS 4 | .00 EARNINGS 4 | 18,449.48 STATE | | |
| | | 12,827.51 OT | 420.58 SUIDI | | |
| | | .00 EARNINGS 5 | 587.56 FLI | | |
| | | 498,100.79 GROSS | 5,945.77 LOCAL | | |

HOURS ANALYSIS: 12.35 BER BEREVE   8.00 BRE   8.00 JUR JURY   1,037.48 PTO PERSNL
24.00 SWG SWING

EARNINGS ANALYSIS: 224.15 BER BEREVE   900.00 BLU   150.00 BON BONUS   136.00 JUR JURY
16,171.52 PTO PERSNL   2,500.00 REF REF   432.00 SWG SWING

MEMO ANALYSIS: 1,161.82 M MCT/AX   2,414.33 EM ER/MAT

STATUTORY DED. ANALYSIS: 18,449.48 01 NY   587.56 01 NY   FLI
420.58 01 NY   SUIDI   28.77 3302 YONKERS
5,917.00 3301 NEW YORK CIT

VOLUNTARY DED. ANALYSIS:
| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6,380.50 K 401K$ | 173.01 R KLOAN | 568.51 6 ROTH$ | 60.39 VH VISHG |
| 48.18 71 TAXLVY | 228.45 73 GARNSH | 1,463.34 75 SUPPRT | 42.00 76 SUPPRT |
| 250.25 77 SUPPRT | 285,472.50 CK1 CHKCK1 | 27,981.13 CK2 CHKCK2 | 8,372.13 CK3 CHKCK3 |
| 274.00 CK4 CHKCK4 | 50.00 CK6 CHKCK5 | 1,383.44 DEN DENTAL | 692.69 GYM GYM |
| 175.27 LIF LIFE | 1,000.00 LNR LOAN | 5,466.78 MED MEDICA | 1,435.04 MHI IHBUFM |
| 160.00 PAR PARK | 112.46 STD STD | 4,225.12 SV1 SAVSV1 | 12,129.10 TRC COMMUT |
| 52.53 VIS VISION | | | |

NET PAYROLL: 40,764.34   CHECKS: 46 FLAGGED:   164   STARTING CHECK NUMBER: SEE BELOW
TOTAL DEPOSITS: 326,374.88   VOUCHERS: 277 NET CASH PAYS 1,000.00 OR MORE   194   ENDING CHECK NUMBER: SEE BELOW
NET VOIDS: 254.73 ADJUSTMENTS: 2   eVOUCHERS:   275
NET CASH: 366,884.49   PAPER VOUCHERS PRINTED:   2

ADP CHECK NUMBERS: STATE NY   JPMORGAN CHASE   STARTING CHECK NUMBER:   ENDING CHECK NUMBER:

© 1996 Automatic Data Processing, Inc.

# Payroll Register

| PERSONNEL | HOURS Reg / O/T / Hours 3&4 | EARNINGS Reg / O/T / Earnings 3&4 / Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| **JOSEY OLIVIA**<br>File: 007905<br>Dept: 002260<br>Rate: 16.0000 | 79.98 .50 8.00 PTO | 1,279.68 12.00 128.00 PTO | 1,291.68 | 82.04 FIT<br>78.08 SS<br>18.26 MED | 42.03 NY 01<br>1.30 NY 19<br>1.98 NY FLI | 1035.69 CK1 CHCK1 28.94 DEN DENTAL<br>3.36 VIS VISION | Voucher# 410001<br>eVoucher<br>.00 |
| **KOWALSKI, SAMANTHA A**<br>File: 007118<br>Dept: 002260<br>Rate: 16.0000 | 48.17 .90 | 770.72 21.60 | 792.32 | 67.99 FIT<br>49.12 SS<br>11.49 MED | 20.01 NY 01<br>1.30 NY 19<br>1.21 NY FLI | 641.20 CK1 CHCK1 | Voucher# 410002<br>eVoucher<br>.00 |
| **OBERLANDER, KELLY**<br>File: 005221<br>Dept: 002260<br>Rate: 16.0000 | 80.00 .60 8.00 PTO | 1,280.00 14.40 128.00 PTO | 1,422.40 | 67.30 FIT<br>83.05 SS<br>19.42 MED | 48.08 NY 01<br>1.30 NY 19<br>2.18 NY FLI | 1112.78 CK1 CHCK1 73.94 DEN DENTAL<br>5.50 LIF LIFE 8.85 VIS VISION | Voucher# 410003<br>eVoucher<br>.00 |
| **RICHARDSON, TROSHELL**<br>File: 009666<br>Dept: 002260<br>Rate: 17.0000 | 88.30 1.02 | 1,501.10 26.01 | 1,527.11 | 134.72 FIT<br>94.45 SS<br>22.09 MED | 70.92 NY 01 S<br>1.30 NY 19<br>2.34 NY FLI | 985.12 CK1 CHCK1 232.50 75 SUPPRT<br>3.67 STD STD | Voucher# 410004<br>eVoucher<br>.00 |

**DEPT TOTAL 002260**

| | | | | |
|---|---|---|---|---|
| 296.45 REG<br>3.02 O/T<br>8.00 HOURS 3<br>.00 HOURS 4 | 4,831.50 REG<br>128.00 O/T<br>.00 EARNINGS 3<br>.00 EARNINGS 5 | 74.01 O/T<br>.00 EARNINGS 4<br>5,033.51 GROSS | 352.05 FIT<br>304.70 SS<br>71.26 MED<br>181.04 STATE<br>5.20 SUIDI<br>7.71 FLI | 48.08 NY 01<br>1.30 NY 19<br>SUIDI<br>2.18 NY FLI |

4,111.55 TOTAL DEDUCTIONS — 4 Pays .00

HOURS ANALYSIS: 8.00 PTO PERSNL 128.00 PTO PERSNL
EARNINGS ANALYSIS:
STATUTORY DED. ANALYSIS: 181.04 01 NY 01 NY 5.20 01 NY SUIDI 7.71 01 NY FLI
VOLUNTARY DED. ANALYSIS: 232.50 75 SUPPRT 3.67 STD STD 3,754.79 CK1 CHKCK1 5.50 LIF LIFE 12.21 VIS VISION

| PERSONNEL | HOURS | EARNINGS | GROSS | STATUTORY Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| **PATRONEK, ALISON ELIZABETH**<br>File: 027079<br>Dept: 002550<br>Rate: 19.0000 | 87.45 | 1,661.55 | 1,661.55 | 172.29 FIT<br>103.01 SS<br>24.09 MED | 72.08 NY 01<br>1.30 NY 19<br>2.54 NY FLI | 1286.24 CK1 CHCK1 | Voucher# 410005<br>eVoucher<br>.00 |

STRATEGIC CLIENT SUP
Company Code: WKS
Batch: 2687-020    Period Ending: 10/09/2019    Week 41
Service Center: 020    Pay Date: 10/15/2019    Page 1

 Payroll Register

© 1996 Automatic Data Processing, Inc.

# Payroll Register

**STRATEGIC CLIENT SUP**
Company Code: WKS

Batch: 2687-020   Service Center: 020
Period Ending: 10/09/2019   Week 41
Pay Date: 10/15/2019   Page 2

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DEPT TOTAL** 002550 | 87.45 REG | .00 O/T | .00 HOURS 3 | 1,661.55 REG | .00 O/T | .00 EARNINGS 3 | .00 OT | .00 EARNINGS 4 | | | | 1 Pays |
| | | | .00 HOURS 4 | | | .00 EARNINGS 5 | 1,661.55 GROSS | | | | .00 |
| STATUTORY DED. ANALYSIS: | 72.08 REG | 1.30 O/T | | 01 NY | SUIDI | | 2.54 01 NY FLI | | 72.08 FIT 1.30 SS 103.01 MED 24.09 STATE 72.08 SUIDI 2.54 FLI | | | |
| VOLUNTARY DED. ANALYSIS: | 1,286.24 | | | CK1 CHCK1 | | | | | | | 1,286.24 TOTAL DEDUCTIONS | .00 |
| **BILSON,ROBERT** File: 007122 Dept: 003200 Rate: 5083.10 | | | | 5,083.10 | | 2,000.00 REF | | 7,083.10 | 172.29 FIT 103.01 SS 24.09 MED 1.30 SUIDI 2.54 FLI | 424.50 NY 01 1.30 NY 19 SUIDI | 5372.90 CK1 CHKCK1 13.57 LIF LIFE 12.67 STD STD | Voucher# 410006 eVoucher ** |
| | | | | | | | | | | | | .00 |
| **DILGARD,BRYAN G** File: 009665 Dept: 003200 Rate: 4668.03 | | | 8.00 BRE | 4,668.03 | | | | 4,668.03 | 717.27 FIT 438.37 SS 102.52 MED | 244.88 NY 01 1.30 NY 19 SUIDI | 1500.00 CK1 CHKCK1 116.70 N- EM ERMAT 200.00 CK4 CHKCK4 15.83 M M MCTTAX 9.50 LIF LIFE 1591.32 CK3 CHKCK3 233.40 K 401K5 11.63 STD STD | Voucher# 410007 eVoucher |
| | | | | | | | | | | | | .00 |
| **DUGGAN,ROBERT** File: 005413 Dept: 003200 Rate: 9583.33 | | | 8.00 PTO | 9,583.33 | | | | 9,583.33 | 1,521.95 FIT 130.94 MED 81.28 MEDST | 622.59 NY 01 1.30 NY 19 SUIDI | 6001.91 CK1 CHKCK1 239.58 N- EM ERMAT 287.50 6 ROTH5 383.33 K 401K5 466.93 MIH BUFMED 73.94 DEN DENTAL 11.66 VIS VISION | Voucher# 410008 eVoucher |
| | | | | | | | | | | | | .00 |
| **HABSCHIED,KAREN** File: 006070 Dept: 003200 Rate: 5147.40 | | | | 5,147.40 | | 500.00 BLU 2,500.00 REF | | 8,147.40 | 1,215.06 FIT 505.13 SS 118.14 MED | 498.03 NY 01 S1 1.30 NY 19 SUIDI | 570.32 K 401K5 203.69 N- EM ERMAT 5239.42 CK1 CHKCK1 | Voucher# 410009 eVoucher ** |
| | | | | | | | | | | | | .00 |
| **STUART,SEAN M.** File: 000584 Dept: 003200 Rate: 2812.50 | | | 8.00 PTO | 2,812.50 | | | | 2,812.50 | 458.65 FIT 145.42 SS 34.01 MED | 114.56 NY 01 1.30 NY 19 SUIDI 4.30 NY FLI | 1573.76 CK1 CHKCK1 13.57 LIF LIFE 466.93 MIH BUFMED | Voucher# 410010 eVoucher |
| | | | | | | | | | | | | .00 |
| **WILSON, CHRISTOPHER L** File: 007878 Dept: 003200 Rate: 3284.62 | | | | 3,031.95 | | | | 3,031.95 | 310.82 FIT 187.98 SS 43.96 MED | 140.01 NY 01 1.30 NY 19 SUIDI 4.64 NY FLI | 2161.67 CK1 CHKCK1 75.80 N- EM ERMAT 29.97 GYM GYM 151.60 K 401K5 | Voucher# 410011 eVoucher |
| | | | | | | | | | | | | .00 |

© 1996Automatic Data Processing, Inc.

A-2536

# Payroll Register

| PERSONNEL | HOURS Reg | OT | Hours 3&4 | EARNINGS Reg | OT | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEPT TOTAL 003200 | .00 REG | .00 OT | .00 HOURS 3 .00 HOURS 4 | 30,326.31 REG 5,000.00 OT | .00 EARNINGS 3 .00 EARNINGS 5 | .00 OT .00 EARNINGS 4 35,326.31 GROSS | | | 4,743.53 FIT 1,565.60 SS 497.09 MED 81.28 MEDST 2,044.57 STATE 7.80 SUIDI 8.94 FLI | | 26,377.50 TOTAL DEDUCTIONS | | 6 Pays .00 |

HOURS ANALYSIS: 8.00 BRE 16.00 PTO PERSNL
EARNINGS ANALYSIS: 500.00 BLU 4,500.00 REF REF
MEMO ANALYSIS: 15.83 M MCTTAX 635.77 EM ERMAT
STATUTORY DED. ANALYSIS: 7.80 01 NY SUIDI 8.94 01 NY FLI
VOLUNTARY DED. ANALYSIS: 1,338.65 K 401KS 287.50 6 ROTHS 21,849.66 CK1 CHKCK1 1,591.32 CK3 CHKCK3
200.00 CK4 CHKCK4 73.94 DEN DENTAL 29.97 GYM GYM 36.64 LIF LIFE
933.86 MIH BUFMED 24.30 STD STD 11.66 VIS VISION

| PYNE,ANDREW M | 8.00 PTO | | | 7,291.67 PTO | | | | 7,291.67 | 1,106.00 FIT 104.05 MED | 389.01 NY 01 1.30 NY 19 SUIDI | 4700.85 CK2 CHKCK2 103.80 DEN DENTAL | 182.29 N- EM ERMAT 875.00 K 401KS 11.66 VIS VISION | Voucher# 410012 eVoucher .00 |
| File: 008453 Dept: 003210 Rate: 7291.67 | | | | | | | | | | | | | |

| RILEY,MELISSA M | | | | 4,759.14 | | 1,012.91 BON | | 5,772.05 | .00 FIT 357.87 SS 83.70 MED | 342.64 NY 01 1.30 NY 19 SUIDI | 4859.55 CK1 CHKCK1 | 63.50 N- EM ERMAT 126.99 K 401KS | Voucher# 410013 eVoucher .00 |
| File: 009313 Dept: 003210 Rate: 4759.14 | | | | | | | | | | | | | |

| TAYLOR,SARAH E | 40.00 PTO | | | 4,166.67 | | | | 4,166.67 | 643.33 FIT 249.96 SS 58.37 MED | 217.14 NY 01 1.30 NY 19 SUIDI 6.38 NY FLI | 2849.09 CK1 CHKCK1 | 141.50 MIH BUFMED | Voucher# 410014 eVoucher .00 |
| File: 027627 Dept: 003210 Rate: 4166.67 | | | | | | | | | | | | | |

| TIGHE,JESSICA | | | | | | 6,589.23 SEV | | 6,589.23 | 1,300.70 FIT 95.54 MED | 418.37 NY 01 1.30 NY 19 SUIDI | 4773.32 CK1 CHKCK1 | 22.40 N- M MCTTAX | Voucher# 410015 eVoucher .00 |
| File: 004015 Dept: 003210 Rate: 6589.23 | | | | | | | | | | | | | |

| DEPT TOTAL 003210 | .00 REG .00 OT 48.00 HOURS 3 .00 HOURS 4 | | | 16,217.48 REG 7,602.14 OT .00 EARNINGS 5 | .00 EARNINGS 3 | .00 OT .00 EARNINGS 4 23,819.62 GROSS | | | 3,050.03 FIT 607.43 SS 341.66 MED 1,367.16 STATE 5.20 SUIDI 6.38 FLI | | 18,441.76 TOTAL DEDUCTIONS | | 4 Pays .00 |

HOURS ANALYSIS: 40.00 PTO PERSNL
EARNINGS ANALYSIS: 1,012.91 BON BONUS 6,589.23 SEV SEVERA

**STRATEGIC CLIENT SUP**
Company Code: WKS

Batch : **2687-020** Period Ending: 10/09/2019 — Week 41
Service Center : 020 Pay Date: 10/15/2019 Page 3



© 1996 Automatic Data Processing, Inc.

A-2537

# ADP Payroll Register

**STRATEGIC CLIENT SUP**
Company Code: WKS

Batch: 4399-020  Period Ending 10/27/2019  Week 44
Service Center: 020  Pay Date: 10/31/2019  Page 5

| PERSONNEL | HOURS Reg / OT / Hours 3&4 / PTO | EARNINGS Reg / OT / Earnings 3&4 / Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| **BAH,FATOUMATA**<br>File: 002071<br>Dept: 003220<br>Rate: 17.5000 | 93.22 / .57 / 8.00 PTO | 1,631.35 / 14.96 / 140.00 PTO / 200.00 BLU | 1,996.31 | 191.11 FIT<br>123.15 SS<br>28.80 MED | 92.25 NY 01<br>1.30 NY 19<br>SUI/DI<br>3.04 NY FLI | 1546.66 CK1 CHKCK1<br>6.75 N- M MCTTAX | .00<br>Voucher# 440019<br>eVoucher |
| **BARRY,RYAN M.**<br>File: 023377<br>Dept: 003220<br>Rate: 2291.67 | | 2,291.67 | 2,291.67 | 268.29 FIT<br>142.08 SS<br>33.23 MED | 121.21 NY 01<br>1.30 NY 19<br>SUI/DI<br>3.51 NY FLI | 1722.05 CK1 CHKCK1 | .00<br>Voucher# 440020<br>eVoucher |
| **BAUGH,CHEVON**<br>File: 007217<br>Dept: 003220<br>Rate: 17.0000 | 83.07 / / 3.00 UNW | 1,412.19 / / 51.00 UNW | 1,463.19 | .00 FIT<br>90.72 SS<br>21.22 MED | 36.85 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.24 NY FLI | 1310.73 CK3 CHKCK3 | .13<br>NY Check# ▮▮▮ |
| **BEAVER,AQUILLE S**<br>File: 027973<br>Dept: 003220<br>Rate: 16.0000 | 91.03 / .17 / 2.00 PTO / 3.00 UNW | 1,456.48 / 4.08 / 32.00 PTO / 48.00 UNW | 1,540.56 | .00 FIT<br>95.52 SS<br>22.34 MED | 61.98 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.36 NY FLI | 1357.06 CK1 CHKCK1 | .00<br>Voucher# 440021<br>eVoucher |
| **BELAUNDE JR,JOSE LUIS**<br>File: 025873<br>Dept: 003220<br>Rate: 18.0000 | 95.72 / 2.03 | 1,722.96 / 54.81 | 1,777.77 | 144.25 FIT<br>110.22 SS<br>25.78 MED | 79.30 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.72 NY FLI | 6.04 N- M MCTTAX | 1,414.20<br>NY Check# 19653215 |
| **BELAUNDE,SHIRLEY LUCERO**<br>File: 026148<br>Dept: 003220<br>Rate: 18.0000 | 87.00 | 1,566.00 | 1,566.00 | 160.83 FIT<br>97.10 SS<br>22.71 MED | 66.15 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.40 NY FLI | 5.32 N- M MCTTAX | 1,215.51<br>NY Check# 19653216 |
| **BERRY,GERARD**<br>File: 003549<br>Dept: 003220<br>Rate: 26.4200 | 83.87 / 2.28 / 8.00 PTO | 2,215.85 / 90.36 / 211.36 PTO | 2,517.57 | 149.03 FIT<br>156.09 SS<br>36.51 MED | 109.72 NY 01<br>1.30 NY 19<br>SUI/DI<br>3.85 NY FLI<br>74.86 330 L2 | 1986.21 CK1 CHKCK1<br>8.56 N- M MCTTAX | .00<br>Voucher# 440022<br>eVoucher |
| **BOHN,KEN**<br>File: 000732<br>Dept: 003220<br>Rate: 16.4500 | 93.47 / .62 / 3.25 UNW | 1,537.58 / 15.30 / 53.46 UNW | 1,606.34 | 150.68 FIT<br>91.85 SS<br>21.48 MED | 60.90 NY 01 S1<br>1.30 NY 19<br>SUI/DI<br>2.46 NY FLI | 1152.75 SV1 SAVSV1<br>124.92 MIH BUFMED | .00<br>Voucher# 440023<br>eVoucher |

© 1996 Automatic Data Processing, Inc.

## Payroll Register

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FLORES,JASON**<br>File: 009335<br>Dept: 003230<br>Rate: 20.7000 | 80.77 | 1.17 | | 1,671.94 | 36.33 | | | 1,708.27 | 152.80 FIT<br>105.92 SS<br>24.77 MED | 70.27 NY 01<br>1.30 NY 19<br>2.61 NY FLI<br>48.50 3301 L1 | 1216.68 CK1 CHCK1<br>51.25  6 ROTHS | 42.71 N- EM ERMAT<br>5.81 N- M MCTTAX<br>34.17 K 401KS | **.00**<br>Voucher# 410229<br>eVoucher |
| **FORPAHL,MICHAEL**<br>File: 000501<br>Dept: 003230<br>Rate: 2291.66 | | | | 2,291.66 | | 500.00 BLU | | 2,791.66 | 331.81 FIT<br>166.44 SS<br>38.92 MED | 128.28 NY 01 S<br>1.30 NY 19<br>SUI/DI<br>4.27 NY FLI | 279.17  K 401KS | 69.79 N- EM ERMAT<br>1734.37 CK1 CHKCK1<br>107.10 MIH BUFMED | **.00**<br>Voucher# 410230<br>eVoucher |
| **FORREST,ALEXYS B**<br>File: 003710<br>Dept: 003230<br>Rate: 17.7900 | 80.02 | .15 | 8.00 PTO | 1,423.56 | 4.00 | 142.32 PTO | | 1,569.88 | 161.29 FIT<br>97.33 SS<br>22.76 MED | 66.39 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.40 NY FLI<br>45.91 3301 L2 | 1172.50 CK1 CHKCK1 | 5.34 N- M MCTTAX | **.00**<br>Voucher# 410231<br>eVoucher |
| **FREELAND,KIARA S**<br>File: 029453<br>Dept: 003230<br>Rate: 16.5000 | 75.03 | | | 1,238.00 | | | 180.00 BON | 1,418.00 | 38.48 FIT<br>87.91 SS<br>20.56 MED | 44.02 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.17 NY FLI | 1223.56 CK1 CHCK1 | | **.00**<br>Voucher# 410232<br>eVoucher |
| **FREENEY,TINA**<br>File: 002836<br>Dept: 003230<br>Rate: 13.5900 | 87.03 | | 1.00 PTO | 1,182.74 | | 13.59 PTO | 200.00 BLU | 1,396.33 | 115.97 FIT<br>84.76 SS<br>19.62 MED | 51.21 NY 01 S<br>1.30 NY 19<br>SUI/DI<br>2.14 NY FLI | 941.80 CK1 CHKCK1<br>22.90 DEN DENTAL<br>2.94 STD STD | 139.63 71 TAXLUY<br>10.50 LIF LIFE<br>3.36 VIS VISION | Voucher# 410233<br>eVoucher |
| **FRENCH,ADAM**<br>File: 029644<br>Dept: 003230<br>Rate: 17.7900 | 88.22 | .45 | | 1,569.43 | 12.01 | | 115.00 BON | 1,696.44 | 176.48 FIT<br>105.18 SS<br>24.60 MED | 74.25 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.60 NY FLI | 1312.03 CK1 CHKCK1 | 5.77 N- M MCTTAX | **.00**<br>Voucher# 410234<br>eVoucher |
| **FRIEDLINE,<br>COURTNEY LYNN**<br>File: 021332<br>Dept: 003230<br>Rate: 15.5000 | 85.05 | | | 1,318.28 | | | | 1,318.28 | 131.10 FIT<br>81.73 SS<br>19.11 MED | 50.77 NY 01<br>1.30 NY 19<br>SUI/DI<br>2.02 NY FLI | | | NY Check# <br>**1,032.25** |

STRATEGIC CLIENT SUP
Company Code: WKS

Batch: 2687-020   Period Ending: 10/09/2019 Week 41
Service Center: 020   Pay Date: 10/15/2019   Page  42

ADP   Payroll Register
© 1996 Automatic Data Processing, Inc.

A-2539

# ADP Payroll Register — Company Totals

**STRATEGIC CLIENT SUP**
Company Code: WKS

Batch: 1408-020  Period Ending: 12/25/2019  Week 53
Service Center: 020  Pay Date: 12/31/2019  Page 91

## COMPANY TOTAL

| COMPANY CODE | HOURS | EARNINGS | STATUTORY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| WKS | 33,386.83 REG | 703,659.65 REG | 72,838.17 FIT | 597,564.69 TOTAL DEDUCTIONS | Pays |
| | 391.92 O/T | 114,379.14 O/T | 48,592.44 SS | | 53,568.95 |
| | 6,901.30 HOURS 3 | .00 EARNINGS 3 | 11,680.09 MED | | |
| | .00 HOURS 4 | .00 EARNINGS 4 | 81.27 MEDST | | |
| | | | 35,004.33 STATE | | 493 |
| | | | 560.42 SUIDI | | |
| | | | 1,162.00 FLI | | |
| | | | 7,696.86 LOCAL | | |

| | | |
|---|---|---|
| 10,718.43 O/T | | |
| .00 EARNINGS 5 | | |
| 828,757.22 GROSS | | |

### HOURS ANALYSIS:

| | | | | | |
|---|---|---|---|---|---|
| 53.50 BER BEREVE | 96.00 BRE | 3,440.00 HOL HOL | | 8.00 JUR JURY | |
| 39.41 OTL OTLAW | 2,184.78 PTO PERSNL | 538.00 SWG SWING | | 543.61 UNW UNW | |

### EARNINGS ANALYSIS:

| | | | | |
|---|---|---|---|---|
| 856.00 BER BEREVE | 7,850.00 BLU | 300.00 BON BONUS | 1,515.84 BRE | |
| 51,920.16 HOL HOL | 1,515.00 INC | 192.00 JUR JURY | 1,040.44 OTL OTLAW | |
| 30,816.75 PTO PERSNL | 1,000.00 REF REF | 50.00 SVB SavBon | 7,938.64 SWG SWING | |
| 9,384.31 UNW | | | | |

### MEMO ANALYSIS:

| | | | |
|---|---|---|---|
| 463,078.94 A HLTHVL | 1,209.68 M MCTTAX | 2,812.01 EM ERMAT | |

### STATUTORY DED. ANALYSIS:

| | | | |
|---|---|---|---|
| 35,004.33 01 NY | 1,162.00 01 NY FLI | | |
| 560.42 01 NY SUIDI | 57.09 3302 YONKERS | | |
| 7,639.77 3301 NEW YORK CIT | | | |

### VOLUNTARY DED. ANALYSIS:

| | | | |
|---|---|---|---|
| 7,014.57 K 401KS | 346.03 R KLOAN | 1,214.11 6 ROTHS | 175.62 TL TAXLV |
| 399.26 71 TAXLV | 50.70 73 GARNSH | 59.54 74 GARNSH | 1,543.08 75 SUPPRT |
| 150.00 76 SUPPRT | 496,033.39 CK1 CHKCK1 | 48,345.99 CK2 CHKCK2 | 7,287.00 CK3 CHKCK3 |
| 304.00 CK4 CHKCK4 | 140.00 CK5 CHKCK5 | 2,500.82 DEN DENTAL | 59.04 EXP EXP RE |
| 815.98 GYM GYM | 209.89 LIF LIFE | 325.00 LNR LOAN | 5,560.89 MED MEDICA |
| 8,793.76 MIH BUFMED | 118.24 STD STD | 10,788.54 SV1 SAVSV1 | 5,348.00 TRC COMMUT |
| 229.32 VIS VISION | | | |

| | |
|---|---|
| 44 FLAGGED: | |
| 399 NET CASH PAYS | 1,000.00 OR MORE |
| 51 | |

### NET PAYROLL:

| | | | |
|---|---|---|---|
| 53,568.95 CHECKS: | 370 | STARTING CHECK NUMBER: | SEE BELOW |
| TOTAL DEPOSITS: 562,868.92 VOUCHERS: | 407 | ENDING CHECK NUMBER: | SEE BELOW |
| NET VOIDS: 538.02 ADJUSTMENTS: | | eVOUCHERS: | 397 |
| NET CASH: 615,901.85 | | PAPER VOUCHERS PRINTED: | 2 |

ADP CHECK NUMBERS: STATE NY JPMORGAN CHASE

STARTING CHECK NUMBER:            ENDING CHECK NUMBER:



© 1991 Automatic Data Processing, Inc.

A-2540



**INVOICE**

| | |
|---|---|
| **Client Name** | : STRATEGIC CS |
| **Client Number** | : 1023197 |
| **Invoice Number** | : 601477471 |
| **Invoice Date** | : 03/11/2022 |
| **Invoice Due Date** | : 03/18/2022 |
| **Total Due This Invoice** | : $22,879.54 |

**ADP, Inc.**
**PO Box 842875**
**Boston MA 02284-2875**

ⓘ **Inquiries**
For Product/Service inquiries, please contact your Client Service Team.

MEGAN HARDY
STRATEGIC CS
711 3RD AVE
FL 6
NEW YORK, NY 10017-4029

### SUMMARY OF CURRENT CHARGES

| NAME | COMPANY CODE | PRODUCT | PROCESSING CHARGES | TAX | TOTAL |
|---|---|---|---|---|---|
| HODYNO & ASSOCIATES PLLC | 0020-10-8BB | ADP Payroll Services | $241.55 | $7.87 | $249.42 |
| DONALD NORRIS ASSOCIATES | 0020-10-8BF | ADP Payroll Services | $221.30 | $7.46 | $228.76 |
| Strategic Client Services | 0020-10-JG0 | ADP Payroll Services | $311.70 | $10.77 | $322.47 |
| Strategic Client Services | 0020-10-LZ6 | ADP Payroll Services | $173.38 | $5.64 | $179.02 |
| Strategic Client Services | 0020-10-LZK | ADP Payroll Services | $248.25 | $8.05 | $256.30 |
| Newport Legal Group | 0020-10-UBD | ADP Payroll Services | $326.60 | $10.66 | $337.26 |
| Spring Legal Group | 0020-10-V66 | ADP Payroll Services | $264.86 | $8.54 | $273.40 |
| Chinn Legal Grouop LLC | 0020-10-WKI | ADP Payroll Services | $266.71 | $9.32 | $276.03 |
| Pioneer Law | 0020-10-WKL | ADP Payroll Services | $322.80 | $3.98 | $326.78 |
| STRATEGIC CS LLC | 0020-10-WKS | ADP Payroll Services | $6,755.63 | $237.08 | $6,992.71 |
| Strategic Consulting | 0020-10-WKT | ADP Payroll Services | $6,672.43 | $228.81 | $6,901.24 |
| Strategic CS | 0020-10-WKV | ADP Payroll Services | $4,275.97 | $136.47 | $4,412.44 |
| Northstar Legal Group | 0020-10-WVC | ADP Payroll Services | $100.22 | $2.80 | $103.02 |
| Strategic CS | 0020-1W-WKV | ADP Workforce Now | $1,956.67 | $64.02 | $2,020.69 |

| | |
|---|---|
| **Sub Total Current Charges** | **$22,138.07** |
| **Tax** | **$741.47** |
| **Total Due This Invoice** | **$22,879.54** |

**WE APPRECIATE YOUR BUSINESS!**
- Send your payment with the return stub below in the enclosed return envelope.
- Include on your check, the client number and invoice number to ensure accurate payment processing.
- Make your check payable to ADP, Inc. and mail to the address listed below.

**Return Stub**



**Mail check payment to:**

ADP, Inc.
PO Box 842875
Boston, MA 02284-2875

| | |
|---|---|
| Client Name | : STRATEGIC CS |
| Client Number | : 1023197 |
| Invoice Number | : 601477471 |
| Invoice Date | : 03/11/2022 |
| Invoice Due Date | : 03/18/2022 |
| Total Due This Invoice | : $22,879.54 |
| Amount Enclosed | $ |

00408750010231973031122601477410022879545   Exhibit 08-0261

A-2541



| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-8BB | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee** 1st State No Charge - GA Addl State Jurisdiction - IL - NY | 2 | $8.95 each | | $17.90 | |
| **Local Jurisdiction Fee** 1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive WFN Cobra Services Essential Document Cloud Essential ACA 41.86% of the Per Pay Fee is Software | 10 | $11.30 each | | $113.00 | $4.14 |
| **Processing Charges for Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive WFN Cobra Services Essential Document Cloud Essential ACA 41.86% of the Per Pay Fee is Software | 9 | $11.30 each | | $101.70 | $3.73 |

| | |
|---|---|
| **Sub Total Current Charges** | **$241.55** |
| **Tax** | **$7.87** |

| | | |
|---|---|---|
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-8BB** | **$249.42** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-8BF | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date: 01/31/2022** | | | | | |

Exhibit 08-0262

A-2542



| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-8BF | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **State Jurisdiction Fee**<br>1st State No Charge - IL Addl State Jurisdiction - NY | 1 | $8.95 each | | $8.95 | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for**<br>**Period Ending Date:  02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | 9 | $11.30 each | | $101.70 | $3.73 |
| **Processing Charges for**<br>**Period Ending Date:  02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | 9 | $11.30 each | | $101.70 | $3.73 |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | $221.30 |
| **Tax** | | $7.46 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-8BF** | $228.76 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-JG0 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date:  01/31/2022** | | | | | |

Exhibit 08-0263

A-2543



| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-JG0 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **State Jurisdiction Fee**<br>1st State No Charge - FL Addl State Jurisdiction - NY | 1 | $8.95 each | | $8.95 | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for**<br>**Period Ending Date:  02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | 14 | $11.30 each | | $158.20 | $5.80 |
| **Processing Charges for**<br>**Period Ending Date:  02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.86% of the Per Pay Fee is Software | 12 | $11.30 each | | $135.60 | $4.97 |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | $311.70 |
| **Tax** | | $10.77 |

| | | |
|---|---|---|
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-JG0** | **$322.47** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-LZ6 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date:  02/08/2022** | | | | | |

Exhibit 08-0264

A-2544



| | Invoice Number | : | 601477471 |
|---|---|---|---|
| | Invoice Date | : | 03/11/2022 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-LZ6 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle** | 8 | $11.07 each | | $88.56 | $3.21 |
| Includes: | | | | | |
| Enhanced Payroll | | | | | |
| Essential Time and Attendance | | | | | |
| Enhanced HR | | | | | |
| Enhanced Benefits | | | | | |
| Benefit Accruals | | | | | |
| iReports | | | | | |
| iArchive | | | | | |
| WFN Cobra Services | | | | | |
| Essential Document Cloud | | | | | |
| Essential ACA | | | | | |
| 41.55% of the Per Pay Fee is Software | | | | | |
| **Courier Delivery** | 1 | | | $9.20 | |
| **Processing Charges for** | | | | | |
| **Period Ending Date:  02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** | 6 | $11.07 each | | $66.42 | $2.43 |
| Includes: | | | | | |
| Enhanced Payroll | | | | | |
| Essential Time and Attendance | | | | | |
| Enhanced HR | | | | | |
| Enhanced Benefits | | | | | |
| Benefit Accruals | | | | | |
| iReports | | | | | |
| iArchive | | | | | |
| WFN Cobra Services | | | | | |
| Essential Document Cloud | | | | | |
| Essential ACA | | | | | |
| 41.55% of the Per Pay Fee is Software | | | | | |
| **Courier Delivery** | 1 | | | $9.20 | |

| | | | |
|---|---|---|---|
| **Sub Total Current Charges** | | | $173.38 |
| **Tax** | | | $5.64 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-LZ6** | | $179.02 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-LZK | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for** | | | | | |
| **Period Ending Date:  01/31/2022** | | | | | |
| **State Jurisdiction Fee** | 2 | $8.95 each | | $17.90 | |
| 1st State No Charge - GA Addl State Jurisdiction - NY - PA | | | | | |
| **Local Jurisdiction Fee** | 1 | $8.95 each | | $8.95 | |
| 1st Lcl No Charge-Mctrn,NY Addl Local Jurisdiction Nyc ,NY | | | | | |
| **Processing Charges for** | | | | | |
| **Period Ending Date:  02/08/2022** | | | | | |

Exhibit 08-0265

A-2545



| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-LZK | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive WFN Cobra Services Essential Document Cloud Essential ACA 41.55% of the Per Pay Fee is Software | 11 | $11.07 each | | $121.77 | $4.44 |
| **Processing Charges for Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive WFN Cobra Services Essential Document Cloud Essential ACA 41.55% of the Per Pay Fee is Software | 9 | $11.07 each | | $99.63 | $3.61 |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | $248.25 |
| **Tax** | | $8.05 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-LZK** | $256.30 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-UBD | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee** 1st State No Charge - FL Addl State Jurisdiction - NY | 1 | $8.95 each | | $8.95 | |
| **Local Jurisdiction Fee** 1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for Period Ending Date: 02/08/2022** | | | | | |

Exhibit 08-0266

A-2546



| | | |
|---|---|---|
| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-UBD | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | 16 | $10.29 each | | $164.64 | $5.70 |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>Essential Document Cloud<br>Essential ACA<br>43.15% of the Per Pay Fee is Software | 14 | $10.29 each | | $144.06 | $4.96 |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | $326.60 |
| **Tax** | | $10.66 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-UBD** | $337.26 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-V66 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - GA Addl State Jurisdiction<br>- NY | 1 | $8.95 each | | $8.95 | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local<br>Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for**<br>**Period Ending Date: 02/08/2022** | | | | | |

Exhibit 08-0267

A-2547



| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

CURRENT CHARGES

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-V66 | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive Essential Document Cloud Essential ACA 43.15% of the Per Pay Fee is Software | 13 | $10.29 each | | $133.77 | $4.62 |
| **Processing Charges for Period Ending Date:  02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive Essential Document Cloud Essential ACA 43.15% of the Per Pay Fee is Software | 11 | $10.29 each | | $113.19 | $3.92 |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | $264.86 |
| **Tax** | | $8.54 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-V66** | **$273.40** |

CURRENT CHARGES

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-WKI | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date:  01/31/2022** | | | | | |
| **Local Jurisdiction Fee** 1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for Period Ending Date:  02/08/2022** | | | | | |

Exhibit 08-0268

A-2548



| | | |
|---|---|---|
| **Invoice Number** | : | **601477471** |
| **Invoice Date** | : | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKI | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.34% of the Per Pay Fee is Software | 13 | $10.74 each | | $139.62 | $5.05 |
| **Processing Charges for**<br>**Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.34% of the Per Pay Fee is Software | 11 | $10.74 each | | $118.14 | $4.27 |

| | |
|---|---|
| **Sub Total Current Charges** | **$266.71** |
| **Tax** | **$9.32** |
| **TOTAL CHARGES FOR COMPANY CODE:**  0020-10-WKI | **$276.03** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKL | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date: 01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - CO Addl State Jurisdiction<br>- IL - NY - TN | 3 | $8.95 each | | $26.85 | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local<br>Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for**<br>**Period Ending Date: 02/08/2022** | | | | | |

Exhibit 08-0269

A-2549



Page 10 of 15

**Invoice Number** : **601477471**
**Invoice Date** : **03/11/2022**

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKL | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.61% of the Per Pay Fee is Software | **5** | **$10.96 each** | | **$54.80** | **$1.99** |
| **Management Reports for**<br>**Period Ending Date:  02/08/2022** | | | | | |
| **Payroll Expenses And Liab** | **5** | | | **$88.70** | |
| **Processing Charges for**<br>**Period Ending Date:  02/22/2022** | **5** | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.61% of the Per Pay Fee is Software | **5** | **$10.96 each** | | **$54.80** | **$1.99** |
| **Management Reports for**<br>**Period Ending Date:  02/22/2022** | | | | | |
| **Payroll Expenses And Liab** | **5** | | | **$88.70** | |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | **$322.80** |
| **Tax** | | **$3.98** |

**TOTAL CHARGES FOR COMPANY CODE:**     **0020-10-WKL**      **$326.78**

**CURRENT CHARGES**

| ADP PAYROLL SERVICES<br>COMPANY CODE 0020-10-WKS | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for**<br>**Period Ending Date:  01/31/2022** | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - FL Addl State Jurisdiction<br>- MA - NY - OR - TX - WA | **5** | **$8.95 each** | | **$44.75** | |

Exhibit 08-0270

A-2550



| | | | | |
|---|---|---|---|---|
| **Invoice Number** | : | | | **601477471** |
| **Invoice Date** | : | | | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-WKS | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| Local Jurisdiction Fee<br>1st Lcl No Charge-Ltss,WA Addl Local<br>Jurisdiction Mctm,NY Nyc ,NY Pfml,WA Pfml,MA | 4 | $8.95 each | | $35.80 | |
| **Processing Charges for<br>Period Ending Date:  02/08/2022** | | | | | |
| Workforce Now Payroll Solution Bundle<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | 311 | $11.32 each | | $3,520.52 | $128.46 |
| **Management Reports for<br>Period Ending Date:  02/08/2022** | | | | | |
| Payroll Expenses And Liab | 311 | | | $88.70 | |
| **Processing Charges for<br>Period Ending Date:  02/22/2022** | | | | | |
| Workforce Now Payroll Solution Bundle<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | 263 | $11.32 each | | $2,977.16 | $108.62 |
| **Management Reports for<br>Period Ending Date:  02/22/2022** | | | | | |
| Payroll Expenses And Liab | 263 | | | $88.70 | |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | **$6,755.63** |
| **Tax** | | **$237.08** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WKS** | **$6,992.71** |

Exhibit 08-0271

A-2551



| | | | | | |
|---|---|---|---|---|---|
| **Invoice Number** | : | | | | **601477471** |
| **Invoice Date** | : | | | | **03/11/2022** |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-WKT | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| Processing Charges for Period Ending Date: 01/31/2022 | | | | | |
| **State Jurisdiction Fee**<br>1st State No Charge - AZ Addl State Jurisdiction - CA - CO - FL - GA - IL - MA - MI - NV - NJ - NM - NY - NC - OH - OK - OR - PA - SC - TN - TX - WI | 20 | $8.95 each | | $179.00 | |
| **Local Jurisdiction Fee**<br>1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Wcpc,NM Nyc ,NY Pfml,MA Hill,OH Gira,PA | 5 | $8.95 each | | $44.75 | |
| Processing Charges for Period Ending Date: 02/08/2022 | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | 291 | $11.32 each | | $3,294.12 | $120.19 |
| Management Reports for Period Ending Date: 02/08/2022 | | | | | |
| **Payroll Expenses And Liab** | 291 | | | $88.70 | |
| Processing Charges for Period Ending Date: 02/22/2022 | | | | | |
| **Workforce Now Payroll Solution Bundle**<br>Includes:<br>Enhanced Payroll<br>Essential Time and Attendance<br>Enhanced HR<br>Enhanced Benefits<br>Benefit Accruals<br>iReports<br>iArchive<br>WFN Cobra Services<br>Essential Document Cloud<br>Essential ACA<br>41.7% of the Per Pay Fee is Software | 263 | $11.32 each | | $2,977.16 | $108.62 |
| Management Reports for Period Ending Date: 02/22/2022 | | | | | |
| **Payroll Expenses And Liab** | 263 | | | $88.70 | |

**Sub Total Current Charges**          Exhibit 08-0272          **$6,672.43**

A-2552



Page 13 of 15

| | |
|---|---|
| **Invoice Number** : | **601477471** |
| **Invoice Date** : | **03/11/2022** |

| | | |
|---|---|---|
| Tax | | $228.81 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WKT** | **$6,901.24** |

CURRENT CHARGES

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-WKV | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date: 01/31/2022** | | | | | |
| **Online Full Service Direct Deposit (FSDD) - Recall and Reversals** | 1 | $25.00 each | | $25.00 | |
| **State Jurisdiction Fee** | 19 | $8.95 each | | $170.05 | |
| 1st State No Charge - CA Addl State Jurisdiction - FL - GA - IL - MA - MI - MN - MO - NE - NJ - NY - NC - OH - OR - PA - SC - TX - UT - VA - WA | | | | | |
| **Local Jurisdiction Fee** | 6 | $8.95 each | | $53.70 | |
| 1st Lcl No Charge-Metr,OR Addl Local Jurisdiction Ltss,WA Mctm,NY Nyc ,NY Pfml,WA Pfml,MA Sole,PA | | | | | |
| **Processing Charges for Period Ending Date: 02/08/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** | 222 | $10.96 each | $139.45 | $2,572.57 | $88.58 |
| Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive WFN Cobra Services Essential Document Cloud Essential ACA 39.35% of the Per Pay Fee is Software | | | | | |
| **Processing Charges for Period Ending Date: 02/22/2022** | | | | | |
| **Workforce Now Payroll Solution Bundle** | 120 | $10.96 each | $139.45 | $1,454.65 | $47.89 |
| Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive WFN Cobra Services Essential Document Cloud Essential ACA 37.62% of the Per Pay Fee is Software | | | | | |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | $4,275.97 |
| Tax | | $136.47 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WKV** | $4,412.44 |

Exhibit 08-0273

A-2553



| Invoice Number | : | 601477471 |
| Invoice Date | : | 03/11/2022 |

**CURRENT CHARGES**

| ADP PAYROLL SERVICES COMPANY CODE 0020-10-WVC | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date:** 01/31/2022 | | | | | |
| **State Jurisdiction Fee** 1st State No Charge - GA Addl State Jurisdiction - NY | 1 | $8.95 each | | $8.95 | |
| **Local Jurisdiction Fee** 1st Lcl No Charge-Mctm,NY Addl Local Jurisdiction Nyc ,NY | 1 | $8.95 each | | $8.95 | |
| **Processing Charges for Period Ending Date:** 02/08/2022 | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive Essential Document Cloud Essential ACA 43.15% of the Per Pay Fee is Software | 4 | $10.29 each | | $41.16 | $1.40 |
| **Processing Charges for Period Ending Date:** 02/22/2022 | | | | | |
| **Workforce Now Payroll Solution Bundle** Includes: Enhanced Payroll Essential Time and Attendance Enhanced HR Enhanced Benefits Benefit Accruals iReports iArchive Essential Document Cloud Essential ACA 43.15% of the Per Pay Fee is Software | 4 | $10.29 each | | $41.16 | $1.40 |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | $100.22 |
| **Tax** | | $2.80 |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-10-WVC** | $103.02 |

**CURRENT CHARGES**

| ADP WORKFORCE NOW COMPANY CODE 0020-1W-WKV | QUANTITY | RATE | BASE | TOTAL CHARGES | TAX |
|---|---|---|---|---|---|
| **Processing Charges for Period Ending Date:** 02/07/2022 | | | | | |

Exhibit 08-0274

A-2554



**Invoice Number** : **601477471**
**Invoice Date** : **03/11/2022**

**CURRENT CHARGES**

| ADP WORKFORCE NOW<br>COMPANY CODE 0020-1W-WKV | QUANTITY | RATE | BASE | TOTAL<br>CHARGES | TAX |
|---|---|---|---|---|---|
| **Workforce Now Human Capital Management (HCM) Suite**<br>Includes:<br>Health and Welfare 3rd Party Carrier Con<br>ADP Data Bridge | 797 | $2.11 each | | $1,681.67 | $39.61 |
| **ADP Marketplace for**<br>**Period Ending Date: 03/23/2022** | | | | | |
| **Orgchart Now For Adp Workforce Now - Orgchart Now Team 750**<br>Salvatore Tirabassi / 119690616 / 23-Sep-2017 | 1 | | | $275.00 | $24.41 |

| | | |
|---|---|---|
| **Sub Total Current Charges** | | **$1,956.67** |
| **Tax** | | **$64.02** |
| **TOTAL CHARGES FOR COMPANY CODE:** | **0020-1W-WKV** | **$2,020.69** |
| **Total Current Charges** | | **$22,138.07** |
| **Tax** | | **$741.47** |
| **Total Due This Invoice** | | **$22,879.54** |

Exhibit 08-0275

A-2555

 **DEEPGRAM**

### Deepgram — Strategic Financial Solutions Inc.

**Overview**

Deepgram will provide the Deepgram Neural Speech Engine to Strategic Financial Solutions. This service will enable Strategic Financial Solutions to send Deepgram audio files and receive the associated keyword search term results and transcription results back from each file sent to Deepgram.

**Scope**

Deepgram will provide access to its "Brain for Business" Deep Search and Transcription products. If Strategic Financial Solutions executes this agreement before 12/31/2018, Deepgram will provide the consulting and professional services free of charge so that Strategic Financial Solutions can consume and display Deepgram's output in their environment. For the fees listed below, Deepgram agrees to process audio files from Strategic Financial Solutions and return keyword search term results and transcription results for each audio file sent to Deepgram.

**Timeline**

Services are available upon January 21, 2019 and shall remain available until January 20, 2020 as long as Strategic Financial Solutions continues to use the Deepgram platform in accordance to the terms of this agreement. After the first 90 days, Strategic Financial Solutions has the option to opt out of this agreement. If Strategic Financial Solutions gives notice to opt out, the agreement will terminate after 60 days of notification being received by Deepgram.

**Other Terms**

This Arrangement will operate under the standard Deepgram Terms of Service (https://www.deepgram.com/business/Business_TOS.pdf), Privacy Policy (https://www.iubenda.com/privacy-policy/88905781), and the Data Processing Agreement (Appendix 1 in this document).

**Fee Structure**

- Strategic Financial Solutions agrees to pay 12 monthly payments of $8,333.33 for up to 700,000 hours of audio processing during the term of this agreement.
- All payments will be billed monthly, starting January 21, 2019, and are due Net 30.

Exhibit 08-0276

Document Ref: IM3E4-RLW9Z-XYWGK-WUOWW

A-2556

# ƆG DEEPGRAM

**Deepgram — Strategic Financial Solutions Inc.**

- Overage beyond 700,000 hours of audio processing during this term will be billed at a rate of $.14 per hour of audio processed. If there is any overage during the term of this agreement, Strategic Financial Solutions will be notified. Overage payments will billed in arrears on the 21th of the month and are due Net 30.

**Acceptance**

**Strategic Financial Solutions Inc.**

Approved by:___*Sal Tirabassi*_____ Date: ___12/30/2018____

Approver's Name: ___S Tirabassi___ Approver's Title: ___CFO_____

**Deepgram, Inc.**

Approved by:___*Chris Dyer*_____ Date: ___12/30/2018____

Approver's Name: ___Chris Dyer___ Approver's Title: ___Head of Sales____

Exhibit 08-0277

A-2557

# **DG** DEEPGRAM

Deepgram — Strategic Financial Solutions Inc.

## **Appendix 1**

**DG DEEPGRAM**

## Data Processing Agreement Overview

Deepgram (the Processor) takes the security and privacy of data subjects (consumers) seriously. Deepgram leverages the Standard Contractual Clauses for data transfers outside the EU. Under the EU GDPR, data transfers can only be made to Processors who agree to the following controls and obligations:

- The Processor must have adequate information security in place, taking into account the sensitivity of the data to be received;
- The data received remains the property of the Controller at all times unless ownership is explicitly shared or transferred by a written agreement.
- The Processor must not use sub Processors without advanced notification or consent of the Controller; sub Processors must have equivalent security and privacy controls to those of Processor.
- The Processor shall cooperate with the relevant Data Protection Authorities in the event of an enquiry;
- The Processor must keep all received information confidential;
- The Processor must report data breaches to the Controller without delay;
- The Processor may need to appoint a mandatory Data Protection Officer. The processor must do its own due diligence in this matter and appoint a qualified individual, if appropriate;
- The Processor must keep records of all processing activities;
- The Processor must comply with EU trans-border data transfer rules;
- The Processor must help the Controller to comply with data subjects rights;
- The Processor must assist the Data Controller in managing the consequences of data breaches;
- The Processor must delete or return all personal data at the end of the contract at the choice of the Controller; and
- The Processor must inform the Controller if the processing instructions infringe GDPR. The processor must comply with security and privacy due diligence requirements placed on the Controller for the validation of the above.

If the data transfer is from the Controller to another Controller (Peer transfer), then the Peer must agree to all of the above controls and obligations, in addition to those required for EU GDPR compliance.

**Signed and Agreed (Exporter)**

Name:     *Sal Tirabassi*

Position:   CFO

Exhibit 08-0278

A-2558

# ⊃G DEEPGRAM

Deepgram — Strategic Financial
Solutions Inc.

Company:   Strategic Financial

Date:   12/30/2018

**Signed and Agreed (Importer)**

Name:   *Chris Dyer*

Position:   Head of Sales

Company: Deepgram

Date:   12/30/2018

Exhibit 08-0279

A-2559

# DG DEEPGRAM

### Deepgram — Strategic Financial Solutions Inc.

## SCHEDULE 1 – DETAILS OF THE PROCESSING

### Categories of Data Subjects

Customer may submit, and users may submit on behalf of Customer: Personal Data to the Services, the extent of which is determined and controlled by Customer in its sole discretion, and which may include, but is not limited to Personal Data relating to the following categories of data subjects:

- · Prospects, customers, business partners and vendors of Customer and Customer's customers (who are natural persons)
- · Employees or contact persons of Customer's prospects, customers, business partners and vendors
- · Employees, agents, advisors, freelancers of Customer (who are natural persons)
- · Customer's Users authorized by Customer to use the Services

### Categories of Personal Data

Customer may submit Personal Data to the Services, the extent of which is determined and controlled by Customer in its sole discretion, and which may include, but is not limited to the following categories of Personal Data:

- · Customer's Users authorized by Customer to use the Services
- · First and last name
- · Title
- · Position
- · Employer
- · Contact information (company, email, phone, physical business address)
- · Order data
- · Professional life data
- · Personal life data
- · Connection data
- · Localization data
- · Business requirements

Exhibit 08-0280

A-2560

# ƆG DEEPGRAM

**Deepgram — Strategic Financial Solutions Inc.**

## SCHEDULE 2 – STANDARD CONTRACTUAL CLAUSES

### Standard Contractual Clauses (processors)

For the purposes of Article 26(2) of Directive 95/46/EC for the transfer of personal data to processors established in third countries which do not ensure an adequate level of data protection.

**Exporting organization:** Strategic Financial

Address: 711 3rd Ave NYC

Telephone: 2128104537

**Importing organization:** Deepgram Inc

Address: 83a Wiese St, San Francisco, CA 94103

Telephone: 9257834624

E-mail: scott@deepgram.c

Each "party"; together "the parties", HAVE AGREED on the following Contractual Clauses (the Clauses) in order to adduce adequate safeguards with respect to the protection of privacy and fundamental rights and freedoms of individuals for the transfer by the data exporter to the data importer of the personal data specified in Appendix 1.

### Clause 1

**Definitions**

For the purposes of the Clauses:

(a) 'personal data', 'special categories of data', 'process/processing', 'controller', 'processor', 'data subject' and 'supervisory authority' shall have the same meaning as in Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data;

(b) 'the data exporter' means the controller who transfers the personal data;

Exhibit 08-0281

A-2561

# ⊃G DEEPGRAM

**Deepgram — Strategic Financial Solutions Inc.**

(c) 'the data importer' means the processor who agrees to receive from the data exporter personal data intended for processing on his behalf after the transfer in accordance with his instructions and the terms of the Clauses and who is not subject to a third country's system ensuring adequate protection within the meaning of Article 25[1] of Directive 95/46/EC;

(d) 'the subprocessor' means any processor engaged by the data importer or by any other subprocessor of the data importer who agrees to receive from the data importer or from any other subprocessor of the data importer personal data exclusively intended for processing activities to be carried out on behalf of the data exporter after the transfer in accordance with his instructions, the terms of the Clauses and the terms of the written subcontract;

(e) 'the applicable data protection law' means the legislation protecting the fundamental rights and freedoms of individuals and, in particular, their right to privacy with respect to the processing of personal data applicable to a data controller in the Member State in which the data exporter is established;

(f) 'technical and organizational security measures' means those measures aimed at protecting personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing.

## Clause 2

### Details of the transfer

The details of the transfer and in particular the special categories of personal data where applicable are specified in Appendix 1 which forms an integral part of the Clauses.

## Clause 3

1. The data subject can enforce against the data exporter this Clause, Clause 4(b) to (i), Clause 5(a) to (e), and (g) to (j), Clause 6(1) and (2), Clause 7, Clause 8(2), and Clauses 9 to 12 as third-party beneficiary.
2. The data subject can enforce against the data importer this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where the data exporter has factually disappeared or has ceased to exist in law unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law, as a result of which it takes on the rights and obligations of the data exporter, in which case the data subject can enforce them against such entity.
3. The data subject can enforce against the subprocessor this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law as a result of which it takes on the rights and obligations of the

Exhibit 08-0282

A-2562

# ⊃G DEEPGRAM

Deepgram — Strategic Financial
Solutions Inc.

data exporter, in which case the data subject can enforce them against such entity. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.

4. The parties do not object to a data subject being represented by an association or other body if the data subject so expressly wishes and if permitted by national law.

Clause 4

**Obligations of the data exporter**

The data exporter agrees and warrants:

(a) that the processing, including the transfer itself, of the personal data has been and will continue to be carried out in accordance with the relevant provisions of the applicable data protection law (and, where applicable, has been notified to the relevant authorities of the Member State where the data exporter is established) and does not violate the relevant provisions of that State;

(b) that it has instructed and throughout the duration of the personal data processing services will instruct the data importer to process the personal data transferred only on the data exporter's behalf and in accordance with the applicable data protection law and the Clauses;

(c) that the data importer will provide sufficient guarantees in respect of the technical and organizational security measures specified in Appendix 2 to this contract;

(d) that after assessment of the requirements of the applicable data protection law, the security measures are appropriate to protect personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing, and that these measures ensure a level of security appropriate to the risks presented by the processing and the nature of the data to be protected having regard to the state of the art and the cost of their implementation;

(e) that it will ensure compliance with the security measures;

(f) that, if the transfer involves special categories of data, the data subject has been informed or will be informed before, or as soon as possible after, the transfer that its data could be transmitted to a third country not providing adequate protection within the meaning of Directive 95/46/EC;

(g) to forward any notification received from the data importer or any subprocessor pursuant to Clause 5(b) and Clause 8(3) to the data protection supervisory authority if the data exporter decides to continue the transfer or to lift the suspension;

(h) to make available to the data subjects upon request a copy of the Clauses, with the exception of Appendix 2, and a summary description of the security measures, as well as a copy of any contract for

Exhibit 08-0283

A-2563

**DG DEEPGRAM**

Deepgram — Strategic Financial Solutions Inc.

subprocessing services which has to be made in accordance with the Clauses, unless the Clauses or the contract contain commercial information, in which case it may remove such commercial information;

(i) that, in the event of subprocessing, the processing activity is carried out in accordance with Clause 11 by a subprocessor providing at least the same level of protection for the personal data and the rights of data subject as the data importer under the Clauses; and

(j) that it will ensure compliance with Clause 4(a) to (i).

Clause 5

**Obligations of the data importer[2]**

The data importer agrees and warrants:

(a) to process the personal data only on behalf of the data exporter and in compliance with its instructions and the Clauses; if it cannot provide such compliance for whatever reasons, it agrees to inform promptly the data exporter of its inability to comply, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(b) that it has no reason to believe that the legislation applicable to it prevents it from fulfilling the instructions received from the data exporter and its obligations under the contract and that in the event of a change in this legislation which is likely to have a substantial adverse effect on the warranties and obligations provided by the Clauses, it will promptly notify the change to the data exporter as soon as it is aware, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(c) that it has implemented the technical and organizational security measures specified in Appendix 2 before processing the personal data transferred;

(d) that it will promptly notify the data exporter about:

(i) any legally binding request for disclosure of the personal data by a law enforcement authority unless otherwise prohibited, such as a prohibition under criminal law to preserve the confidentiality of a law enforcement investigation,

(ii) any accidental or unauthorized access, and

(iii) any request received directly from the data subjects without responding to that request, unless it has been otherwise authorized to do so;

Exhibit 08-0284

A-2564

# ⊃G DEEPGRAM

Deepgram — Strategic Financial
Solutions Inc.

(e) to deal promptly and properly with all inquiries from the data exporter relating to its processing of the personal data subject to the transfer and to abide by the advice of the supervisory authority with regard to the processing of the data transferred;

(f) at the request of the data exporter to submit its data processing facilities for audit of the processing activities covered by the Clauses which shall be carried out by the data exporter or an inspection body composed of independent members and in possession of

(g) the required professional qualifications bound by a duty of confidentiality, selected by the data exporter, where applicable, in agreement with the supervisory authority;

(h) to make available to the data subject upon request a copy of the Clauses, or any existing contract for subprocessing, unless the Clauses or contract contain commercial information, in which case it may remove such commercial information, with the exception of Appendix 2 which shall be replaced by a summary description of the security measures in those cases where the data subject is unable to obtain a copy from the data exporter;

(i) that, in the event of subprocessing, it has previously informed the data exporter and obtained its prior written consent; that the processing services by the subprocessor will be carried out in accordance with Clause 11;

(j) to send promptly a copy of any subprocessor agreement it concludes under the Clauses to the data exporter.

## Clause 6

### Liability

1. The parties agree that any data subject, who has suffered damage as a result of any breach of the obligations referred to in Clause 3 or in Clause 11 by any party or subprocessor is entitled to receive compensation from the data exporter for the damage suffered.

2. If a data subject is not able to bring a claim for compensation in accordance with paragraph 1 against the data exporter, arising out of a breach by the data importer or his subprocessor of any of their obligations referred to in Clause 3 or in Clause 11, because the data exporter has factually disappeared or ceased to exist in law or has become insolvent, the data importer agrees that the data subject may issue a claim against the data importer as if it were the data exporter, unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law, in which case the data subject can enforce its rights against such entity.

The data importer may not rely on a breach by a subprocessor of its obligations in order to avoid its own liabilities.

Exhibit 08-0285

A-2565

# DG DEEPGRAM

**Deepgram — Strategic Financial Solutions Inc.**

3. If a data subject is not able to bring a claim against the data exporter or the data importer referred to in paragraphs 1 and 2, arising out of a breach by the subprocessor of any of their obligations referred to in Clause 3 or in Clause 11 because both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, the subprocessor agrees that the data subject may issue a claim against the data subprocessor with regard to its own processing operations under the Clauses as if it were the data exporter or the data importer, unless any successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law, in which case the data subject can enforce its rights against such entity. The liability of the subprocessor shall be limited to its own processing operations under the Clauses.

## Clause 7

**Mediation and jurisdiction**

1. The data importer agrees that if the data subject invokes against it third-party beneficiary rights and/or claims compensation for damages under the Clauses, the data importer will accept the decision of the data subject:

(a) to refer the dispute to mediation, by an independent person or, where applicable, by the supervisory authority;

(b) to refer the dispute to the courts in the Member State in which the data exporter is established.

2. The parties agree that the choice made by the data subject will not prejudice its substantive or procedural rights to seek remedies in accordance with other provisions of national or international law.

The parties agree that the choice made by the data subject will not prejudice its substantive or procedural rights to seek remedies in accordance with other provisions of national or international law.

## Clause 8

**Cooperation with supervisory authorities**

1. The data exporter agrees to deposit a copy of this contract with the supervisory authority if it so requests or if such deposit is required under the applicable data protection law.
2. The parties agree that the supervisory authority has the right to conduct an audit of the data importer, and of any subprocessor, which has the same scope and is subject to the same conditions as would apply to an audit of the data exporter under the applicable data protection law.

Exhibit 08-0286

A-2566

# ⊃G DEEPGRAM

### Deepgram — Strategic Financial Solutions Inc.

3. The data importer shall promptly inform the data exporter about the existence of legislation applicable to it or any subprocessor preventing the conduct of an audit of the data importer, or any subprocessor, pursuant to paragraph 2. In such a case the data exporter shall be entitled to take the measures foreseen in Clause 5 (b).

#### Clause 9

**Governing Law**

The Clauses shall be governed by the law of the Member State in which the data exporter is established.

#### Clause 10

**Variation of the contract**

The parties undertake not to vary or modify the Clauses. This does not preclude the parties from adding clauses on business related issues where required as long as they do not contradict the Clause.

#### Clause 11

**Subprocessing**

1. The data importer shall not subcontract any of its processing operations performed on behalf of the data exporter under the Clauses without the prior written consent of the data exporter. Where the data importer subcontracts its obligations under the Clauses, with the consent of the data exporter, it shall do so only by way of a written agreement with the subprocessor which imposes the same obligations on the subprocessor as are imposed on the data importer under the Clauses [3]. Where the subprocessor fails to fulfill its data protection obligations under such written agreement the data importer shall remain fully liable to the data exporter for the performance of the subprocessor's obligations under such agreement.
2. The prior written contract between the data importer and the subprocessor shall also provide for a third-party beneficiary clause as laid down in Clause 3 for cases where the data subject is not able to bring the claim for compensation referred to in paragraph 1 of Clause 6 against the data exporter or the data importer because they have factually disappeared or have ceased to exist in law or have become insolvent and no successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.
3. The provisions relating to data protection aspects for subprocessing of the contract referred to in paragraph 1 shall be governed by the law of the Member State in which the data exporter is established.
4. The data exporter shall keep a list of subprocessing agreements concluded under the Clauses and notified by the data importer pursuant to Clause 5(j), which shall be updated at least once a year. The list shall be available to the data exporter's data protection supervisory authority.

Exhibit 08-0287

A-2567

# ⊃G DEEPGRAM

## Deepgram — Strategic Financial Solutions Inc.

Clause 12

**Obligation after the termination of personal data processing services**

1. The parties agree that on the termination of the provision of data processing services, the data importer and the subprocessor shall, at the choice of the data exporter, return all the personal data transferred and the copies thereof to the data exporter or shall destroy all the personal data and certify to the data exporter that it has done so, unless legislation imposed upon the data importer prevents it from returning or destroying all or part of the personal data transferred. In that case, the data importer warrants that it will guarantee the confidentiality of the personal data transferred and will not actively process the personal data transferred anymore.

2. The data importer and the subprocessor warrant that upon request of the data exporter and/or of the supervisory authority, it will submit its data processing facilities for an audit of the measures referred to in paragraph 1.

**Signed and Agreed (Exporter)**

Name:      *Sal Tirabassi*

Position:   CFO

Company:   Strategic Financial

Date:   12/30/2018

**Signed and Agreed (Importer)**

Name:      *Chris Dyer*

Position:   Head of Sales

Company: Deepgram

Date:   12/30/2018

Exhibit 08-0288

A-2568

# ⊃G DEEPGRAM

Deepgram — Strategic Financial
Solutions Inc.

## APPENDIX 1 TO THE STANDARD CONTRACTUAL CLAUSES

This Appendix forms part of the Clauses and must be completed and signed by the parties

The Member States may complete or specify, according to their national procedures, any additional necessary information to be contained in this Appendix.

Data exporter

*The data exporter is (please specify briefly your activities relevant to the transfer):*

Data Exporter is (i) the legal entity that has executed the Standard Contractual Clauses as a Data Exporter and, (ii) all Affiliates (as defined in the Agreement) of Customer established within the European Economic Area (EEA) and Switzerland that have purchased Services on the basis of one or more Order Form(s) or Subscriptions.

Data importer

*The data importer is (please specify briefly activities relevant to the transfer):*

Deepgram is a speech analytics company that uses end-to-end deep learning techniques to provide its customers with state-of-the-art audio transcription, search capabilities, and business insight.

Data subjects

*The personal data transferred concern the following categories of data subjects (please specify):*

Data exporter may submit Personal Data to the Services, the extent of which is determined and controlled by the data exporter in its sole discretion, and which may include, but is not limited to Personal Data relating to the following categories of data subjects:

- · Prospects, customers, business partners and vendors of data exporter (who are natural persons)
- · Employees or contact persons of data exporter's prospects, customers, business partners and vendors
- · Employees, agents, advisors, freelancers of data exporter (who are natural persons)
- · Data exporter's Users authorized by data exporter to use the Services

Categories of data

*The personal data transferred concern the following categories of data (please specify):*

Exhibit 08-0289

A-2569

# ƆG DEEPGRAM

**Deepgram — Strategic Financial Solutions Inc.**

Data exporter may submit Personal Data to the Services, the extent of which is determined and controlled by the data exporter in its sole discretion, and which may include, but is not limited to the following categories of Personal Data:

- · First and last name
- · Title
- · Position
- · Employer
- · Contact information (company, email, phone, physical business address)
- · Order data
- · Professional life data
- · Personal life data
- · Connection data
- · Localization data

Special categories of data (if appropriate)

*The personal data transferred concern the following special categories of data (please specify):*

Data exporter may submit special categories of data to the Services, the extent of which is determined and controlled by the data exporter in its sole discretion, and which is for the sake of clarity Personal Data with information revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, and the processing of data concerning health or sex life.

Processing operations

*The personal data transferred will be subject to the following basic processing activities (please specify):*

The objective of Processing of Personal Data by data importer is the performance of the Services pursuant to the Agreement.

**Signed and Agreed (Exporter)**

Name: *Sal Tirabassi*

Position: CFO

Company: Strategic Financial

Date: 12/30/2018

Exhibit 08-0290

A-2570

# ⊃G DEEPGRAM

Deepgram — Strategic Financial
Solutions Inc.

**Signed and Agreed (Importer)**

Name:  *Chris Dyer*

Position:  Head of Sales

Company:  Deepgram, Inc.

Date:  12/30/2018

Exhibit 08-0291

A-2571

# ƎG DEEPGRAM

Deepgram — Strategic Financial
Solutions Inc.

## APPENDIX 2 TO THE STANDARD CONTRACTUAL CLAUSES

This Appendix forms part of the Clauses and must be completed and signed by the parties

*Description of the technical and organizational security measures implemented by the data importer in accordance with Clauses 4(a) and 5(c) (or document/legislation attachea):*

Data importer will maintain administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Personal Data uploaded to the Services, as described in the Security, Privacy and Architecture Documentation applicable to the specific Services purchased by data exporter, and accessible via www.deepgram.com or otherwise made reasonably available by data importer. Data Importer will not materially decrease the overall security of the Services during a subscription term.

GDPR Additions:

1. Data will only be processed as long as it is needed for business and legal reasons as envisioned when the data was submitted by the relevant parties.
2. All parties authorized to process the personal data covered by this contract are committed to protect the confidentiality of the data.
3. In the event of a request by a data subject, the processor will reasonably assist the controller to respond to the data subject in an accurate and timely manner.
4. The Service provider will cooperate with the controller in the event of a personal data breach, to GDPR standards.
5. Service provider will cooperate with controller in the event the controller initiates a data protection impact assessment.
6. The processor is not permitted to engage in onward transfers to additional countries outside of the EEA, without the explicit permission of the customer, in advance.

**Signed and Agreed (Exporter)**

Name: *Sal Tirabassi*

Position: CFO

Company: Strategic Financal

Date: 12/30/2018

**Signed and Agreed (Importer)**

Exhibit 08-0292

A-2572

# DG DEEPGRAM

**Deepgram — Strategic Financial Solutions Inc.**

Name: *Chris Dyer*

Position: Head of Sales

Company: Deepgram

Date: 12/30/2018

[1] Parties may reproduce definitions and meanings contained in Directive 95/46/EC within this Clause if they considered it better for the contract to stand alone.

[2] Mandatory requirements of the national legislation applicable to the data importer which do not go beyond what is necessary in a democratic society on the basis of one of the interests listed in Article 13(1) of Directive 95/46/EC, that is, if they constitute a necessary measure to safeguard national security, defense, public security, the prevention, investigation, detection and prosecution of criminal offences or of breaches of ethics for the regulated professions, an important economic or financial interest of the State or the protection of the data subject or the rights and freedoms of others, are not in contradiction with the standard contractual clauses. Some examples of such mandatory requirements which do not go beyond what is necessary in a democratic society are, *inter alia,* internationally recognized sanctions, tax-reporting requirements or anti-money-laundering reporting requirements.

[3] This requirement may be satisfied by the subprocessor co-signing the contract entered into between the data exporter and the data importer under this Decision.

Exhibit 08-0293

A-2573



# Signature Certificate

Document Ref.: IM3E4-RLW9Z-XYWGK-WUOWW

Document signed by:

**Sal Tirabassi**
Verified E-mail:
stirabassi@stratfs.com

*Sal Tirabassi*

67.82.104.172     30 Dec 2018 12:27:13 UTC

**Chris Dyer**
Verified E-mail:
chris@deepgram.com

*Chris Dyer*

24.130.249.188     30 Dec 2018 19:27:39 UTC

Document completed by all parties on:
30 Dec 2018 19:27:39 UTC
Page 1 of 1

Signed with **PandaDoc.com**

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.

Exhibit 08-0294

Deepgram, Inc.   Dashboard   Business   Accounting   Contacts                                    JR

Contacts
## Strategic Financial Solutions, Inc.

New

### No invoices awaiting payment
They usually pay in 22 days - View recent invoices report

THEY OWE **0.00**

**Money in over last 12 months**

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Activity   Notes   Email                                                                        Add a note

| ITEM | NUMBER | REFERENCE | DATE | ACTIVITY DATE | DUE | TOTAL |
|---|---|---|---|---|---|---|
| Invoice paid | 122119-1 | ervice Period 12/21/2019 - 1/20/2020 | Dec 21, 2019 | Paid Dec 31, 2019 | | 8,333.33 |
| Invoice paid | 112119-1 | Service Period: 11/21/2019 - 12/20/2019 | Nov 21, 2019 | Paid Dec 2, 2019 | | 8,333.33 |
| Invoice paid | 102119-1 | ervice Period 10/21/2019 - 11/20/2019 | Oct 21, 2019 | Paid Nov 5, 2019 | | 8,333.33 |
| Invoice paid | 092119-1 | Service Period: 9/21/2019 10/20/2019 | ep 21, 2019 | Paid Oct 28, 2019 | | 8,333.33 |
| Invoice paid | 082119-1 | ervice Period 8/21/2019 - 9/20/2019 | Aug 21, 2019 | Paid Aug 29, 2019 | | 8,333.33 |
| Invoice paid | 072119-1 | Service Period: 7/21/2019 - 8/20/2019 | Jul 21, 2019 | Paid Jul 30, 2019 | | 8,333.33 |
| Invoice paid | 062119-1 | Service Period: 6/21/2019 - 7/20/2019 | Jul 1, 2019 | Paid Jul 30, 2019 | | 8,333.33 |
| Invoice paid | 052119-1 | Service Period: 5/21/2019 - 6/20/2019 | Jun 1, 2019 | Paid Jun 11, 2019 | | 8,333.33 |
| Edited By Austin Bagby | | | May 29, 2019 | May 29, 2019 | | |
| Addi ional contact person's email address changed from no value to chris@deepgram.com. | | | | | | |
| Invoice paid | 040119-6 | Service Period: 4/21/2019 - | May 1, 2019 | Paid May 29, 2019 | | 8,333.33 |

Exhibit 08-0295

A-2575

| | | | | | |
|---|---|---|---|---|---|
| | | 5/20/2019 | | | |
| Invoice paid | 012119-2 | Service Period: 1/21/2019-2/20/2019 | Feb 1, 2019 | Paid Apr 9, 2019 | 8,333.33 |
| Invoice paid | 022119-1 | ervice Period 2/21/19 - 3/20/19 | Mar 1, 2019 | Paid Apr 9, 2019 | 8,333.33 |
| Invoice paid | 032119 1 | Service Period: 3/21/19 4/20/19 | Apr 1, 2019 | Paid Apr 3, 2019 | 8,333 33 |
| Edited<br>By Austin Bagby<br>Addi ional contact person's email address changed from no value to ap@stratfs com | | | Mar 28, 2019 | Mar 28, 2019 | |
| Invoice sent<br>By Austin Bagby<br>This invoice has been sent to kbagby@vcpartners com | 012119 2 | | Mar 28, 2019 | Mar 28, 2019 | |
| Invoice sent<br>By Austin Bagby<br>This invoice has been sent to kbagby@vcpartners com | 022119 1 | | Mar 28, 2019 | Mar 28, 2019 | |
| Invoice sent<br>By Austin Bagby<br>This invoice has been sent to kbagby@vcpartners com | 032119 1 | | Mar 28, 2019 | Mar 28, 2019 | |
| Note<br>By Austin Bagby<br>tatement has been sent to stirabassi@stratfs com; chris@deepgram com | | | Mar 28, 2019 | Mar 28, 2019 | |
| Edited<br>By Austin Bagby<br>Primary contact person's email address changed from no value to stirabassi@stratfs com | | | Jan 21, 2019 | Jan 21, 2019 | |
| Created<br>By Austin Bagby<br>trategic Financial Solutions, Inc has been created | | | Jan 21, 2019 | Jan 21, 2019 | |

100 items per page      20 total items

Exhibit 08-0296

A-2576

**Declaration of Amy Wagar**

As provided by 28 U.S.C. §1746, I, Amy Wagar, declare as follows:

1.    My name is Amy Wagar. I am a United States citizen over 18 years of age. I live in Peabody, Massachusetts. The following facts are known to me personally, and if called as a witness, I could and would competently testify to them.

2.    I worked as a client service representative at Strategic Financial Solutions from April to August 2021. A large part of my job was receiving inbound calls from consumers who had enrolled in Strategic's debt-settlement program.

3.    Strategic handles debt settlement for consumers in approximately 18 different portfolios (e.g., Anchor Law Group, Newport Legal Group, Option 1 Legal Group). It's my understanding that each of these portfolios claims to be a law office.

4.    It's my understanding that Strategic also handles debt settlement through a portfolio called Timberline. I did not work on that portfolio.

5.    As part of the enrollment process for the debt-settlement program for the "law firm" portfolios, Strategic sends notaries to meet consumers in person, usually in the consumers' homes. The consumers sign the enrollment contract in the presence of the notary.

6.    The enrollment documents are reviewed by attorneys employed by Strategic.



PLAINTIFF'S EXHIBIT PX-003

7.    Many consumers I spoke with said the notary did not give them a copy of the contract.

8.    Many consumers I spoke with thought that, by signing up for the program, they were hiring an attorney who would handle the entire debt-settlement process, including representing them if they were sued by a creditor. In reality, Strategic does not assign an attorney to represent a debt-settlement client unless and until the consumer receives a summons.

9.    When consumers in all states except for Arizona, Florida, Hawaii, Ohio, Oklahoma, New York, Pennsylvania, and Texas receive a summons in a debt-collection case and send it to the assigned "law firm," an attorney will review the summons and the case and decide whether to represent the consumer. In my experience, the majority of the time the attorneys decided not to represent the consumers or give any legal advice.

10.    When consumers in all states except for Arizona, Florida, Hawaii, Ohio, Oklahoma, New York, Pennsylvania, and Texas send a summons to the assigned "law firm" and the attorney decides not to take the case, a non-attorney litigation negotiator employed by Strategic will be assigned to negotiate the debt with the creditors. (If the attorney decides to take the case, Strategic will not assign a non-attorney litigation negotiator.)

11.    When consumers in Arizona, Florida, Hawaii, Ohio, Oklahoma, New York, Pennsylvania, or Texas receive a summons in a debt-collection case and send it to the assigned "law firm," an attorney is automatically assigned to the

A-2578

matter. The attorney will either answer the complaint or advise the consumer how to answer the complaint, but the attorney will not negotiate with the creditor. I was told not to provide the attorney's name or contact information to any of these consumers, even though the attorney was automatically assigned to the consumer's case.

12. In addition, every time consumers in Arizona, Florida, Hawaii, Ohio, Oklahoma, New York, Pennsylvania, or Texas send a summons to the assigned "law firm," Strategic assigns a non-attorney litigation negotiator to negotiate the debt with the creditors.

13. At least once a week, I received calls from consumers who received default judgments in debt-collection cases. In some cases, they thought the assigned "law firm" would represent them and the assigned lawyer would attend the court hearing, but this did not happen. Many times, the consumers assumed that we (as a "law firm") would file a response with the court or would give them updates, but this did not happen unless an attorney had decided to take on the case (as discussed in paragraph 9) or an attorney had been automatically assigned (as discussed in paragraph 11).

14. Consumers frequently told me that they had the impression that the notary who enrolled them in the program was an attorney or that various salespeople from Strategic were attorneys.

15. I answered incoming phone calls from consumers who had enrolled in the program. When a call came in, my computer program told me the person's

A-2579

name and the name of the assigned "law firm." I was told to answer the phone using the name of the assigned "law firm" (e.g., "Thank you for calling Option 1 Legal. This is Amy.")

16.     Consumers enrolled in the "law firm" debt-settlement program maintain escrow accounts through Global Holdings, LLC (formerly Global Client Solutions, LLC) or Reliant Account Management, LLC. Strategic withdraws its fees from these accounts on a monthly basis beginning as soon as the enrollment documents are signed, before Strategic settles any debt for the consumer.

17.     More often than not, clients pay more into the program than their enrolled debt.

18.     Many clients do not receive their first settlement until they have been in the program for 7-9 months or so. I have seen some clients go 2 years in the program without a settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ____10____ day of September 2021.

AMY WAGAR
250 Washington Street, Apt. 1
Peabody, MA 01960

A-2580

## Agreement for Legal Representative Services

On this 4TH day of JANUARY , 2017, NATIONAL PARALEGAL & NOTARY, LLC (hereinafter "NPN") and **RAGGIO & ASSOCIATES, LLC** (Hereinafter "COMPANY"), agree that:

**WHEREAS**, the parties seek to enter into a relationship whereby NPN will provide in person face-to-face presentation services to COMPANY, in order to refer representatives ("Representatives") who will meet with COMPANY'S clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE**, the parties mutually agree as follows:

1. COMPANY shall pay NPN a fee ("Fee") for referring a Representative, as follows:

   a. ONE HUNDRED-FIFTEEN Dollars ($115.00) for a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents; upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

   b. Additionally, in cases where the client is located in a remote area, NPN may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel twenty-five (25) miles or more, one way. In such cases, NPN will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

   a. the COMPANY shall pay NPN $65.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to NPN.

4. The following is a list of service level expectations for this business partnership:

   a. Professionalism: It is expected that NPN will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified client at least one hour in advance of the appointment to confirm the time and location.

Page 1 of 5



PLAINTIFF'S
EXHIBIT
**PX-005**

Exhibit 17-0001

A-2581

b. Execution: It is expected that NPN and the assigned Representative will work to complete all tasks and assignments in a timely and professional manner. Specific expectations would be:

    i. Scheduling appointments: It is expected that NPN will work with COMPANY representatives to initiate contact with the client within 24 hours of notification by COMPANY, in order to schedule an in-person appointment that is convenient to the client. In the event that the appointment cannot be completed as scheduled, NPN should immediately notify both the client and the COMPANY.

    ii. Completion of paperwork: It is expected that NPN will provide a Representative who fully completes all paperwork at the time of the scheduled in-person appointment. The definition of completing the paperwork includes getting all appropriate signatures from the client, including adding signatures for any co-applicant, if applicable. NPN is then responsible for uploading all completed paperwork to the COMPANY website, within 24-hours of the completion of the in-person appointment.

    iii. Communication: It is expected that NPN will communicate with COMPANY in a manner that provides for a superior client experience. All efforts should be made to communicate all status updates, including:

        a. Confirmation of client appointments,

        b. Rescheduling of client appointments,

        c. The need for additional remote area fees,

        d. Any issues or concerns relayed by the Representative during the in-person appointment, and

        e. NPN notifying the COMPANY in the event of a client no-show or other scheduling concern.

c. Service Level Agreements

    i. Scheduling: It is expected that 90% of all appointments will be handled on-time, as defined by:

        a. The Representative arriving on-time for the appointment as scheduled.

        b. The Representative calling the client at least 1 hour prior to the appointment to confirm the appointment.

    ii. Completion of paperwork: It is expected that 100% of all paperwork will be handled as expected, as defined by:

CONFIDENTIAL - FOIA EXEMPT

Exhibit 17-0002

NPN0000002

A-2582

    a.     All paperwork submitted will be complete with signatures.
    b.     All paperwork will be uploaded to the COMPANY system within 24-hours of the in-person appointment.

iii.  Communication: It is expected that 100% of all communication from NPN to COMPANY will be handled on-time, as defined by:

    a.     All notifications will be provided real-time, during the business hours of 9 AM EST and 9 PM EST, Monday through Friday.
    b.     All notifications will be provided real-time, during the business hours of 10 AM EST and 5 PM EST, on Saturday.
    c.     All remote area fee requests will be provided, in writing (including by email), and will be included in the monthly invoice with details about the date, time, distance and name of client.

iv.  Failure to meet one, or more, of the Service Level agreements, as defined above, will result in a monetary penalty of 5% of the total monthly invoice for the month that the service level failure occurred if the identified service level shortfall is not remedied before the end of the following month

5. NPN shall issue invoices to the COMPANY by the 5th of each month, covering all services provided hereunder during the prior month. COMPANY shall make payment to NPN by the 25th of the month, for all services provided hereunder during the prior month. (E.g., for services provided by NPN in January, NPN shall issue its invoice by February 5, and COMPANY shall pay such invoice by February 25.)

6. If COMPANY fails to deliver the monthly payment on the 25th day of the succeeding calendar month as set forth in the preceding paragraph to NPN, a three (3)% daily compounding interest penalty will apply until payment is received in full.

7. Either party may terminate this Agreement with thirty (30) days written notice to the other party. Upon the termination of this Agreement, COMPANY shall promptly return to NPN any records, electronically stored files or other media containing NPN'S Confidential Information, and shall not retain any copies of same. Similarly, NPN shall promptly return to COMPANY any records, electronically stored files or other media containing COMPANY'S Confidential Information, and shall not retain any copies of same. All provisions of this Agreement that by their terms or context are intended to survive the termination of this Agreement, including without limitation, shall so survive and remain in full force and effect in accordance with their terms.

8. Pursuant to the Letter of Engagement signed by each respective client and COMPANY for each case representation, COMPANY is responsible for the legal services provided to its clients. Accordingly, COMPANY agrees to defend and hold harmless NPN and its legal

Page 3 of 5

Exhibit 17-0003

CONFIDENTIAL - FOIA EXEMPT            NPN0000003

A-2583

representatives for duties performed on behalf of its clients as it relates to the Debt Resolution Program.

9. In the event of litigation, including breach, enforcement or interpretation, arising out of or relating to this Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

10. The validity, construction, enforcement, and interpretation of this Agreement are governed by the laws of the State of Illinois and the federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions.

11. An amendment or modification of this Agreement will be valid and effective only if it is in writing and signed by each party to this Agreement. In addition, a waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced.

12. Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law. However, if a provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed severable from the remaining provisions of this Agreement and will not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that provision to other circumstances in which it is valid and enforceable.

13. The parties agree that no relationship is created by this Agreement that could any way imply (a) a partnership, joint venture or other commercial relationship between the parties, (b) an authorization for either party to act as agent or representative of the other or (c) an agreement or commitment by the other party to purchase, acquire, develop or use the products or services of the other party.

14. This Agreement records the entire understanding between the parties with respect to the terms and conditions set forth herein, and supersedes any previous or contemporaneous agreement, representation or understanding, oral or written, by either of them with respect to such terms and conditions. The parties may execute this Agreement in counterparts. Each executed counterpart of this Agreement will constitute an original document, and all of them, together, will constitute the same agreement.

Exhibit 17-0004

CONFIDENTIAL - FOIA EXEMPT

NPN0000004

A-2584

RAGGIO & ASSOCIATES, LLC

BY:

NAME: JAMES A. AGOSTO

DATE: 1/5/2017

NATIONAL PARALEGAL & NOTARY, LLC

BY:

NAME: LISA MUNYON

DATE: 1/4/2017

Page 5 of 5

Exhibit 17-0005

CONFIDENTIAL - FOIA EXEMPT                                    NPN0000005

A-2585

## PAYMENT AGREEMENT

On this _16th_ day of _February_ , 2018, **SUNSHINE SIGNING CONNECTION, INC.** (hereinafter "SUNSHINE") and **JMS INDUSTRIES, LLC d/b/a CANYON LEGAL GROUP, LLC** (Hereinafter "COMPANY"), agree that:

**WHEREAS,** the parties seek to enter into a relationship whereby SUNSHINE will provide referral services to COMPANY, in order to refer mobile professional representatives ("Representatives") who will meet with COMPANY'S clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE,** the parties mutually agree as follows:

1. COMPANY shall pay SUNSHINE a fee ("Fee") for referring a Representative, as follows:

   a. ONE HUNDRED-TEN Dollars ($110.00) for referring a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents; upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

   b. Additionally, in cases where the client is located in a remote area, SUNSHINE may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel thirty-one (31) miles or more, one way. In such cases, SUNSHINE will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

   a. the COMPANY shall pay SUNSHINE $110.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to SUNSHINE.

4. The following is a list of service level expectations for this business partnership:

   a. Professionalism: It is expected that SUNSHINE will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified

Exhibit 17-0006

SUNSHINE-CID-000126

A-2586

client at least one hour in advance of the appointment to confirm the time and location.

b.  Execution:  It is expected that SUNSHINE and the assigned Representative will work to complete all tasks and assignments in a timely and professional manner.  Specific expectations would be:

   i.  Scheduling appointments:  It is expected that SUNSHINE will work with COMPANY representatives to initiate contact with the client within 24 hours of notification by COMPANY, in order to schedule an in-person appointment that is convenient to the client.  In the event that the appointment cannot be completed as scheduled, SUNSHINE should immediately notify both the client and the COMPANY.

   ii.  Completion of paperwork:  It is expected that SUNSHINE will provide a Representative who fully completes all paperwork at the time of the scheduled in-person appointment.  The definition of completing the paperwork includes getting all appropriate signatures from the client, including adding signatures for any co-applicant, if applicable.  SUNSHINE is then responsible for uploading all completed paperwork to the COMPANY website, within 24-hours of the completion of the in-person appointment.

   iii.  Communication:  It is expected that SUNSHINE will communicate with COMPANY in a manner that provides for a superior client experience.  All efforts should be made to communicate all status updates, including:

      a.  Confirmation of client appointments,
      b.  Rescheduling of client appointments,
      c.  The need for additional remote area fees,
      d.  Any issues or concerns relayed by the Representative during the in-person appointment, and
      e.  SUNSHINE notifying the COMPANY in the event of a client no-show or other scheduling concern.

c.  Service Level Agreements

   i.  Scheduling:  It is expected that 90% of all appointments will be handled on-time, as defined by:

      a.  The Representative arriving on-time for the appointment as scheduled.
      b.  The Representative calling the client at least 1 hour prior to the appointment to confirm the appointment.

Exhibit 17-0007

SUNSHINE-CID-000127

A-2587

ii.    Completion of paperwork: It is expected that 100% of all paperwork will be handled as expected, as defined by:

        a.    All paperwork submitted will be complete with signatures.
        b.    All paperwork will be uploaded to the COMPANY system within 24-hours of the in-person appointment.

iii.    Communication: It is expected that 100% of all communication from SUNSHINE to COMPANY will be handled on-time, as defined by:

        a.    All notifications will be provided real-time, during the business hours of 9 AM EST and 9 PM EST, Monday through Friday.
        b.    All notifications will be provided real-time, during the business hours of 10 AM EST and 2 PM EST, on Saturday.
        c.    All remote area fee requests will be provided, in writing (including by email), and will be included in the monthly invoice with details about the date, time, distance and name of client.

iv.    Failure to meet one, or more, of the Service Level agreements, as defined above, will result in a monetary penalty of 5% of the total monthly invoice for the month that the service level failure occurred if the identified service level shortfall is not remedied before the end of the following month.

5. SUNSHINE shall issue invoices to the COMPANY by the 5th of each month, covering all services provided hereunder during the prior month. COMPANY shall make payment to SUNSHINE by the 15th of the month, for all services provided hereunder during the prior month. (E.g., for services provided by SUNSHINE in January, SUNSHINE shall issue its invoice by February 5, and COMPANY shall pay such invoice by February 15.)

6. During the term of this Agreement and for a period of twelve months thereafter, COMPANY shall not, directly or indirectly:

    a.  use the services of any Representative who SUNSHINE has previously referred to perform services for COMPANY, unless: (1) the Representative is contracted directly through SUNSHINE; or (2) COMPANY has previously used the Representative without SUNSHINE'S involvement, prior to the date of this Agreement; or
    b.  accept or do business with the third-party notary scheduling platform utilized by SUNSHINE (i.e., SnapDocs) to provide services to COMPANY.

7. COMPANY shall not, directly or indirectly, use or disclose, for any reason or in any manner, SUNSHINE's confidential and non-public information, whether written or unwritten, including in electronic form or other media ("Confidential Information"); provided that, during the term of this Agreement, COMPANY may utilize the Confidential Information in connection with its business activities in accordance with this Agreement, and disclose Confidential Information to COMPANY's employees who have a legitimate need to know such Confidential Information, in

Exhibit 17-0008

SUNSHINE-CID-000128

each case only to the extent necessary for the sole purpose of conducting its business operations in accordance with this Agreement. Confidential Information shall include, without limitation, trade secrets, proprietary data or other non-public confidential information of SUNSHINE regarding SUNSHINE'S processes, procedures, platforms, vendors and Representatives. Confidential Information shall not include information which is in or hereafter enters the public domain through no fault or action of COMPANY, is obtained by COMPANY from a third party which is not subject to any legal restriction on its right to use and disclose such information, is in the possession of COMPANY prior to the date of disclosure, or of which COMPANY has knowledge prior to the date of disclosure. The above restrictions shall not apply to any disclosure required by law or by a court of competent jurisdiction, so long as COMPANY promptly notifies SUNSHINE in writing of such mandated disclosure.

8. COMPANY stipulates that any breach of its covenants set forth in Sections 6 or 7 above (the "Covenants") would diminish the value of SUNSHINE and cause irreparable and continuing injury to SUNSHINE for which an adequate legal remedy would not exist. Accordingly, COMPANY stipulates that, if COMPANY breaches any of the Covenants, SUNSHINE will be entitled to seek the automatic entry by a court having jurisdiction of an order granting specific performance or injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by COMPANY, but without proof of actual monetary damage or an inadequate remedy at law. SUNSHINE'S entitlement to the above remedy shall not limit or exclude any other available remedy.

9. If a client of COMPANY directly enters an in-person presentation signing request on SUNSHINE'S website, and SUNSHINE refers a Representative for the signing, then COMPANY shall pay SUNSHINE the Fee for such signing

10. Either party may terminate this Agreement with thirty (30) days written notice to the other party. Upon the termination of this Agreement, COMPANY shall promptly return to SUNSHINE any records, electronically stored files or other media containing SUNSHINE'S Confidential Information, and shall not retain any copies of same. Similarly, SUNSHINE shall promptly return to COMPANY any records, electronically stored files or other media containing COMPANY'S Confidential Information, and shall not retain any copies of same. All provisions of this Agreement that by their terms or context are intended to survive the termination of this Agreement, including without limitation the provisions of Sections 5 – 8, 11 – 13, and 15, shall so survive and remain in full force and effect in accordance with their terms.

11. In the event of litigation, including breach, enforcement or interpretation, arising out of or relating to this Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

12. This Agreement is binding on, may be enforced by, and inures to the benefit of, SUNSHINE's authorized assignees and successors in interest. COMPANY consents to the assignment of the Covenants herein by SUNSHINE, without COMPANY's consent. COMPANY expressly agrees that the Covenants may be enforced against COMPANY by: (a)

Exhibit 17-0009

SUNSHINE-CID-000129

A-2589

any such assignee; or (b) any successor in interest of all or any part of SUNSHINE's business, whether pursuant to a merger, reorganization, or sale, lease, or exchange of its assets or stock.

13. The validity, construction, enforcement, and interpretation of this Agreement are governed by the laws of the State of Florida and the federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions.

14. An amendment or modification of this Agreement will be valid and effective only if it is in writing and signed by each party to this Agreement. In addition, a waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced.

15. Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law. However, if a provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed severable from the remaining provisions of this Agreement and will not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that provision to other circumstances in which it is valid and enforceable.

16. The parties agree that no relationship is created by this Agreement that could any way imply (a) a partnership, joint venture or other commercial relationship between the parties, (b) an authorization for either party to act as agent or representative of the other or (c) an agreement or commitment by the other party to purchase, acquire, develop or use the products or services of the other party.

17. This Agreement records the entire understanding between the parties with respect to the terms and conditions set forth herein, and supersedes any previous or contemporaneous agreement, representation or understanding, oral or written, by either of them with respect to such terms and conditions. The parties may execute this Agreement in counterparts. Each executed counterpart of this Agreement will constitute an original document, and all of them, together, will constitute the same agreement.

Exhibit 17-0010

SUNSHINE-CID-000130

A-2590

**WITNESSES:**

Witness

Witness

Witness

JMS INDUSTRIES, LLC d/b/a CANYON LEGAL GROUP, LLC

BY: _Richard R. Jacof_

NAME: _Richard R. Gustafson, II_

DATE: _2/16/18_

SUNSHINE SIGNING CONNECTION, INC.

BY _Crystal Willis_

NAME: _Crystal Willis_

DATE: _02/16/18_

Exhibit 17-0011

SUNSHINE-CID-000131

# PAYMENT AGREEMENT

On this 8th day of June, 2018, SUNSHINE SIGNING CONNECTION, INC. (hereinafter "SUNSHINE") and GREAT LAKES LAW FIRM, LLC (Hereinafter "COMPANY"), agree that:

**WHEREAS**, the parties seek to enter into a relationship whereby SUNSHINE will provide referral services to COMPANY, in order to refer mobile professional representatives ("Representatives") who will meet with COMPANY'S clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE**, the parties mutually agree as follows:

1. COMPANY shall pay SUNSHINE a fee ("Fee") for referring a Representative, as follows:

   a. ONE HUNDRED-TEN Dollars ($110.00) for referring a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents; upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

   b. Additionally, in cases where the client is located in a remote area, SUNSHINE may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel thirty-one (31) miles or more, one way. In such cases, SUNSHINE will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

   a. the COMPANY shall pay SUNSHINE $110.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to SUNSHINE.

4. The following is a list of service level expectations for this business partnership:

   a. Professionalism: It is expected that SUNSHINE will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified

Exhibit 17-0012

SUNSHINE-CID-000629

A-2592

Witness _____

Witness _____

Witness _____

GREAT LAKES LAW FIRM, LLC

BY: _____

NAME: G E Gauss

DATE: 6-5F-18

SUNSHINE SIGNING CONNECTION, INC.

BY: Crystal Willis

NAME: Crystal Willis

DATE: 04/05/18

Exhibit 17-0013
SUNSHINE-CID-000630

A-2593

## PAYMENT AGREEMENT

On this 23rd day of September 2019, **SUNSHINE SIGNING CONNECTION, INC.** (hereinafter "SUNSHINE") and **Henry Legal Group LLP d/b/a Heartland Legal Group** (Hereinafter "COMPANY"), agree that:

**WHEREAS**, the parties seek to enter into a relationship whereby SUNSHINE will provide referral services to COMPANY, in order to refer mobile professional representatives ("Representatives") who will meet with COMPANY'S clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE**, the parties mutually agree as follows:

1. COMPANY shall pay SUNSHINE a fee ("Fee") for referring a Representative, as follows:

   a. ONE HUNDRED-TEN Dollars ($110.00) for referring a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents; upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

   b. Additionally, in cases where the client is located in a remote area, SUNSHINE may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel thirty-one (31) miles or more, one way. In such cases, SUNSHINE will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

   a. the COMPANY shall pay SUNSHINE $110.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to SUNSHINE.

4. The following is a list of service level expectations for this business partnership:

   a. Professionalism: It is expected that SUNSHINE will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified

Exhibit 17-0014

SUNSHINE-CID-000662

A-2594

client at least one hour in advance of the appointment to confirm the time and location.

b.  Execution: It is expected that SUNSHINE and the assigned Representative will work to complete all tasks and assignments in a timely and professional manner. Specific expectations would be:

    i.  Scheduling appointments: It is expected that SUNSHINE will work with COMPANY representatives to initiate contact with the client within 24 hours of notification by COMPANY, in order to schedule an in-person appointment that is convenient to the client. In the event that the appointment cannot be completed as scheduled, SUNSHINE should immediately notify both the client and the COMPANY.

    ii.  Completion of paperwork: It is expected that SUNSHINE will provide a Representative who fully completes all paperwork at the time of the scheduled in-person appointment. The definition of completing the paperwork includes getting all appropriate signatures from the client, including adding signatures for any co-applicant, if applicable. SUNSHINE is then responsible for uploading all completed paperwork to the COMPANY website, within 24-hours of the completion of the in-person appointment.

    iii.  Communication: It is expected that SUNSHINE will communicate with COMPANY in a manner that provides for a superior client experience. All efforts should be made to communicate all status updates, including:

        a.  Confirmation of client appointments,
        b.  Rescheduling of client appointments,
        c.  The need for additional remote area fees,
        d.  Any issues or concerns relayed by the Representative during the in-person appointment, and
        e.  SUNSHINE notifying the COMPANY in the event of a client no-show or other scheduling concern.

c.  Service Level Agreements

    i.  Scheduling: It is expected that 90% of all appointments will be handled on-time, as defined by:

        a.  The Representative arriving on-time for the appointment as scheduled.
        b.  The Representative calling the client at least 1 hour prior to the appointment to confirm the appointment.

Exhibit 17-0015

SUNSHINE-CID-000663

 ii. Completion of paperwork: It is expected that 100% of all paperwork will be handled as expected, as defined by:

   a. All paperwork submitted will be complete with signatures.
   b. All paperwork will be uploaded to the COMPANY system within 24-hours of the in-person appointment.

 iii. Communication: It is expected that 100% of all communication from SUNSHINE to COMPANY will be handled on-time, as defined by:

   a. All notifications will be provided real-time, during the business hours of 9 AM EST and 9 PM EST, Monday through Friday.
   b. All notifications will be provided real-time, during the business hours of 10 AM EST and 2 PM EST, on Saturday.
   c. All remote area fee requests will be provided, in writing (including by email), and will be included in the monthly invoice with details about the date, time, distance and name of client.

 iv. Failure to meet one, or more, of the Service Level agreements, as defined above, will result in a monetary penalty of 5% of the total monthly invoice for the month that the service level failure occurred if the identified service level shortfall is not remedied before the end of the following month.

5. SUNSHINE shall issue invoices to the COMPANY by the 5th of each month, covering all services provided hereunder during the prior month. COMPANY shall make payment to SUNSHINE by the 15th of the month, for all services provided hereunder during the prior month. (E.g., for services provided by SUNSHINE in January, SUNSHINE shall issue its invoice by February 5, and COMPANY shall pay such invoice by February 15.)

6. During the term of this Agreement and for a period of twelve months thereafter, COMPANY shall not, directly or indirectly:

 a. use the services of any Representative who SUNSHINE has previously referred to perform services for COMPANY, unless: (1) the Representative is contracted directly through SUNSHINE; or (2) COMPANY has previously used the Representative without SUNSHINE'S involvement, prior to the date of this Agreement; or
 b. accept or do business with the third-party notary scheduling platform utilized by SUNSHINE (i.e., SnapDocs) to provide services to COMPANY.

7. COMPANY shall not, directly or indirectly, use or disclose, for any reason or in any manner, SUNSHINE's confidential and non-public information, whether written or unwritten, including in electronic form or other media ("Confidential Information"); provided that, during the term of this Agreement, COMPANY may utilize the Confidential Information in connection with its business activities in accordance with this Agreement, and disclose Confidential Information to COMPANY's employees who have a legitimate need to know such Confidential Information, in

Exhibit 17-0016

SUNSHINE-CID-000664

each case only to the extent necessary for the sole purpose of conducting its business operations in accordance with this Agreement. Confidential Information shall include, without limitation, trade secrets, proprietary data or other non-public confidential information of SUNSHINE regarding SUNSHINE'S processes, procedures, platforms, vendors and Representatives. Confidential Information shall not include information which is in or hereafter enters the public domain through no fault or action of COMPANY, is obtained by COMPANY from a third party which is not subject to any legal restriction on its right to use and disclose such information, is in the possession of COMPANY prior to the date of disclosure, or of which COMPANY has knowledge prior to the date of disclosure. The above restrictions shall not apply to any disclosure required by law or by a court of competent jurisdiction, so long as COMPANY promptly notifies SUNSHINE in writing of such mandated disclosure.

8. COMPANY stipulates that any breach of its covenants set forth in Sections 6 or 7 above (the "Covenants") would diminish the value of SUNSHINE and cause irreparable and continuing injury to SUNSHINE for which an adequate legal remedy would not exist. Accordingly, COMPANY stipulates that, if COMPANY breaches any of the Covenants, SUNSHINE will be entitled to seek the automatic entry by a court having jurisdiction of an order granting specific performance or injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by COMPANY, but without proof of actual monetary damage or an inadequate remedy at law. SUNSHINE'S entitlement to the above remedy shall not limit or exclude any other available remedy.

9. If a client of COMPANY directly enters an in-person presentation signing request on SUNSHINE'S website, and SUNSHINE refers a Representative for the signing, then COMPANY shall pay SUNSHINE the Fee for such signing.

10. Either party may terminate this Agreement with thirty (30) days written notice to the other party. Upon the termination of this Agreement, COMPANY shall promptly return to SUNSHINE any records, electronically stored files or other media containing SUNSHINE'S Confidential Information, and shall not retain any copies of same. Similarly, SUNSHINE shall promptly return to COMPANY any records, electronically stored files or other media containing COMPANY'S Confidential Information, and shall not retain any copies of same. All provisions of this Agreement that by their terms or context are intended to survive the termination of this Agreement, including without limitation the provisions of Sections 5 – 8, 11 – 13, and 15, shall so survive and remain in full force and effect in accordance with their terms.

11. In the event of litigation, including breach, enforcement or interpretation, arising out of or relating to this Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

12. This Agreement is binding on, may be enforced by, and inures to the benefit of, SUNSHINE's authorized assignees and successors in interest. COMPANY consents to the assignment of the Covenants herein by SUNSHINE, without COMPANY's consent. COMPANY expressly agrees that the Covenants may be enforced against COMPANY by: (a)

Exhibit 17-0017

SUNSHINE-CID-000665

A-2597

any such assignee; or (b) any successor in interest of all or any part of SUNSHINE's business, whether pursuant to a merger, reorganization, or sale, lease, or exchange of its assets or stock.

13. The validity, construction, enforcement, and interpretation of this Agreement are governed by the laws of the State of Florida and the federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions.

14. An amendment or modification of this Agreement will be valid and effective only if it is in writing and signed by each party to this Agreement. In addition, a waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced.

15. Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law. However, if a provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed severable from the remaining provisions of this Agreement and will not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that provision to other circumstances in which it is valid and enforceable.

16. The parties agree that no relationship is created by this Agreement that could any way imply (a) a partnership, joint venture or other commercial relationship between the parties, (b) an authorization for either party to act as agent or representative of the other or (c) an agreement or commitment by the other party to purchase, acquire, develop or use the products or services of the other party.

17. This Agreement records the entire understanding between the parties with respect to the terms and conditions set forth herein, and supersedes any previous or contemporaneous agreement, representation or understanding, oral or written, by either of them with respect to such terms and conditions. The parties may execute this Agreement in counterparts. Each executed counterpart of this Agreement will constitute an original document, and all of them, together, will constitute the same agreement.

Exhibit 17-0018

SUNSHINE-CID-000666

A-2598

WITNESSES:

_____
Witness

_____
Witness

_____
Witness

Henry Legal Group LLP d/b/a Heartland Legal Group
41000 Woodward Ave
Suite 350
Bloomfield, MI 48304

BY: _____

NAME: _Timothy F. Burnette_

DATE: _9/23/19_

SUNSHINE SIGNING CONNECTION, INC.

BY: _____

NAME: _Crystal Willis_

DATE: _09/23/19_

Page 6 of 6

Exhibit 17-0019
SUNSHINE-CID-000667

A-2599

## PAYMENT AGREEMENT

On this __26__ day of ___June___, 2019, **SUNSHINE SIGNING CONNECTION, INC.** (hereinafter "SUNSHINE") and **NORTHSTAR LEGAL GROUP, LLC** (Hereinafter "COMPANY"), agree that:

**WHEREAS**, the parties seek to enter into a relationship whereby SUNSHINE will provide referral services to COMPANY, in order to refer mobile professional representatives ("Representatives") who will meet with COMPANY's clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE**, the parties mutually agree as follows:

1. COMPANY shall pay SUNSHINE a fee ("Fee") for referring a Representative, as follows:

   a.  ONE HUNDRED-TEN Dollars ($110.00) for referring a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents; upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

   b.  Additionally, in cases where the client is located in a remote area, SUNSHINE may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel thirty-one (31) miles or more, one way. In such cases, SUNSHINE will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

   a.  the COMPANY shall pay SUNSHINE $110.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to SUNSHINE.

4. The following is a list of service level expectations for this business partnership:

   a.  Professionalism: It is expected that SUNSHINE will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified

Exhibit 17-0020

SUNSHINE-CID-000780

client at least one hour in advance of the appointment to confirm the time and location.

b. Execution: It is expected that SUNSHINE and the assigned Representative will work to complete all tasks and assignments in a timely and professional manner. Specific expectations would be:

    i. <u>Scheduling appointments:</u> It is expected that SUNSHINE will work with COMPANY representatives to initiate contact with the client within 24 hours of notification by COMPANY, in order to schedule an in-person appointment that is convenient to the client. In the event that the appointment cannot be completed as scheduled, SUNSHINE should immediately notify both the client and the COMPANY.

    ii. <u>Completion of paperwork:</u> It is expected that SUNSHINE will provide a Representative who fully completes all paperwork at the time of the scheduled in-person appointment. The definition of completing the paperwork includes getting all appropriate signatures from the client, including adding signatures for any co-applicant, if applicable. SUNSHINE is then responsible for uploading all completed paperwork to the COMPANY website, within 24-hours of the completion of the in-person appointment.

    iii. <u>Communication:</u> It is expected that SUNSHINE will communicate with COMPANY in a manner that provides for a superior client experience. All efforts should be made to communicate all status updates, including:

        a. Confirmation of client appointments,
        b. Rescheduling of client appointments,
        c. The need for additional remote area fees,
        d. Any issues or concerns relayed by the Representative during the in-person appointment, and
        e. SUNSHINE notifying the COMPANY in the event of a client no-show or other scheduling concern.

c. Service Level Agreements

    i. Scheduling: It is expected that 90% of all appointments will be handled on-time, as defined by:

        a. The Representative arriving on-time for the appointment as scheduled.
        b. The Representative calling the client at least 1 hour prior to the appointment to confirm the appointment.

Exhibit 17-0021

SUNSHINE-CID-000781

A-2601

    ii.    Completion of paperwork: It is expected that 100% of all paperwork will be handled as expected, as defined by:

        a.    All paperwork submitted will be complete with signatures.
        b.    All paperwork will be uploaded to the COMPANY system within 24-hours of the in-person appointment.

    iii.    Communication: It is expected that 100% of all communication from SUNSHINE to COMPANY will be handled on-time, as defined by:

        a.    All notifications will be provided real-time, during the business hours of 9 AM EST and 9 PM EST, Monday through Friday.
        b.    All notifications will be provided real-time, during the business hours of 10 AM EST and 2 PM EST, on Saturday.
        c.    All remote area fee requests will be provided, in writing (including by email), and will be included in the monthly invoice with details about the date, time, distance and name of client.

    iv.    Failure to meet one, or more, of the Service Level agreements, as defined above, will result in a monetary penalty of 5% of the total monthly invoice for the month that the service level failure occurred if the identified service level shortfall is not remedied before the end of the following month.

5. SUNSHINE shall issue invoices to the COMPANY by the 5th of each month, covering all services provided hereunder during the prior month. COMPANY shall make payment to SUNSHINE by the 15th of the month, for all services provided hereunder during the prior month. (E.g., for services provided by SUNSHINE in January, SUNSHINE shall issue its invoice by February 5, and COMPANY shall pay such invoice by February 15.)

6. During the term of this Agreement and for a period of twelve months thereafter, COMPANY shall not, directly or indirectly:

    a.    use the services of any Representative who SUNSHINE has previously referred to perform services for COMPANY, unless: (1) the Representative is contracted directly through SUNSHINE; (2) COMPANY has previously used the Representative without SUNSHINE's involvement, prior to the date of this Agreement; or (3) COMPANY receives the Representative's services through another, third-party provider of mobile professional representatives; or
    b.    accept or do business with the third-party notary scheduling platform utilized by SUNSHINE (i.e., SnapDocs) to provide services to COMPANY.

7. (a)    COMPANY shall not, directly or indirectly, use or disclose, for any reason or in any manner, SUNSHINE's confidential and non-public information, whether written or unwritten, including in electronic form or other media ("SUNSHINE Confidential Information"); provided that, during the term of this Agreement, COMPANY may utilize the SUNSHINE Confidential

Exhibit 17-0022

SUNSHINE-CID-000782

A-2602

Information in connection with its business activities in accordance with this Agreement, and disclose SUNSHINE Confidential Information to COMPANY's employees and independent contractors who have a legitimate need to know such SUNSHINE Confidential Information, in each case only to the extent necessary for the sole purpose of conducting its business operations in accordance with this Agreement. SUNSHINE Confidential Information shall include, without limitation, trade secrets, proprietary data or other non-public confidential information of SUNSHINE regarding SUNSHINE's processes, procedures, platforms, vendors and Representatives. SUNSHINE Confidential Information shall not include information which is in or hereafter enters the public domain through no fault or action of COMPANY, is obtained by COMPANY from a third party which is not subject to any legal restriction on its right to use and disclose such information, is in the possession of COMPANY prior to the date of disclosure, or of which COMPANY has knowledge prior to the date of disclosure. The above restrictions shall not apply to any disclosure required by law or by a court of competent jurisdiction, so long as COMPANY promptly notifies SUNSHINE in writing of such mandated disclosure.

7. (b)   SUNSHINE shall not, directly or indirectly, use or disclose, for any reason or in any manner, COMPANY's confidential and non-public information, whether written or unwritten, including in electronic form or other media ("COMPANY Confidential Information"); provided that, during the term of this Agreement, SUNSHINE may utilize the COMPANY Confidential Information in connection with its business activities in accordance with this Agreement, and disclose COMPANY Confidential Information to SUNSHINE's employees who have a legitimate need to know such COMPANY Confidential Information, in each case only to the extent necessary for the sole purpose of conducting its business operations in accordance with this Agreement. COMPANY Confidential Information shall include, without limitation, trade secrets, proprietary data or other non-public confidential information of COMPANY regarding COMPANY's processes, procedures, platforms, vendors and Representatives. COMPANY Confidential Information shall not include information which is in or hereafter enters the public domain through no fault or action of SUNSHINE, is obtained by SUNSHINE from a third party which is not subject to any legal restriction on its right to use and disclose such information, is in the possession of SUNSHINE prior to the date of disclosure, or of which SUNSHINE has knowledge prior to the date of disclosure. The above restrictions shall not apply to any disclosure required by law or by a court of competent jurisdiction, so long as SUNSHINE promptly notifies COMPANY in writing of such mandated disclosure.

8. (a)   COMPANY stipulates that any breach of its covenants set forth in Sections 6 or 7(a) above (the "Covenants") would diminish the value of SUNSHINE and cause irreparable and continuing injury to SUNSHINE for which an adequate legal remedy would not exist. Accordingly, COMPANY stipulates that, if COMPANY breaches any of the Covenants, SUNSHINE will be entitled to seek the automatic entry by a court having jurisdiction of an order granting specific performance or injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by COMPANY, but without proof of actual monetary damage or an inadequate remedy at law. SUNSHINE's entitlement to the above remedy shall not limit or exclude any other available remedy.

Exhibit 17-0023

SUNSHINE-CID-000783

A-2603

8. (b)   SUNSHINE stipulates that any breach of its covenants set forth in Section 7(b) above (the "Covenants") would diminish the value of COMPANY and cause irreparable and continuing injury to COMPANY for which an adequate legal remedy would not exist.  Accordingly, SUNSHINE stipulates that, if SUNSHINE breaches any of the Covenants, COMPANY will be entitled to seek the automatic entry by a court having jurisdiction of an order granting specific performance or injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by SUNSHINE, but without proof of actual monetary damage or an inadequate remedy at law. COMPANY's entitlement to the above remedy shall not limit or exclude any other available remedy.

9. If a client of COMPANY directly enters an in-person presentation signing request on SUNSHINE's website, and SUNSHINE refers a Representative for the signing, then COMPANY shall pay SUNSHINE the Fee for such signing

10.  Either party may terminate this Agreement with thirty (30) days written notice to the other party.  Upon the termination of this Agreement, COMPANY shall promptly return to SUNSHINE any records, electronically stored files or other media containing SUNSHINE's Confidential Information, and shall not retain any copies of same.  Similarly, SUNSHINE shall promptly return to COMPANY any records, electronically stored files or other media containing COMPANY's Confidential Information, and shall not retain any copies of same.  All provisions of this Agreement that by their terms or context are intended to survive the termination of this Agreement, including without limitation the provisions of Sections 5 – 8, 11 – 13, and 15, shall so survive and remain in full force and effect in accordance with their terms.

11. In the event of litigation, including breach, enforcement or interpretation, arising out of or relating to this Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

12. This Agreement is binding on, may be enforced by, and inures to the benefit of, SUNSHINE's authorized assignees and successors in interest.  COMPANY consents to the assignment of the Covenants herein by SUNSHINE, without COMPANY's consent. COMPANY expressly agrees that the Covenants may be enforced against COMPANY by: (a) any such assignee; or (b) any successor in interest of all or any part of SUNSHINE's business, whether pursuant to a merger, reorganization, or sale, lease, or exchange of its assets or stock.

13. The validity, construction, enforcement, and interpretation of this Agreement are governed by the laws of the State of Florida and the federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions.

14. An amendment or modification of this Agreement will be valid and effective only if it is in writing and signed by each party to this Agreement.  In addition, a waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced.

Exhibit 17-0024

SUNSHINE-CID-000784

A-2604

15. Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law. However, if a provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed severable from the remaining provisions of this Agreement and will not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that provision to other circumstances in which it is valid and enforceable.

16. The parties agree that no relationship is created by this Agreement that could any way imply (a) a partnership, joint venture or other commercial relationship between the parties, (b) an authorization for either party to act as agent or representative of the other or (c) an agreement or commitment by the other party to purchase, acquire, develop or use the products or services of the other party.

17. This Agreement records the entire understanding between the parties with respect to the terms and conditions set forth herein, and supersedes any previous or contemporaneous agreement, representation or understanding, oral or written, by either of them with respect to such terms and conditions. The parties may execute this Agreement in counterparts. Each executed counterpart of this Agreement will constitute an original document, and all of them, together, will constitute the same agreement.

NORTHSTAR LEGAL GROUP, LLC
Address: 100 S. 5th Street, Suite 1900
Minneapolis, MN 55402

BY: _James A. Agosto_

NAME: **James A. Agosto**

DATE: June 26, 2019


SUNSHINE SIGNING CONNECTION, INC.
6440 Ridge Road
Port Richey, FL 34668

BY: _____

NAME: Herbert Willis

DATE: 06/26/2019

Page 6 of 6

Exhibit 17-0025
SUNSHINE-CID-000785

A-2605

## PAYMENT AGREEMENT

As of ____3__|_i_4____ 2019, **SUNSHINE SIGNING CONNECTION, INC.** (hereinafter "SUNSHINE") and **Gardner Legal LLC d/b/a Option 1 Legal** (Hereinafter "COMPANY"), agree that:

**WHEREAS,** the parties seek to enter into a relationship whereby SUNSHINE will provide referral services to COMPANY, in order to refer mobile professional representatives ("Representatives") who will meet with COMPANY'S clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE,** the parties mutually agree as follows:

1. COMPANY shall pay SUNSHINE a fee ("Fee") for referring a Representative, as follows:

   a. ONE HUNDRED-TEN Dollars ($110.00) for referring a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents; upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

   b. Additionally, in cases where the client is located in a remote area, SUNSHINE may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel thirty-one (31) miles or more, one way. In such cases, SUNSHINE will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

   a. the COMPANY shall pay SUNSHINE $110.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to SUNSHINE.

4. The following is a list of service level expectations for this business partnership:

   a. Professionalism: It is expected that SUNSHINE will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified client at least one hour in advance of the appointment to confirm the time and location.

Page 1 of 6

Exhibit 17-0026

SUNSHINE-CID-000819

A-2606

b. Execution: It is expected that SUNSHINE and the assigned Representative will work to complete all tasks and assignments in a timely and professional manner. Specific expectations would be:

   i. Scheduling appointments: It is expected that SUNSHINE will work with COMPANY representatives to initiate contact with the client within 24 hours of notification by COMPANY, in order to schedule an in-person appointment that is convenient to the client. In the event that the appointment cannot be completed as scheduled, SUNSHINE should immediately notify both the client and the COMPANY.

   ii. Completion of paperwork: It is expected that SUNSHINE will provide a Representative who fully completes all paperwork at the time of the scheduled in-person appointment. The definition of completing the paperwork includes getting all appropriate signatures from the client, including adding signatures for any co-applicant, if applicable. SUNSHINE is then responsible for uploading all completed paperwork to the COMPANY website, within 24-hours of the completion of the in-person appointment.

   iii. Communication: It is expected that SUNSHINE will communicate with COMPANY in a manner that provides for a superior client experience. All efforts should be made to communicate all status updates, including:

      1. Confirmation of client appointments,
      2. Rescheduling of client appointments,
      3. The need for additional remote area fees,
      4. Any issues or concerns relayed by the Representative during the in-person appointment, and
      5. SUNSHINE notifying the COMPANY in the event of a client no-show or other scheduling concern.

c. Service Level Agreements

   i. Scheduling: It is expected that 90% of all appointments will be handled on-time, as defined by:

      1. The Representative arriving on-time for the appointment as scheduled.
      2. The Representative calling the client at least 1 hour prior to the appointment to confirm the appointment.

   ii. Completion of paperwork: It is expected that 100% of all paperwork will be handled as expected, as defined by:

      1. All paperwork submitted will be complete with signatures.
      2. All paperwork will be uploaded to the COMPANY system within 24-hours of the in-person appointment.

Page 2 of 6

Exhibit 17-0027

SUNSHINE-CID-000820

A-2607

    iii.    Communication: It is expected that 100% of all communication from SUNSHINE to COMPANY will be handled on-time, as defined by:

        1.    All notifications will be provided real-time, during the business hours of 9 AM EST and 9 PM EST, Monday through Friday.

        2.    All notifications will be provided real-time, during the business hours of 10 AM EST and 2 PM EST, on Saturday.

        3.    All remote area fee requests will be provided, in writing (including by email), and will be included in the monthly invoice with details about the date, time, distance and name of client.

    iv.    Failure to meet one, or more, of the Service Level agreements, as defined above, will result in a monetary penalty of 5% of the total monthly invoice for the month that the service level failure occurred if the identified service level shortfall is not remedied before the end of the following month.

5.  SUNSHINE shall issue invoices to the COMPANY by the 5th of each month, covering all services provided hereunder during the prior month. COMPANY shall make payment to SUNSHINE by the 15th of the month, for all services provided hereunder during the prior month. (E.g., for services provided by SUNSHINE in January, SUNSHINE shall issue its invoice by February 5, and COMPANY shall pay such invoice by February 15.)

6.  . During the term of this Agreement and for a period of twelve months thereafter, COMPANY shall not, directly or indirectly:

    a.    use the services of any Representative who SUNSHINE has previously referred to perform services for COMPANY, unless: (1) the Representative is contracted directly through SUNSHINE; (2) COMPANY has previously used the Representative without SUNSHINE'S involvement, prior to the date of this Agreement; or (3) COMPANY receives the Representative's services through another, third-party provider of mobile professional representatives; or

    b.    accept or do business with the third-party notary scheduling platform utilized by SUNSHINE (i.e., SnapDocs) to provide services to COMPANY

7.  Confidentiality.

    a.    Company shall not, directly or indirectly, use or disclose, for any reason or in any manner, SUNSHINE'S confidential and non-public information, whether written or unwritten, including in electronic form or other media ("SUNSHINE Confidential Information"); provided that, during the term of this Agreement, COMPANY may utilize the SUNSHINE Confidential Information in connection with its business activities in accordance with this Agreement, and disclose SUNSHINE Confidential Information to COMPANY''S employees and independent contractors who have a legitimate need to know such SUNSHINE Confidential Information, in each case only to the extent necessary for the sole purpose of conducting its business operations in accordance with this Agreement. SUNSHINE Confidential Information shall include,

Exhibit 17-0028

SUNSHINE-CID-000821

without limitation, trade secrets, proprietary data or other non-public confidential information of SUNSHINE regarding SUNSHINE'S processes, procedures, platforms, vendors and Representatives. SUNSHINE Confidential Information shall not include information which is in or hereafter enters the public domain through no fault or action of COMPANY, is obtained by COMPANY from a third party which is not subject to any legal restriction on its right to use and disclose such information, is in the possession of COMPANY prior to the date of disclosure, or of which COMPANY has knowledge prior to the date of disclosure. The above restrictions shall not apply to any disclosure required by law or by a court of competent jurisdiction, so long as COMPANY promptly notifies SUNSHINE in writing of such mandated disclosure.

b. SUNSHINE shall not, directly or indirectly, use or disclose, for any reason or in any manner, COMPANY'S confidential and non-public information, whether written or unwritten, including in electronic form or other media ("COMPANY Confidential Information"); provided that, during the term of this Agreement, SUNSHINE may utilize the COMPANY Confidential Information in connection with its business activities in accordance with this Agreement, and disclose COMPANY Confidential Information to SUNSHINE'S employees and independent contractors who have a legitimate need to know such COMPANY Confidential Information, in each case only to the extent necessary for the sole purpose of conducting its business operations in accordance with this Agreement. COMPANY Confidential Information shall include, without limitation, trade secrets, proprietary data or other non-public confidential information of COMPANY regarding COMPANY'S processes, procedures, platforms, vendors and Representatives. COMPANY Confidential Information shall not include information which is in or hereafter enters the public domain through no fault or action of SUNSHINE, is obtained by SUNSHINE from a third party which is not subject to any legal restriction on its right to use and disclose such information, is in the possession of SUNSHINE prior to the date of disclosure, or of which SUNSHINE has knowledge prior to the date of disclosure. The above restrictions shall not apply to any disclosure required by law or by a court of competent jurisdiction, so long as SUNSHINE promptly notifies COMPANY in writing of such mandated disclosure.

c. COMPANY stipulates that any breach of its covenants set forth in Section 7(a) above (the "Covenants") would diminish the value of SUNSHINE and cause irreparable and continuing injury to SUNSHINE for which an adequate legal remedy would not exist. Accordingly, COMPANY stipulates that, if COMPANY breaches any of the Covenants, SUNSHINE will be entitled to seek the automatic entry by a court having jurisdiction of an order granting specific performance or injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by COMPANY, but without proof of actual monetary damage or an inadequate remedy at law. SUNSHINE'S entitlement to the above remedy shall not limit or exclude any other available remedy.

d. SUNSHINE stipulates that any breach of its covenants set forth in Section 7(b) above (the "Covenants") would diminish the value of COMPANY and cause irreparable and continuing injury to COMPANY for which an adequate legal remedy would not exist.

Exhibit 17-0029

SUNSHINE-CID-000822

A-2609

Accordingly, SUNSHINE stipulates that, if SUNSHINE breaches any of the Covenants, COMPANY will be entitled to seek the automatic entry by a court having jurisdiction of an order granting specific performance or injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by SUNSHINE, but without proof of actual monetary damage or an inadequate remedy at law. COMPANY'S entitlement to the above remedy shall not limit or exclude any other available remedy.

8. If a client of COMPANY directly enters an in-person presentation signing request on SUNSHINE'S website, and SUNSHINE refers a Representative for the signing, then COMPANY shall pay SUNSHINE the Fee for such signing.

9. Either party may terminate this Agreement with thirty (30) days written notice to the other party. Upon the termination of this Agreement, COMPANY shall promptly return to SUNSHINE any records, electronically stored files or other media containing SUNSHINE'S Confidential Information, and shall not retain any copies of same. Similarly, SUNSHINE shall promptly return to COMPANY any records, electronically stored files or other media containing COMPANY'S Confidential Information, and shall not retain any copies of same. All provisions of this Agreement that by their terms or context are intended to survive the termination of this Agreement, including without limitation the provisions of Sections 5-7, 9-12 and 14 shall so survive and remain in full force and effect in accordance with their terms.

10. In the event of litigation, including breach, enforcement or interpretation, arising out of or relating to this Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

11. This Agreement is binding on, may be enforced by, and inures to the benefit of, SUNSHINE's authorized assignees and successors in interest. COMPANY consents to the assignment of the Covenants herein by SUNSHINE, without COMPANY's consent. COMPANY expressly agrees that the Covenants may be enforced against COMPANY by: (a) any such assignee; or (b) any successor in interest of all or any part of SUNSHINE's business, whether pursuant to a merger, reorganization, or sale, lease, or exchange of its assets or stock.

12. The validity, construction, enforcement, and interpretation of this Agreement are governed by the laws of the State of Florida and the federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions.

13. An amendment or modification of this Agreement will be valid and effective only if it is in writing and signed by each party to this Agreement. In addition, a waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced.

14. Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law. However, if a provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed severable from the remaining provisions of this Agreement and will

Page 5 of 6

Exhibit 17-0030

SUNSHINE-CID-000823

A-2610

not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that provision to other circumstances in which it is valid and enforceable.

15. The parties agree that no relationship is created by this Agreement that could any way imply (a) a partnership, joint venture or other commercial relationship between the parties, (b) an authorization for either party to act as agent or representative of the other or (c) an agreement or commitment by the other party to purchase, acquire, develop or use the products or services of the other party.

16. This Agreement records the entire understanding between the parties with respect to the terms and conditions set forth herein, and supersedes any previous or contemporaneous agreement, representation or understanding, oral or written, by either of them with respect to such terms and conditions. The parties may execute this Agreement in counterparts. Each executed counterpart of this Agreement will constitute an original document, and all of them, together, will constitute the same agreement.

Gardner Legal LLC d/b/a OPTION 1 LEGAL
10440 Little Patuxent Parkway
Suite 300
Columbia, MD 21044

BY: _Harry F. Butler_

NAME: _Harry Bunnetts  owner/Agent_

DATE: _3/14/19_


SUNSHINE SIGNING CONNECTION, INC.

BY: _Herbert Willis_

NAME: _Herbert Willis_

DATE: _3/14/19_

Exhibit 17-0031
SUNSHINE-CID-000824

A-2611

# PAYMENT AGREEMENT

On this 2nd day of November 2018, **SUNSHINE SIGNING CONNECTION, INC.** (hereinafter "SUNSHINE") and **The Sands Law Group, LLP d/b/a Whitestone Legal Group** (Hereinafter "COMPANY"), agree that:

**WHEREAS**, the parties seek to enter into a relationship whereby SUNSHINE will provide referral services to COMPANY, in order to refer mobile professional representatives ("Representatives") who will meet with COMPANY'S clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE**, the parties mutually agree as follows:

1. COMPANY shall pay SUNSHINE a fee ("Fee") for referring a Representative, as follows:

    a.  ONE HUNDRED-TEN Dollars ($110.00) for referring a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents; upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

    b.  Additionally, in cases where the client is located in a remote area, SUNSHINE may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel thirty-one (31) miles or more, one way. In such cases, SUNSHINE will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

    a.  the COMPANY shall pay SUNSHINE $110.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to SUNSHINE.

4. The following is a list of service level expectations for this business partnership:

    a.  Professionalism: It is expected that SUNSHINE will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified

Exhibit 17-0032

SUNSHINE-CID-001218

A-2612

client at least one hour in advance of the appointment to confirm the time and location.

b.   Execution:  It is expected that SUNSHINE and the assigned Representative will work to complete all tasks and assignments in a timely and professional manner.  Specific expectations would be:

    i.   Scheduling appointments:  It is expected that SUNSHINE will work with COMPANY representatives to initiate contact with the client within 24 hours of notification by COMPANY, in order to schedule an in-person appointment that is convenient to the client.  In the event that the appointment cannot be completed as scheduled, SUNSHINE should immediately notify both the client and the COMPANY.

    ii.   Completion of paperwork:  It is expected that SUNSHINE will provide a Representative who fully completes all paperwork at the time of the scheduled in-person appointment.  The definition of completing the paperwork includes getting all appropriate signatures from the client, including adding signatures for any co-applicant, if applicable.  SUNSHINE is then responsible for uploading all completed paperwork to the COMPANY website, within 24-hours of the completion of the in-person appointment.

    iii.   Communication:  It is expected that SUNSHINE will communicate with COMPANY in a manner that provides for a superior client experience.  All efforts should be made to communicate all status updates, including:

        a.   Confirmation of client appointments,
        b.   Rescheduling of client appointments,
        c.   The need for additional remote area fees,
        d.   Any issues or concerns relayed by the Representative during the in-person appointment, and
        e.   SUNSHINE notifying the COMPANY in the event of a client no-show or other scheduling concern.

c.   Service Level Agreements

    i.   Scheduling:  It is expected that 90% of all appointments will be handled on-time, as defined by:

        a.   The Representative arriving on-time for the appointment as scheduled.
        b.   The Representative calling the client at least 1 hour prior to the appointment to confirm the appointment.

Exhibit 17-0033

SUNSHINE-CID-001219

    ii.    Completion of paperwork: It is expected that 100% of all paperwork will be handled as expected, as defined by:

        a.    All paperwork submitted will be complete with signatures.
        b.    All paperwork will be uploaded to the COMPANY system within 24-hours of the in-person appointment.

    iii.    Communication: It is expected that 100% of all communication from SUNSHINE to COMPANY will be handled on-time, as defined by:

        a.    All notifications will be provided real-time, during the business hours of 9 AM EST and 9 PM EST, Monday through Friday.
        b.    All notifications will be provided real-time, during the business hours of 10 AM EST and 2 PM EST, on Saturday.
        c.    All remote area fee requests will be provided, in writing (including by email), and will be included in the monthly invoice with details about the date, time, distance and name of client.

    iv.    Failure to meet one, or more, of the Service Level agreements, as defined above, will result in a monetary penalty of 5% of the total monthly invoice for the month that the service level failure occurred if the identified service level shortfall is not remedied before the end of the following month.

5. SUNSHINE shall issue invoices to the COMPANY by the 5th of each month, covering all services provided hereunder during the prior month. COMPANY shall make payment to SUNSHINE by the 15th of the month, for all services provided hereunder during the prior month. (E.g., for services provided by SUNSHINE in January, SUNSHINE shall issue its invoice by February 5, and COMPANY shall pay such invoice by February 15.)

6. During the term of this Agreement and for a period of twelve months thereafter, COMPANY shall not, directly or indirectly:

    a.  use the services of any Representative who SUNSHINE has previously referred to perform services for COMPANY, unless: (1) the Representative is contracted directly through SUNSHINE; or (2) COMPANY has previously used the Representative without SUNSHINE'S involvement, prior to the date of this Agreement; or
    b.  accept or do business with the third-party notary scheduling platform utilized by SUNSHINE (i.e., SnapDocs) to provide services to COMPANY.

7. COMPANY shall not, directly or indirectly, use or disclose, for any reason or in any manner, SUNSHINE's confidential and non-public information, whether written or unwritten, including in electronic form or other media ("Confidential Information"); provided that, during the term of this Agreement, COMPANY may utilize the Confidential Information in connection with its business activities in accordance with this Agreement, and disclose Confidential Information to COMPANY's employees who have a legitimate need to know such Confidential Information, in

Exhibit 17-0034

SUNSHINE-CID-001220

A-2614

each case only to the extent necessary for the sole purpose of conducting its business operations in accordance with this Agreement. Confidential Information shall include, without limitation, trade secrets, proprietary data or other non-public confidential information of SUNSHINE regarding SUNSHINE'S processes, procedures, platforms, vendors and Representatives. Confidential Information shall not include information which is in or hereafter enters the public domain through no fault or action of COMPANY, is obtained by COMPANY from a third party which is not subject to any legal restriction on its right to use and disclose such information, is in the possession of COMPANY prior to the date of disclosure, or of which COMPANY has knowledge prior to the date of disclosure. The above restrictions shall not apply to any disclosure required by law or by a court of competent jurisdiction, so long as COMPANY promptly notifies SUNSHINE in writing of such mandated disclosure.

8. COMPANY stipulates that any breach of its covenants set forth in Sections 6 or 7 above (the "Covenants") would diminish the value of SUNSHINE and cause irreparable and continuing injury to SUNSHINE for which an adequate legal remedy would not exist. Accordingly, COMPANY stipulates that, if COMPANY breaches any of the Covenants, SUNSHINE will be entitled to seek the automatic entry by a court having jurisdiction of an order granting specific performance or injunctive relief, upon the posting of any requisite bond and the filing with the court of an appropriate pleading and affidavit specifying each obligation breached by COMPANY, but without proof of actual monetary damage or an inadequate remedy at law. SUNSHINE'S entitlement to the above remedy shall not limit or exclude any other available remedy.

9. If a client of COMPANY directly enters an in-person presentation signing request on SUNSHINE'S website, and SUNSHINE refers a Representative for the signing, then COMPANY shall pay SUNSHINE the Fee for such signing

10. Either party may terminate this Agreement with thirty (30) days written notice to the other party. Upon the termination of this Agreement, COMPANY shall promptly return to SUNSHINE any records, electronically stored files or other media containing SUNSHINE'S Confidential Information, and shall not retain any copies of same. Similarly, SUNSHINE shall promptly return to COMPANY any records, electronically stored files or other media containing COMPANY'S Confidential Information, and shall not retain any copies of same. All provisions of this Agreement that by their terms or context are intended to survive the termination of this Agreement, including without limitation the provisions of Sections 5 – 8, 11 – 13, and 15, shall so survive and remain in full force and effect in accordance with their terms.

11. In the event of litigation, including breach, enforcement or interpretation, arising out of or relating to this Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses.

12. This Agreement is binding on, may be enforced by, and inures to the benefit of, SUNSHINE's authorized assignees and successors in interest. COMPANY consents to the assignment of the Covenants herein by SUNSHINE, without COMPANY's consent. COMPANY expressly agrees that the Covenants may be enforced against COMPANY by: (a)

Exhibit 17-0035

SUNSHINE-CID-001221

A-2615

any such assignee; or (b) any successor in interest of all or any part of SUNSHINE's business, whether pursuant to a merger, reorganization, or sale, lease, or exchange of its assets or stock.

13. The validity, construction, enforcement, and interpretation of this Agreement are governed by the laws of the State of Florida and the federal laws of the United States of America, excluding the laws of those jurisdictions pertaining to resolution of conflicts with laws of other jurisdictions.

14. An amendment or modification of this Agreement will be valid and effective only if it is in writing and signed by each party to this Agreement. In addition, a waiver of any duty, obligation, or responsibility of a party under this Agreement will be valid and effective only if it is evidenced by a writing signed by or on behalf of the party against whom the waiver is sought to be enforced.

15. Whenever possible, each provision of this Agreement should be construed and interpreted so that it is valid and enforceable under applicable law. However, if a provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, that provision will be deemed severable from the remaining provisions of this Agreement and will not affect the validity, interpretation, or effect of the other provisions of this Agreement or the application of that provision to other circumstances in which it is valid and enforceable.

16. The parties agree that no relationship is created by this Agreement that could any way imply (a) a partnership, joint venture or other commercial relationship between the parties, (b) an authorization for either party to act as agent or representative of the other or (c) an agreement or commitment by the other party to purchase, acquire, develop or use the products or services of the other party.

17. This Agreement records the entire understanding between the parties with respect to the terms and conditions set forth herein, and supersedes any previous or contemporaneous agreement, representation or understanding, oral or written, by either of them with respect to such terms and conditions. The parties may execute this Agreement in counterparts. Each executed counterpart of this Agreement will constitute an original document, and all of them, together, will constitute the same agreement.

Exhibit 17-0036

SUNSHINE-CID-001222

A-2616

**WITNESSES:**

_____
Witness

_____
Witness

_____
Witness

THE SANDS LAW GROUP, LLP d/b/a WHITESTONE LEGAL GROUP
10880 Wilshire Blvd
Suite 1101
Los Angeles, CA 90024

BY: _____

NAME: JAMES A. Agasto

DATE: Nov. 06, 2018

SUNSHINE SIGNING CONNECTION, INC.

BY: _____

NAME: Herbert Willis

DATE: 11/06/2018

Exhibit 17-0037
SUNSHINE-CID-001223

# PAYMENT AGREEMENT

On this 5th day of June, 2018, **SUNSHINE SIGNING CONNECTION, INC.** (hereinafter "SUNSHINE") and **WYCLAW, LLC d/b/a SUMMIT LAWFIRM, LLC** (Hereinafter "COMPANY"), agree that:

**WHEREAS**, the parties seek to enter into a relationship whereby SUNSHINE will provide referral services to COMPANY, in order to refer mobile professional representatives ("Representatives") who will meet with COMPANY'S clients, provide an in-person, face-to-face presentation and oversee the proper execution of legal documents issued by COMPANY;

**NOW, THEREFORE**, the parties mutually agree as follows:

1. COMPANY shall pay SUNSHINE a fee ("Fee") for referring a Representative, as follows:

   a. ONE HUNDRED-TEN Dollars ($110.00) for referring a Representative to meet face to face with the COMPANY's client to give an in-person presentation and oversee execution of documents, upon completion documents will be scanned back and uploaded to COMPANY's website, within 24-hours from the completion of the signing; and

   b. Additionally, in cases where the client is located in a remote area, SUNSHINE may refer a Representative to commute to said area, thus incurring extra fees. For the purposes of this agreement, a remote area is defined as one that requires the Representative to travel thirty-one (31) miles or more, one way. In such cases, SUNSHINE will notify COMPANY on a case-by-case basis to seek additional fee approval from COMPANY via email before moving forward. The fee for such mileage charges will be based on standard mileage rates for business, which are published by the IRS on an annual basis.

2. If a Representative meets with the potential client of COMPANY and, for any reason, the transaction is not completed (e.g., the client does not sign the document or otherwise fails to cooperate with the process, or is a no show), then:

   a. the COMPANY shall pay SUNSHINE $110.00 in total for the incomplete transaction.

3. If a Representative meets with a client and the transaction is completed, but the client thereafter cancels the transaction, COMPANY shall nonetheless pay the full amount of the Fee to SUNSHINE.

4. The following is a list of service level expectations for this business partnership:

   a. Professionalism: It is expected that SUNSHINE will provide a Representative who is professional in appearance, actions and communication. All assigned Representatives must wear professional business attire for any appointment with the identified client. In addition, they should be on time for all client appointments, and it is a requirement that each Representative call the identified

Exhibit 17-0038

SUNSHINE-CID-001288

A-2618

Witness

Witness

Witness

WYOLAW, LLC d/b/a SUMMIT LAWFIRM, LLC

BY:

NAME: CC Oscar

DATE: 6 - 5 - 2018

SUNSHINE SIGNING CONNECTION, INC.

BY:

NAME: Herbert Willis

DATE: 6 - 5 - 2018

Exhibit 17-0039

SUNSHINE-CID-001289

A-2619

## DECLARATION OF JODI L. LUBKEMAN

As provided by 28 U.S.C. § 1746, I, Jodi L. Lubkeman, hereby declare as follows:

1.      My name is Jodi L. Lubkeman. I am a United States citizen and over eighteen years of age. I reside in the State of Wisconsin.

2.      I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify to them.

3.      I am a Registered Professional Reporter in Wisconsin and Certified Realtime Captioner.

4.      Since December 1992 I have been an official court reporter for the State of Wisconsin, employed in the area of Janesville and Beloit, Wisconsin. Currently, I work in the Rock County Circuit Court and as a realtime captioner at the University of Wisconsin-Madison McBurney Disability Resource Center.

5.      Since June 2005 I have also been self-employed as a freelance court reporter.

6.      On October 10, 2022, working as an independent contractor with Madison Freelance Reporters, I transcribed the testimony of Mr. Steven Pavlow pursuant to a subpoena issued by the State of Wisconsin Department of Financial Institutions, Division of Banking.

7.      The October 10, 2022, testimony of Mr. Steven Pavlow was conducted virtually via Zoom Videoconferencing. I administered the oath to Mr. Pavlow.

8.      Attached hereto is a true and authentic copy of the transcript that I transcribed and prepared of Mr. Pavlow's October 10, 2022, testimony, and true and authentic copies of the exhibits provided to me by Attorney Lewis Beilin of the Wisconsin Department of Justice and used and referred to in Mr. Pavlow's testimony.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November ___, 2023.

JODI L. LUBKEMAN

**PLAINTIFF'S**
EXHIBIT
**PX-006**

Exhibit 25-0001

A-2620

---

STATE OF WISCONSIN - DANE COUNTY
DEPARTMENT OF FINANCIAL INSTITUTIONS

IN THE DIVISION OF BANKING
BEFORE THE ADMINISTRATOR

In the Matter of:           )
                            )   CONFIDENTIAL
STRATEGIC FINANCIAL         )   INVESTIGATIVE INTERVIEW
SOLUTIONS, LLC.             )

TESTIMONY OF STEVEN PAVLOW, called as a
witness herein, conducted virtually via Zoom
Videoconferencing, was taken at the instance of the
Department of Financial Institutions, before JODI L.
LUBKEMAN, RPR/RMR/CRR, a Notary Public in and for the
State of Wisconsin, on the 10th day of October, 2022,
commencing at 12:57 p.m.

A P P E A R A N C E S

ALL PARTIES APPEARING REMOTELY

Lewis W. Beilin, Assistant Attorney General
17 West Main Street
Madison, WI 53545
appeared on behalf of the
Department of Financial Institutions

1

Jodi L. Lubkeman, CRR, RMR, RPR
Janesville, Wisconsin 53545
(608) 201-7030

---

Investigative Interview of STEVEN PAVLOW, 10/10/2022

1  WITNESS INDEX
2
3  Witness: STEVEN PAVLOW          Page
   By Mr. Beilin                    3
4
5
6  EXHIBITS
7  Number   Description              Page
   1   In-Person Presentation        38
8
   2   Affidavit of Compliance       61
9
   3   Client's Authorization for Settlement   57
10
   4   Arbitration Agreement         58
11
   5   Subpoena                      70
12
13
14  MATERIAL REQUESTED              PAGE
15  None
16
17
18
19
20
21
22
23
24
25

2

---

Investigative Interview of STEVEN PAVLOW, 10/10/2022

1         TRANSCRIPT OF PROCEEDINGS
2              STEVEN PAVLOW, having been first
3   duly sworn, was examined and testified as follows:
4              REPORTER:  Could you please state
5   and spell your first and last name for the
6   record?
7              THE WITNESS:  First name is Steven;
8   S-T-E-V-E-N.  Last name is Pavlow; P as in
9   Paul A-V-L-O-W.
10             E X A M I N A T I O N
11  BY MR. BEILIN:
12  Q  Good afternoon, Mr. Pavlow.  My name is Lewis
13     Beilin, as you know, and I'm an assistant attorney
14     general with the Wisconsin Department of Justice.
15     We are here to ask you some questions
16     pursuant to an investigative subpoena that was
17     issued by the Wisconsin Department of Financial
18     Institutions.  Do you understand all of that?
19  A  I do.
20  Q  Have you ever given testimony under oath before?
21  A  No, I haven't.
22  Q  Before we went onto the record, we cleared that we
23     could hear each other and see each other quite
24     well this morning.
25             As it was mentioned, the court reporter,

3

---

Investigative Interview of STEVEN PAVLOW, 10/10/2022

1   Jodi, will be transcribing our discussion today.
2   I'm going to do my best not to interrupt any of
3   your answers and hopefully you can do your best
4   not to cut me off in a question, tempting as that
5   may be sometimes, because I'm sure you'll be able
6   to tell where the question is going and sort of
7   complete the words.  Try to avoid doing that.  I
8   will do the same so that we can give a good record
9   of our conversation.
10             Mr. Pavlow, where are you now?
11  A  I'm at home.
12  Q  Okay.  And what is your residential address?
13  A  ██████████████, Wisconsin 54403.
14  Q  Is there anyone else in the room with you today?
15  A  There is not.
16  Q  Is there anyone else listening in on the
17     conversation or what you are saying to me like
18     via phone or something like that?
19  A  No.
20  Q  Okay.  And we discussed before today, you and I by
21     the phone, that I would not have objected to your
22     appearing with an attorney.  Do you recall that
23     conversation we had?
24  A  I do.
25  Q  Okay.  And so you've had an opportunity to consult

---

Exhibit 25-0002

A-2621

```
1    with a lawyer if you wanted to before today's
2    questioning?
3  A I had the opportunity but I chose not to consult.
4  Q So I really appreciate your taking the time to
5    speak with us today and your corporation with the
6    investigative subpoena. I will try to be as
7    efficient with your time as possible this
8    afternoon.
9        Could we just get started with some
10   background about you and your work history? Could
11   you tell me something about your work background,
12   employment history?
13 A How far back would you like me to go? I'm 70.
14 Q Well, how about give me the highlights, if you
15   will, without having to go back. I don't need to
16   know about all of the jobs you've done, but what
17   you do now for a living and how long that's been
18   going on.
19 A Okay. I previously worked for Abbott
20   Laboratories. I covered an area from Wisconsin
21   Rapids all the way up to the UP and I sold
22   injectable drugs and anesthetics to hospitals.
23       After 22 years I was called to north Chicago
24   and they terminated my territory, along with about
25   four other people, so it was kind of an early
```
5

```
1    retirement in the late '90s.
2        After that I went to school at Nicolet
3    College and I received my broker's license to be a
4    real estate broker. And my wife and I opened a
5    business in 1995, I believe it was, and had that
6    for 12 years. And I sold that.
7        Presently I'm working various jobs such as
8    what I'm doing here with Great Lakes and other
9    companies to -- there's refinances, reverse
10   mortgages, debt consolidations, things like that.
11 Q Okay. And do you hold a license as a notary
12   public in the State of Wisconsin?
13 A I do and I have for quite some time.
14 Q Do you hold notary licenses in any other states?
15 A No.
16 Q Do you have any other professional licenses that
17   you've come by over the years?
18 A Well, just my broker's license, and that is pretty
19   much expired. I'm no longer doing that.
20 Q Okay. So would the phrase mobile closing agent be
21   familiar to you?
22 A Correct.
23 Q Is that the phrasing we would use to describe what
24   you do for Great Lakes?
25 A No. Great Lakes is more of a situation where it's
```
6

```
1    a debt consolidation. I would use a mobile notary
2    as far as -- well, I guess it could be, yes, but I
3    usually used that phrase for refinances and things
4    like that, reverse mortgages and things like that.
5    Debt consolidation is kind of a separate thing.
6  Q Okay. So what role would you say you play with
7    respect to the debt consolidation work?
8  A Well, according to the presentation that we read
9    to the customer upon arrival is syndicating that
10   we are a representative of Great Lakes, which I
11   really wasn't in agreement to begin with but -- I
12   questioned it and they told me that that was the
13   format that you use.
14 Q Okay. And I think we will come back to that later
15   on. So when did you start doing this kind of work
16   with Great Lakes Law Firm, in particular?
17 A Around 2015. I've done probably in excess of 50
18   of these thus far.
19 Q And when you say in excess of 50, is that -- could
20   you be a little more specific? What range do you
21   think that number --
22 A Oh, I would say between 50 and 60.
23 Q Okay. And are there any other law firms or
24   companies for which you do similar work, what you
25   call the debt consolidation meetings?
```
7

```
1  A No. Great Lakes is the only one that I have done.
2  Q Okay. So the first -- what would be the most
3    appropriate word in your mind for us to describe
4    when you are out or when you are meeting with
5    these debtors or clients of Great Lakes? Should
6    we call that a meeting or would you rather -- is
7    it more appropriate to call it a visit or a
8    presentation?
9  A Well, I would call it probably a meeting to
10   include the presentation. The presentation is the
11   first thing we do.
12 Q Okay.
13 A They are already aware that, you know, that I was
14   coming and they are -- I have yet to find anyone
15   who was not well versed in the program prior to me
16   being there.
17 Q Okay. So you started it sometime in 2015, you
18   say. When is the most recent meeting presentation
19   that you have held for Great Lakes?
20 A I can get my journal book and tell you.
21 Q Okay.
22 A It's in the same room. Excuse me for one minute.
23       Naturally we have to document everything, so
24   I have it here. Debt resolution. I will see what
25   I have got. The last one I did was on June 17th
```
8

Exhibit 25 0003

A-2622

**Page 9**

1      this year.
2 Q  Okay.
3 A  That took place in Three Lakes, Wisconsin. I
4      could be more specific if you want the info.
5 Q  Well, we may follow up on more specifics after
6      that question and answer.
7      Could you describe what sort of equipment you
8      use when you go to these meetings and
9      presentations?
10 A  What I have is my briefcase. Naturally in a
11      presentation, I take the presentation with me.
12      They tell me to read the presentation to each
13      person, and I do that, but I also like to give
14      them a hard copy because, if you're reading 21
15      pages to somebody, they are not going to remember
16      it. So I leave everyone a hard copy of the
17      presentation. And then I also have in a separate
18      file the actual contract itself that I do not
19      leave behind. I have them sign the contract. And
20      I'm instructed then to take it back with me, but I
21      do leave the presentation.
22 Q  Okay. The presentation that you read, is that in
23      paper form?
24 A  It is. And it's exactly the one that I sent to
25      you.

**Page 10**

1 Q  And the one you leave for them, you leave a paper
2      copy with them?
3 A  Correct.
4 Q  And then the other documents that the client --
5      documents that the client signs, et cetera, are
6      you saying that -- how are those shown and
7      reviewed by the client? In what format? Paper or
8      on a mobile device of some kind?
9 A  On paper. I go through each page with them. Many
10      pages require their signatures. In addition to
11      that, Great Lakes is required to sign, which is
12      why I do not leave a copy with them because I'm
13      instructed that Great Lakes will then follow up
14      with all the signed agreements back to the
15      customer.
16 Q  Okay. Understood. And who are your primary
17      contacts at Great Lakes regarding these meetings
18      and presentations?
19 A  I do not have contacts with Great Lakes. Any
20      contact I have is with the signing firm that
21      contacted me to go to the client's home. And that
22      being Express Notary or FASS -- I'm a little
23      nervous on this. I can't remember what FASS --
24 Q  Okay.
25 A  They are out of California. I do a lot for them.

**Page 11**

1      REPORTER: Excuse me, Did you say
2      FASS?
3      THE WITNESS: Yeah, F-A-S as in
4      Sam, S as in Sam.
5      REPORTER: Thank you.
6      THE WITNESS: I'm sorry, it stands
7      for First American Signing Service. Excuse
8      me, I'm sorry. I'm just a little nervous.
9 Q  That's quite all right. So it's one of these two
10      firms, which do both of those firms arrange for
11      you to do meetings, presentations for Great Lakes?
12 A  Yes. I would have to say that First American
13      probably is 90 percent of the workload for those
14      particular signings. And Express Notary has
15      gotten into this a little bit but not too much.
16 Q  Okay. So do you have any kind of contract or
17      other agreement with FASS or Express Notary?
18 A  Just our formal agreement that we had when I
19      signed on with them as a signing agent, which is
20      to not divulge information and make sure you
21      secure everything and follow the instructions on
22      the information that you receive from the client,
23      whether it be shredding them or whether it be
24      sending them back.
25      In the case of Great Lakes, I always shred

**Page 12**

1      the documents after five days.
2 Q  I thought you said that you send the documents --
3 A  Electronically after I have the customer sign
4      their portion of it, they are electronically
5      uploaded back to Great Lakes through First
6      American Signing Service who then forwards them to
7      Great Lakes. And then I'm instructed on the
8      papers on the presentation actually -- on the
9      contract I keep them for five days and then I
10      shred them.
11 Q  Okay. And you send the paper contracts that have
12      been signed to Express or FASS and then they scan
13      them into electronic format? Or do you produce
14      the electronic files from the paper copies?
15 A  I produce the electronic files from the paper
16      copy.
17 Q  Okay.
18 A  And I'm instructed to retain a -- I'm instructed
19      to retain the hard copy five days because if
20      anything is missed like a signature or initials,
21      you have to go back to the client again. I never
22      had to do that, but I was instructed to keep it
23      for five days in which time they would notify me
24      if there was a problem.
25 Q  Do you use a personal scanner to create those

Exhibit 25 0004

A-2623

| | | |
|---|---|---|
| 1 | | electronic files of the client documents? |
| 2 | A | I do. |
| 3 | Q | Okay. So who pays you for your work at the |
| 4 | | meetings/presentations? |
| 5 | A | That would be the individual signing service that |
| 6 | | hires me. In this case ether Express Notary or |
| 7 | | First American Signing Service. |
| 8 | Q | And they pay you on a per-visit basis or is it |
| 9 | | more based on time, timing spent? |
| 10 | A | It's a-visit basis and it's pretty much based on |
| 11 | | distance. |
| 12 | Q | Okay. Now, would you happen to know if Great |
| 13 | | Lakes is -- if Express Notary or First American |
| 14 | | are scheduling similar meetings and presentations |
| 15 | | for Great Lakes with other notaries besides |
| 16 | | yourself in Wisconsin? |
| 17 | A | It's very possible. I'm not aware of that |
| 18 | | situation. I only get a call from them when they |
| 19 | | have an assignment that I want to accept. |
| 20 | | And what they do is they have a list of |
| 21 | | people. We are graded with like First American |
| 22 | | Signing Service, and the higher your grade, the |
| 23 | | more calls that you will get. I know I'm pretty |
| 24 | | much up towards the top. I get a lot of calls. |
| 25 | | If I can, I will. If I can't, I tell them I |

13

| | | |
|---|---|---|
| 1 | | can't, I'm tied up with something, and then they |
| 2 | | go to someone else. That someone else, I have no |
| 3 | | idea who it would be. |
| 4 | Q | Do you know why you're graded so highly on their |
| 5 | | lists? |
| 6 | A | It has to do with the time frame that you get to a |
| 7 | | customer. If you are on time, it's based on how |
| 8 | | fast you get documents or electronics back from |
| 9 | | them, and it's based on the number of errors that |
| 10 | | they find in your documents when you receive them. |
| 11 | Q | Okay. Is that grading done, to your knowledge, in |
| 12 | | consultation with the ultimate client, in this |
| 13 | | case Great Lakes? |
| 14 | A | This I'm unaware of. |
| 15 | Q | Okay. Did I understand you correctly to say that |
| 16 | | the process begins with a phone call from one of |
| 17 | | the closing companies? |
| 18 | A | That's correct. They would call me and ask me if |
| 19 | | I could do the assignment, at which time I would |
| 20 | | then call the customer that they give me the phone |
| 21 | | number for to let them know that I will be coming |
| 22 | | by. And in this case I always asked them if they |
| 23 | | have someone at Great Lakes that they have been |
| 24 | | talking to, and in every case they have said yes, |
| 25 | | I have, and I'm expecting you. |

14

| | | |
|---|---|---|
| 1 | Q | Okay. And what else, if anything, does Express or |
| 2 | | FASS send to you prior to the meeting? |
| 3 | A | Just an order confirmation with the customer's |
| 4 | | name, my fee that we negotiated, and the time and |
| 5 | | date that I'm supposed to go there, and |
| 6 | | instructions on, you know, what to wear and what |
| 7 | | you should do and that you are not there to advise |
| 8 | | people of any situations. |
| 9 | | I'm simply there to make sure they sign what |
| 10 | | they do and explain the documents, quote, to the |
| 11 | | best of my ability. I'm very guarded on that. |
| 12 | | I have people say, well, do you think this is |
| 13 | | the right thing to do? And my response to that |
| 14 | | is, that's totally up to you, but if it wasn't |
| 15 | | something you wanted to do, I wouldn't be here |
| 16 | | right now. |
| 17 | Q | Those instructions that you mentioned, to your |
| 18 | | knowledge are those instructions prepared by the |
| 19 | | closing agents or are those coming from Great |
| 20 | | Lakes, do you think? |
| 21 | A | I would have to say it's twofold. It's coming |
| 22 | | from the instructions from the signing company |
| 23 | | which are pretty standard, and then if Great Lakes |
| 24 | | has other instructions, they would include that |
| 25 | | within notes on the actual order. And in most |

15

| | | |
|---|---|---|
| 1 | | cases -- I'm sorry. |
| 2 | Q | Go ahead. |
| 3 | A | In most cases it's just pretty much notes as to |
| 4 | | what to be aware of on places on the documents |
| 5 | | where people have missed signing. They are quite |
| 6 | | elaborate on their instructions and they want to |
| 7 | | make sure that everything is at 100 percent. |
| 8 | Q | And who is "they," you are referring to? |
| 9 | A | That would be Great Lakes. |
| 10 | Q | Okay. |
| 11 | A | No individual person. It's just the format that |
| 12 | | they send you to check this, check this, and check |
| 13 | | this. |
| 14 | Q | Have you retained those instructions that you |
| 15 | | received with respect to the 50 or 60 meetings |
| 16 | | that you did for Great Lakes? |
| 17 | A | No, I do not. And the reason being is once I'm |
| 18 | | paid for that particular job, I destroy those |
| 19 | | documents. If I was ever broken into, it has |
| 20 | | person's phone number, person's name, and I just |
| 21 | | don't want to -- that's information up until now I |
| 22 | | didn't feel I had to require that. |
| 23 | Q | Okay. Understood. And how do you receive the |
| 24 | | client documents that are to be signed by the |
| 25 | | client prior to heading out for the meeting? |

16

Exhibit 25 0005

A-2624

| | | |
|---|---|---|
| 1 | A | Those documents are sent to me as a secure e-mail. |
| 2 | Q | And then you print out at home using your |
| 3 | | equipment? |
| 4 | A | That's correct. |
| 5 | Q | Now, other than the instructions that you |
| 6 | | mentioned that come with the scheduling material, |
| 7 | | have you received any training from persons, |
| 8 | | whether in person or by video or in writing, about |
| 9 | | how to conduct these meetings and presentations |
| 10 | | for Great Lakes? |
| 11 | A | I've taken some time to think about that, and I |
| 12 | | knew you were going to ask that, and I do recall |
| 13 | | back in 2015 or thereabouts, that there were |
| 14 | | some -- like a written course that you took to |
| 15 | | make sure you were competent to do these type of |
| 16 | | signings. There was no formal meetings with them |
| 17 | | or individual agents. |
| 18 | | They would always call before you leave and |
| 19 | | say, if there's any questions, you know, call me, |
| 20 | | and they give me a number and a name, and that was |
| 21 | | usually on the instructions of the person that -- |
| 22 | | the person that I'm meeting with is going to be |
| 23 | | reflected to as the congruent counsel. But other |
| 24 | | than that, I haven't had a customer in front of me |
| 25 | | ever call them back. |

17

| | | |
|---|---|---|
| 1 | Q | Okay. I'm not sure I followed everything that you |
| 2 | | just said. |
| 3 | A | Okay, I'm sorry. |
| 4 | Q | That's all right. Let me go back and try to |
| 5 | | unpack it. You mentioned a written course that |
| 6 | | you recall may have sort of taken, followed, back |
| 7 | | in 2015. |
| 8 | | Now, are you -- is that something that the |
| 9 | | closing agent company was providing to you, or |
| 10 | | would that have been Great Lakes itself? |
| 11 | A | I believe it was Great Lakes itself. I do |
| 12 | | remember their form at the very top of the course. |
| 13 | | And this is common with many different signings. |
| 14 | | They want to make sure that you're capable of |
| 15 | | doing it and it's just a one-time thing that they |
| 16 | | do. |
| 17 | Q | Okay. Do you retain that written course material, |
| 18 | | by chance? |
| 19 | A | I did not. |
| 20 | Q | Okay. Have you ever spoken by phone with anybody |
| 21 | | who you believed or understood to be an employee |
| 22 | | of Great Lakes? |
| 23 | A | I have not. |
| 24 | Q | Have you ever talked on the phone with anybody |
| 25 | | other than people at the closing company in |

18

| | | |
|---|---|---|
| 1 | | relation to these meetings and presentations? |
| 2 | A | No. |
| 3 | Q | I mean -- okay, I don't mean -- in your personal |
| 4 | | life, perhaps, mentioning it to some friend or |
| 5 | | acquaintance? Have you ever had that -- |
| 6 | A | You're talking about professional matter, no, from |
| 7 | | the signing company. |
| 8 | Q | -- that kind of contact regarding this work? |
| 9 | A | No. |
| 10 | Q | Okay. Got it. The 50 to 60 meetings, roughly, |
| 11 | | for Great Lakes, where did they take place? Did |
| 12 | | they all take place in the home? |
| 13 | A | No. |
| 14 | Q | Okay. |
| 15 | A | I would say -- |
| 16 | Q | Where -- |
| 17 | A | I'm sorry, I'm sorry. Go ahead. |
| 18 | Q | Where else have you conducted those meetings? |
| 19 | A | Sometimes at a coffee shop. Sometimes at |
| 20 | | McDonald's. Many times with today's world a lot |
| 21 | | of people don't want you to come directly to their |
| 22 | | home, and I understand that. And I think that |
| 23 | | once I meet with them, they are pretty much at |
| 24 | | ease. |
| 25 | | I try to keep our conversations as private as |

19

| | | |
|---|---|---|
| 1 | | we can with other people around, which is, as I'm |
| 2 | | reading it to them, I put a copy in front of them |
| 3 | | so that they can read along with me. It's a very |
| 4 | | low tone. But I would say about ten percent of |
| 5 | | the time it's out of their homes. The rest of the |
| 6 | | time would be at their homes. |
| 7 | Q | Is a location outside the home something that you |
| 8 | | have suggested in some instances? Or was it |
| 9 | | always at the request or suggestion of the client? |
| 10 | A | It's always at the suggestion of the client. |
| 11 | | Because when I confirm that I'm going to be |
| 12 | | showing up to them, I say now your address is such |
| 13 | | and such. Many times then they may say to me, I |
| 14 | | want to meet at a different place. Or that |
| 15 | | address is Starbucks. Like, okay, you know. |
| 16 | Q | Have you ever used Zoom or a videoconferencing |
| 17 | | system like we are doing now to conduct one of |
| 18 | | these meetings? |
| 19 | A | This is the first time. That's why I'm nervous. |
| 20 | | It's the first time I've ever done this. |
| 21 | Q | Okay. And so I gather -- you already answered |
| 22 | | this. How do you schedule the meeting with these |
| 23 | | clients? Is it always by phone? |
| 24 | A | It is always by phone to actually schedule it. |
| 25 | Q | And how do you identify yourself when you reach |

20

Exhibit 25 0006

**Page 21**

1     out for that first contact?
2 A I usually indicate that to people that I'm a
3     mobile signing agent or in this case with the
4     actual debt consolidations I will tell them that I
5     have been contracted to meet with you concerning
6     this debt resolution by Great Lakes Law Firm.
7 Q Okay. And when you do, in fact, meet them in
8     person for the meeting presentation, do you hand
9     them any business card or document that identifies
10     who you are?
11 A I show them my driver's license. I give them my
12     business card. It has the name of my company as
13     an LLC and my address, and I show them the
14     laminated card with my COVID injections that I
15     have had.
16 Q Oh, that's very considerate, sir. But no document
17     that identifies you as an employee of Great Lakes?
18 A That's correct, I do not give them any
19     identification concerning Great Lakes.
20 Q I think we've covered everything that you bring
21     with you to these meetings, but do you think that
22     we might have overlooked something that you bring
23     with you that's involved in your interaction with
24     these folks?
25 A No.

**Page 22**

1 Q So when -- let's now think forward to these actual
2     meetings themselves. What, broadly speaking, do
3     you discuss with them during those meetings,
4     presentations?
5 A If I was meeting with you, the first thing I would
6     say, I'm -- tell them my name and "I'm here to
7     represent Great Lakes Law Firm. I take it that
8     you have spoken to someone at Great Lakes Law
9     Firm?" And they always answered "yes."
10       And I say, "Are you comfortable with the
11     situation that you are in right now with Great
12     Lakes Law Firm?" And they say "yes."
13       And I say, "You are aware that you are in a
14     program that's going to build an actual account
15     that's going to help to pay out to the debtors
16     once they negotiate with you?" And they say
17     "yes."
18       And I say, "You understand that there's legal
19     fees involved with this that you are going to be
20     paying initially with this account that you are
21     setting up?" And they say "yes."
22       And I say, "Okay, let's get into the
23     presentation."
24 Q And everything that you just said to me, is that
25     something you have read off of a document? How do

**Page 23**

1     you know to say those things? Or why do you say
2     those things to them to get things started?
3 A I want to make sure the people understand exactly
4     what they are doing before I get into the actual
5     content of the information. And if there was a
6     situation where they were like, well, I was not
7     aware of this or that, personally I wouldn't
8     proceed.
9 Q Okay.
10 A I would then contact Great Lakes and talk to the
11     person that they have been assigned to, which the
12     customer has their name and number. And I would
13     ask them why the person is questioning me on
14     things that you should have covered previous to my
15     being here. And I have not had that situation.
16 Q Okay. Sounds like that preamble set of statements
17     that you make is a matter of your personal
18     responsibility, it's something you want to -- it's
19     something you do to ensure that everyone knows why
20     they are there. It's not something that was asked
21     of you by Great Lakes or anyone else?
22 A That's correct. That is something I need to
23     personally clear up. Whether I'm right or wrong,
24     I don't know, but I follow that. And I don't want
25     to mislead anybody or get them to -- same like if

**Page 24**

1     I go to a nursing home or something for a person
2     to sign something. I make absolutely sure that
3     person is well aware of what they are signing
4     before I will even give them a pen.
5 Q And does making them well aware of what they are
6     signing include like reading to them every word on
7     all of the documents that they are signing?
8 A I'm sorry, rephrase that again, if you would.
9 Q I don't know if --
10 A Just repeat it.
11 Q Well, does making the clients aware of what they
12     are signing include reading to them everything
13     written on all of the pages that they are, in
14     fact, signing?
15 A I try to read all of the information that involves
16     them receiving a -- putting down their signature
17     so that they understand it. Many times they do
18     not want me to read the presentation to them or
19     the contract. Although if it's a contract, I
20     still go over it with them.
21       Many times they wish to read the presentation
22     themselves, which usually takes place after about
23     the third page, and they say, "I'm not going to
24     remember any of this." And that's when I say, "If
25     you want me to continue, I will. Otherwise, I'm

Exhibit 25 0007

```
 1    going to leave you this hard copy of the entire
 2    presentation," which I do every time.
 3  Q Okay.
 4  A But for the actual contract, I go through and say,
 5    "Okay, this column here is the fees that you are
 6    going to be paying.  This is the residual that's
 7    going to be in your account.  And this is what
 8    they are taking out every month" so they totally
 9    understand and they say, "Yes, we saw that."
10  Q Sounds like you got familiar with those documents,
11    the client contract materials, before you are
12    appearing with them for the meeting; is that a
13    fair statement?
14  A I go over every contract at least twice before I
15    meet with them.
16  Q How much time do you estimate you spend reviewing
17    their contracts before you meet with them?
18  A Oh, probably 20 minutes.
19  Q Okay.  And what are you focusing on when you're
20    conducting that personal review?
21  A Well, first thing I look for is if there is
22    anything unusual to what I haven't seen before,
23    which is not the case, but I also look at the
24    numbers, the amount of indebtedness that they are
25    so that I can point that out to the people, and
```
                              25

```
 1    what Great Lakes is looking at estimating the
 2    negotiations amount will be and a percentage.
 3  Q Okay.  And just for the record, you're not
 4    involved in the preparation of any of those
 5    documents, correct?
 6  A Absolutely not.  I have nothing to do with that.
 7  Q So is it fair to say that when you're reviewing
 8    those documents, you are familiarizing yourself
 9    with what they say but you are not assessing for
10    yourself whether they are accurate or appropriate
11    or correct in any fashion?
12  A That's correct.
13  Q So if you could help me paint a picture, if you
14    are sitting across a table with them, are you
15    essentially putting the documents in front of them
16    and then like slowly turning them over and
17    pointing at places you want them to pay attention
18    to?  Or are you just handing it to them and
19    letting them go at their pace?
20  A Are you referring to the actual contract or are
21    you referring to the actual presentation?  If it's
22    a presentation, I have a copy sitting in front of
23    me like you have, and then I also give them their
24    copy and we go through page by page.  Sometimes
25    they want to read -- sometimes I read the entire
```
                              26

```
 1    thing to them.  Sometimes they stop me and say,
 2    "This is too much information.  I need to read it
 3    on my own."
 4  Q Okay.
 5  A Which they also have a right of cancellation.
 6    That form I leave behind with them also.
 7  Q And in terms of the client contract now, is that
 8    different than the presentation in terms of how
 9    it's physically reviewed between the --
10  A Yes, because I'm only allowed to make one copy of
11    the contract itself which they sign and I have to
12    take back with me to electronically scan.  That
13    one I do -- I'm not allowed to leave the actual
14    contract with them.  I'm instructed that once they
15    sign the contract, after the initial signatures
16    from the client, they will then return the entire
17    contract to the client.
18  Q Do you hand the client contract materials over to
19    them to be reviewed page by page, or are you
20    reading that material to them prior to handing it
21    over?
22  A No, I put the contract in front of them page by
23    page and I am familiarized enough with the
24    contracts that I can read upside down as to what
25    those particular details are.  And if they are
```
                              27

```
 1    okay with that, then they sign the particular page
 2    if it requires signature.
 3        I have a contract if you want it.
 4  Q We can discuss that after we finish today.  But
 5    thank you.
 6        Do you discuss during these meetings with the
 7    clients whether or not they should sign up for
 8    this service at all?
 9  A I do not.
10  Q Has anyone ever asked you for your like opinion or
11    your advice on that question during one of these
12    meetings?
13  A They have.
14  Q And how do you handle such a question?
15  A I tell them, people are individuals.  Some people
16    are disciplined to make payments on time.  Some
17    people forget payments.  Some people want someone
18    else to handle that for them.  It's up to them.
19        "Apparently you've read over the program and
20    have been informed on it and it's apparently
21    working -- or is this going to work for you."
22        So I can't really advise them whether they
23    should or shouldn't do it.  That's not what I'm
24    there for.
25        And I tell them, "I'm hoping that you talked
```
                              28

Exhibit 25 0008

A-2627

---

29

1 to your counselor at Great Lakes because what I'm
2 here for is to just verify where you are supposed
3 to sign, explain the program that's in front of me
4 to the best of my ability."
5 Q So it's your understanding that they have spoken
6 to a counselor before you arrive with these
7 documents?
8 A Every time.
9 Q Okay.
10 A That's one of the first things I ask: "Have you
11 been in contact with Great Lakes and are you
12 assigned an individual that you have been talking
13 to?" Because I think the individual that they are
14 assigned to after the contract is signed I think
15 is separate from the ones that did the initial
16 work.
17 Q Okay. And do you -- have you ever had any direct
18 contact with those counselors that the clients
19 have spoken to before they meet you?
20 A I have not.
21 Q And do you know if those counselors are attorneys?
22 A I do not know that.
23 Q Okay. Do you recall any other kinds of questions
24 that they may have asked you, they had asked you
25 in the course of these meetings other than whether

---

30

1 you think they should sign up at all?
2 A Some of the questions I get asked a lot, is this
3 something I would do. And as a layperson never
4 knowing me or my situation, it's hard for me to
5 answer that. And I tell them, "I'm really not in
6 the situation that you are in." And I really, I
7 can't advise because everyone has different
8 agendas."
9 Sometimes I ask them, "Have you talked to any
10 other family members about this?" And many times
11 the response is, "Well, we wish to keep this
12 private." Which is fine. Okay.
13 Q And why are you reluctant to tell them what you
14 would do personally in that situation?
15 A Because I would go about it in an entirely
16 different way.
17 Q Sorry, go about what?
18 A I would go about handling the debt situation in a
19 different way than they choose. I would probably
20 go more direct with the lender, indicating I have
21 a problem and work with them instead of going
22 through a law firm.
23 Q Okay.
24 A And I know you're a lawyer, but I look at some of
25 these fees for what they are going to be doing and

---

31

1 I just think it's a lot of money. But everyone,
2 you know, everyone has to make a living, so --
3 Q In that training that you mentioned from 2015 or
4 at any time subsequently, have you received
5 instruction on how to handle questions like that,
6 from the clients, that might occur?
7 A No.
8 Q So nobody from Great Lakes discouraged you from
9 answering questions like that?
10 A Our instructions are that we're not legal people
11 and we're not to give advice or opinions.
12 Q Okay. And when you say "the instructions," just
13 to be clear, would that be the set of instructions
14 that would come from the closing agent when the
15 appointment is being set up with you?
16 A That would be the instructions that I receive on
17 the actual order from like First American. It's
18 kind of bold letters, "You are not a legal
19 counsel." Do not, you know, try to act like one,
20 I guess.
21 Q Okay. Sounds like you maybe go a little bit
22 farther than that, further than that, and even
23 declining to provide your personal opinion or your
24 personal advice, leaving aside whether it's legal?
25 A Well, I ethically believe that what they are doing

---

32

1 is legal. If it wasn't, I wouldn't be doing it.
2 But it's not my place to advise a client at that
3 point -- that they've already been with Great
4 Lakes and talked to them initially -- it's not my
5 place to actually whether it's right or wrong
6 or whatever.
7 Q Did you ever receive a question from one of these
8 clients during a meeting that you wanted to answer
9 but didn't know the information to provide in
10 answer to the question? And, if so, how did you
11 deal with that situation?
12 A I can't recall that happening. But if it did
13 happen, I would probably stop the meeting at that
14 time and have them in my presence call Great Lakes
15 and talk to the person that could answer their
16 questions. I wouldn't break up the meeting and
17 say we're not going to do it.
18 I would just say, "I think we need to give
19 them a call and find out what's going on or what
20 your concerns are before we proceed any further."
21 And I have not had that situation.
22 Q And would you be in possession of the telephone
23 number to call to try to get an answer like that?
24 A Well, they would probably have that particular
25 phone number themselves because they have already

---

Exhibit 25 0009

A-2628

```
 1    talked to the actual person.
 2  Q Okay.  Were you -- and I understand that.  Would
 3    you also have a number that you could call, a
 4    Great Lakes number, you know, if you thought it
 5    was appropriate?
 6  A On the actual order it would say on there that if
 7    you have questions, you know, to contact attorneys
 8    or Great Lakes, here is the phone number.  They
 9    provide you with a phone number to use.
10    I like to let the client, if it came to that,
11    to use the phone number that they were provided
12    with because I'd probably have the number at a
13    main switchboard but they would have the
14    individual person.
15  Q Okay.  So if I understand you correctly, you're
16    saying that scenario has never transpired with you
17    for the 50 or 60 meetings that you've held for
18    Great Lakes?
19  A I'm thinking back.  I can't recall.  You know,
20    maybe there was one that actually had a question
21    and I stopped the meeting and I think they might
22    have called them.  I don't recall ending a meeting
23    because they were unaware of something.  If they
24    did call, their concern was addressed and they
25    were okay with continuing.
                        33
```

```
 1    I just can't remember if it was -- if it was
 2    at all, it was one time.  But I would never just
 3    say "Here, just sign this."  If they don't
 4    understand it, I'm gonna stop it.  I mean, I don't
 5    need the money that bad to be able to go home at
 6    night and go to sleep and think are these elderly
 7    people, are they really going to be sorry for what
 8    they did because I pushed the signature?  It's not
 9    worth it.
10  Q Are you paid whether or not they sign on these
11    documents and commence the service?
12  A In some cases you would get what's known as a
13    document fee for printing it and a travel fee,
14    which equates to about half of what you would
15    receive.
16  Q I see.  So if they decline, if, in fact, in a
17    given instance they say no, having looked at these
18    documents more carefully, I've decided I'm not
19    going to do it, just ripped them up, you would
20    still be paid something?
21  A Well, they wouldn't rip the documents.  The
22    documents would come back to me and I would have
23    to destroy them.  But I believe I would still be
24    paid something, yes.
25  Q Okay.  Sounds like maybe you're a little unsure
                        34
```

```
 1    whether you would?
 2  A Well, because different companies work different
 3    ways.  I never had the situation happen with Great
 4    Lakes.  I've had it happen with a refinance where
 5    someone says, "Well, somebody should have told you
 6    that you shouldn't have been coming by.  We decided not
 7    to do it," which in that case I did receive the
 8    $50 fee.  And someone forgot to call me from the
 9    signing agent.  But I never had that situation
10    happen with Great Lakes.
11  Q So you mentioned earlier that you bring an extra
12    copy of the presentation document and leave it
13    with the clients when you are finished, but then
14    you don't leave a copy of the client contract
15    material with them because you're instructed not
16    to; is that -- am I restating your testimony
17    correctly?
18  A You are correct.
19  Q Have any clients ever asked you to leave a copy of
20    the client contracts anyway?
21  A Not to my recollection, because I always explain
22    to them that once they sign these, these go back
23    electronically to Great Lakes.  Great Lakes will
24    put their signature on it and you will receive
25    your copies from them, which is in the
                        35
```

```
 1    instructions.
 2  Q Do you tell them how long they should expect to
 3    wait before they receive that by e-mail?
 4  A No.
 5  Q Did you ever do any of these meetings,
 6    presentations for a firm called the Cornerstone
 7    Legal Group, LLC?
 8  A Cornerstone Legal?  About what time frame?
 9  Q It could be any time frame.  I'm asking about any
10    time frame.
11  A I don't recall.  And if they went through a
12    signing agency, all I would have in my records was
13    the agency that hired me.  But Cornerstone doesn't
14    sound familiar to me.
15  Q And why wouldn't you have their name if they
16    had -- if they had gone through let's say FASS,
17    wouldn't you know that it was Cornerstone that had
18    retained you?
19  A Well, I put down what type of thing I'm doing.  In
20    this case it would be a loan modification.
21    Person's address, person's name, driver's license,
22    whether I saw it or not.  I don't put the driver's
23    license number in my paperwork in case it gets
24    stolen.  I put my FedEx or UPS and then who
25    contracted me to do it, which is First American
                        36
```

Exhibit 25_0010

A-2629

| | | |
|---|---|---|
| 1 | | Signing, and then the amount that they are paying |
| 2 | | me. |
| 3 | Q | Okay. So we're going to take a look soon at the |
| 4 | | document that you sent to me. |
| 5 | A | **Okay.** |
| 6 | Q | And that's a Great Lakes Law Firm document |
| 7 | | presentation. To your recollection, have you ever |
| 8 | | used one of those presentations that had |
| 9 | | Cornerstone Legal Group on it instead of the name |
| 10 | | Great Lakes? |
| 11 | A | **I do not recall that.** |
| 12 | Q | Okay. All right. So before today, Mr. Pavlow, |
| 13 | | you e-mailed me a document. And could you just |
| 14 | | recapitulate for me briefly what that document was |
| 15 | | that you e-mailed me? |
| 16 | A | **That was I believe the presentation. And that's** |
| 17 | | **what I'm supposed to go through with the client** |
| 18 | | **when I meet them after my initial appearance, you** |
| 19 | | **know, How are you? How-do-you-do-type thing. We** |
| 20 | | **get into that, and I go page by page with that and** |
| 21 | | **read it to them.** |
| 22 | Q | I'm going to now attempt to put that document onto |
| 23 | | our screens. |
| 24 | A | **I've got a hard copy also if you want me to get** |
| 25 | | **it.** |

37

| | | |
|---|---|---|
| 1 | | MR. BEILIN: Jodi, this will be |
| 2 | | marked as Exhibit 1. And you can call it |
| 3 | | In-Person Presentation. |
| 4 | | (Exhibit No. 1 marked for |
| 5 | | identification.) |
| 6 | Q | See at the bottom we have it marked Pavlow |
| 7 | | Testimony Exhibit 1? I'm just going to scroll |
| 8 | | through that document, Mr. Pavlow. |
| 9 | | Okay, so this is where doing this via Zoom is |
| 10 | | a little more awkward than in person but bear with |
| 11 | | me. And I'm just scrolling through so that you |
| 12 | | can -- |
| 13 | A | **Why don't you go back one page?** |
| 14 | Q | Sure. |
| 15 | A | **The second star I had when I started doing these.** |
| 16 | Q | Oh, we will talk about each page. |
| 17 | A | **Okay. I'm sorry.** |
| 18 | Q | Or not every page, but we will talk about a few |
| 19 | | pages. Right now I'm just scrolling through so |
| 20 | | that you can ascertain whether this is what you |
| 21 | | sent to me. It's what lawyers call laying |
| 22 | | foundation. |
| 23 | | Okay. So I've gotten through 21 pages. Is |
| 24 | | that the document that you e-mailed to me I think |
| 25 | | it was a few weeks ago? |

38

| | | |
|---|---|---|
| 1 | A | **That is correct.** |
| 2 | Q | And you've been to between 50 and 60 |
| 3 | | presentations, meetings for Great Lakes. Is |
| 4 | | Exhibit 1 the format of presentation that you use |
| 5 | | for every single one of them? |
| 6 | A | **That's correct.** |
| 7 | Q | Okay. So no changes since when you started the |
| 8 | | process? |
| 9 | A | **I have not seen any changes in this format or the** |
| 10 | | **actual verbiage itself. It's always been the** |
| 11 | | **same.** |
| 12 | Q | And maybe this will repeat a bit previous |
| 13 | | questions, but did you receive instruction on how |
| 14 | | to use the presentation with clients? |
| 15 | A | **The instruction was to read the presentation to** |
| 16 | | **the individual person upon your meeting. That was** |
| 17 | | **the instructions.** |
| 18 | Q | Okay. And is that the instructions from 2015, the |
| 19 | | training, or is that the instruction that comes |
| 20 | | from the closing company with the scheduling? |
| 21 | A | **That was the instructions from the initial meeting** |
| 22 | | **and it's also part of the actual order form that I** |
| 23 | | **received from the signing companies as to what** |
| 24 | | **their requirements are from Great Lakes Law Firm.** |
| 25 | Q | Okay. How long would you say you typically spend |

39

| | | |
|---|---|---|
| 1 | | going through the presentation with each client? |
| 2 | A | **I would say it takes 20 minutes or 25 minutes on** |
| 3 | | **presentation unless there's questions.** |
| 4 | Q | And most of the time is spent you actually reading |
| 5 | | the pages word for word? |
| 6 | A | **If they allow me to continue through the entire** |
| 7 | | **process, yes.** |
| 8 | Q | All right. This is what you were saying earlier |
| 9 | | that sometimes after a few pages, they ask you to |
| 10 | | stop? |
| 11 | A | **That's correct. Or "do we have to continue with** |
| 12 | | **this because I'm not going to remember any of it?"** |
| 13 | Q | Okay. Does that often happen to you? |
| 14 | A | **I would say 50 percent of the time, which is the** |
| 15 | | **reason why I leave a copy of this presentation, to** |
| 16 | | **be honest, so that they can refer to it.** |
| 17 | Q | Okay. |
| 18 | A | **Great Lakes does not require me to leave this** |
| 19 | | **particular copy. This is something I do on my own** |
| 20 | | **and I figure I'm not hiding anything.** |
| 21 | Q | Is Great Lakes aware that you are leaving them |
| 22 | | with the clients? |
| 23 | A | **Probably not.** |
| 24 | Q | So we got -- we're looking at page 2 now. And so |
| 25 | | you mentioned that there was something on this |

40

Exhibit 25_0011

A-2630

**Page 41**

1     page that maybe bothered you a little bit?
2 A Yes. When I initially received this presentation
3     my very first time I called Great Lakes directly
4     and asked them what they mean by representative of
5     Great Lakes Law Firm. Am I an employee of your
6     law firm? Their answer was no, you are simply
7     representing the information they're contained
8     within this documentation. I still have a little
9     issue with that, especially now.
10 Q Do you recall the name of the person you spoke
11     with?
12 A I do not. At that time I didn't really think it
13     was relevant to write the name down. I probably
14     should have.
15 Q Did you understand that it was a person in
16     Wisconsin?
17 A I did understand that it was a person from Great
18     Lakes Law Firm, which I assumed was in Wisconsin,
19     Madison. It may not have been.
20 Q And so that was -- that conversation, was it
21     probably in 2015, do you think?
22 A That is correct.
23 Q Okay. Was there anything else on that page that
24     concerned you?
25 A Well, yes, let's go a little bit deeper with this.

**Page 42**

1     We have a resource in becoming a notary as a
2     resource, and I believe it was Notary Rotary that
3     you can actually look up companies that you're
4     going to be representing and the input from other
5     notaries as to what their experiences are. And I
6     do recall seeing something I believe it was on
7     Notary Rotary of a person that decided not to do
8     these after the first couple for a reason of
9     charges and reason of being an employee of the
10     company. But when I had talked to them previously
11     at Great Lakes, they told me that the
12     representative was not an employee, it's just that
13     you're just representing the company for that
14     particular meeting, which kind of -- I didn't know
15     if I liked that or not with someone else
16     indicating that they may have been employees of
17     this company.
18     But in hindsight, I continued to do it as a
19     representative of Great Lakes. I never told
20     anyone I was an employee of Great Lakes. I always
21     said I am a representative of Great Lakes Law
22     Firm.
23     In fact, some persons would ask me if I work
24     for them or if I'm their counselor. And I tell
25     them, no, I'm strictly a notary. I've been

**Page 43**

1     assigned to take this to you for you to sign it
2     and I explain it to the best of my ability.
3 Q Okay. You get that question -- I mean, have you
4     gotten that question very often?
5 A The question being am I an employee of Great Lakes
6     Law Firm?
7 Q Yes.
8 A Occasionally. I would probably have to say about
9     25 percent of the time. I don't want to mislead
10     people. Because I think that when I show up,
11     based on the information that I read to them, I
12     think they would assume that I am an employee of
13     Great Lakes. And I personally think that Great
14     Lakes would like people to believe that.
15 Q What makes you say that?
16 A I just think that they may feel -- the client may
17     feel comfortable if they think that I am actually
18     an agent from that company. And I don't like that
19     feeling, because I'm not. And when they question
20     it, I clear that up immediately. I don't know if
21     I answered your question in a roundabout way.
22 Q You did. Thank you. I mean not in a roundabout
23     way. You answered my question. And thank you.
24 A I just feel if they were to do -- if they were --
25     whatever you're doing there, if they were to

**Page 44**

1     receive any kind of discussion from the Department
2     of Justice, I think that entire sentence should be
3     left out of there, as far as being a
4     representative of Great Lakes Law Firm. I'm not
5     comfortable with that right now. Now I'm really
6     not comfortable with it. I think it's misleading.
7 Q Looking at the third or fourth paragraph, it says,
8     quote, after the presentation, you will decide if
9     you want to sign and submit enrollment documents
10     today.
11     Have any of the people that you visited for
12     these meetings for Great Lakes ever decided not to
13     proceed after watching or reading the
14     presentation?
15 A No.
16 Q Let's take a look at -- I'm going to look now at a
17     couple pages down, page 4, entitled *The Debt*
18     *Negotiation Process.* This slide refers to a
19     package review call and a strategy call. Do you
20     see those references?
21 A I do.
22 Q Are you involved either of those calls?
23 A No, I am not.
24 Q Page 8 we are looking at now entitled *Important*
25     *Things to Know.* So based on your previous

Exhibit 25_0012

A-2631

**Page 45**

1     answers, is it fair to say that many of the
2     clients have stopped reading by the time they get
3     to this page or before they would have gotten to
4     this page?
5  A  **No. Many times I go over this one with them.**
6  Q  Okay. And so there are some warnings here,
7     including the warning that your credit score will
8     likely be negatively impacted. That was in quotes
9     and, quote, your creditors typically take six
10    months to charge off your account, unquote.
11        Do you get any questions when this slide is
12    being reviewed?
13  A  **Sometimes.**
14  Q  What kind of questions do people ask?
15  A  **"How bad is it going to influence my credit**
16     **score?"**
17        **"Well, I don't know."**
18  Q  Do you answer that question?
19  A  **I answer the question by saying, "I know that it's**
20     **probably going to impact your credit score**
21     **negatively. As far as the amount or magnitude, I**
22     **don't know that."**
23  Q  How do you know that it will?
24  A  **Well, after 70 years, I pretty much know how the**
25     **credit bureau works. You know, if there's still a**

**Page 46**

1     **write-off by a credit card company, I know it's**
2     **going to negatively impact your credit score.**
3  Q  But what is it about the program they are
4     enrolling in that causes the negative impact?
5  A  **Well, probably because they are not going to be**
6     **making any kind of a payment for a while --**
7  Q  Why do --
8  A  **-- and probably because they are working through a**
9     **law firm to negotiate the amounts that they owe.**
10  Q  Okay. So you don't give them any estimation on
11    the impact of the credit score?
12  A  **I do not.**
13  Q  Let's look at page 9. Page 9 refers to the
14    welcome packet. Do you know what's in the welcome
15    packet?
16  A  **I do not.**
17  Q  And it mentions that it will be sent to the e-mail
18    address. Am I correct in thinking that you don't
19    need to collect the e-mail address from the client
20    because that has already been collected from them?
21  A  **I do believe it's already been collected from them**
22     **if it's applicable, and I believe that they have**
23     **been told that if they don't have an e-mail, it**
24     **would be mailed to them.**
25  Q  Okay. The next page entitled *What to Expect from*

**Page 47**

1     *Great Lakes Attorneys,* it says on the left side of
2     the page, "Your attorney will speak to you before
3     you start. You will either meet face to face with
4     a representative or with an attorney to review the
5     program."
6        Is it your understanding that -- do you have
7     an understanding or belief as to whether any of
8     the clients when you meet them have already had
9     contact with an attorney or not?
10  A  **What I hear from the customer is that they have**
11    **been in contact with Great Lakes. Whether that is**
12    **an attorney or a paralegal, I'm not aware of. I**
13    **have assumption on it, but I don't tell the**
14    **customer that.**
15  Q  And what is your assumption?
16  A  **My assumption is probably a paralegal reviews this**
17    **case and has criteria whether it can be accepted**
18    **or not, and then probably after all the initial**
19    **paperwork is done, it's probably turned over to an**
20    **attorney. That's just my assumption.**
21  Q  Turned over after your meeting with the client,
22    you mean?
23  A  **No. I think prior to my meeting with the client.**
24  Q  Okay. Now, what's your assumption about those
25    matters based upon?

**Page 48**

1  A  **Well, I just -- my opinion is that I don't feel**
2     **the attorney is involved at this point until all**
3     **the information is acquired, all the debt**
4     **information is acquired, probably credit reports**
5     **done, all of the verbal authorizations are**
6     **completed that would allow me to visit them with**
7     **the actual documents. I think all that is**
8     **probably done paralegal before involvement with**
9     **the attorneys.**
10  Q  Okay. Do you have any direct indication that, in
11    fact, attorneys do speak with the clients before
12    you meet them?
13  A  **I do not. Like I say, I think they are talking to**
14    **someone naturally at Great Lakes, but whether it's**
15    **an attorney or not, I'm not aware of that.**
16  Q  Okay. Now, page 12 describes the letter of
17    engagement. Are you familiar with that document?
18  A  **I think so. I can get it if you would like me to.**
19  Q  That's okay. What is the letter of engagement as
20    you understand it?
21  A  **I believe a letter of engagement is between the**
22    **attorney and a client as to what the relationship**
23    **is going to be and how Great Lakes is going to**
24    **represent them.**
25  Q  Okay. And does that constitute most of the

Exhibit 25 0013

**Page 49**

1  material that you are there to have them sign?
2  A  I don't think I follow that question.
3  Q  Are most of the paperwork or most of the pages
4  that you show to the clients and that they sign
5  part of the letter of engagement?
6  A  I believe so.
7  Q  Do you have a understanding as to whether there's
8  a lawyer-client relationship between these people
9  before they sign all of these materials?
10  A  I'm not aware of that.  Once again, I know they
11  have a relationship with Great Lakes.  As far as
12  the individual title of the person that they are
13  working with, I'm not aware of.
14  Q  So from these instructions -- do the instructions
15  you receive say anything about, you know, what a
16  lawyer-client relationship is all about?  That's
17  not a very good question, Mr. Pavlow.  I'm sorry.
18  *What it's all about*; that's way too vague.
19    Do the instructions you receive say something
20  about the nature of a lawyer-client relationship?
21  A  No.
22  Q  Do the instructions tell you anything about how to
23  handle confidentiality?
24  A  The instructions initially tell me about
25  confidentiality and how that should be handled,

**Page 50**

1  yes.  You know, I can't be telling people about
2  the situation or client's name or anything like
3  that.  I would kind of personally take that as
4  common sense in this profession.
5  Q  Okay.  What things are you instructed to preserve
6  as confidential?
7  A  All of it.
8  Q  Okay.
9  A  I mean, these documents, outside of what you're
10  looking at, the actual contract has a lot of
11  personal information in it.  And as far as I'm
12  concerned, it's all confidential.  And when I
13  destroy it, I don't say, "Well, this page goes in
14  the garbage can and this page goes in the
15  shredder."  I just shred the entire thing.
16  Q  Okay.  And what about the conversation -- well,
17  strike that.  We can move on.
18    And I think we have seen enough of this.  Is
19  there anything else about this document, the
20  presentation, that you would specifically want to
21  draw my attention to or talk about?
22  A  Well, I think the part that I scratched out, the
23  actual initials, the individual person has to
24  initial every page to confirm that they understand
25  it and went through it.  And I try -- even if they

**Page 51**

1  decide that they don't want to sign this, I still
2  highlight each page as to what it is without
3  reading word for word so that they have a big
4  understanding of what they are looking at.
5  Q  Okay.  So they will initial that page even if they
6  are one of those clients who said to you, "Hey, I
7  don't want to read every page, I'm not going to
8  remember it anyway"?
9  A  That's correct.
10  Q  Okay.
11  A  And I don't just say initial here and then turn
12  the page, initial here.  I go through it quickly
13  with them.  Even if they refuse not to read it,
14  hoping that if there's something there that they
15  are not familiar with, they are going to say,
16  "Whoa, wait a minute," but that doesn't happen.
17  But I give them that opportunity.
18  Q  So now we're going to spend a little time talking
19  about the other documents that you show to them.
20  A  Okay.
21  Q  The client agreement and related materials.  I'm
22  going to show you a couple pages that have been
23  taken from one such agreement.  But we're not
24  going to go through the whole thing.  It's
25  unnecessary for us to discuss those documents in

**Page 52**

1  detail.
2  A  Okay.
3  Q  But I have some questions about those documents in
4  general and how they are used.
5    So are the instructions that you receive
6  specific to those documents in any way?  Like will
7  they draw your attention to any specific facts in
8  the client's letter of engagement, for example, or
9  specific facts in the client's budget and other
10  information when you receive the packet?
11  A  The client's budget information is part of that
12  packet.  It's already spelled out as to what their
13  budget is.  As far as them telling me pay
14  particular attention to a specific document, no.
15  Q  Okay.
16  A  Does that answer your question?
17  Q  It does.  Just to clarify, the instructions don't
18  highlight any of the like the individually
19  specific things, like Mrs. Smith has, you know,
20  five accounts instead of four.  Mr. Jones has, you
21  know, two credit union accounts so you should be
22  sure to mention that.  Correct?
23  A  No.  Sometimes they will have multiple accounts
24  like credit unions, but there's nothing specific
25  that tells me to pay particular attention or

Exhibit 25_0014

A-2633

| | |
|---|---|
| 1 disclose particularly to the client that this | 1 a fee for the documents that you need to print or |
| 2 particular item is on there twice from two | 2 et cetera. Could you break that down for me |
| 3 different account numbers, no, that's not the | 3 specifically? |
| 4 case. | 4 A Well, in my case that's not true. I charge |
| 5 Q Do the instructions ever tell you to ask any | 5 probably -- in the Wausau area, I usually charge |
| 6 specific questions of a specific client? | 6 $100 to do there. If there's distance involved, |
| 7 A No. | 7 like over 40 miles, I will charge an additional 25 |
| 8 Q Now, do you have the authority to modify any of | 8 bucks for every 40 miles. |
| 9 the terms or language in any of the enrollment | 9 Q Okay. |
| 10 documents? | 10 A And that's round-trip. So in most cases when I do |
| 11 A Absolutely not. | 11 these, if it's in the Wausau area particularly |
| 12 Q And how do you know that you don't have that | 12 it's 100 bucks. If it's outside this particular |
| 13 authority? | 13 area, it's 125 to 150. And if it goes beyond |
| 14 A Because it's quite specific that they tell you do | 14 that, I question whether I'm going to go that far |
| 15 not modify the document in any way. | 15 into it. |
| 16 Q Okay. And they tell you that where? | 16 Q Oh, okay. How far have you gone for Great Lakes, |
| 17 A That I believe is in the initial instructions when | 17 to the best of your recollection? |
| 18 I receive it from the actual lender. I'm sorry, | 18 A Maybe a total round-trip distance of maybe 120 |
| 19 not the lender. I'm thinking something else. The | 19 miles. |
| 20 actual signing company. | 20 Q Round-trip distance? |
| 21 Q Understood. Okay. | 21 A Yeah, there and back. |
| 22 A Great Lakes is very particular on how these | 22 Q I see. So the 50 or 60 clients are all within -- |
| 23 documents come back to them. If there's anything | 23 maybe not all of them, but roughly speaking, |
| 24 left out, a date or anything, they will send it | 24 within 60 miles of your residence? |
| 25 back. | 25 A Correct. |
| 53 | 55 |

| | |
|---|---|
| 1 Q Has -- oh, okay. Has that happened? | 1 Q Okay. |
| 2 A I believe it happened to me one time with a date. | 2 A I mean, there may be an outlier here and there, |
| 3 Q Just one time out of the 50 or 60? | 3 but the pay goes up according to the distance. |
| 4 A Yeah. One time with the date that the person | 4 Q And you mentioned -- but didn't -- I thought you |
| 5 forgot to put after their signature, I believe. | 5 mentioned to me like a document fee as well that |
| 6 Q And how were you notified of that problem? | 6 you received. |
| 7 A I received that notification through First | 7 A Oh, the document fee I was talking about, we were |
| 8 American Signing Service. | 8 referring to the case of a cancellation or if |
| 9 Q And what were the next steps that you took? | 9 someone decided when I got there he didn't want to |
| 10 A Next steps is I was supposed to go back and have | 10 do it, then what happens is the signing company or |
| 11 them redo it, which I did. | 11 maybe they are being reimbursed, I don't know, but |
| 12 Q Okay. | 12 the signing company will give you a doc fee and |
| 13 A Even for a simple date or a simple initials, I | 13 they will pay like 50 bucks for printing the |
| 14 mean, you have to go back and get it done, and you | 14 documents and presenting it, even though they |
| 15 don't get paid extra for that. That's part of the | 15 didn't get signed. |
| 16 deal. | 16 Q So you don't receive a document fee routinely for |
| 17 Q Okay. | 17 each of these 50 or 60 people? |
| 18 A That's why we look everything over twice, | 18 A I would say I receive maybe two to three document |
| 19 sometimes three times while we are sitting there, | 19 fees in the entire time I've been doing it. |
| 20 just to make sure everything is done correctly. I | 20 Q Nonetheless, it's your responsibility to come home |
| 21 don't want to go back. | 21 and -- you have to print out the client engagement |
| 22 Q Right. And getting back to the fees, you were | 22 enrollment documents, right, on your printer? |
| 23 saying that, you know, it sounds to me like you | 23 A That's correct. |
| 24 are paid through multiple components of your fee, | 24 Q And then you need to scan them once they are |
| 25 right? Like there's a fee for the trip. There's | 25 signed and e-mail them to the people? |
| 54 | 56 |

Exhibit 25 0015

A-2634

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | No separate fee for those aspects of the service? |
| 3 | A | No. I include that. |
| 4 | Q | Okay. So let's take a look, just -- like I said, |
| 5 | | a couple of documents that are part of the service |
| 6 | | packet. This one is Exhibit -- that's labeled 3. |
| 7 | | Yeah, we are going to do 3 first before 2. |
| 8 | | (Exhibit No. 3 marked for |
| 9 | | identification) |
| 10 | Q | So this is Exhibit 3, Mr. Pavlow, entitled |
| 11 | | *Client's Authorization for Settlement*, and it's |
| 12 | | taken from a given example that I possess. And if |
| 13 | | you are able to read through that redaction, I'd |
| 14 | | just ask you not to say that name while we are |
| 15 | | here today. |
| 16 | A | Okay. Sure. |
| 17 | Q | So do you recognize that particular document as |
| 18 | | among the documents used with each client? |
| 19 | A | I do. |
| 20 | Q | And the arrows, are the arrows of the signature |
| 21 | | lines, is that something that you put in there in |
| 22 | | these documents? |
| 23 | A | No, I have not seen those. That must be a |
| 24 | | sticker. |
| 25 | Q | Okay. It's not something you routinely use? |

57

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay. And now we've learned today, they're with |
| 3 | | paper, so I take it that all these signatures |
| 4 | | would be done with a pen or some kind of ink pen? |
| 5 | A | Absolutely. |
| 6 | Q | All right. Let me -- |
| 7 | A | I never have anyone sign in pencil. |
| 8 | Q | I'm trying to get to another one of these |
| 9 | | underneath, you know what I mean? What I'm |
| 10 | | saying? Maybe I will close the first one. I'm |
| 11 | | just dealing with tabs here, sir. |
| 12 | A | That's all right. |
| 13 | Q | There we go. |
| 14 | | MR. BEILIN: The arbitration |
| 15 | | agreement, Jodi, this is marked Exhibit 4. |
| 16 | | (Exhibit No. 4 marked for |
| 17 | | identification) |
| 18 | Q | Do you recognize that? |
| 19 | A | I do. |
| 20 | Q | Okay. Let's take a look at the last paragraph in |
| 21 | | that agreement. Could you read the last paragraph |
| 22 | | that I'm kind of highlighting? |
| 23 | A | Yeah. "Please consult with independent legal |
| 24 | | counsel of your choice prior to signing this |
| 25 | | agreement as the binding arbitration requirement |

58

| | | |
|---|---|---|
| 1 | | and class-action waiver contained herein affect |
| 2 | | your rights. Please do not sign this agreement if |
| 3 | | you do not understand these limitations." |
| 4 | Q | Do you recall clients or a client ever asking you |
| 5 | | about that paragraph? |
| 6 | A | No. |
| 7 | Q | Now, do you always read that paragraph to them? |
| 8 | A | No. |
| 9 | Q | Oh, okay, so let's step back a bit. What is your |
| 10 | | approach to this document and the other pages of |
| 11 | | the client agreement? Do you let them kind of |
| 12 | | turn the page over and read it at their pace or do |
| 13 | | you read parts of it to them? |
| 14 | A | That's correct. If they ask me "what is all of |
| 15 | | this?" my arbitration agreement, in my opinion, |
| 16 | | would be more or less, giving the attorneys |
| 17 | | permission to work with the client to try to |
| 18 | | rectify the amount that they owe and come up with |
| 19 | | a lower amount. |
| 20 | Q | Oh, you think it relates to -- |
| 21 | A | I'm sorry, I'm sorry, this has to do with that |
| 22 | | they can't sue. They can't do a class-action |
| 23 | | suit; is that what this refers to? I believe it |
| 24 | | is. "Both parties give up the right to a trial by |
| 25 | | a jury and their rights to have a dispute resolved |

59

| | | |
|---|---|---|
| 1 | | in a court of law." |
| 2 | | Does that have to do with an arbitrator? |
| 3 | Q | It's entitled Arbitration Agreement. My question |
| 4 | | is stepping -- back a bit from this particular |
| 5 | | page -- to ask you about your process for |
| 6 | | reviewing the client agreement as a whole. |
| 7 | | Do you let them read through it at their own |
| 8 | | pace, stopping whenever they want to stop, or do |
| 9 | | you control their review process through the |
| 10 | | document? |
| 11 | A | I try to have them read every page. |
| 12 | Q | And how do you -- |
| 13 | A | Many times they don't. |
| 14 | Q | How do you try to make that happen? |
| 15 | A | Well, I'd say, "This is the arbitration agreement, |
| 16 | | the section 6 that talks about your rights under |
| 17 | | legal counsel and your rights as far as if there |
| 18 | | was a lawsuit involved and a binding arbitration, |
| 19 | | both parties giving up their rights to a trial by |
| 20 | | jury." |
| 21 | | I'm really not that familiar with it, to be |
| 22 | | honest with you. I don't know all the legal |
| 23 | | ramifications involved in that arbitration |
| 24 | | agreement. |
| 25 | Q | Sure. |

60

Exhibit 25_0016

A-2635

| | | |
|---|---|---|
| 1 | A | **In all honesty, I do look at it. I have them look** |
| 2 | | **at it, read it, but I don't really know that much** |
| 3 | | **about it.** |
| 4 | Q | Okay. You mentioned that you spend about 20 to 25 |
| 5 | | minutes with the presentation. |
| 6 | A | **Mm-hmm.** |
| 7 | Q | How much time is spent with the client services |
| 8 | | agreement? |
| 9 | A | **Equal amount of time.** |
| 10 | Q | Okay. |
| 11 | A | **But there are pages that they wish to see more** |
| 12 | | **than others. This is not one of them.** |
| 13 | Q | Which pages draw their most attention, would you |
| 14 | | say? |
| 15 | A | **Numbers. "What's it going to cost me?"** |
| 16 | Q | Okay. So in your experience has anybody ever |
| 17 | | consulted with an independent legal counsel before |
| 18 | | initialling this page? |
| 19 | A | **Not to my knowledge. Or not directly in front of** |
| 20 | | **me. But then again, they have the right to** |
| 21 | | **rescission, so maybe they do after the fact.** |
| 22 | Q | Let's close that one. |
| 23 | | Okay. Do you recognize Exhibit 2? |
| 24 | | (Exhibit No. 2 marked for |
| 25 | | identification) |

61

| | | |
|---|---|---|
| 1 | | MR. BEILIN: And, Jodi, this is |
| 2 | | Exhibit 2 I'm showing now, a one-page |
| 3 | | document entitled *Affidavit of Compliance*. |
| 4 | Q | Do you recognize this? |
| 5 | A | **I do.** |
| 6 | Q | And you can see it has your name on it. This is |
| 7 | | one you did. |
| 8 | | So on the first line it says, "I, Steven |
| 9 | | Pavlow, as representative affiliated with and |
| 10 | | under contract to Great Lakes Law Firm." |
| 11 | | We've kind of talked a little bit about this |
| 12 | | already, and you consider them to be under |
| 13 | | contract with Great Lakes? |
| 14 | A | **Well, I'm an individual contractor.** |
| 15 | Q | Okay. |
| 16 | A | **But I'm not an employee.** |
| 17 | Q | Okay. Let's take a look at the second paragraph |
| 18 | | of the Affidavit of Compliance where it says, the |
| 19 | | following subjects were -- |
| 20 | | For the record, quote, "The following |
| 21 | | subjects were reviewed with client in writing and, |
| 22 | | where appropriate, orally or in response to |
| 23 | | questions regarding such representation." |
| 24 | | Did I read that correctly? |
| 25 | A | **You did.** |

62

| | | |
|---|---|---|
| 1 | Q | Now, what's your understanding of when it would be |
| 2 | | appropriate to review something orally, rather |
| 3 | | than in writing? |
| 4 | A | **I don't think I follow the question.** |
| 5 | Q | Well, it says there -- let's step back a bit. |
| 6 | | What's the purpose that you understand it of this |
| 7 | | affidavit? |
| 8 | A | **The affidavit is to indicate that I did meet with** |
| 9 | | **the person at a certain time and date and that** |
| 10 | | **they understand what they are signing. But as far** |
| 11 | | **as orally, I don't give advice. I read the** |
| 12 | | **information to them. I don't put the information** |
| 13 | | **in my own words. Nor do I give opinions.** |
| 14 | | **And I would think that the words talking** |
| 15 | | **about the "orally" aspect would cover if you are** |
| 16 | | **giving opinions to people. "Or in response to** |
| 17 | | **questions regarding such representation." If they** |
| 18 | | **have questions, they need to talk to Great Lakes,** |
| 19 | | **not to me.** |
| 20 | Q | When do you fill out this affidavit? |
| 21 | A | **That's the very last -- that's the last page of** |
| 22 | | **the presentation.** |
| 23 | Q | Okay. After or before they have signed the client |
| 24 | | documents? |
| 25 | A | **That would be before they sign the documents. No,** |

63

| | | |
|---|---|---|
| 1 | | **I'm sorry, that would be after they sign the** |
| 2 | | **documents.** |
| 3 | Q | Okay. It's like the last thing you do -- |
| 4 | A | **Yeah.** |
| 5 | Q | -- with these people at all. |
| 6 | A | **Because in this case it took 53 minutes.** |
| 7 | Q | Yes, I was going to ask about that. That's the |
| 8 | | start and end time of your entire interaction with |
| 9 | | these folks? |
| 10 | A | **Correct. 3:03 was our start time. 3:58 was our** |
| 11 | | **ending time.** |
| 12 | Q | Is that your handwriting, or do you have the |
| 13 | | clients fill out those lines on the document? |
| 14 | A | **No, that's my handwriting. This "Steven Pavlow"** |
| 15 | | **after it was crossed out, that's not mine. The** |
| 16 | | **typed, the printed name, somebody did that.** |
| 17 | | **That's not my "P." That's not my "W."** |
| 18 | Q | You mean -- |
| 19 | A | **As you can see on the very bottom where I sign it** |
| 20 | | **above my signature, that's my printing. That's** |
| 21 | | **not the same as what's up there (indicating.)** |
| 22 | Q | Okay. So maybe it was the client who wrote your |
| 23 | | name on that first line, knowing that -- |
| 24 | A | **Could be, yeah, because they put their name on** |
| 25 | | **there too.** |

64

**Exhibit 25 0017**

A-2636

| | | |
|---|---|---|
| 1 | Q | Okay. So essentially the client witnesses your |
| 2 | | signature on this affidavit? |
| 3 | A | Correct. |
| 4 | Q | Okay. Now, the affidavit refers to a number of |
| 5 | | other materials. I'm going to draw your attention |
| 6 | | to the statements that come underneath, directly |
| 7 | | beneath the Location of Meeting line. And it |
| 8 | | refers to the enrollment documents, the |
| 9 | | face-to-face script, and the face-to-face |
| 10 | | PowerPoint presentation. |
| 11 | | Do you see that where I would -- |
| 12 | A | Yes, I do. |
| 13 | Q | So Exhibit 1 that we looked at earlier today, |
| 14 | | which of those was it? Was it the face-to-face |
| 15 | | script or the face-to-face PowerPoint? |
| 16 | A | Face-to-face script. |
| 17 | Q | Okay. And what is the face-to-face PowerPoint |
| 18 | | then? |
| 19 | A | That would probably be if you had one of those |
| 20 | | projectors with you and wanted to put it up on the |
| 21 | | screen. Because of the actual -- the actual -- |
| 22 | | the actual presentation has two formats when I |
| 23 | | download and print it. One format is in a |
| 24 | | PowerPoint and the next format is if you are |
| 25 | | leaving it in writing to do the presentation -- |

65

| | | |
|---|---|---|
| 1 | | I'm sorry, one format is if you are doing the |
| 2 | | PowerPoint. The other format is if you are |
| 3 | | reading it to them, then you print out the one |
| 4 | | that I just did here. |
| 5 | Q | I see. |
| 6 | A | I never print out the PowerPoint. |
| 7 | Q | I see. So those two things being referred to on |
| 8 | | that line in this document are the same thing, |
| 9 | | just two different formats, and you used the |
| 10 | | script format? |
| 11 | A | Correct, because the PowerPoint portion, it also |
| 12 | | shows, you know, look at slide one, slide two, and |
| 13 | | I don't use PowerPoint. |
| 14 | Q | You've never used it with the Great Lakes clients? |
| 15 | A | I don't use it, period. |
| 16 | Q | Okay. So that's very helpful. |
| 17 | | Paragraph 2(a) -- further up on the document |
| 18 | | says that these are the subjects that have been |
| 19 | | reviewed in writing and, where appropriate, orally |
| 20 | | or in response to questions. |
| 21 | | One of the things it mentions in 2, it |
| 22 | | mentions 2(a): |
| 23 | | "The scope of the representation is |
| 24 | | specifically limited to the following: (a), |
| 25 | | determine which specific debt resolution option is |

66

| | | |
|---|---|---|
| 1 | | most appropriate for the client, including an |
| 2 | | initial review of their budget, income, and debt." |
| 3 | | Do you review those things with them |
| 4 | | specifically? |
| 5 | A | I show them what -- I show them the page, it has |
| 6 | | all of their debt. I also show them the page of |
| 7 | | the actual contract that they must have chose to |
| 8 | | go with. |
| 9 | | There's never any options as to which program |
| 10 | | they can go with. When I receive the |
| 11 | | documentation, it's always specific to what |
| 12 | | apparently they have negotiated on the phone |
| 13 | | between themselves and Great Lakes. |
| 14 | Q | Okay. So the process you're engaged in with them |
| 15 | | does not involve a selection by them between |
| 16 | | multiple options; that's what you're saying? |
| 17 | A | That is correct. |
| 18 | Q | All right. I think we are finished with those |
| 19 | | documents, reviewing those documents. |
| 20 | | I asked whether you recall doing any work |
| 21 | | with Cornerstone Law Firm clients. That didn't |
| 22 | | ring any bells. |
| 23 | | Do you recognize -- I'm going to read you a |
| 24 | | few names and ask you if you recognize any of |
| 25 | | these names: |

67

| | | |
|---|---|---|
| 1 | | Arnie Skatrud or Arne Skatrud? First name |
| 2 | | A-R-N-E. Last name Skatrud; S-K-A-T-R-U-D? |
| 3 | A | Is this the name of a client or the name of the |
| 4 | | actual firm that's presenting the documents? |
| 5 | Q | That's the name of an attorney. |
| 6 | A | I've never -- I don't recollect ever hearing about |
| 7 | | that person. |
| 8 | Q | Okay. How about the name Chad Kemp; K-E-M-P? |
| 9 | A | I don't recall anything with that. |
| 10 | Q | Sam Wayne? |
| 11 | A | No. |
| 12 | Q | And Crystal Banse; B-A-N-S-E? Crystal with a "C"? |
| 13 | A | There again, these are lawyers, correct? |
| 14 | Q | Yes. The four names are names of lawyers. |
| 15 | A | No, I have not heard of any of those four. |
| 16 | Q | Okay. And to your knowledge you've never spoken |
| 17 | | to them of these meetings, presentations? |
| 18 | A | No. |
| 19 | Q | Okay. Just two more names, Mr. Pavlow. |
| 20 | | Jason Blust; B-L-U-S-T? |
| 21 | A | No. |
| 22 | | REPORTER: Did you say "B" as in |
| 23 | | boy, or "D" as in dog? |
| 24 | | MR. BEILIN: "B" as in boy, |
| 25 | | L-U-S-T. |

68

Exhibit 25_0018

A-2637

```
 1  Q  And the last name is Timothy Burnett.  Is that
 2     name familiar to you?  Another attorney?
 3  A  No, sir.
 4  Q  All right.  So basically it seems to me, based on
 5     what you have said, that your only contacts with
 6     individuals in person or by phone or through
 7     e-mail are the people at the closing companies or
 8     closing agencies Express Notary and FASS.  Aside
 9     from the actual clients themselves who you meet in
10     person, it's the people at the closing companies
11     that you interact with and no one else with
12     respect to the work you've done for Great Lakes?
13  A  That is correct.
14  Q  Okay.  What's the name of your principle contact,
15     if you will, at each of those firms?
16  A  I don't have a principle contact.  It's a main
17     switchboard that I would call into.  They usually
18     always call me.  In this case they would say, We
19     have a debt resolution in Stevens Point or
20     wherever on hypothetically October 16th.  Are you
21     available at 1 p.m.?  And I would say yes or no.
22         And if I say yes, then they say, What would
23     your fee be?  And I tell them.  And they would
24     say, Okay, we will send it over to you.  And then
25     I get the e-mail.  That's as far as it goes.
                          69
```

```
 1     paperwork snafu there that it wasn't included
 2     initially.
 3         So I wanted to go through that.  And when we
 4     chatted by the phone a few weeks ago, I understood
 5     from what you said that you really did not have
 6     retained any documentation relating to this work
 7     we've been discussing today other than the
 8     presentation copy that you e-mailed to me and that
 9     became Exhibit 1.
10         Is that my correct understanding?
11  A  That's correct.
12  Q  So documents described under No. 1, contracts or
13     agreements between you and Strategic Financial
14     Solutions, you don't have anything like that?
15  A  In fact, I indicated to you I did not even
16     understand who Strategic Financial Solutions were.
17     And then you alluded to the fact that they
18     probably were the owners of Great Lakes Law Firm.
19  Q  Oh, I don't think I said that to you, sir, but --
20  A  Okay.
21  Q  In fact, I don't believe --
22  A  Well, let's say they were affiliated with Great
23     Lakes Law Firm.
24  Q  So any documents that would fall within No. 2,
25     any between you and Global Client Solutions?
                          71
```

```
 1  Q  Right.  Okay.  And your payment is received from
 2     those two companies and no one else?
 3  A  Correct.
 4  Q  Oh, I'm sorry, I've got to share the screen again.
 5     I forgot about Exhibit 5.
 6            (Exhibit No. 5 marked for
 7             identification).
 8  Q  Did you discuss the subpoena, Mr. Pavlow, with any
 9     other individuals before meeting here today to
10     answer questions?
11  A  I wanted to but I did not.
12  Q  What stopped you if you wanted to do that?
13  A  Because I figured if Great Lakes needs to know
14     about this, it's something you'd take care of.
15  Q  Exhibit 5 is the subpoena that was sent to you by
16     the Department of Financial Institutions.  And the
17     second page is an addendum.  Do you recognize
18     that?
19  A  I do now.  At the initial -- when I received the
20     initialling subpoena, it did not include the
21     addendum.
22  Q  How did you get the addendum then?
23  A  I called you and talked to you about it and you
24     had sent me by e-mail a separate addendum.
25  Q  Yes.  And I apologize that -- some kind of
                          70
```

```
 1  A  I never worked for Global Client Solutions.  I
 2     never did any for them, I don't believe.
 3  Q  Okay.  And the same with No. 3?
 4  A  Which is same, yep.
 5  Q  And training materials, No. 4, you mentioned
 6     something from 2015 but today you don't believe
 7     you retained any of that, correct?
 8  A  I did not.
 9  Q  And the e-mails between you and anyone relating to
10     the process whereby people sign up, do you have
11     like a -- basically a set of e-mails from the
12     closing company setting up these meetings and
13     such?
14  A  I probably have e-mails from them concerning the
15     actual agreement if I did not clear out my trash.
16  Q  And when you say "the actual agreement," you mean
17     the initial relationship between you and that
18     company?
19  A  No.  I'm talking about the actual assignment where
20     they called me up and say, okay, we will send it
21     over to you, and then in an e-mail I would receive
22     the actual order to go to the person's home and
23     what the fee would be and the date.
24  Q  Okay.
25  A  And any special instructions.  That's what I would
                          72
```

Exhibit 25 0019

A-2638

| | | |
|---|---|---|
| 1 | | have, if it was still in my computer. |
| 2 | Q | Okay. Do you use one of the free e-mail services |
| 3 | | like Gmail or Yahoo or something? |
| 4 | A | I use Gmail. |
| 5 | Q | And No. 6 is really any other correspondence that |
| 6 | | is not e-mail. That was the intention of it. Am |
| 7 | | I correct in saying it sounds like you don't have |
| 8 | | any material like that either, correct? |
| 9 | A | I do not. |
| 10 | Q | And No. 7 would cover the presentation that you |
| 11 | | sent to me and all the other stuff that goes back |
| 12 | | and forth between you and the clients. And I |
| 13 | | understand you to say you don't -- none of that is |
| 14 | | retained; you had a copy of the presentation but |
| 15 | | there's nothing else? |
| 16 | A | I have also a copy of the actual documents that |
| 17 | | they sign, the agreement. |
| 18 | Q | You mean you have like a template that would be |
| 19 | | applicable? |
| 20 | A | I have an actual contract where I blanked out the |
| 21 | | personal names and signatures. And I talked to |
| 22 | | you about that and you told me you would get back |
| 23 | | to me on that if it was required. |
| 24 | Q | Right. And I told you -- I mean, I didn't ask for |
| 25 | | it. |

73

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | And at this time I don't think, sir, that it is |
| 3 | | necessary for me to ask you to send that. |
| 4 | A | Okay. |
| 5 | Q | But I'm curious, why is that in your possession? |
| 6 | | I'm not suggesting there's something wrong with it |
| 7 | | being in your possession. But I'm curious why it |
| 8 | | is if what you told me earlier was that, you know, |
| 9 | | they are destroyed? |
| 10 | A | Okay, whenever I do an assignment like this, I |
| 11 | | have a separate file on my e-mail, my -- not on my |
| 12 | | e-mail, on my computer that's password protected. |
| 13 | | I keep anything that I scan with their name on |
| 14 | | there until I get paid on it. Once I get paid on |
| 15 | | it, I delete it off my computer completely. |
| 16 | | That's why I had one for you that was still |
| 17 | | in my possession because I wasn't paid for it yet. |
| 18 | | The actual hard copy was destroyed. The |
| 19 | | electronic copy of the contract and that |
| 20 | | presentation I still had on my computer. |
| 21 | Q | Okay. Okay. Now I understand. Well, I -- |
| 22 | A | I kept that one on there right now pending this |
| 23 | | meeting that we're having in case you wanted me to |
| 24 | | e-mail it to you or something. |
| 25 | | So if after this meeting you think I should |

74

| | | |
|---|---|---|
| 1 | | get rid of it, I've already been paid on it, I can |
| 2 | | get rid of it. |
| 3 | Q | Well, we can chat separately after today about |
| 4 | | that. At this time I don't anticipate requesting |
| 5 | | you to produce that because, as you see, I have a |
| 6 | | client agreement already. |
| 7 | A | Right. Which looks very familiar to what I have. |
| 8 | | Yeah. And I didn't want to go through the whole |
| 9 | | thing, for various reasons, with you. It wasn't |
| 10 | | really necessary to my interests today. |
| 11 | | MR. BEILIN: So we got through this |
| 12 | | a little more quickly than I anticipated, but |
| 13 | | I'm glad we did. I very much, again, |
| 14 | | appreciate your time today, Mr. Pavlow. |
| 15 | | THE WITNESS: Okay. |
| 16 | | MR. BEILIN: And if you do have |
| 17 | | further questions, I'm not sure I will be |
| 18 | | able to answer them, but if you do, you can |
| 19 | | give me a call down the road. |
| 20 | | THE WITNESS: Can I ask you |
| 21 | | something right now? |
| 22 | | MR. BEILIN: Let's go off the |
| 23 | | record. |
| 24 | | (Discussion held off the record) |
| 25 | | MR. BEILIN: I am going to one more |

75

| | | |
|---|---|---|
| 1 | | actual question, so why don't we go back on |
| 2 | | the record. |
| 3 | | BY MR. BEILIN: |
| 4 | Q | Mr. Pavlow, have you done meetings and |
| 5 | | presentations like those we've discussed today for |
| 6 | | any debt settlement companies besides Great Lakes |
| 7 | | Law Firm? |
| 8 | A | Not to my knowledge. |
| 9 | Q | Okay. |
| 10 | A | You had mentioned that one earlier and I could not |
| 11 | | recall the name of that one. But no, Great Lakes |
| 12 | | Law Firm is the only ones that I do -- I do loan |
| 13 | | modifications for like Quicken Loans and Wells |
| 14 | | Fargo for people who've missed their payments |
| 15 | | during the COVID crisis and now they are |
| 16 | | re-establishing that again. I do those also, but |
| 17 | | that really has nothing to do with this debt |
| 18 | | consolidation. |
| 19 | Q | Okay. All right. |
| 20 | A | This is the only firm I'm doing those debt |
| 21 | | consolidations with. |
| 22 | Q | Okay. So you really think of this as a |
| 23 | | consolidation of the client's debts? |
| 24 | A | Yeah. I would have -- in my terminology I would |
| 25 | | term it as a debt consolidation. |

76

Exhibit 25 0020

A-2639

| | | |
|---|---|---|
| 1 | Q | Do you use that phrase with the clients when you |
| 2 | | meet them? |
| 3 | A | **I believe that that's part of the actual** |
| 4 | | **presentation, if I recall, it is a debt** |
| 5 | | **consolidation.** |
| 6 | | MR. BEILIN: All right, I don't |
| 7 | | have any other questions today. Again thank |
| 8 | | you very much. And we can go off the record. |
| 9 | | (Concluding at 2:48 p.m.) |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

77

STATE OF WISCONSIN          )
COUNTY OF ROCK              )

I, Jodi L. Lubkeman, a Registered Professional
Reporter and Notary Public in and for the State of
Wisconsin, do hereby certify that the foregoing
Confidential Interview was taken remotely via Zoom
Video Conferencing before me, that it was taken at
the instance of the Wisconsin Department of Justice,
upon verbal interrogatories; that it was taken in
shorthand by me, a competent court reporter and
disinterested person, approved by all parties in
interest and thereafter converted to typewriting
using computer-aided transcription; that said
interview is a true record of the interviewee's
testimony; that the appearances were as shown on Page
2 of the transcript; that said STEVEN PAVLOW before
examination was sworn by me to testify the truth, the
whole truth, and nothing but the truth relative to
said cause.

Dated this 24th day of October, 2022.

Registered Professional Reporter
Notary Public, State of Wisconsin

My commission expires: 9/6/2023

JODI L. LUBKEMAN
Notary Public
State of Wisconsin

Exhibit 25-0021

A-2640

# IN-PERSON PRESENTATION

## Debt Negotiation Program



**GREAT LAKES**
**LAW FIRM**

| 1 |  | In-Person Client Presentation | Client Initial:  |

A-2641

# IN-PERSON PRESENTATION

MY NAME IS _____ AND I AM A REPRESENTATIVE OF GREAT LAKES LAW FIRM.

TODAY WE ARE GOING TO DISCUSS GREAT LAKES' DEBT NEGOTIATION PROGRAM AND HOW IT CAN HELP YOU WITH YOUR FINANCIAL SITUATION.

BEFORE WE BEGIN, PLEASE UNDERSTAND THAT I AM NOT AN ATTORNEY, AND AS SUCH, I AM NOT QUALIFIED TO PROVIDE LEGAL ADVICE TO YOU, OR TO ANSWER QUESTIONS OUTSIDE THE SCOPE OF THE PRESENTATION I AM ABOUT TO DELIVER.

AFTER THE PRESENTATION, YOU WILL DECIDE IF YOU WANT TO SIGN AND SUBMIT ENROLLMENT DOCUMENTS TODAY. IF YOU DO DECIDE TO MOVE FORWARD, A GREAT LAKES ATTORNEY WILL REVIEW YOUR FILE AND CONTACT YOU BY TELEPHONE WITHIN THE NEXT FEW DAYS.

YOU MUST MAKE YOURSELF AVAILABLE TO SPEAK WITH THE ATTORNEY, AS GREAT LAKES' POLICIES REQUIRE THAT THIS CONVERSATION TAKE PLACE BEFORE YOU CAN MAKE YOUR FIRST PAYMENT AND BEGIN YOUR PROGRAM. IT WILL ALSO ENSURE THAT ALL OF YOUR QUESTIONS HAVE BEEN ADDRESSED BY AN ATTORNEY.

**2**      GREAT LAKES LAW FIRM     In-Person Client Presentation     Client Initial: 

Exhibit 25-0023

A-2642

# DEBT NEGOTIATION EXPLAINED

Debt Negotiation is a program designed to pay off your debts through a negotiation strategy.

Great Lakes negotiates with your creditors on your behalf to pay back, in a lump sum or term payments, less than the amount owed on your accounts.

Your involvement in these negotiations and conversations may be necessary and important.

  

 

| 3 | GREAT LAKES LAW FIRM | In-Person Client Presentation | Client Initial |

Exhibit 25-0024

A-2643

# THE DEBT NEGOTIATION PROCESS

| What You Will Do | What Great Lakes Will Do |
|---|---|
| • Save money in your Global Holdings Special Purpose Savings Account to fund your settlements.<br><br>• Forward any communications from your creditors to Great Lakes and notify it of any attempts made by your creditors or their collectors to contact you.<br><br>• Strategically notify certain creditors that you are represented by an attorney and they should stop any further communication with you regarding your debts. | • Keep constant lines of communication with you to keep you up to date on the status of your program.<br><br>• Create and discuss your unique debt negotiation strategy with you. Be on the lookout for the Package Review Call in month one and the detailed Strategy Call in month three.<br><br>• Strategically negotiate with your creditors throughout your representation and obtain your written approval on any agreements Great Lakes successfully negotiates. |

**4**



**In-Person Client Presentation**

**Client Initial** 

Exhibit 25-0025

A-2644

# NEGOTIATION AND DEBT NEGOTIATION STRATEGY

**YOUR DEBT NEGOTIATION STRATEGY AND HOW DEBTS ARE NEGOTIATED WITH YOUR CREDITORS**

## Debt Negotiation Strategy and Implementation

You hired Great Lakes to get your debts resolved as quickly and for as little money as possible. Great Lakes' strategy is based on saving funds in your Global Holdings Special Purpose Savings Account, which is why sticking to your payment plan is so important. As funds build in your account, Great Lakes will contact your creditors to negotiate the best settlements on your behalf.

When Great Lakes reaches an agreement with one of your creditors to resolve a debt, your Great Lakes attorney will review and approve all settlements before your approval.

Great Lakes presents you with the details of the debt resolution offer in writing and either the attorney or negotiator will contact you to confirm the settlement and how you wish to proceed.

If you approve, then you will provide your written or verbally recorded acceptance of the offer and also authorize the funds that will be sent to your creditor. This process is repeated until all debts are negotiated and resolved with your creditors.

| 5 |  GREAT LAKES LAW FIRM | In-Person Client Presentation | Client Initial:  |

Exhibit 25-0026

A-2645

# LITIGATION SUPPORT SERVICES
## Great Lakes Supports You Throughout The Program

  

| **REPRESENTATION** | **END LITIGATION** | **NEGOTIATE AND RESPOND** |
|---|---|---|
| When appropriate, Great Lakes attorneys will represent you if you are sued relating to a debt that is enrolled in the program. | Great Lakes attorneys can often take measures to prevent litigation in a way that protects you and expedites a settlement. | Great Lakes attorneys can negotiate with creditors' attorneys, prepare responsive documents and appear at court hearings on your behalf when necessary. |

**6**



**In-Person Client Presentation**

Client Initial: 

Exhibit 25-0027

A-2646

# GREAT LAKES NOTIFIES YOUR CREDITORS

## Great Lakes' Representation is communicated to your creditors

Notification of representation is sent to your creditors when it is in your best interest. If Great Lakes has made the determination that sending notification to specific creditors is going to make them more aggressive, strategically, it does not send it to them.




Great Lakes requests that your creditors communicate with the law firm directly, rather than contacting you. In some limited cases you may be asked to communicate with your creditor directly. In those instances Great Lakes will advise you on what to say and how to handle it.

**1**



**In-Person Client Presentation**

**Client Initial:** 

Exhibit 25-0028

A-2647

# IMPORTANT THINGS TO KNOW

You may experience an increase in collection activity, including calls or letters from creditors or collectors.

Great Lakes cannot stop interest, penalties or late fees, but reduction of these expenses is typically included in any settlement negotiated on your behalf.

Great Lakes does not contact credit bureaus to clean up or repair your credit.

Your creditors typically take 6 months to charge off your account.

Clients typically see their first settlement in 6 to 9 months of enrolling in the program.

Great Lakes does not provide any tax advice, and any reductions in debt may be taxable by the IRS.

Your credit score will likely be negatively impacted.

8          **In-Person Client Presentation**     

Exhibit 25-0029

A-2648

# AS A CLIENT, YOU WILL BE IN CONTACT WITH US

**GREAT LAKES IS AVAILABLE TO ANSWER YOUR QUESTIONS AT ANY TIME**

| **Client Services Team** | Great Lakes' Client Services Team is available to answer all non-legal questions and help you throughout the debt negotiation process. Don't hesitate to call with any questions or concerns. |
| --- | --- |
| **Welcome Call and Orientation** | • Please be available to speak with them so they can discuss important topics such as:<br>• How to handle creditor calls.<br>• What to do if you receive a summons? |
| **Welcome Package** | Your welcome package will be emailed to you within one week of the receipt of your first retainer payment. It will include a program guide and a copy of your executed agreement. |

9

GREAT LAKES
LAW FIRM

**In-Person Client Presentation**

**Client Initial:**

Exhibit 25-0030

A-2649

# WHAT TO EXPECT FROM GREAT LAKES ATTORNEYS



**Your Attorney will speak to you before you start**

- You will either meet face to face with a representative or with an attorney to review the program.
- If you do not meet with an attorney face-to-face, the attorney will call to review the representation with you.
- A letter is sent from the attorney after your meeting or call confirming what you discussed.



**Quarterly attorney file review and attorney-client calls**

- A Great Lakes attorney reviews your file quarterly for any program change recommendations.
- If there is a concern during the quarterly review the attorney will contact you.
- You will receive an attorney call at least once a year to review your program progress.
- In addition to the above, your attorney can be made available at any time for questions.



**Post Program Exit Interview with an Attorney**

- All clients will have an exit interview with an attorney whether they completed the program or not.

Great Lakes wants to know:
- Was it as expected?
- Was it fully explained?
- Would you refer someone else?
- Lastly, do you have any remaining questions that need to be addressed?

10



**In-Person Client Presentation**



Client Initial:

Exhibit 25-0031

A-2650

# DOCUMENTS TO BE SIGNED TODAY

- Letter of Engagement

- Authorization for Settlement

- Payment Schedule

- Electronic Communication Verification

- Bankruptcy vs. Debt Negotiation and Election of Services

- Arbitration Disclosure

- Credit Union Disclaimer – If applicable



- Private Student Loan Disclaimer – If applicable

- Authorization to Communicate with Creditors

- Power of Attorney

- Presentation Acknowledgment

- Account Information Authorization

- In-Person Client Presentation

**11**

 GREAT LAKES LAW FIRM

In-Person Client Presentation          Client Initial 

Exhibit 25-0032

A-2651

# THE LETTER OF ENGAGEMENT

- **The Letter of Engagement (LOE)** is the Agreement between you and Great Lakes. The LOE forms and describes an Attorney – Client relationship, which secures Great Lakes' representation of you with respect to specific creditors, regarding specific debts.

- **The Attorney-Client Relationship** is governed by the terms of the LOE, and is officially created only after ALL THREE of the following events have occurred;

    1. You and an authorized representative of Great Lakes have both signed the Letter of Engagement,

    2. A Great Lakes attorney has reviewed and approved your representation and has had a telephone conversation with you, AND

    3. You have made your first payment to Great Lakes.

- The LOE lists and explains Great Lakes' services, which will be provided by professionals including attorneys, paralegals, negotiators, assistants, and other personnel. Services performed by non-attorney personnel will be directly authorized and supervised by Great Lakes attorneys.

12      GREAT LAKES LAW FIRM     **In-Person Client Presentation**     **Client Initial:** 

Exhibit 25-0033

A-2652

# THE LETTER OF ENGAGEMENT (CONTINUED)

## Retainer Fee

This is a flat $995.00 fee that compensates Great Lakes for many of the legal services it performs at the outset of representation.

## Monthly Administrative Fees

These fees compensate Great Lakes for continuing legal services provided throughout the program.

## Service Cost

The Service Cost pays for non-legal work involved in the implementation, management, and maintenance of your representation.

- The LOE contains a section covering fees and costs you agree to pay to Great Lakes for its services. The specific timing and amounts of your fees are detailed in the LOE, and are broken down into three distinct types of fees.

13

 GREAT LAKES LAW FIRM

**In-Person Client Presentation**

Client Initial: 

Exhibit 25-0034

A-2653

# THE LETTER OF ENGAGEMENT (CONTINUED)

The LOE contains a binding arbitration agreement. This means that both you and the law firm give up their right to have a dispute resolved by a court of law, either by a Judge or a jury. Any dispute between you and the law firm or any of its attorneys or third-party service providers would be determined by an arbitrator in accordance with your state's laws in the county in which you live.

The LOE also contains a class action waiver. This means that you would be prohibited from participating in any class action lawsuit regarding a dispute between you and the law firm, and instead your dispute would be settled in an individual arbitration action.

**14**      GREAT LAKES LAW FIRM     **In-Person Client Presentation**     Client Initial: 

Exhibit 25-0035

A-2654

# ENROLLMENT DOCUMENTS

- **Letter of Engagement** – This is your contract with Great Lakes, which outlines the terms and conditions of the representation.

- **Notice of Right to Cancel** – Should you change your mind about engaging Great Lakes' service.

- **Authorization to Communicate with Creditors** – Permits Great Lakes to communicate with your creditors for your enrolled debts.

- **Authorization for Settlement** – Allows Great Lakes to act on your behalf when necessary.

- **Private Student Loan Disclaimer** - This explains how student loan debts may alter the performance standards Great Lakes otherwise provides to you in the LOE.



15


GREAT LAKES
LAW FIRM

**In-Person Client Presentation**

**Client Initial:**

Exhibit 25-0036

A-2655

# ENROLLMENT DOCUMENTS (CONTINUED)

- **Credit Union Disclaimer** – This explains how credit union debt may alter the performance standards Great Lakes otherwise provides to you in the LOE.

- **Bankruptcy vs. Debt Negotiation and Election of Services** – Useful information about the various options available to address debt.

- **Hardship and Budget Information** – Sets out your reasons for hardship and your monthly budget.

- **Creditor Listing** – A listing of the specific debts enrolled by you in the Great Lakes debt negotiation program.

- **Payment Schedule** – Outlines all payments of fees and savings funds.

- **Electronic Communication Verification** – Describes how the letter of engagement and other documents signed today will be delivered to you.



16



**In-Person Client Presentation**

**Client Initial:** 

Exhibit 25-0037

A-2656

# ENROLLMENT DOCUMENTS (CONTINUED)

- **Arbitration Disclosure** – Provides important information regarding arbitration.

- **Power of Attorney** – Authorizes Great Lakes to represent you in negotiations with your creditors.

- **Presentation Acknowledgment** – Acknowledges that this face-to-face presentation was conducted with you.

- **Account Information Authorization** – Provides authorization for Great Lakes to facilitate your establishment of your Special Purpose Savings Account through Global Holdings.



17

GREAT LAKES
LAW FIRM

In-Person Client Presentation

Client Initial 

Exhibit 25-0038

A-2657

# SPECIAL PURPOSE SAVINGS ACCOUNT

## THE FDIC INSURED SPECIAL PURPOSE SAVINGS ACCOUNT EXPLAINED

| Personal Checking / Savings Account | An automatic monthly payment is made from your Personal Account to your Global Holdings Savings Account | Great Lakes fees are paid out of your Global account / On YOUR authorization Settlements are paid out of your Global account |
|---|---|---|

### How Your FDIC Insured Special Purpose Account Will Work

- Great Lakes helps you establish your new Global Holdings Special Purpose Savings Account. You will use this account to save the money that will resolve your debts.

- Your new Global account is separate from your current checking and savings accounts, it is FDIC insured and controlled by you. As the balance in your account grows, Great Lakes will work with your creditors to negotiate a resolution of your debts.

- The funds in the Global account belong to you and you may withdraw any funds that have not previously been earned by Great Lakes at any time.

- You will have online access to this account and the funds you save 24 hours a day.

**18**

GREAT LAKES LAW FIRM

**In-Person Client Presentation**

Client Initial 

Exhibit 25-0039

A-2658

# SPECIAL PURPOSE SAVINGS ACCOUNT AND FINANCIAL INFORMATION

- You will pay Great Lakes' fees and fund settlements through a Special Purpose Savings Account provided and maintained by Global Holdings. Global will draw funds directly from your checking account into your Special Purpose Savings Account.

- The funds in this account will remain under your control, and you will be able to access the account directly with the use of a Passcode / Password. You can withdraw any funds that have not been earned by Great Lakes at any time.

- This is a non-interest-bearing account, and is only used to pay fees to Great Lakes and fund settlements that Great Lakes negotiates and pays on your behalf.

**19**

 GREAT LAKES LAW FIRM

**In-Person Client Presentation**

**Client Initial** 

Exhibit 25-0040

A-2659

# SPECIAL PURPOSE SAVING ACCOUNT AND FINANCIAL INFORMATION

- Funds in your Global Holdings account are FDIC insured, and the amount of coverage may increase or decrease subject to changes in FDIC policy from time to time.

- Fees associated with this account, as well as all other terms and conditions affecting your interactions with Global Holdings are covered in your Account Servicing Agreement. Monthly fees include $10.95 for maintenance of the account, as well as other fees from time to time as listed in the Agreement. Please review the Account Servicing Agreement now, and initial once you have finished reviewing and understand its terms.

- Now that you have read and understand your Account Servicing Agreement, I can take your financial information to assist you in completing the application.

**20**


GREAT LAKES
LAW FIRM

**In-Person Client Presentation**

**Client Initia** 

Exhibit 25-0041

A-2660

# THINGS CAN CHANGE

**Contact Us Immediately to Discuss Your Options if:**

| **SAVE AS MUCH MONEY AS POSSIBLE** | **CHANGE IN EMPLOYMENT STATUS** | **UNEXPECTED LIFE CHANGES** |
|---|---|---|
| If you receive a tax refund, get a monetary gift, or get a raise in your pay, adding those funds to your program will enable us to achieve quicker settlements with your creditors. | If you lose your job or earn less money, call us right away. | If you experience health or medical issues or any other hardship which causes your situation to get worse. |

21

GREAT LAKES
LAW FIRM

In-Person Client Presentation

Client Initial: 

Exhibit 25-0042

A-2661

GREAT LAKES LAW FIRM                    AFFIDAVIT OF COMPLIANCE

## Affidavit of Compliance

I, STEVEN PAVLOW _____ as representative affiliated with and under contract to Great Lakes Law Firm in my role as a Member, Partner, Employee or Independent Contractor of said firm (Great Lakes), confirm that I have conducted a personal and face-to-face meeting with ▮▮▮▮▮▮▮▮▮▮ (Client's Full Legal Name) to review the Client's file and present all relevant information regarding our representation of said Client, as it relates to our Letter of Engagement to legal representation, including debt resolution and financial workout services, to Client. I have determined that no fees have been received from Client prior to the execution of the Letter of Engagement on this date and such execution has taken place in my presence following my in-person meeting with Client. This Affidavit of Compliance establishes a written record to verify compliance with any and all applicable local, state or federal laws or regulations (collectively the "Applicable Laws"), including, but not limited, to the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-08, and the Telemarketing Sales Rule, as amended, 16 C.F.R. Part 310; 75 Fed. Reg. 48458, 48522.

The following subjects were reviewed with Client in writing and, where appropriate, orally or in response to questions regarding such representation:

1) That debt resolution that alters the terms of payment of unsecured debt might have a negative effect on Client's credit and that Great Lakes does not clean up, fix, or repair credit.

2) That the scope of the representation is specifically limited to the following:
   a. Determine which specific debt resolution option is most appropriate for Client, including an initial review of their budget, income and debt.
   b. Review Client's current unsecured debt burden and thereafter negotiate and attempt to negotiate settlements with Client's creditors in an effort to modify or restructure Client's current unsecured debt.
   c. Provide litigation defense as outlined in the Letter of Engagement.

3) A full review of all fees and costs associated with the representation of the Client.

4) That Great Lakes maintains a Performance Guarantee for each individual account entered by Client into the Great Lakes debt resolution plan, of a minimum of settlement debt reduction of thirty-five percent (35%) of the debt's face value at the time of settlement, including interest, penalties, cost and late fees, as outlined further in the Terms and Conditions of the Engagement Letter. In the event that Great Lakes does not meet this minimum standard for a particular account, it shall refund the pro rata share of all fees and costs paid to Great Lakes for such work and Great Lakes shall settle that individual account for Client at no additional cost. Exceptions to the minimum Performance Standard include: client skipping or defaulting on plan and/or settlement payments, Clients failure to accept proposed settlement of at least a thirty-five percent (35%) reduction of an enrolled debt, any enrolled debts that become subject to a lawsuit during representation, any debts with a balance transfer or cash advance within six months of enrollment, any debts with a balance of less than $1,000 at time of this Agreement's execution, any debts with a credit union and any debt being garnished or subject to voluntary garnishment.

5) The Client has been advised that the attorney or paralegal who conducted the initial meeting with Client limits their scope of representation or presentation to that initial meeting and review of the Client's file. The Client was made aware that the actual supervising attorney for their file may be a different attorney of the law firm who is licensed in their state.

6) A full review of the arbitration provision, including the fact that, by electing to go to arbitration, both parties were waiving certain rights, including the right to a trial in a court of law.

Names of all attendees: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Steven Pavlow

Start Time: 3:03 PM          End Time: 3:58 PM

Location of Meeting: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Have any materials been provided or presented to the attendees in addition to the Enrollment Documents, the Face to Face Script, and the Face to Face Power Point Presentation?   NO   (YES)   (Circle One)
If so, indicate here and scan/upload all such additional documents or materials: ▮▮▮▮▮▮▮

I affirm the above statements are true and accurate.

Executed on this Date: ▮▮▮▮▮▮▮

Representative on behalf of Great Lakes:

Name: STEVEN PAVLOW
Signature: Steven Paul
Executed in my Presence
Client Name: ▮▮▮▮▮▮▮▮   Signature: ▮▮▮▮▮▮▮

xi

A-2662

GREAT LAKES LAW FIRM                SETTLEMENT AUTHORIZATION

## Client's Authorization for Settlement

Great Lakes shall make all reasonable efforts* to obtain Client's approval for any settlement offer obtained on Client's behalf. In the event Great Lakes, cannot contact Client after making reasonable efforts, Client authorizes Great Lakes to proceed with any settlement resulting in a savings of 50% or more of the Client's debt at the time of settlement.

Furthermore, I/we direct Global Client Solutions to release the funds from my/our Special Purpose Savings Account to the creditor, per the terms of a settlement agreement negotiated in accordance with the terms of this authorization.

<u>This form may be revoked** by Client at any time upon written notice to Great Lakes.</u>



Client Name                                          Date   ·18

Co-Client Name                                       Date   18

*Reasonable efforts can include phone call(s), email(s), fax(es), and standard mail.

**Client can revoke such authorization at any time before any settlement payments are processed.

ii

A-2663

GREAT LAKES LAW FIRM                    CLIENT AGREEMENT

## 6. ARBITRATION AGREEMENT

In the event of any controversy, claim or dispute between the Parties arising out of or relating to this agreement or the breach, termination, enforcement, performance, interpretation or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in the county in which the Client, in accordance with the laws of the state of the Client's residence. The Parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") or JAMS, or in the event of their unavailability, an arbitration service with substantially similar rules and arbitrator rosters, pursuant to its rules and procedures, and a single arbitrator shall be selected to preside by the arbitration service. The arbitrator shall be neutral and independent and shall comply with the relevant code of ethics. Any award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the Parties. If either Party fails to comply with the arbitrator's award, the injured Party may petition the applicable court for enforcement.

The Parties agree that either Party may bring claims against the other only in his/her or its individual capacity and not as a plaintiff or class member in any purported class or representative proceeding. Further, the Parties agree that the arbitrator may not consolidate proceedings of more than one person's claims, and may not otherwise preside over any form of representative or class proceeding.

The Parties shall share the cost of arbitration, including attorneys' fees, equally. If the Client's share of the costs is greater than $2,000.00 (Two-thousand dollars), Great Lakes will pay the Client's share of costs in excess of that amount.

**Binding arbitration means that both Parties give up the right to a trial by a jury and their rights to have a dispute resolved in a court of law. It also means that both Parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. In addition, under the terms of this Agreement, the parties also give up the right to bring any claims on a consolidated or class action basis. In addition, certain remedies, such as statutory injunctions and fee shifting, that may be available in a court of law may not be available in an arbitration.**

In the event a Party brings suit against the other Party in federal, state or local court instead of proceeding with arbitration, or unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other Party is entitled to costs of suit, including reasonable attorneys' and paralegals' fee and costs for having to compel arbitration or defend or enforce the award. This section and the requirement to arbitrate any dispute shall survive any termination.

PLEASE CONSULT WITH INDEPENDENT LEGAL COUNSEL OF YOUR CHOICE PRIOR TO SIGNING THIS AGREEMENT AS THE BINDING ARBITRATION REQUIREMENT AND CLASS ACTION WAIVER CONTAINED HEREIN AFFECT YOUR RIGHTS. PLEASE DO NOT SIGN THIS AGREEMENT IF YOU DO NOT UNDERSTAND THESE LIMITATIONS.

Initial 

17

A-2664

# PX-009

## DUPLICATE OF DKT. 7-1

## REFER TO A-352

A-2665

# PX-010

## DUPLICATE OF DKT. 7-11

## REFER TO A-684

A-2666

# PX-011

## DUPLICATE OF DKT. 7-7

## REFER TO A-596

A-2667

### Declaration of Sabil Edgar

As provided by 28 U.S.C. § 1746, I, Sabil Edgar, declare as follows:

1. My name is Sabil Edgar. I am a United States citizen over 18 years of age. I live in Denver, Colorado. The following facts are known to me personally, and if called as a witness, I could and would competently testify to them.

2. On June 18, 2021, I entered into a contract with a company called Newport Legal Group ("Newport") to help negotiate and settle two of my debts. *See* Newport Legal Group Client Retainer Agreement, attached as **Exhibit A**. Pursuant to this agreement, I paid Newport $419.66/month. *Id*. at 3. I enrolled two debts (1) a credit card debt with Wells Fargo in the amount of $12,541.90, and (b) a personal loan with Upstart in the amount of $10,773. *Id*.

3. I had a very negative experience with Newport. Prior to my relationship with Newport, I was current on my debts. After engaging Newport, my accounts went delinquent, I was sued by my creditor, and all the money in my checking account was withdrawn to satisfy a judgment.

4. I first became aware of Newport via a social media advertisement on Instagram. I clicked on the Instagram advertisement and filled out an application. I was contacted by a consultant over the phone. The consultant told me that if I made Newport monthly payments, it would negotiate and settle my debts, and it would lower my debts by half. Even though I was current on my debts, I decided to enroll in the program to lower my debts. Newport told me to stop paying my creditors. Newport told me that if I stopped paying my creditors that this would hurt my credit score, but it would only take a few months to recover. I understand now that I have damaged my credit score for a much longer period of time, and that it will take one to three years to recover.

Subject to Protective Order


**PLAINTIFF'S**
EXHIBIT
**PX-012**

A-2668

5.     After I agreed to enroll in the program over the phone, I met with a notary in person at my home to sign paperwork. Her name was Allison Debolt and the meeting lasting 20 minutes. I only signed paperwork at the meeting. I remember finding the meeting odd because I had questions, but she did not have any answers and simply referred me back to Newport. I believe now that she was doing freelance work for Newport and was not affiliated with Newport.

6.     After signing my contract, I was contacted over email by "Forrest Dewey, Newport Legal Group" who told me he was the attorney "on [my] legal team that will be handling my file" and overseeing a team of "attorneys, paralegals, and administrative staff" working my file. *See* E-Mail Correspondence with Mr. Dewey, attached as **Exhibit B**. I responded to this email immediately because this name was different from the one I had seen on the paperwork I signed. *Id.* The email returned as undeliverable, and I was not able to reach Mr. Dewey. *Id.*

7.     My contract provided that I would pay $419.66/month with the goal of paying off my debts in 45 months. This amount was automatically withdrawn from my bank account monthly. I understood that these payments would be used to settle my debts. I understood that Newport would settle the disputes with my creditors on my behalf for half of the amount I owed.

8.     When I enrolled in the program, I understood that the money I was paying Newport monthly would be used to settle my debts. I believed that I would pay Newport fees, but only after Newport performed services to settle my debts. I now know that I was being charged monthly fees from the outset before Newport settled any of my debts. I do not believe they performed any services to settle my debts for the entire time I was in the program. From my $419.66 payment, Newport deducted (a) a monthly service charge of $10.95, (b) a service fee of $180.17, (c) an administrative fee of $55.00, and (d) a retainer fee of $100.00 (some of these amounts minimally decreased over time.) *See* **Exhibit C**, Global Holdings Transaction Log. After deducting these fees

A-2669

from my $419.66 monthly payment, only $73.54 remained to build up my account to settle my debts. *Id.*

9.      I was enrolled in the Newport debt settlement program for about 13 months. On June 29, 2022, I was sued by Wells Fargo. I immediately contacted Newport. I spoke with a representative over the phone. I asked why I was being sued and why Newport had not settled my debt with Wells Fargo. She told me that my monthly payments were not high enough and I did not have enough money in my account to settle my debts. At that point, I had paid Newport $5,035.92, nearly half of the amount of the debt I owed Wells Fargo.

10.      This representative also told me to file an extension in the lawsuit. She said I would need to support my extension with a "letter of good standing" from Newport showing I was current on my obligations to Newport.  I filed the extension attaching the letter of good standing and received an extension.

11.      After being sued by Wells Fargo, I decided to close my account with Newport. The lawsuit was a red flag to me, and made me think that Newport was not in negotiations with my creditors. I logged into my account through the mobile phone application, removed my debts from the program, and withdrew my funds. I only had $1,066.68 remaining in my account.

12.      I did not get a lawyer for the Wells Fargo lawsuit because I understood that Newport was representing me. It is a law firm and I was paying it a $100/month retainer. Newport did not represent me in the lawsuit. I did not understand that, and I did not know that I needed to file an answer after my extension expired. Wells Fargo obtained a default judgment against me early in 2023. Wells Fargo collected on this judgment debiting the entire balance of my Wells Fargo savings account, approximately $1,000. I am now trying to negotiate a resolution with Wells Fargo directly.

Subject to Protective Order

A-2670

13.     Newport did not settle my Upstart debt, and I am not aware of any services that Newport performed to attempt to settle that debt. I received a letter from Upstart that my account was being closed for nonpayment, and my debt transferred to a collection agency.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19 day of April, 2023.

_____
Sabil Edgar
███████████████
Denver, Colorado 80222

Subject to Protective Order



Services of: Greene Legal Group LLC

300 Baker Avenue

Suite 300

Concord, MA 01742-2124

Subject to Protective Order

A-2672

# NEWPORT LEGAL GROUP  CLIENT RETAINER AGREEMENT

This document is a legally binding agreement confirming that you ("Client") and Greene Legal Group LLC d/b/a Newport Legal Group ("Newport") wish to form an Attorney / Client relationship.

Pursuant to this Agreement's terms, Newport will assist you with the resolution of burdensome debt, and as such, the Representation contemplated in this Agreement is referred to as a Debt Resolution Program. In return for Newport's services, you agree to pay specific amounts to Newport, as specified in this Agreement and its enclosures.

Client is retaining Newport to help resolve specific debts that Client cannot reasonably satisfy according to existing terms. These specific debts are listed in this Agreement.

Client must pay as agreed for Newport to operate as contemplated in this Agreement. The law firm puts in place a customized strategy based on the individual client and their debts in order to effectuate the goals of the law firm's representation. Following this strategy, Newport's ability to resolve the proposed debt load is projected to take a number of months and an amount of payments listed in this document. A variance from this strategy, including Client's failure to make timely payments, will directly affect Newport's ability to perform as agreed.

Newport holds itself to a standard of minimum results even though Creditors are under no obligation to negotiate with you, Newport, or anyone else. Newport takes this risk in exchange for Client's promise not to unreasonably withhold consent when presented with offers to settle debts.

The specifics of Newport and Client's responsibilities and expectations with regard to this relationship are discussed in this Agreement in the following order:

1. **LEGAL SERVICES NEWPORT PROVIDES**
2. **FEES AND COSTS OF SERVICES PROVIDED**
3. **NEWPORT'S PERFORMANCE STANDARD**
4. **TERMINATION OF REPRESENTATION**
5. **FURTHER IMPORTANT TERMS AND DISCLOSURES**
6. **ARBITRATION AGREEMENT**
7. **CLASS ACTION WAIVER**

**Following the Attorney / Client Agreement are various notices, disclosures, schedules, lists, and authorizations related to this Agreement's terms. All enclosed documents are material to Newport's representation of Client, and are incorporated into this Agreement.**

Subject to Protective Order

A-2673

# NEWPORT LEGAL GROUP    CLIENT RETAINER AGREEMENT

## Client Information

### CLIENT

| Full Name: | DOB: | SSN: |
|---|---|---|
| Sabil Edgar | ███████ | ███████ |
| Address: | City | State, Zip Code: |
| ████ | Denver | CO        80222 |
| Home Phone: | Cell Phone: | Email Address: |
| (850) ███ | (850 ███████ | ███████@gmail.com |

### CO-CLIENT

| Full Name: | DOB: | SSN: |
|---|---|---|
| | | |
| Address: | City | State, Zip Code: |
| | | |
| Home Phone: | Cell Phone: | Email Address: |
| | | |

## PROPOSED PROGRAM INFORMATION

| Total Unsecured Debt: | *Estimated Program Length (months): |
|---|---|
| $23,314.90 | 45 |
| Date of First Payment: | Program's Payment Amount: |
| 7/15/2021 | $419.66 |
| *Estimated Total Payments: | |
| $18,884.28 | |

\* - The estimates provided above are just that – good faith estimates. The actual results vary on a case by case basis. In addition, the accuracy of these estimates is dependent on the accuracy of the information that you provide, the terms of the settlements we are able to negotiate with your creditors and on your ability to save a consistent amount each month.

Subject to Protective Order

A-2674

NEWPORT LEGAL GROUP    CLIENT RETAINER AGREEMENT

## 1. LEGAL SERVICES NEWPORT PROVIDES

Newport's services are performed by a group of professionals, including attorneys, paralegals, negotiators, assistants, and others. Attorneys directly supervise the activities they do not directly perform. Newport will perform the various services described in this section.

### 1.1. Debt Analysis

Newport will review Client's personal hardship and other debt circumstances and formulate a plan to negotiate improved terms.

### 1.2. Negotiate and Resolve Client Debt

Newport will represent Client in the negotiation and resolution of the unsecured debts listed in the Creditor List enclosed with this Agreement. Representation related to any debt is governed by the promises and limitations discussed throughout this Agreement.

### 1.3. Services Outside Scope of Representation

Newport's services are limited to those specifically listed above. This means that Newport will not provide accounting, financial planning, or tax advice. Newport does not engage in credit repair or credit reporting. Newport does not attempt to resolve debts on which a judgment has been obtained. Bankruptcy services, and defense or prosecution of any debt not listed in this agreement are outside the scope of representation. Further, Newport cannot guarantee that creditor or collector harassment will cease at any point in the representation. However, under some circumstances, Newport may take appropriate legal action against creditors or collectors engaged in illegal activity.

### 1.4. Work Performed by Contracted Parties

Newport may contract work relating to this Agreement to third parties for such tasks including, but not limited to customer service and debt negotiations. Newport attorneys will supervise all third-party entities to ensure contracted services comply with Newport's rules and regulations.

### 1.5. Litigation Defense

Newport will advise and represent Clients in their defense of litigation initiated by creditors or collectors to recover debts listed in this Agreement. Newport attorneys are immediately notified of litigation, and may be assigned to address any litigation served on Client after the effective date of this Agreement. Litigation services are further conditioned and limited by other terms of this Agreement, circumstances of practicality, and jurisdictional rules.

4

Subject to Protective Order

A-2675

# NEWPORT LEGAL GROUP      CLIENT RETAINER AGREEMENT

## 1.6.   Litigation Defense: Services / Conditions and Limitations

Creditors and/or debt collectors may file lawsuit(s) against Client in order to collect non-payment of owed debt(s). Newport will provide Litigation Defense Services in the event the client receives a Summons and Complaint. The Litigation Defense Services will include work done in court and/or negotiations out of court. Newport's Litigation Defense Services and limitations include:

### Services

1. Newport will receive, review, and analyze any summons, complaint, petition, application, or other operative pleading the client has received.

2. Newport will evaluate potential legal defenses to the Plaintiff creditor's suit.

3. Newport will review, analyze, and counsel Client regarding collection activity and debt restructuring associated with the litigated debt.

4. Newport will engage with the Plaintiff or its hired legal counsel on Client's behalf to negotiate a resolution of the litigation.

5. Newport attorneys may determine that a valid defense exists to the law suit, or that the suit is defective in some way favorable to Client. This determination varies by jurisdiction, current legal trends, and the personal knowledge of the local attorney.

6. If Newport's assigned attorney determines that Client is likely to gain a favorable result through continued defense of the litigation, he or she will prepare and file responsive pleadings on the Client's behalf, appear at subsequent court proceedings, and continue defense through various stages of litigation, including trial, if prudent.

7. If Newport determines in its sole discretion that it does not have a good faith basis to assert a defense to the litigation on Client's behalf, Newport will communicate this determination to the Client and discuss alternative potential strategies for resolving the litigation. In such cases, Newport's strategy may include, but would not be limited to, engaging in out of court negotiations directly with the creditor. No fees for Litigation Defense Services will be charged if Newport determines it cannot provide a defense to

the litigation.

### Conditions and Limitations

1. All pages of any summons, complaint, exhibits, petitions, and/or other pleadings served to the client must be submitted to Newport.

2. All lawsuit paperwork must be submitted to Newport no less than fifteen (15) days prior to the lawsuit response date, or immediately upon the client's receipt of lawsuit paperwork.

3. If the litigation is in a State that permits less than fifteen (15) days' notice, all lawsuit paperwork must be submitted no less than seven (7) days prior to lawsuit response date.

4. All lawsuit paperwork must be submitted to Newport at their fax number 888-317-1892 or email address cs@newportlegalgroup.com.

5. The "Retainer Fee," outlined in the enclosed Payment and Fee schedule, must be paid in full, or payments must be current on any agreed payment plan specific to the "Retainer Fee" in order for Newport to provide Litigation services.

6. Newport is not required to provide Litigation Services on any lawsuit of which the Client had knowledge prior the execution of this Agreement with Newport. Knowledge of a lawsuit is typically determined by service of process (delivery of a legal complaint to a party being sued).

7. Newport will not provide Litigation Services related to debts which are not included in this Agreement, or any attachments or amendments to this agreement made prior to Client's knowledge of the lawsuit.

5

A-2676

NEWPORT LEGAL GROUP          CLIENT RETAINER AGREEMENT

## 1.7. Conditions of this Agreement's Effectiveness

a. This Agreement does not take effect, and Newport has no obligation to provide any services, until both Client and Newport have executed a copy of this Agreement and such copy is delivered to both Parties.

b. Further, this agreement does not take effect until Client has paid the initial payment of the flat fee retainer as set forth in the payment schedule enclosed, and the payment has cleared.

## 1.8. Assistance in Dealing with Difficult Creditors

It is important to understand that Newport cannot force a creditor to negotiate your debt. Although Newport will not accept a debt into the program from creditors it knows will not negotiate debts, there are times when a creditor that has negotiated with Newport in the past may refuse to negotiate a debt. In such instances, the Newport attorneys or negotiators may require your assistance in participating in the negotiation process. Newport personnel will provide you with the information you will need in order to contact your creditor directly in an effort to reach a satisfactory settlement. If Newport cannot successfully negotiate a debt for you, even with your assistance, it will refund to you the portion of your fees associated with that debt.

## 1.9. Timing and Amount of Settlement Offers:

Newport will begin contacting your creditors as soon as we determine that a good faith offer to settle a given debt, whether on a lump-sum or installment basis, may be made, with such factors as the creditor's settlement policies, the rate of account accretion, the size of each debt and how close a debt may be to charge-off. Some creditors prefer that they not be contacted until you have accumulated sufficient funds in your Dedicated Account to allow a negotiated resolution within their historic norms. While settlement guidelines differ widely among creditors, an accumulation of 25% of the then-current balance of a debt will normally enable us to make a good-faith offer to settle that debt.

Subject to Protective Order

A-2677

NEWPORT LEGAL GROUP  CLIENT RETAINER AGREEMENT

## 2. FEES AND COSTS OF SERVICES PROVIDED

Newport's fees are payable according to the following terms. All fees are charged on a flat fee basis according to the Payment Schedule enclosed with this Agreement. The estimated total fees for Newport's services are $ _7433.53_ including the Retainer Fee, Monthly Legal Administration Fees and Service Costs described below.

### 2.1. Retainer Fee and Monthly Administration Fees

a  Client will initially pay Newport $ _995.00_ as a Retainer Fee.

b  The Retainer Fee shall be paid on a monthly basis over _10_ months. The first _2_ payments  shall  be _$100.00_, thereafter payments will be _$100.00_ and a final payment of _$95.00_.

c  In addition, Client shall pay an ongoing monthly flat Legal Administration Fee of $ _55.00_  for debt review, debt resolution plan analysis and structuring, supervision of and participation in creditor negotiations, pre-litigation settlement support, and the Litigation Defense Services described in Section 1.6 of this Agreement. The estimated total Legal Administration Fee is $ _2,475.00_  based on Newport's estimate that it will take a total of _45_ months to settle Client's debt.

d  Client shall be responsible for Legal Administration Fees for all months Client remains active with Newport.

### 2.2. Service Cost – Related Services

In addition to the legal services provided by Newport, there are non-legal services related to the implementation, management and maintenance of Client's debt negotiation plan performed under the supervision of Newport's attorneys. These services are provided at a cost equal to _17%_ % of Client's total scheduled debt (hereinafter referred to as Service Cost). The Service Cost shall be paid by Client to Newport in equal consecutive monthly payments in the amount of $ _$180.17_  per month, totaling $ _$3,963.53_.

Newport has a non-exclusive reciprocal referral agreement with independent contractors to provide these services under Newport's direct supervision. Representatives of such independent contractors cannot and will not provide any legal advice to the Client, and any such advice will only be communicated to Client by Newport. Although these services are performed under Newport's supervision, a court or courts might determine that there is no attorney-client relationship between Client and the independent contractor representatives in regard to these services, and communications between Client and the independent contractor representatives might not be protected by attorney- client privilege.

### 2.3. Application Client of Funds

All funds paid by Client will be saved in a Dedicated Account that is owned by Client and held by a third party dedicated account holder (See Dedicated Account Agreement) for use in making payments toward any settlements negotiated paying Newport's fees under the terms of this Agreement.

**All funds in Client's Dedicated Account shall remain under Client's control at all times, and may be withdrawn by Client at any time without penalty. If Client notifies Newport or the third party dedicated account holder of a request to withdraw their funds, Client shall be entitled to receive all funds in the Dedicated Account, other than any funds that have previously been earned by Newport under the terms of this Agreement, within seven (7) business days of such request.**

It is strongly recommended that Client retain all funds available for settlement payments and fees to allow Newport the greatest ability to effectively represent Client under the terms of this Agreement.

7

A-2678

# NEWPORT LEGAL GROUP    CLIENT RETAINER AGREEMENT

### 2.4.  Method of Payment

Under this Agreement, Client agrees:

a   to have Client's initial flat fee retainer and subsequent fees and costs as outlined above based on the attached Payment Schedule to be automatically drafted by Client's third party dedicated account holder from Client's bank account into an authorized Federal Deposit Insurance Corporation ("FDIC") insured bank account held in Client's name (the "Dedicated Account") with Client's first payment to start on ____7/15/2021____, and thereafter each month on the ___15th___ day; and

b   to have Client's payments of Service Cost and settlement savings fund payments based on the attached Payment Schedule to be automatically drafted from Client's bank account into the Dedicated Account held in Client's name with Client's first payment to start on ____7/15/2021____ and thereafter each month on the ___15th___ day.

### 2.5.  Early Program Completion and Pre-Payment of Program Fees

If Newport resolves all debts listed in this Agreement before the scheduled date of Client's final Service Cost payment, Client must continue to make all payments for the Service Cost and Retainer outlined in this Agreement. However, Client will not be responsible for any Legal Administration Fees following the date that a settlement agreement is entered on the final listed debt. Client can pay off their program early with no pre-payment penalties.

### 2.6.  Costs of Litigation Services – Court Costs and Trial Preparation Costs

a   Client must pay all costs associated with Litigation Services, including the payment of any court filing fees or any other court-imposed costs associated with the litigation. These costs vary by jurisdiction. Newport will NOT advance such costs. Client acknowledges that failing to timely pay necessary costs may have adverse consequences, including but not limited to entry of judgment against Client in the litigation.

b   If a litigated matter proceeds to trial, Client shall also be required to pay the costs associated with Newport's trial preparation, which the parties hereby agree in advance shall be set at three hundred fifty dollars ($350.00) per trial (the "Trial Costs"). Trial Costs commonly include but are not limited to, photocopying and reproduction costs, notary fees, long distance telephone charges, messenger and other delivery fees, postage, travel costs including parking, mileage, transportation, meals, and hotel costs, investigation expenses, and other similar items. The Trial Costs must be paid sixty (60) days before the scheduled trial date unless otherwise agreed upon by Newport and the Client. The Client shall not be responsible for, and shall be refunded the Trial Costs if the litigation is settled at least thirty (30) days  before the trial date.

### 2.7.  Additional Fees

Client may be responsible for additional processing fees. Such fees may include: Payment Plan Change Fees ($19.95), Adding/Removing Debts ($25.00), Renegotiation Fee ($299.00), Reactivation Fee ($299.00), Non-Sufficient Funds Fee ($25.00), Settlement Payment Fees (up to $10.00 per payment transaction), and Banking Changes ($25.00).

### 2.8.  Increases in Balances of Accounts Subject to Representation

a   Client acknowledges and agrees that Client will not continue to incur any additional debt on any accounts subject to this Agreement, other than late fees, interest, and penalties.

b   Client's program fees, program length, and draft amounts may increase due to any additional balances incurred by Client.

Subject to Protective Order

A-2679

# NEWPORT LEGAL GROUP     CLIENT RETAINER AGREEMENT
## 3. NEWPORT'S PERFORMANCE STANDARD

Newport has a set Performance Standard for each debt enrolled in the Debt Resolution Program. Newport sets a target debt reduction of at least thirty-five percent (35%) of the amount owed on the debt at the time of settlement. If Newport is unable to meet this target debt reduction, Newport will refund the share of all Newport fees & costs for work on this individual debt.

### 3.1. Terms and Conditions Affecting Performance Standard:

a. Client must be in complete compliance and cooperation with Newport under the terms of this agreement.

b. Client's payments must be current under the Service Cost obligations and cannot default on payments to Creditors pursuant to settlement of any listed debt.

c. Client may not be entitled to a refund if Client is unwilling or unable to accept a proposed settlement at a reduction of thirty-five percent (35%) of the amount of the debt at the time of its settlement.

d. If Newport is unable to settle Client's listed debts, the refund shall be calculated on a pro rata basis as to Service Cost paid per each individual debt.

e. The Performance Standard does NOT apply to any enrolled debt that becomes subject to a lawsuit during representation. Client will be required to notify Newport of any lawsuit, at which time the Performance Standard will cease to apply, and Litigation Services will commence.

### 3.2. Performance Standard Does Not Apply to the Following Types of Debt:

a. Any debt with a balance transfer or cash advance which occurs within six months of enrollment;

b. Any debt with a balance of less than one-thousand dollars ($1,000.00) at the time of this Agreement's execution;

c. Any debt which is subject to a lawsuit at the time of this Agreement's execution;

d. Debts being garnished, or subject to voluntary garnishment are also excluded from this provision;

e. Any debt with a credit union. Newport will endeavor to settle such debts on behalf of Client on the best terms possible, but cannot guarantee that such settlements will meet the Performance Standard.

f. Debts that are charged off or written off by a creditor or become uncollectable, as a result of Newport's strategy, shall be considered approved settlements. As an approved settlement, these debts will not be subject to any refund.

g. Client must complete all payments as listed and hereafter amended in order to provide Newport with the opportunity to settle all enrolled debt on the Creditor Listing enclosed. Any refund may be disqualified if Client terminates representation prior to completion of payments contemplated in this Agreement.

### 3.3. Bankruptcy and Other Alternatives

Newport may discuss alternative legal routes in the event of changing circumstances on any enrolled debt(s), such as Chapter 7 & 13 Bankruptcies.

### 3.4. Should Client Default on Negotiated Settlement Terms

Newport is not required to renegotiate any debts that enter default after Newport has arranged payment terms, and those terms were agreed to by Client. Client may request Newport renegotiate such debt, and will be subject to an additional fee of two-hundred-ninety-nine dollars ($299.00) per renegotiation at the client's expense. Client must also comply with following terms for renegotiation(s):

a. The Representation Standard provision only applies to the balance of enrolled debt, not accounting for payments made on initial settlement prior to default.

b. Renegotiation may result in the settlement amount increasing.

*Client understands & agrees they are not entitled to any refunds under the Performance Standard if any of the above terms are not met.*

Subject to Protective Order

A-2680

NEWPORT LEGAL GROUP          CLIENT RETAINER AGREEMENT

## 4. TERMINATION OF REPRESENTATION

### 4.1.  Termination by Client

Client may terminate this Agreement at any time, and for any reason. Should Client terminate this Agreement before all debts subject to the representation are resolved, all savings and unearned fees in Client's Dedicated Account will be refunded to the Client.

### 4.2.  Termination by Newport

This Agreement may be terminated by Newport at any time for good cause, and upon reasonable notice to Client. In addition, subject to any applicable legal and ethical standards governing Newport's right to withdraw representation, Newport may withdraw from representing Client in any litigation under the terms of this Agreement either with Client's consent, or with the permission of the court in which such litigation is pending.

### 4.3.  Definition of "Good Cause" for Termination by Newport

a   **Client's Failure to Cooperate with Newport.** Client must cooperate and comply with all reasonable requests by Newport and its agents in connection with the services to be performed under this Agreement, including requests for information and documentation, responses to settlement offers, and matters related to any litigation. Client acknowledges and agrees that failure to cooperate with Newport is grounds for Newport to terminate this Agreement and/or to withdraw from representation of Client in any litigation associated with the Client's failure to cooperate.

b   **Failure to Pay Fees and Costs.** If Client fails to pay the legal fees and Service Costs required under the terms of this Agreement, Newport may terminate this Agreement and withdraw from representation of Client in any litigation associated with this Agreement.

c   **Failure to Pay Costs of Litigation.** In the event that Client fails to pay any of the court filing fees or other fees or costs associated with the litigation of a listed debt, Newport will not be responsible for acting in response to the lawsuit until such time as the fees or costs associated with the filing have been received by Newport. Moreover, Client agrees and acknowledges that the failure to pay the three hundred fifty dollar ($350.00) Trial Costs associated with a trial in a timely manner shall constitute sufficient grounds for Newport to withdraw from representing Client in connection with the lawsuit.

d   **Failure to Follow Newport's Advice on Reasonable Settlements.** Client agrees and acknowledges that Newport has an obligation to Client as both a counselor and as an advocate, and that the underlying purpose of the Representation is to negotiate settlement of Client's debts. In the event that Newport negotiates a reasonable settlement offer and advises the Client to accept, Client agrees that he or she shall not unreasonably withhold consent to accept the offer. Client acknowledges and agrees that it is unreasonable to withhold consent on a settlement offer when Client has no valid defense to the litigation claims at issue or when the settlement offer is within Newport's Standard of Performance. If Client refuses to consent to a reasonable settlement offer, Client agrees that Newport may withdraw from representing the Client in any litigation associated with the settlement offer at issue.

### 4.4.  Withdrawal from Representation of Client in Litigation

In the event that Newport is entitled to withdraw from any litigation for whatever reason, Client agrees to execute any documents necessary to effectuate this withdrawal, including, without limitation, the execution of a substitution of attorney document that relieves Newport as counsel in the litigation. If Client fails to execute any necessary documents, Newport may request the court to be relieved as Client's attorney in that particular matter. Client acknowledges and agrees that Newport's withdrawal from any specific litigation does not necessarily terminate Client's entire Agreement with Newport for any other litigation or for any other services falling within the scope of this Agreement. Notwithstanding Newport's withdrawal and without regard to the reasons for the withdrawal, Client will remain obligated to pay Newport for any services performed up to and including when Newport delivers its withdrawal notice to Client or Newport receives a court order authorizing its withdrawal.

Subject to Protective Order

A-2681

# NEWPORT LEGAL GROUP     CLIENT RETAINER AGREEMENT
## 5. FURTHER IMPORTANT TERMS AND DISCLOSURES

### 5.1. Client's Responsibilities to Newport

a. In consideration of Newport's experienced counselling, work out a feasible monthly payment plan based on the total amount of debt to be modified, which contemplates all fees and costs to Newport as well as funds to deposit for use in settling debts on which Newport represents Client. The Payment Schedule is enclosed;

b. Provide Newport with accurate and complete information relating to any Client's finances and the state of Client's financial hardship as documented in the attached Hardship and Budget Information statement.

c. Provide Newport accurate and complete information and documents relating to any debts subject to Newport's representation. These documents must identify each debt by creditor's name, current account balances, and account numbers. Newport is under no obligation to verify the information supplied by Client;

d. Forward all correspondence from creditors and collection agencies as soon as possible, but no longer than five (5) days from receipt;

e. Make all payments according to the Payment Schedule;

f. Refrain from discussing debts with creditors or collection agencies when contacted;

g. Notify Newport in writing of any settlement offers you receive, including all of the terms and conditions of the offer;

h. Be willing and able to aid in negotiations when necessary, and understand that your level of involvement will not affect the terms of this Agreement, but may affect the speed and effectiveness of Newport's efforts;

i. Respond timely to all requests or communications from Newport or its representatives, and promptly provide Newport with any change of address or other contact information;

j. Make timely and complete payments on settlements negotiated by Newport and approved by Client.



**Initial Here**     Initial: _____

### 5.2. Client's Authorizations

Client Authorizes Newport to:

a. To disclose information regarding Client's financial condition or status to any creditors and collectors in connection with effective representation;

b. To hold itself out as Client's representative to any party seeking to collect the debts listed in this Agreement's Creditor Listing;

c. To engage creditors and collectors to negotiate reduction of the debts listed in this Agreement's Creditor Listing;

d. To provide Client's bank account information to the third party dedicated account holder in order to facilitate the establishment of the Dedicated Account for Client. This authority shall remain effective until cancelled by Client in writing. Client will provide Newport with a voiced check or savings deposit slip with respect to Client's bank account.

### 5.3. Client Acknowledgments

Client Acknowledges and agrees that:

a. The Payment Schedule is based on previous settlement averages achieved and calculated by Newport. Accordingly, the actual amount paid into the program may vary. More or less funding may be required to settle all represented debts;

b. The program's contemplated duration is an estimate based on full and timely payment each month as listed in the Payment Schedule. Any variation of payments, as well as many other factors, can affect the length of the program;

c. Newport will deduct monthly Legal Administration fees through the duration of Client's participation in the debt resolution program;

d. The success of Newport's representation on any particular debt may vary based on a number of factors, including your ongoing ability to make timely deposits to your Dedicated Account, the willingness of your creditors to negotiate settlements of your debt and other factors that are outside Newport's control;

e. Your participation in the program may result in you being subject to collections. Creditors may still contact you regarding debts subject to this Agreement. However, you should notify Newport of harassment, as there may be steps Newport can take to prevent or rectify illegal harassment;

Subject to Protective Order

# NEWPORT LEGAL GROUP

f. Any reduction in the amount owed by Client may be considered a taxable event. You should consult a tax professional to determine any tax obligations they may have as a result of any settlements negotiated on their behalf;

**Initial Here** → Initial: _____

g. The fees and costs paid to Newport are compensation for the services described in the Scope of Engagement and the funds deposited into your Dedicated Account are for the purpose of saving funds for settling your accounts with creditors. Until you authorize and approve any such settlements, no payments of any kind, including any monthly minimum payments will be made to your creditors on the accounts, except those that are subject to Newport's Settlement Pre-Authorization form which states that Newport shall make all reasonable efforts to obtain your approval for any settlement offer obtained on your behalf. In the event Newport cannot contact you after making reasonable efforts, you authorize Newport to proceed with any settlement resulting in a savings of 45% or more of your debt;

h. Newport will refund the entire portion of any unused retainer fees for services that have not yet been rendered in the event you to terminate Newport's representation;

i. The amount you owe to your creditors or collectors may increase due to the accrual of late fees, interest and penalties on the accounts while enrolled in the program;

j. Your participation in the program will likely have an adverse effect on your credit worthiness and may result in you being sued by creditors or debt collectors;

**Initial Here** → Initial: _____

k. You should not incur any new or additional debt and should refrain from using or obtaining credit during the Newport debt resolution representation. You understand and agree that all credit cards or lines of credit shall be closed and that no additional credit cards or lines of credit should be applied for during the Newport debt resolution representation. You understand and acknowledge that you may keep credit cards out the program for emergency purposes only. These credit cards should not be from the same issuing bank as any accounts you entered into the Newport debt resolution representation;

l. No debts listed in this Agreement have been secured by any personal or real property.

# CLIENT RETAINER AGREEMENT

m. Active, inactive, or former military personnel understand that his/her military rank, pay, and/or benefits may be adversely affected by delinquent debt accounts and/or a decreased credit rating and Newport shall not be held responsible for any negative consequences that may occur by such personnel by their enrollment into the Debt Resolution plan.

n. Individuals with, or who are seeking Security Clearance, including military members, contractors and consultants, understand that his or her Security Clearance may be adversely affected by delinquent debt accounts and/or a decreased credit rating and Newport shall not be held responsible for any negative consequences that may occur by such personnel by their enrollment into the Debt Resolution plan.

## 5.4. Voluntary Participation

Client understands that participation in Newport's program is voluntary and you may, upon written request, cancel Newport's services at any time prior to the original estimated conclusion date of the program.

Client also agrees that:

a. Early termination may prevent Newport from providing all services outlined herein and Newport will not be responsible for any unresolved accounts upon cancellation.

b. In the event of any early termination of this Agreement, all Service Costs, Legal Administration Fees, Banking Fees, and Other Fees shall be considered earned and are non- refundable.

c. Upon termination of this Agreement, any funds held in your Dedicated Account, less any amounts paid or owed in the form of fees and settlement payments, shall be remitted to you by paper check or ACH transfer.

d. Newport will not collect any additional fees that have not previously become due after the termination date.

e. With Newport's permission, you may re-enroll Client Debts after termination. Any re-enrollment shall be at Newport's sole discretion and is subject to a Reactivation Fee in the amount of two hundred ninety-nine dollars ($299.00).

## 5.5. Skipped Drafts

a. In the event Client requests to skip a monthly draft, Client shall notify Newport at least five (5) business days prior to the scheduled draft.

b. Client will continue to be charged any applicable monthly Legal Administration service costs, retainer fees and any banking fees for any skipped months.

Subject to Protective Order

A-2683

# NEWPORT LEGAL GROUP

# CLIENT RETAINER AGREEMENT

c. An additional month shall be added onto the Client's program to make up for each month Client skips a draft.

d. Newport may deny a Skip Request and/or limit the number of approved Skipped Drafts if Newport determines it is in the client's best interest to continue drafting Client's monthly payment. Reasons for denying a Skip Request may include, but are not limited to, a resulting inability to negotiate and settle debts, potential acceleration of litigation and the default of active settlements.

## 5.6. Extension of Representation

a. Subject to the terms of the Performance Standard, in the event Client's debts are not fully settled at the end of the estimated program timeframe, Newport will automatically extend Client's program and continue to draft Client's monthly payment unless Client notifies Newport in writing that Client does not wish to extend representation. Any fees due during the extension will be reduced by 50%.

b. Client shall remain responsible for the monthly Legal Administration Fees during any extended representation period.

## 5.7. Additional Disclosures & Disclaimers

a. There are other remedies/solutions available for clients to relieve themselves of their debt burdens. Those remedies include bankruptcy and consumer credit counseling.

b. Declaring bankruptcy may discharge or allow a court-imposed repayment plan for the majority of Client's debts. However, this will be reflected as a permanent

record on a Client's credit report for up to 10 years. Newport will discuss and advise Client as to the bankruptcy option, including fees and costs, at any time that Client's circumstances change, or Client requests such consultation. There are no additional fees required from Client for such consultation and preliminary advice regarding bankruptcy.

c. Consumer credit counseling may have less impact on a Client's credit rating than bankruptcy and reduce interest rates on current debts, but it generally requires re-payment of most-to-all of Client's existing debt and not provide significant monthly payment relief.

## 5.8. Confidentiality of Client Information

Newport agrees that any information provided by Client to Newport and/or its independent contractors will be kept confidential and only be used in providing the services delineated in Newport's Privacy Policy and in this Agreement, which may include, among other things, disclosure of confidential information to appropriate third parties in order to (a) streamline the negotiation process, and (b) enhance Client's opportunities for settlement offers with Client's various creditors Client agrees and acknowledges that such disclosures will be made with Client's express consent and will not require any additional consent or consultation by Client before such disclosures are made.

## 5.9. Counterparts

This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single document. Signatures delivered by facsimile or by email in PDF format shall be effective.

## 5.10. Privacy Policy

Client agrees to receive notices and disclosures regarding Client's privacy information and rights in connection with this Agreement, including any future changes to the terms of Newport's Privacy Policy, by electronic means, including but not limited to by email, by links to the Privacy Policy, and/or by reviewing current and future updated notices, disclosures and policies posted on Newport's website.

## 5.11. Authorization to Obtain Credit Report

Client agrees that Newport and its independent contractors may, from time to time during Client's engagement with Newport, obtain and review Client's credit report as necessary or appropriate to evaluate Client's current financial situation and perform the legal services on Client's behalf.

## 5.12. Entire Agreement

This Agreement is the entire agreement between the parties. All prior negotiations and discussions are superseded by this Agreement. Newport has made no representations other than those expressly set forth in this Agreement, and neither Party has relied upon any representations or promises other than those expressly set forth herein.

13

A-2684

NEWPORT LEGAL GROUP       CLIENT RETAINER AGREEMENT

## 6. ARBITRATION AGREEMENT

Any controversy, claim or dispute between Client, on the one hand, and Newport, and/or any of its third-party service providers, and/or any of the attorneys, employees, representatives, affiliates or agents of the foregoing (collectively, "Newport"), on the other hand, arising out of or relating to this Agreement or the breach, termination, enforcement, performance, interpretation or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration before a single arbitrator in the county in which Client lives in accordance with the Federal Arbitration Act pursuant to the substantive laws of the state of Client's residence. Client and Newport shall be referred to collectively as the "Arbitrating Parties."

The Arbitrating Parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures or, in the event of the AAA's unavailability, an arbitration service with substantially similar rules and procedures. Any award rendered by the arbitrator shall be final and binding, but subjection to review in accordance with applicable statutes governing arbitration awards. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction. If any Arbitrating Party fails to comply with the arbitrator's award, the injured party may petition the applicable court for enforcement.

Any controversy, claim or dispute between any Arbitrating Parties shall be adjudicated and resolved, regardless of the forum in which it is adjudicated and resolved, on an individual basis without resort to any form of class action. **This class action waiver precludes Client from participating in or being represented in any class action regarding a controversy, claim or dispute against Newport.** Client waives the right to arbitrate any controversy, claim or dispute between Client and any other Arbitrating Party, as a class action, either as a member of a class or as a class representative. This class action waiver also applies even if the Client's claims are adjudicated in a court of law or in some forum other than arbitration.

The Arbitrating Parties shall share the arbitration costs (filing, administration and arbitration fees) equally up to $1,000. If the arbitration costs exceed $1,000, Newport will pay Client's share of arbitration costs in excess of $1,000. In all circumstances, each of the Arbitrating Parties shall bear their own attorneys' fees and costs.

**Binding arbitration means that the Arbitrating Parties give up the right to a trial by a jury and their rights to have a dispute resolved in a court of law. It also means that the Arbitrating Parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can be appealed, and that discovery may be severely limited by the arbitrator. In addition, under the terms of this Agreement, Client also gives up the right to bring any claims on a consolidated or class basis in the arbitration.**

14

Subject to Protective Order

A-2685

# NEWPORT LEGAL GROUP    CLIENT RETAINER AGREEMENT

In the event any Arbitrating Party brings suit against the other party in federal, state or local court instead of proceeding with arbitration other than as provided in this Agreement, or unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party shall be entitled to costs of suit, including reasonable attorneys' and paralegals' fees and costs for having to compel arbitration or defend or enforce the award. If any portion of this Arbitration Agreement is determined to be invalid or unenforceable, the remaining provisions shall nonetheless remain in force. The provisions of this Arbitration Agreement section shall survive any termination of this Agreement.

**For Texas residents**: Notwithstanding the foregoing, if you are a resident of the State of Texas, these arbitration provisions shall be voluntary.

**NOTICE: This Agreement contains provisions requiring arbitration of fee disputes. Before you sign this Agreement, you should consider consulting with another lawyer about the advisability of making an agreement with mandatory arbitration requirements. Arbitration proceedings are ways to resolve disputes without use of the court system. By entering into agreements that require arbitration as the way to resolve fee disputes, you give up (waive) your right to go to court to resolve those disputes by a judge or jury. These are important rights that should not be given up without careful consideration.**

**Please consult with independent legal counsel of your choice prior to signing this Agreement as the Class Action Waiver contained herein affects your rights. Please do not sign this Agreement if you do not understand these limitations.**

Initial Here    Initial: _____

15

Subject to Protective Order

A-2686

NEWPORT LEGAL GROUP        CLIENT RETAINER AGREEMENT

## 7. CLASS ACTION WAIVER

Any court proceedings (whether before a judge or jury) of any controversy, claim or dispute between Client, on the one hand, and Newport, and/or any of its third-party service providers, and/or any of the attorneys, employees, representatives, affiliates or agents of the foregoing (collectively, "Newport"), on the other hand, will take place on an individual basis without resort to any form of class action). THIS CLASS ACTION WAIVER PRECLUDES CLIENT FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS ACTION REGARDING A CONTROVERSY, CLAIM OR DISPUTE. Client waives the right to litigate in court any controversy, claim or dispute between Client, on the one hand, and Newport, on the other hand, as a class action, either as a member of a class or as a class representative. The provisions of this Class Action Waiver section shall survive any termination of this Agreement.

**Please consult with independent legal counsel of your choice prior to signing this Agreement as the Class Action Waiver contained herein affects your rights. Please do not sign this Agreement if you do not understand these limitations.**

Initial Here ▷  Initial: _____

Subject to Protective Order

A-2687

# NEWPORT LEGAL GROUP          CLIENT RETAINER AGREEMENT

I represent that I have read, understand and agree to be bound by the terms of this Client Representation Agreement as set forth above and in the documents incorporated in this Agreement. I further acknowledge that the terms and conditions of this Agreement have been explained to my satisfaction by a representative of Newport and that I have no unanswered questions about the program or this Agreement. I confirm that I agree to arbitrate any claims and to waive any right to bring or participate in a class action against Newport.

You, the Client, may cancel this transaction at any time. See the attached notice of cancellation form for an explanation of this right.

Agreed to this __18__ day of __June__ , 20 __21__

**Sign Here** ➡ _____
Signature of Client

**Sign Here** ➡ _____
Signature of Co-Client

_____
Signature of Newport

Subject to Protective Order

A-2688

# AUTHORIZATION TO COMMUNICATE AND NEGOTIATE WITH CREDITORS AND COLLECTION AGENCIES

I (We) have retained _____ Newport Legal Group _____ (the "Firm") to provide me with legal advice and/or representation. In order for the Firm to accomplish this, I (we) authorize the Firm, including its agents, representatives, vendors, and service providers to take the following actions:

1. Communicate with my (our) creditors, including but not limited to any agent, representative or third-party collection agency or law firm, and discuss any and all details of my (our) financial situation for the purpose of collecting information and/or negotiating settlements on my (our) behalf on my (our) debt obligations; and

2. Obtain any records, debt validations, credit reports and support for the debts allegedly owed on my (our) behalf.

I (We) further authorize the recipient of this Authorization, including my (our) creditors or their agents, representatives or third-party collection agencies or law firms, whether transmitted by original, photocopy, facsimile or electronic copy, to communicate with the Firm and/or its employees, agents, representatives, vendors and/or service providers, regarding any of the purposes described above.

I (We) affirm that all of the information that I (we) have or will provide to the Firm is accurate, timely and correct.

Sabil Edgar
_____
Client Name

_____
Co-Client Name

_____
Client SSN

_____
Co-Client SSN

_____        SIGN HERE
Client Signature

_____
Co-Client Signature

6/18/2021
_____
Date

_____
Date

Subject to Protective Order

A-2689

# CLIENT'S AUTHORIZATION FOR SETTLEMENT

Greene Legal Group LLC d/b/a Newport Legal Group shall make all reasonable efforts* to obtain Client's approval for any settlement offer obtained on Client's behalf. In the event Newport, cannot contact Client after making reasonable efforts, Client authorizes Newport to proceed with any settlement resulting in a savings of 45% or more of the Client's debt at the time of settlement.

Furthermore, I/we direct Global Holdings LLC to release the funds from my/our Special Purpose Savings Account to the creditor, per the terms of a settlement agreement negotiated in accordance with the terms of this authorization.

This form may be revoked** by Client at any time upon written notice to Newport.



Sign Here ➤

_____            4/18/21
Signature of Client                          Date

Sign Here ➤

_____            _____
Signature of Co-Client                       Date

*Reasonable efforts can include phone call(s), email(s), fax(es), and standard mail.

**Client can revoke such authorization at any time before any settlement payments are processed.

Subject to Protective Order

A-2690

# DISCLAIMER – SETTLEMENT OF PRIVATE STUDENT LOAN ACCOUNTS

This confirms my/our understanding and acknowledgement that, in Greene Legal Group LLC d/b/a Newport Legal Group's experience, private student loan accounts may cost me/us more to settle and result in a smaller reduction from the debts at the time of enrollment. For this reason, private student loan accounts are excluded from Newport Performance Standard in Section 2 of the Agreement and Newport provides no assurance that such debts will be settled for any amount. I/we acknowledge that my private student loan account(s) that are to be enrolled into the program are NOT cross-collateralized with any other obligations with the same lending institution, are unsecured, and are not federally-backed loans. I/we understand that in the event it is later determined that any enrolled private student loan account does not meet the criteria above, Newport shall have the right to remove such account from the program and the removed account shall become my sole obligation to be resolved in the manner I see fit. I/we acknowledge that Newport would thereby have no obligations to represent me regarding any removed accounts whether ongoing or in the future.

Furthermore, I/we understand private student loan accounts tend to have significantly higher average enrolled balances than those of traditional unsecured credit obligations. Accordingly, I/we understand that private student loan accounts may require a longer period of time to resolve when compared to my/our other enrolled accounts.

Sign Here

Sign Here

_____
Client Signature

_____
Co-Client Signature

Sabil Edgar _____ 6/18/21

_____
Client Name          Date

_____      _____
Co-Client Name              Date

v

Subject to Protective Order

A-2691

# DISCLAIMER – SETTLEMENT OF CREDIT UNION ACCOUNTS

This confirms my/our understanding and acknowledgement that, in the experience of Greene Legal Group LLC d/b/a Newport Legal Group, credit union debt accounts are often resolved for higher settlement amounts, meaning that such debts may cost me/us more to settle and result in smaller reductions from the debt amounts at the time of enrollment. For this reason, credit union debt accounts are excluded from Newport's Performance Standard in Section 2 of the Agreement and Newport provides no assurance that such debts will be settled for any amount.

I/we acknowledge that my current credit union account(s) that are to be enrolled into the program are NOT cross-collateralized with any other credit union obligation(s). I/we understand that in the event it is later determined that any enrolled credit union account is cross-collateralized with any other credit union obligation that any enrolled credit union account(s) would be removed from the program and become my sole obligation to be resolve in the manner I see fit.

Further, I/we acknowledge that Newport would thereby have no obligations to represent me regarding these accounts whether ongoing or in the future.

Sign Here

Sign Here

Client Signature

Co-Client Signature

Sabil Edgar                 6/18/21

Client Name          Date

Co-Client Name          Date

Subject to Protective Order

A-2692

## ARBITRATION DISCLOSURE

Arbitration is a confidential process in which disputes amongst the parties are resolved by an arbitrator selected by the parties (often a retired judge or attorney) rather than in the court system. Arbitration is a private process that uses streamlined rules and procedures. Because of this, parties are often able to resolve disputes more cheaply and efficiently than they would if they proceeded in the court system. Under this Agreement, all disputes amongst the parties would be arbitrated, including disputes over fees and any claims of malpractice. There are several important differences between arbitration and litigation.

<u>Binding Arbitration is confidential and private.</u> Arbitration is a confidential process, in which an arbitrator selected by the parties will resolve disputes between the parties. In arbitration, the parties give up their right to a trial before a judge or jury in a public court. This means arbitration proceedings and awards are typically confidential.

<u>Binding Arbitration uses streamlined procedures.</u> Arbitration often proceeds more quickly and cheaply than court proceedings. In great measure, that is because arbitration typically involves streamlined discovery – which is where the parties share information and documents before a hearing or trial. In arbitration, the parties do not have a right to broad discovery, and discovery may be substantially limited by the rules of the arbitration service and/or arbitrator. In addition, certain remedies that may be available in a court action, such as injunctive relief, special damages, and attorney fee-shifting, are often unavailable in an arbitration proceeding.

<u>Binding Arbitration has costs.</u> In the public court system, the judge and jury are paid by the taxpayers. In arbitration, the parties are responsible for paying the arbitrator's fees. In the event of an arbitration, the parties share the costs of arbitration, including any arbitrator fees, in accordance with the arbitration agreement between the parties. All parties to the arbitration, however, bear their own attorney's fees, costs, and expenses, unless an arbitrator orders otherwise.

<u>Binding Arbitration is final.</u> In a court action, all parties have a right to appeal a judgment entered by a judge or jury, a process that may extend lawsuits by months or years. In binding arbitration, all parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed.

If you would like to learn more about the arbitration process, our attorneys are happy to answer any questions you may have, or you may seek a separate opinion from a non-Firm attorney regarding the pros and cons of arbitration. In addition, for your reference, we are also providing a link to the website for the American Arbitration Association which can provide you with additional information, including its current rules. Disputes between attorneys and clients often are resolved under the AAA's Consumer Rules. American Arbitration Association:  https://www.adr.org

I acknowledge receipt of this Arbitration Disclosure.

Sign Here →

_____
Client Signature

Sign Here →

_____
Co-Client Signature

Sabil Edgar
_____    6/18/21
Client Name                 Date

_____
Co-Client Name

_____
Date

Subject to Protective Order

A-2693

# BANKRUPTCY VS DEBT NEGOTIATION AND ELECTION OF SERVICES

## Bankruptcy and Debt Negotiation

Greene Legal Group LLC d/b/a Newport Legal Group is a full-service debt resolution law firm which provides services including debt negotiation and restructuring and bankruptcy services. The following provides information about these approaches to debt resolution for your review. Clients should fully understand the advantages and disadvantages of each to make an informed decision.

## Bankruptcy

Bankruptcy will usually discharge your unsecured debt and your creditors are not permitted to contact you once you have filed with the court. There are two kinds of bankruptcy: Chapter 13 bankruptcy where you are generally able to keep property that is mortgaged, such as your house or car, and are expected to repay debts in three to five years, and Chapter 7 bankruptcy where you must give up all non-exempt property and assets that you own in exchange for a discharge of most debt. Bankruptcy may be appropriate if you have pending foreclosures, collection litigation or wage garnishments; however, you will generally be unable to establish credit for up to ten years. In 2005, the bankruptcy law was changed to make it more difficult for some consumers to file Chapter 7 bankruptcy based on a financial means test and credit counseling requirements that may require a repayment of some of your debt.

Newport is a debt relief agency under the United States Bankruptcy Code Sections 527 (a) and (b), and we are required to provide the following information and notice:

A debt relief agency providing bankruptcy assistance to an assisted person shall provide—

(1)     The written notice required under section 342(b) (1); and

(2)     To the extent not covered in the written notice described in paragraph (1), and not later than 3 business days after the first date on which a debt relief agency first offers to provide any bankruptcy assistance services to an assisted person, a clear and conspicuous written notice advising assisted persons that—

(A)     All information that the assisted person is required to provide with a petition and thereafter during a case under this title is required to be complete, accurate, and truthful;

(B)     All assets and all liabilities are required to be completely and accurately disclosed in the documents filed to commence the case, and the replacement value of each asset as defined in section 506 must be stated in those documents where requested after reasonable inquiry to establish such value;

(C)     Current monthly income, the amounts specified in section 707(b) (2), and, in a case under chapter 13 of this title, disposable income (determined in accordance with section 707(b) (2)), are required to be stated after reasonable inquiry; and

(D)     Information that an assisted person provides during their case may be audited pursuant to this title, and that failure to provide such information may result in dismissal of the case under this title or other sanction, including a criminal sanction.

## IMPORTANT INFORMATION ABOUT BANKRUPTCY ASSISTANCE SERVICES FROM AN ATTORNEY OR BANKRUPTCY PETITION PREPARER

If you decide to seek bankruptcy relief, you can represent yourself, you can hire an attorney to represent you, or you can get help in some localities from a bankruptcy petition preparer who is not an attorney. THE LAW REQUIRES AN ATTORNEY OR BANKRUPTCY PETITION

Subject to Protective Order

A-2694

PREPARER TO GIVE YOU A WRITTEN CONTRACT SPECIFYING WHAT THE ATTORNEY OR BANKRUPTCY PETITION PREPARER WILL DO FOR YOU AND HOW MUCH IT WILL COST. Ask to see the contract before you hire anyone.

The following information will help you to understand what must be done in a routine bankruptcy case and will help you to evaluate how much assistance you may need. Although bankruptcy can be complex, many cases are routine.

Before filing a bankruptcy case, either you or your attorney should analyze your eligibility for different forms of debt relief available under the Bankruptcy Code and which form of relief is most likely to be beneficial for you. Be sure you understand the relief you can obtain and its limitations. To file a bankruptcy case, documents called a Petition, Schedules and Statement of Financial Affairs, as well as in some cases a Statement of Intention need to be prepared correctly and filed with the bankruptcy court. You will have to pay a filing fee to the bankruptcy court. Once your case starts, you will have to attend the required first meeting of creditors where you may be questioned by a court official called a 'trustee' and by creditors.

If you choose to file a chapter 7 case, you may be asked by a creditor to reaffirm a debt. You may want help deciding whether to do so. A creditor is not permitted to coerce you into reaffirming your debts.

If you choose to file a chapter 13 case in which you repay your creditors what you can afford over 3 to 5 years, you may also want help with the preparation of your chapter 13 plan and with the confirmation hearing on your plan which will take place before a bankruptcy judge.

If you select another type of relief under the Bankruptcy Code (other than chapter 7 or chapter 13), you will want to find out what should be done from someone familiar with that type of relief.

Your bankruptcy case may also involve litigation. You are generally permitted to represent yourself in litigation in bankruptcy court, but only attorneys, not bankruptcy petition preparers, can give you legal advice.

**Debt Negotiation**

Debt Negotiation is a process where the law firm, based on your specific circumstances, develops a plan to manage your debt resolution with your creditors. In general terms, it is a process of negotiating with your creditors for a lower balance or forgiveness of debt, a reduced interest rate, a reduced monthly payment or other restructuring alternatives. To be successful in debt negotiation, you need to have sufficient cash flow to meet your living expenses each month and provide some funds towards resolution of your debt.

If appropriate for your situation, Newport will contact your unsecured creditors in writing to notify them that you are represented by the law firm and that we are advising you as to all alternatives for debt resolution. As you have indicated in your compliance review, you prefer Newport to attempt debt negotiation as an alternative to bankruptcy or other options. However, if your financial circumstances change, we will advise you as to other debt resolution alternatives, including those outlined above, so you can make an informed decision based on our advice.

If you have any questions regarding the above options, please contact us for further explanation. If you are ready to proceed, sign below your acknowledgement that you have reviewed the available debt resolution options and have determined that debt negotiation by Newport is your preference, subject to your ability to request a different alternative if your circumstances change in the future.

Subject to Protective Order

A-2695

I have reviewed all debt resolution options available to me including doing nothing, filing for bankruptcy and consumer credit counseling, and elect to pursue debt negotiation services with Newport, subject to my ability to request other alternatives, based on changes in my financial circumstances.

Sign Here ⟶ _____     6/18/21
Signature of Client                                                        Date

Sign Here ⟶ _____     _____
Signature of Co-Client                                                  Date

Subject to Protective Order

A-2696

# HARDSHIP AND BUDGET INFORMATION

## Reason for Hardship

- [ ] Temporary Loss of Work
- [x] Loss of Job
- [ ] Medical Problems
- [ ] Personal Injury
- [ ] Divorce

- [ ] Company Reduced Hours
- [ ] Pay Cut
- [ ] Disability
- [ ] Loss of Spouses Income
- [ ] Other: _____

Please Briefly Explain Hardship: covid

## BUDGET ANALYSIS

(All information should be on a monthly basis)

| | |
|---|---|
| Client Net Monthly Income | $ 2,800.00 |
| Co-Client Net Monthly Income | $ 0.00 |
| Total Income | $ 2,800.00 |

Funds Available  $ 1,859.00

| | | | |
|---|---|---|---|
| Mortgage/Rent | $ 600.00 | | |
| Home Owners Insurance | $ | Housekeeping Supplies | $ 0.00 |
| Life Insurance | $ | Apparel & Services | $ 88.00 |
| Medical Care | $ | Utilities | $ 0.00 |
| Child Care / Support / Alimony | $ | Telephone | $ 0.00 |
| Cable TV / Satellite | $ 0.00 | Auto Loans | $ 0.00 |
| Charity / Donations | $ 0.00 | Auto Other | $ 0.00 |
| Entertainment | $ 0.00 | Auto Insurance | $ 0.00 |
| Gym / Health | $ | Education | $ |
| Personal Care | $ 0.00 | Student Loans | $ 0.00 |
| Back Taxes | $ | Misc. / Other | $ 170.00 |
| Food | $ 0.00 | Total Expenses | $ 941.00 |

Subject to Protective Order

A-2697

I/We confirm that to the best of my/our knowledge and belief the information contained in the above budget accurately reflects my/our monthly amounts for the budgeted items, including any amounts provided by reference to IRS National Standards for Allowable Living Expenses associated with my/our location of residence with respect to food, housekeeping supplies, apparel and services, personal care products and services and/or miscellaneous items. I/we further confirm that I/we have provided you with accurate information regarding the state of my/our financial hardship as documented in the hardship statement.

_____
Client signature

_____
Co-client signature

Subject to Protective Order

A-2698

# CREDITOR LISTING

| Creditor / Collection Agency | Account Number | Balance | Account Holder(s) | Last Payment Date |
|---|---|---|---|---|
| | | | | |
| CRBUPSTART | ███ | $10,773.00 | Applicant | |
| WFB CD SVC | ████ | $12,541.90 | Applicant | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | **Total Debt Owed:** | | $ $23,314.90 |

Subject to Protective Order

A-2699

## PAYMENT SCHEDULE

| | | Total Amount of Debt | $23,314.90 | | Estimated Settlements: | | $10,958.00 |
|---|---|---|---|---|---|---|---|
| | | Service Cost Percentage | 17% | | | | |
| | | Estimated Total Fees & Settlements | $18,884.28 | | TOTAL ESTIMATED SAVINGS | | $4,430.62 |
| Month in Program | Retainer Fee | Service Cost | Settlement Reserves | Legal Admin Fee | Banking Fees | Total Draft | Draft Due Date |
| 1 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 7/15/2021 |
| 2 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 8/15/2021 |
| 3 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 9/15/2021 |
| 4 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 10/15/2021 |
| 5 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 11/15/2021 |
| 6 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 12/15/2021 |
| 7 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 1/15/2022 |
| 8 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 2/15/2022 |
| 9 | $100.00 | $180.17 | $73.54 | $55.00 | $10.95 | $419.66 | 3/15/2022 |
| 10 | $95.00 | $180.17 | $78.54 | $55.00 | $10.95 | $419.66 | 4/15/2022 |
| 11 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 5/15/2022 |
| 12 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 6/15/2022 |
| 13 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 7/15/2022 |
| 14 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 8/15/2022 |
| 15 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 9/15/2022 |
| 16 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 10/15/2022 |
| 17 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 11/15/2022 |
| 18 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 12/15/2022 |
| 19 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 1/15/2023 |
| 20 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 2/15/2023 |
| 21 | | $180.17 | $173.54 | $55.00 | $10.95 | $419.66 | 3/15/2023 |
| 22 | | $179.96 | $173.75 | $55.00 | $10.95 | $419.66 | 4/15/2023 |
| 23 | | | $353.71 | $55.00 | $10.95 | $419.66 | 5/15/2023 |
| 24 | | | $353.71 | $55.00 | $10.95 | $419.66 | 6/15/2023 |
| 25 | | | $353.71 | $55.00 | $10.95 | $419.66 | 7/15/2023 |
| 26 | | | $353.71 | $55.00 | $10.95 | $419.66 | 8/15/2023 |
| 27 | | | $353.71 | $55.00 | $10.95 | $419.66 | 9/15/2023 |
| 28 | | | $353.71 | $55.00 | $10.95 | $419.66 | 10/15/2023 |
| 29 | | | $353.71 | $55.00 | $10.95 | $419.66 | 11/15/2023 |
| 30 | | | $353.71 | $55.00 | $10.95 | $419.66 | 12/15/2023 |
| 31 | | | $353.71 | $55.00 | $10.95 | $419.66 | 1/15/2024 |
| 32 | | | $353.71 | $55.00 | $10.95 | $419.66 | 2/15/2024 |
| 33 | | | $353.71 | $55.00 | $10.95 | $419.66 | 3/15/2024 |
| 34 | | | $353.71 | $55.00 | $10.95 | $419.66 | 4/15/2024 |
| 35 | | | $353.71 | $55.00 | $10.95 | $419.66 | 5/15/2024 |
| 36 | | | $353.71 | $55.00 | $10.95 | $419.66 | 6/15/2024 |
| 37 | | | $353.71 | $55.00 | $10.95 | $419.66 | 7/15/2024 |
| 38 | | | $353.71 | $55.00 | $10.95 | $419.66 | 8/15/2024 |
| 39 | | | $353.71 | $55.00 | $10.95 | $419.66 | 9/15/2024 |
| 40 | | | $353.71 | $55.00 | $10.95 | $419.66 | 10/15/2024 |

Subject to Protective Order

A-2700

## PAYMENT SCHEDULE

| | Total Amount of Debt | | $23,314.90 | | Estimated Settlements: | | $10,958.00 |
|---|---|---|---|---|---|---|---|
| | Service Cost Percentage | | 17% | | | | |
| | Estimated Total Fees & Settlements | | $18,884.28 | | TOTAL ESTIMATED SAVINGS | | $4,430.62 |
| Month in Program | Retainer Fee | Service Cost | Settlement Reserves | Legal Admin Fee | Banking Fees | Total Draft | Draft Due Date |
| 41 | | | $353.71 | $55.00 | $10.95 | $419.66 | 11/15/2024 |
| 42 | | | $353.71 | $55.00 | $10.95 | $419.66 | 12/15/2024 |
| 43 | | | $353.71 | $55.00 | $10.95 | $419.66 | 1/15/2025 |
| 44 | | | $353.71 | $55.00 | $10.95 | $419.66 | 2/15/2025 |
| 45 | | | $353.29 | $55.00 | $10.95 | $419.24 | 3/15/2025 |
| 46 | | | $353.71 | $55.00 | $10.95 | $419.66 | 4/15/2025 |
| 47 | | | $353.71 | $55.00 | $10.95 | $419.66 | 5/15/2025 |
| 48 | | | $353.71 | $55.00 | $10.95 | $419.66 | 6/15/2025 |
| 49 | | | $353.71 | $55.00 | $10.95 | $419.66 | 7/15/2025 |
| 50 | | | $353.71 | $55.00 | $10.95 | $419.66 | 8/15/2025 |
| 51 | | | $353.71 | $55.00 | $10.95 | $419.66 | 9/15/2025 |
| 52 | | | | | | | |
| 53 | | | | | | | |
| 54 | | | | | | | |
| 55 | | | | | | | |
| 56 | | | | | | | |
| 57 | | | | | | | |
| 58 | | | | | | | |
| 59 | | | | | | | |
| 60 | | | | | | | |

The program length is given in a range because there are factors that are not consistent with all clients. These factors include: 1) the actual amount of debt that comes into the program when the first payment is received as sometimes there are more charges than the credit report that was provided pre-enrollment. 2) Creditors will charge fees and penalties during the first few months of the program until they charge off your debt. 3) the program is based on an average settlement that we believe we can achieve based on our experience. Also, these estimates are based on the accuracy of the information that you provide, past results of our clients, the terms of the settlements we are able to negotiate with your creditors, and on your ability to make consistent payments each month. Actual results will vary on a case by case basis. **Should your program length exceed the number of months listed on this Payment Schedule, the draft and fee amounts for each additional month would match those of the last listed month. If the program takes longer than the range above, the law firm will do all future work with no further monthly maintenance fees.**

Client Signature _Sm Edgr_      Co-Client Signature _____

Print Name _Sibil Edgar_      Print Name _____